USA v. Jenkins, 3:23-cr-11, 12/17/2024

1           UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF VIRGINIA
2             CHARLOTTESVILLE DIVISION

3   ************************************************************

4   UNITED STATES OF AMERICA,    CRIMINAL CASE NO.:  3:23-CR-11
                                 DECEMBER 17, 2024, 8:54 A.M.
5                                CHARLOTTESVILLE, VIRGINIA
           Plaintiff,           JURY TRIAL, DAY 5
6   vs.

7   SCOTT HOWARD JENKINS,        Before:
                                 HONORABLE ROBERT S. BALLOU
8                                UNITED STATES DISTRICT JUDGE
           Defendant.           WESTERN DISTRICT OF VIRGINIA
9
    ************************************************************
10
    APPEARANCES:
11

12  For the Government:          CELIA RUTH CHOY, ESQUIRE
                                 LINA PENG, ESQUIRE
13                               DOJ-Crm
                                 Public Integrity Section
14                               1301 New York Avenue NW, 10th Floor
                                 Washington, DC 20530
15                               202-875-1557

16                               MELANIE SMITH, ESQUIRE
                                 DOJ-USAO
17                               Western District of Virginia
                                 255 West Main Street, Suite 130
18                               Charlottesville, VA 22902
                                 434-293-4283
19

20

21

22  Court Reporter:  Lisa M. Blair, RPR, RMR, CRR, FOCR
                     255 West Main Street, Suite 304
23                   Charlottesville, Virginia  22902
                     434.296.9284
24
            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25  TRANSCRIPT PRODUCED BY COMPUTER.

USA v. Jenkins, 3:23-cr-11, 12/17/2024

1  APPEARANCES CONTINUED:

2  For the Defendant:           PHILIP ANDONIAN, ESQUIRE
                                JOSEPH P. CALEB, ESQUIRE
3                               Caleb Andonian PLLC
                                1100 H Street, NW, Suite 315
4                               Washington, DC 20005
                                202-953-9850
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA v. Jenkins, 3:23-cr-11, 12/17/2024

1                        I N D E X

2    WITNESSES ON BEHALF OF THE GOVERNMENT:              PAGE

3    UC-2 ("MIKE")

4     Direct Examination by Ms. Smith                       8
      Cross-Examination by Mr. Andonian                    44
5
      HARRY CARR
6
      Direct Examination by Ms. Smith                      48
7     Cross-Examination by Mr. Caleb                       54

8    DAWN MIESLE

9     Direct Examination by Ms. Choy                       56

10   SCOTT MEDEARIS

11    Direct Examination by Ms. Peng                       65

12   WITNESSES ON BEHALF OF THE DEFENSE:              PAGE

13   SCOTT HOWARD JENKINS

14    Direct Examination by Mr. Andonian                  150
      Cross-Examination by Ms. Peng                       206
15

16

17

18

19

20

21

22

23

24

25

USA v. Jenkins, 3:23-cr-11, 12/17/2024

1                          INDEX OF EXHIBITS

2    EXHIBITS ON BEHALF OF THE GOVERNMENT:

3          EXHIBIT:                  Marked      Received

4          410                         16          16

5          424                         21          21

6          26                          22          22

7          425                         24          24

8          521                         25          25

9          441                         26          26

10         27                          29          29

11         28                          33          33

12         29                          36          36

13         801                         77          77

14         804                         81          81

15         805                        135         135

16         412                        126         126

17         413                        128         128

18         806                        134         134

19         803                        141         141

20         Court Ex. 1               146         146

21         Court Ex. 2               146         146

22

23

24

25

USA v. Jenkins, 3:23-cr-11, 12/17/2024

1  (Proceedings commenced, 8:54 a.m.)

2              THE COURT:  We're back on the record in the matter of

3  *United States v. Jenkins*.  Let the record reflect that the

4  government is present by its counsel.  The defendant likewise

5  is present along with counsel.

6              A couple of things this morning.  So we're going to

7  start with the second undercover.  Can we make sure that we

8  have a CSO outside of the door here at least for the first

9  witness so that no one brings any electronics into the

10  courtroom.

11              So anyone who is in the courtroom, the courtroom is

12  going to remain open for the first witness, but there cannot be

13  any electronics or any other device that has the capability of

14  photographs or recording at all.  And then we'll remove that

15  restriction after this witness.

16              I received the jury instructions, I've looked through

17  the changes that you all have made.  Really, I think you added

18  just a couple of substantive things.  I've accepted them all.

19  Like I said, I've made a couple of other kind of stylistic

20  changes.  I'll send those back to you.  Does the fact that as I

21  went through there, there were no comments about -- we're going

22  to have to go through them and make sure that the evidence fits

23  each one of them.  I saw you had removed several of the

24  instructions where we know the evidence isn't going to fit,

25  like the deposition of Mr. Rychlik and so forth, that there are

USA v. Jenkins, 3:23-cr-11, 12/17/2024

1   no disagreements with respect to any other substantive

2   instructions, it's just a question of whether the evidence is

3   supporting it.  Is that the government's belief?

4           MS. CHOY:  The only instruction to bring to the

5   Court's attention was that Your Honor had put a definition of

6   honest services in there.

7           THE COURT:  Correct.

8           MS. CHOY:  And the government is requesting that in

9   place of that you give government's proposed instruction number

10  25.

11          THE COURT:  Okay.

12          MS. CHOY:  And we understand that defense is

13  deferring to the Court on that.

14          THE COURT:  They don't want anything I think -- I

15  think what I had seen in the comments when I first looked at

16  the instructions was -- don't let me speak for you,

17  Mr. Andonian -- that you didn't think there was a need for that

18  definition.  I looked at that, and I'll have an explanation for

19  why I shortened it, but there was a reason.

20          MS. CHOY:  Thank you, Your Honor.

21          THE COURT:  Okay.  The verdict form was substantially

22  the government's verdict form.  I always put not guilty on the

23  left side, so that's the first choice as you read from left to

24  right.  So I made that change.  But otherwise, I think it's

25  pretty much the government's verdict form, and we'll address

USA v. Jenkins, 3:23-cr-11, 12/17/2024

1    that as well at that time.

2              All right.  Anything else we need to address before

3    we start up?

4              MS. CHOY:  Nothing from the government, Your Honor.

5              THE COURT:  How about from the defendant?

6              MR. ANDONIAN:  Nothing from us, Your Honor.

7              THE COURT:  All right.  Very well.

8              How's everybody feeling this morning?  Any better?  A

9    little iffy?

10             THE CLERK:  You don't sound good.

11             THE COURT:  I have a -- it's gone to my head, but I

12   feel fine.

13             You feeling better, Mr. Caleb?

14             MR. CALEB:  Yeah, a little bit better.

15             THE COURT:  Everyone is on two feet.  That's the way

16   to start the day.

17             All right.  Are we ready for the jury?  Let's bring

18   the jury in.

19   (*Jury in, 8:59 a.m.*)

20             THE COURT:  Good morning, ladies and gentlemen.

21             Good morning.  I hope you all had a nice evening.

22   We're going to continue this morning with the government's

23   case.  I am advised that we remain well on schedule.  So I

24   appreciate you all's careful and close attention.  I've been

25   paying attention to you all throughout, and I very much

Mike - Direct

1    appreciate all the attention you've given to the lawyers and to

2    the presentation thus far, and I know you'll continue to do so.

3              All right.  Who's got the next witness, Ms. Smith?

4              MS. SMITH:  I do, Your Honor.

5              THE COURT:  Call your next witness, please.

6              MS. SMITH:  The government calls Mike.

7              THE COURT:  All right.  Mike.

8              Sir, come on up, if you would, please.

9          UC-2, "MIKE", CALLED BY THE GOVERNMENT, SWORN

10             THE COURT:  Step right on over here.  As you sit

11   down, slide up to the microphone, bring the microphone to you

12   and speak into the microphone.  And that way we'll be able to

13   hear your testimony.

14             Ms. Smith, go right ahead, please.

15             MS. SMITH:  Thank you, Your Honor.

16                       DIRECT EXAMINATION

17    BY MS. SMITH:

18   Q    Good morning.

19   A    Good morning.

20   Q    Are you an FBI agent who works in an undercover capacity?

21   A    Yes, ma'am.

22   Q    And did you receive permission from the Court to testify

23   using a pseudonym today?

24   A    Yes, ma'am.

25   Q    And what pseudonym will you be using today?

9

Mike - Direct

1  A    Mike or Michael.

2  Q    And are you listed as undercover agent 2 in the

3  superseding indictment?

4  A    Yes, ma'am.

5  Q    Now, you just testified you're an FBI agent.  How long

6  have you been an FBI agent?

7  A    Approximately 26 years.

8  Q    And what are your duties and responsibilities as an FBI

9  agent?

10  A    To engage in investigations and gather evidence for

11  criminal prosecution.

12  Q    And what types of cases do you work on?

13  A    The last 26 years, I've done everything from white collar

14  cases, violent crime cases, human trafficking, terrorism, just

15  about all the cases.

16  Q    You previously mentioned you work in an undercover

17  capacity.  Is there a term that is used for that position?

18  A    Undercover employee, or UC.

19  Q    And what is an undercover employee?

20  A    An undercover employee is an employee that has been

21  trained, received special training, and has the proper

22  experience and background to engage in undercover operations.

23  Q    And you mentioned there's special training.  Can you tell

24  the jury a little bit about that training you've received?

25  A    The training you receive is -- it's -- the actual training

Mike - Direct

1  is two weeks in Atlanta.  It's pretty intense training.  But

2  before that, you go through a selection process and screening,

3  and then upon completion of the training, then you're an

4  undercover certified employee.

5  Q    And how long have you been an undercover employee?

6  A    Approximately 20 years.

7  Q    And how are undercover employees used in investigations?

8  A    Undercover employees are used in investigations to get

9  close to subjects of investigations in order to engage with

10  them and gather evidence, so -- of any -- any wrongdoing or

11  criminal behavior.

12  Q    And when you are working in an undercover capacity, do you

13  rely on other undercover agents or cooperating witnesses to

14  introduce you to subjects or targets of an investigation?

15  A    Yes, ma'am, that's generally the preferred method of

16  getting close to --

17        THE COURT:  Sir, can you slide the microphone to your

18  left so that as you turn your head to the left it will still

19  pick up your voice?

20        THE WITNESS:  Sure.  Yes, Your Honor.

21        THE COURT:  Thank you.

22  BY MS. SMITH:

23  Q    Can you say that last part again?

24  A    Yes, ma'am.

25  Q    And why do you usually get an introduction from a

Mike - Direct

1  cooperating witness or another undercover agent?

2  A    Generally that's how you get to be introduced if you're a

3  stranger and there's a way to actually meet them.  That's

4  generally the preferred way of meeting them.

5  Q    And when you're working as an undercover employee, do you

6  assume an alias or an assumed identity?

7  A    Yes, ma'am, 100 percent of the time.

8  Q    And does the FBI do things to establish that identity?

9  A    Yes, ma'am.  And also the undercover employee is

10 responsible for establishing some of your own ID as well.

11 Q    And what types of things would you do to establish that

12 alias?

13 A    Obtain certain things that are normal with any other

14 individual, credit cards, bank statements, driver's licenses,

15 that sort of thing.

16 Q    And those are all in your assumed alias's name?

17 A    Yes, ma'am.

18 Q    And how many investigations have you been involved in as

19 an undercover employee?

20 A    A lot of them over the 20 years, but I would say easy

21 probably 25, 30, or more, and that includes short and

22 long-term.

23 Q    When you say a long-term investigation, what does that

24 mean?

25 A    In some cases, some undercover operations might be only

Mike - Direct

1   one or two meetings.  Some of them might go on for years.  So I

2   would consider that a long-term operation.

3   Q     Were you utilized as an undercover employee in the Scott

4   Jenkins investigation?

5   A     Yes, ma'am.

6   Q     Is that an example of a short-term involvement as an

7   undercover employee?

8   A     Yes, ma'am.

9   Q     What was your assignment as it related to the Jenkins

10  investigation?

11  A     My assignment in this investigation was to go and meet

12  Mr. Jenkins, and be a particular person, and then to obtain

13  deputization for -- for an auxiliary deputy sheriff.

14  Q     And how were you supposed to obtain that deputy sheriff --

15  auxiliary deputy badge?

16  A     After meeting -- after meeting the -- Mr. Jenkins, I was

17  supposed to give him a certain amount of cash, and in exchange

18  I would be deputized.

19  Q     Now, do you usually have a backstory as an undercover

20  employee?

21  A     Yes, ma'am.

22  Q     And have you had multiple backstories and multiple aliases

23  during your time as an undercover employee?

24  A     Yes, ma'am.

25  Q     What was your backstory as it related to the Jenkins

Mike - Direct

1    investigation?

2    A    My backstory was I was a successful and somewhat wealthy

3    or well-off businessman from northern Virginia.

4    Q    Did you have a driver's license under the assumed name,

5    Mike?

6    A    Yes, ma'am.

7    Q    Was it sent to anyone at the Culpeper County sheriff's

8    office?

9    A    Yes, ma'am.

10   Q    And did you travel to Culpeper, Virginia, on December 28th

11   of 2022?

12   A    Yes, ma'am.

13   Q    And prior to the meeting with Jenkins in Culpeper, were

14   you briefed by the FBI agents investigating this case?

15   A    Yes, ma'am.

16   Q    And why is it important to be briefed by the investigative

17   team?

18   A    You kind of have to have some sort of basic of what you're

19   doing, and what are the circumstances, and who is all involved.

20   So you have to know what you're getting into before you start

21   such an operation.

22   Q    Now, do they typically provide you a lot about the

23   investigation or just enough to fit your role?

24   A    I think it's just enough to fit your role.

25   Q    And apart from that briefing, did you have any other

Mike - Direct

1  information about this case?

2  A    No, ma'am.

3  Q    Were you involved in any other way in this case?

4  A    No, ma'am.

5  Q    Were you wired with a covert recording device when you

6  went to meet with Scott Jenkins?

7  A    Yes, ma'am.

8  Q    And what is the purpose of having you wired with covert

9  recording equipment?

10 A    To obtain the best evidence, obviously, any sort of

11 recording would be a great way to capture conversations and

12 things to be used in an investigation.

13 Q    Did you have multiple recording devices on you?

14 A    Yes, ma'am.

15 Q    Where were those devices located generally?

16 A    Just generally on my person.

17 Q    Are there sometimes limitations to recording equipment?

18 A    Yes, ma'am.

19 Q    Could you tell the jury about that, please?

20 A    The devices that we use, they're homemade in-house, and

21 the emphasis is on agent safety, because you don't want these

22 devices to be discovered on your person during an operation.

23 So the emphasis is on the concealability and size more than

24 anything else.

25 Q    And on that date where you met with Scott Jenkins, did you

Mike - Direct

1   have both an audio recorder and a video recorder?

2   A    Yes.  Yes, ma'am.

3   Q    And when did you turn them on approximately?

4   A    Approximately before I went to the sheriff's office that

5   day.

6   Q    And when did you turn them off?

7   A    After the end of the day when I was -- I left the general

8   area.

9   Q    Did you realize after you met with Scott Jenkins that

10  there were issues with the recording equipment?

11  A    Yes, ma'am.

12  Q    Could you tell the jury about that?

13  A    Some of the equipment generally does -- it does fail.  In

14  my experience, it's actually fairly common.  And that is the

15  reason why we have redundancy, more than one recorder, because

16  of the fact that they're so micro small, and they're usually

17  custom made for the agent for that operation.

18  Q    Were you able to audio record the entire interaction with

19  Scott Jenkins?

20  A    Yes, ma'am.

21  Q    But was there a problem with the video recording?

22  A    Yes, ma'am.

23  Q    Besides that recording equipment, did you bring anything

24  else with you that day?

25  A    Oh, yes, I did.  I brought $10,000 in cash in a manila

Mike - Direct

1  envelope.

2  Q    And when U.S. currency is being used in an undercover

3  operation, does the FBI typically take photographs of it before

4  it's used?

5  A    Yes, ma'am.

6          MS. SMITH:  If we could pull up Government's Exhibit

7  410, please.  And just flip through it, please.

8  BY MS. SMITH:

9  Q    Do you recognize Government's 410?

10 A    Yes, ma'am.

11 Q    Okay.  And what is it?

12 A    It looks like the money that I had that day.

13 Q    Is that a true and accurate depiction of the $10,000 in

14 cash you used to pay Scott Jenkins?

15 A    Yes, ma'am, it looks like it.

16          MS. SMITH:  And the government would move to admit

17 Government's Exhibit 410.

18          THE COURT:  Any objection?

19          MR. CALEB:  No objection.

20          THE COURT:  So admitted and may be published to the

21 jury.

22          (Government Exhibit 410 marked and admitted.)

23 BY MS. SMITH:

24 Q    So these were all in $100 bills; is that right?

25 A    Yes, ma'am.

Mike - Direct

1  Q    Now, in order to get to Culpeper, did you obtain a car?

2  A    Yes, ma'am.

3  Q    What type of car did you drive to Culpeper?

4  A    I do believe it was a white Mercedes.

5  Q    And did you request a certain type of car to drive?

6  A    Yes, ma'am.

7  Q    And why is that?

8  A    It had to be something that was conducive to a background

9  of someone that was a successful businessman.

10  Q    And when you went to Culpeper, where did you go first?

11  A    The first place I went to was the sheriff's office.

12  Q    And who was with you when you went to the sheriff's

13  office?

14  A    I was initially by myself, but then I met people.  I met

15  Kevin along the way.

16  Q    Is that Kevin Rychlik?

17  A    Yes, ma'am.

18  Q    And was Kevin Rychlik aware you were working in an

19  undercover capacity that day?

20  A    Yes, ma'am.

21  Q    What happened when you got to the sheriff's office?

22  A    I met outside with Kevin, spoke briefly, and then we went

23  inside the sheriff's office.

24  Q    And who met you in the sheriff's office?

25  A    There was some initial conversation with some staff, and

Mike - Direct

1  then I met Mr. Jenkins.

2  Q    Can you tell the jury about that initial meeting at the

3  sheriff's office with Scott Jenkins?

4  A    The initial meeting, we just kind of -- we kind of shook

5  hands, and it was a cordial conversation you would generally

6  have with somebody you met the first time, small talk

7  basically.

8  Q    And was this the first time you had ever met him?

9  A    Yes, ma'am.

10 Q    And where did you go to next?

11 A    After some conversation, we went to have lunch in downtown

12 Culpeper.

13 Q    And who was present for that lunch?

14 A    Myself, Mr. Jenkins, and Kevin.

15 Q    What was the lunch like?

16 A    It was a cordial lunch.  It was a busy day.  It was busy

17 at the restaurant.  But it was just a cordial general lunch

18 with conversation.

19 Q    What types of things were discussed at the lunch?

20 A    Just basically things you would talk about -- anything

21 from the weather to the area and such.  Nothing really -- just

22 kind of small talk.

23 Q    Did Scott Jenkins ever ask you if you had any law

24 enforcement background?

25 A    No, ma'am.

Mike - Direct

1   Q    What about -- did he ask you whether or not you had any

2   law enforcement training?

3   A    No, ma'am.

4   Q    Did he ask you if you had a military background?

5   A    No, ma'am.

6   Q    Did you ever fill out an application?

7   A    No, ma'am.

8   Q    Did you guys discuss any qualifications your alias may

9   have to be an auxiliary deputy?

10  A    No, ma'am.

11  Q    Did he ask you whether or not you'd ever been trained with

12  a firearm?

13  A    No, ma'am.

14  Q    After that lunch, what happened next?

15  A    After lunch, we left and then went to a nearby courthouse,

16  where I was sworn in and received a deputy's badge.

17  Q    And now before I get to the swearing-in, as part of your

18  backstory, were you posing as a convicted felon?

19  A    Yes, ma'am.

20  Q    And so that was part of the backstory that day; is that

21  correct?

22  A    Yes, ma'am.

23  Q    And when you were sworn in, who were you sworn in by?

24  A    I believe it was the clerk of court.

25  Q    And did anyone come with you to get sworn in?

Mike - Direct

1  A    Yes, Mr. Jenkins, and Kevin was there.

2  Q    If we could pull up Government's 713, which has already

3  been admitted into evidence.

4       And do you recognize this?

5  A    Yes, ma'am.

6  Q    Okay.  And what is this?

7  A    That's the form that I signed when I got deputized.

8  Q    And this is the oath of office that you took that day?

9  A    Yes, ma'am.

10 Q    And it's redacted; is that correct?

11 A    Yes, ma'am.

12 Q    Consistent with you testifying only under the alias Mike?

13 A    Yes, ma'am.

14 Q    And then down below, is that the clerk of the court's

15 signature?

16 A    Yes, ma'am.

17 Q    And what date were you sworn in?

18 A    The date was December 28th, 2022.

19 Q    If we could pull up Government's Exhibit 424, please.

20      And do you recognize this?

21 A    Yes, ma'am.

22 Q    And what are you looking at?

23 A    That's a picture of myself standing on the left,

24 Mr. Jenkins on the right, and I'm getting sworn in as a deputy.

25 Q    And your face appears to be blurred; is that correct?

Mike - Direct

1  A    Yes, ma'am.

2  Q    Apart from your blurred face, is this a true and accurate

3  depiction of you being sworn in that day?

4  A    Yes, ma'am.

5         MS. SMITH:  The government would move into evidence

6  424.

7         THE COURT:  Any objection?

8         MR. ANDONIAN:  No, Your Honor.

9         THE COURT:  So admitted and may be published to the

10  jury.

11         (Government Exhibit 424 marked and admitted.)

12   BY MS. SMITH:

13  Q    And you mentioned you have a blurred face.  Why is your

14  face blurred in this photograph?

15  A    To hide my identity.

16  Q    Is that standard practice in cases in which you testify to

17  hide your identity by blurring your face or redacting your

18  name?

19  A    Yes, ma'am.

20  Q    And who is on the right whose face is not blurred?

21  A    Mr. Jenkins.

22  Q    Now, during the time that you were sworn in, were you

23  wearing that recording device we spoke about earlier?

24  A    Yes, ma'am.

25  Q    If we could pull up Government's Exhibit 26, please.

Mike - Direct

1      Did you previously review Government's Exhibit 26?

2    A    Yes, ma'am.

3    Q    And is it a true and accurate version of the events that

4    happened on December 28th of 2022?

5    A    Yes, ma'am.

6           MS. SMITH:  The government would move into evidence

7    Government's 26.

8           THE COURT:  Any objection?

9           MR. ANDONIAN:  No objection.

10           THE COURT:  So admitted and may be published to the

11   jury.

12           (Government Exhibit 26 marked and admitted.)

13           MS. SMITH:  Thank you, Your Honor.

14           If we could start the clip, Ms. Fastenau, and stop at

15   11 seconds, please.

16           (Audio playing.)

17    BY MS. SMITH:

18   Q    Who was present for this conversation?

19   A    I think this was at the courtroom.  This would be myself,

20   Mr. Jenkins, Kevin, and the clerk of court.

21           MS. SMITH:  If we could play until 1:09, please.

22           (Audio playing.)

23    BY MS. SMITH:

24   Q    What just happened in that clip?

25   A    In that clip, I was just getting sworn in as a deputy

Mike - Direct

1  sheriff -- auxiliary deputy sheriff.

2  Q    And after you were sworn in as an auxiliary deputy

3  sheriff, what happened?

4  A    After that -- after just a little bit of brief

5  conversation, we went back to the sheriff's office.

6  Q    And who did you meet with at the sheriff's office?

7  A    It was myself, it was Mr. Jenkins, and Kevin.

8  Q    And what happened when you arrived at the sheriff's

9  office?

10  A    I think I received an ID, and then we went to a conference

11  room near the front of the building.

12  Q    What was the process for receiving the ID?  Did you have

13  to fill out any paperwork at the sheriff's office?

14  A    I provided some information, and then there was a

15  photograph given.

16  Q    It was pretty minimal?  Oh, I'm sorry, I didn't mean to

17  interrupt you.  It was pretty minimal?

18  A    Yes.  Yes.  Minimal.  It was pretty simple,

19  straightforward.

20  Q    And you mentioned you then met Scott Jenkins in a

21  conference room.  What happened once you met him in the

22  conference room?

23  A    We started to discuss, and I provided him shortly

24  afterwards the $10,000 that I had with me.

25  Q    Did he give you a badge as well?

Mike - Direct

1  A    Yes, ma'am.

2  Q    And did you guys take a photo?

3  A    Yes, ma'am.

4  Q    I'm going to show you what's been marked as Government's

5  Exhibit 425.

6       Do you recognize this photograph?

7  A    Yes, ma'am.

8  Q    And what is it?

9  A    I'm on the left, and then Mr. Jenkins is on the right,

10 providing me with a deputy sheriff badge.

11 Q    And apart from the blurred face, is this a true and

12 accurate depiction of you receiving your badge that day?

13 A    Yes, ma'am.

14      MS. SMITH:  The government would move into evidence

15 425, please.

16      THE COURT:  Any objection?

17      MR. ANDONIAN:  No, Your Honor.

18      THE COURT:  So admitted and may be published to the

19 jury.

20      (Government Exhibit 425 marked and admitted.)

21  BY MS. SMITH:

22 Q    And so this is you receiving your badge; is that correct?

23 A    Yes, ma'am.

24 Q    And the blurred face is whom?

25 A    That's myself.

Mike - Direct

1  Q    And on the right, who is that?

2  A    Mr. Jenkins.

3  Q    I'm going to show you what's been marked as Government's

4  Exhibit 521.

5       Do you recognize Government's Exhibit 521?

6  A    Yes, ma'am.

7  Q    And what is that?

8  A    This is the badge that I received that day in that

9  conference room.

10 Q    And that's the same badge you received from Scott Jenkins

11 that day?

12 A    Yes, ma'am.

13      MS. SMITH:  The government would move into evidence

14 Government's 521.

15      THE COURT:  Any objection?

16      MR. ANDONIAN:  No, Your Honor.

17      THE COURT:  So admitted and may be published to the

18 jury.

19      (Government Exhibit 521 marked and admitted.)

20  BY MS. SMITH:

21 Q    Could you hold it up and show the jury, please?

22 A    (Witness complies).

23 Q    If we could pull up Government's Exhibit 441, please.

24      And do you recognize this photograph?

25 A    Yes, ma'am.

Mike - Direct

1  Q    And what is depicted here?

2  A    On the left is the badge that I just held up, and on the

3  right is the ID card that I got at the same time.

4  Q    And has that ID been redacted?

5  A    Yes, ma'am.

6  Q    But apart from those redactions, are these true and

7  accurate depictions of your badge and identification card?

8  A    Yes, ma'am.

9        MS. SMITH:  The government would move into evidence

10  Government's Exhibit 441.

11        THE COURT:  Any objection?

12        MR. ANDONIAN:  No.

13        THE COURT:  So admitted and may be published to the

14  jury.

15        (Government Exhibit 441 marked and admitted.)

16  BY MS. SMITH:

17  Q    So those are the two items you received that day?

18  A    Yes, ma'am.

19  Q    You mentioned that after you received your badge, you gave

20  a payment to Scott Jenkins.  Can you describe how you paid

21  Scott Jenkins?

22  A    Engaged in some conversation.  We discussed the -- you

23  know, basically the position, you know, some things, and then I

24  just had it in a manila envelope, $10,000, and then I just

25  offered it to him, provided it to him at that point.

27

Mike - Direct

1  Q    What was Scott Jenkins's reaction when you handed him an

2  envelope with $10,000 in cash in it?

3  A    He seemed pleased and not surprised.

4  Q    What makes you say that he seemed pleased?

5  A    I think that he had a smile on his face a little bit, and

6  just kind of general reaction of being pleased, I guess.

7  Q    Was Scott Jenkins aware that you were a felon?

8  A    Yes.  Yes, ma'am.

9  Q    And how do you know he was aware that you were a felon?

10 A    I was -- I believe he was once told that before by Kevin,

11 and then I started to have a conversation and explained my

12 felony conviction, and that I appreciated the fact that he did

13 not hold that against me.

14 Q    Did he have any reaction to you being a felon?

15 A    No, ma'am.

16 Q    After being sworn in, did you have any conversations with

17 Scott Jenkins about your ability to carry a concealed weapon

18 now that you had the badge?

19 A    Yes, ma'am.

20 Q    And what did Scott Jenkins tell you?

21 A    We discussed various ways of getting firearms to get

22 around security, and just general conversations about where I

23 could carry, how I could carry, whether I could carry it in an

24 airport, and that sort of thing.

25 Q    You mentioned how to get around security.  What did you

Mike - Direct

1  mean by that?

2  A    In one of the conversations, we discussed about I believe

3  it was an amusement park that they had security, that you could

4  carry two guns, and you could actually present yourself as a

5  law enforcement personnel, and then you would have that gun

6  locked up and have a second one on your person.

7  Q    And that second gun would be hidden on your person?

8  A    Yes, ma'am.

9  Q    And you would turn in the first gun; is that correct?

10 A    Yes, ma'am.

11 Q    But by having it hidden on your person, what would that

12 allow you to do?

13 A    Get around the security measures at an amusement park.

14 Q    And was your desire to carry a concealed weapon part of

15 your backstory?

16 A    Yes, ma'am.

17 Q    And Scott Jenkins was telling you all this even though he

18 knew you were a felon?

19 A    Yes, ma'am.

20 Q    Now, have you also -- if we could pull up Government's

21 Exhibit 27, please.

22     Have you also previously reviewed Government's Exhibit 27?

23     (Audio playing.)

24 BY MS. SMITH:

25 Q    Do you -- have you reviewed this one?

Mike - Direct

1   A    Yes, ma'am.

2   Q    Is this a clip of your much longer recording device?

3   A    Yes, ma'am.

4   Q    Is it a true and accurate depiction of the events that

5   happened on December 28th, 2022 that you were a part of?

6   A    Yes, ma'am.

7          MS. SMITH:  The government would move into evidence

8   Government's Exhibit 27.

9          THE COURT:  Any objection?

10         MR. ANDONIAN:  No, Your Honor.

11         THE COURT:  So admitted and may be published to the

12  jury.

13         (Government Exhibit 27 marked and admitted.)

14         MS. SMITH:  If we could please start the video from

15  the beginning and play until the 25-second mark.

16         (Audio playing.)

17   BY MS. SMITH:

18  Q    And who is speaking when the blue and white text appears?

19  A    I'm the initial person speaking, and Mr. Jenkins is the

20  other person speaking.

21  Q    And during this conversation, it was between you,

22  Mr. Jenkins.  Was there anyone else present as well?

23  A    Yes, ma'am.  Kevin was present.

24  Q    Otherwise, it was just the three of you; is that correct?

25  A    Yes, ma'am.

Mike - Direct

1          MS. SMITH:  If we could continue playing this video

2  until the 3:09 mark, please.

3          (Audio playing.)

4   BY MS. SMITH:

5  Q    Is this part of the conversation where Scott Jenkins is

6  telling you where you can carry a concealed weapon?

7  A    Yes, ma'am.

8  Q    And what was Scott Jenkins telling you to do if you had

9  issues carrying that concealed weapon in certain places?

10  A    It would -- the best practice would be to give him a call

11  on his cell phone.

12  Q    And when he mentioned you could also call Kevin, who was

13  he referring to?

14  A    Kevin was his other person he knows that introduced me.

15  Q    That was Kevin Rychlik?

16  A    Yes, ma'am.

17  Q    And he mentioned that dispatch wouldn't -- if they called

18  the dispatch at Culpeper County, that they wouldn't recognize

19  you and wouldn't recognize your name.  Why would dispatch not

20  recognize you?

21  A    Because I was an auxiliary and I wasn't a full-time deputy

22  sheriff.

23  Q    Because you really didn't work for the office; is that

24  right?

25  A    Yes, ma'am, correct.

Mike - Direct

1  Q    Now, during this conversation and prior to him telling you

2  these ways that you could carry a concealed weapon, had you

3  told Scott Jenkins your firearms rights had been restored and

4  that you were able to lawfully carry a firearm?

5  A    No, ma'am.

6  Q    And what was Scott Jenkins describing for you -- excuse

7  me.  Sorry.

8       So there was no conversation about you having a legal

9  ability to carry a firearm?

10 A    No, ma'am, not at all.

11 Q    The only thing he knew was that you were a convicted

12 felon?

13 A    Yes, ma'am.

14 Q    Now, as the conversation went on, what was Scott Jenkins

15 describing for you that he does to circumvent security and

16 continue to carry a firearm in places where it's banned?

17 A    To carry two different firearms and have a second one

18 concealed on your person.

19       MS. SMITH:  If we could continue Government's Exhibit

20 27 to the end.

21       (Audio playing.)

22  BY MS. SMITH:

23 Q    In that clip, was Scott Jenkins describing what you

24 previously described about him carrying two firearms?

25 A    Yes, ma'am.

Mike - Direct

1  Q    And was he acknowledging that he was breaking the rules?

2  A    Yes, ma'am.

3  Q    And in fact, did he even say you're actually breaking the

4  law?

5  A    Yes, ma'am.

6  Q    Did you speak with Scott Jenkins about any expectations he

7  had about your involvement as an auxiliary deputy sheriff?

8  A    There were no expectations.

9  Q    And he told you there were no expectations?

10 A    We had a conversation.  I kind of asked during the

11 conversation that I didn't have any time or that sort of thing,

12 to come down.

13 Q    Did he have a problem with the fact that you weren't

14 planning on working for the sheriff's office at all?

15 A    No, ma'am.

16 Q    Did you previously review Government's Exhibit 28?

17 A    Yes, ma'am.

18        MS. SMITH:  Pull that one up, please.

19        (Audio playing.)

20        MS. SMITH:  If you could pause that.  Thank you.

21  BY MS. SMITH:

22 Q    Is that a true and accurate version of the events that

23 happened that day?

24 A    Yes, ma'am.

25 Q    Again, this is just a smaller clip of a much larger audio

Mike - Direct

1  recording?

2  A    Yes, ma'am.

3        MS. SMITH:  If we could move Government's Exhibit 28

4  into evidence, please.

5        THE COURT:  Any objection?

6        MR. ANDONIAN:  No, Your Honor.

7        THE COURT:  So admitted and may be published to the

8  jury.

9        (Government Exhibit 28 marked and admitted.)

10  BY MS. SMITH:

11  Q    And before I play it, occasionally we have like an

12  inaudible in the transcript.  What's happening when that

13  occurs?

14  A    Usually if you hear sort of like a noise, it has something

15  to do with clothing brushing by the microphone.  They're very

16  small microphones and they're very sensitive, so it's very hard

17  to avoid that.

18        MS. SMITH:  If we could play Government's Exhibit 28

19  in full, please.

20        (Audio playing.)

21  BY MS. SMITH:

22  Q    At the beginning of the clip, Scott Jenkins was referring

23  to a range.  What was he talking about with you?

24  A    I believe it was a gun range.

25  Q    And was he telling you that you could go shoot with him?

Mike - Direct

1   A    I think there was -- yes, ma'am, I think there was some

2   conversation about shooting.

3   Q    And that was despite the fact that you were a felon?

4   A    Yes, ma'am.

5   Q    Now, during that conversation that we just heard, was that

6   when you were telling him that you were unavailable to really

7   help in any way?

8   A    Yes, ma'am.

9   Q    Did he seem to have any problem with that?

10  A    No, ma'am.

11  Q    At any point, did Scott Jenkins tell you there were

12  requirements about a certain number of hours you had to work

13  for the sheriff's office?

14  A    No, ma'am.

15  Q    Did he tell you that you had to be available or on call in

16  any way?

17  A    No, ma'am.

18  Q    And at the end of that clip, you said that you appreciated

19  that he wasn't judging you.  What were you referring to in --

20  by that?

21  A    I was referring to the fact that I had a felony conviction

22  and that I would be able to carry a firearm despite the fact

23  that it's against the law to carry one as a felon.

24  Q    What else did you discuss with Scott Jenkins after being

25  sworn as it pertains to that bribe payment?

Mike - Direct

1  A    The -- besides the felony, or --

2  Q    Yes, besides the felony, what else did you guys discuss?

3  A    The fact that I didn't want the money to be traced back to

4  me if I was giving money for the badge.

5  Q    Did Scott Jenkins tell you ways in which you could conceal

6  that payment?

7  A    Yes, ma'am.

8  Q    And what was he specifically telling you, if you can

9  recall?

10  A    Basically, the conversation was there's ways to get money

11  from myself to Mr. Jenkins.  There's ways around the -- to

12  hide, it's not really a campaign contribution, and suggested

13  maybe that I could hand it to Kevin, who would subsequently

14  hand it to Mr. Jenkins.

15          MS. SMITH:  If we could pull up Government's Exhibit

16  29.

17          (Audio playing.)

18   BY MS. SMITH:

19  Q    Do you recognize Government's Exhibit 29?

20  A    Yes, ma'am.

21  Q    And again, is that a true and accurate depiction of the

22  events that occurred on that day?

23  A    Yes, ma'am.

24  Q    It's a clip; is that correct?

25  A    Yes, ma'am.

Mike - Direct

1           MS. SMITH:  Government would move into evidence

2    Government's Exhibit 29.

3           THE COURT:  Any objection?

4           MR. ANDONIAN:  No, Your Honor.

5           THE COURT:  All right.  So admitted and may be

6    published to the jury.

7           (Government Exhibit 29 marked and admitted.)

8           MS. SMITH:  If we could begin at the beginning and

9    play until the 1 minute and 10 second stamp, please.

10          (Audio playing.)

11   BY MS. SMITH:

12   Q    Who has been speaking in this clip so far?

13   A    Myself.  I was describing my situation as a felon, and

14   Mr. Jenkins was adding comment to it.

15   Q    And what did Scott Jenkins say in response to your

16   question about whether or not he knew what you were convicted

17   of?

18   A    He didn't know the details.

19   Q    But he was acknowledging that he was aware of it?

20   A    Yes, ma'am.

21          MS. SMITH:  If we could continue playing Government's

22   Exhibit 29 until 2 minutes and 3 seconds, please.

23          (Audio playing.)

24   BY MS. SMITH:

25   Q    During the end of this clip while you guys were talking,

Mike - Direct

1   what were you doing?

2   A    At this point, I was handing over the manila envelope with

3   $10,000 in cash over to Mr. Jenkins.

4   Q    And when you said, most people give you 5, what were you

5   referring to?

6   A    I was referring to the -- that I was aware that the usual

7   price for deputization was $5,000, but I was really

8   appreciative because I had a felony conviction, that I would

9   actually give more than the usual amount.  I would give $10,000

10  to show my appreciation.

11  Q    So when you said, I gave you double, 10, you're referring

12  to $10,000?

13  A    Yes, ma'am.

14          MS. SMITH:  If we could continue playing until 2

15  minutes and 28 seconds, please.

16          (Audio playing.)

17   BY MS. SMITH:

18  Q    What was Scott Jenkins's physical response when you were

19  giving him that envelope of cash?

20  A    He seemed very pleased.

21  Q    Did he seem confused about what you were referring to when

22  you said some people give you 5, I'm giving you double, I'm

23  giving you 10?

24  A    No, ma'am, not at all.

25          MS. SMITH:  If we could continue to the time stamp of

Mike - Direct

1   4 minutes.

2            (Audio playing.)

3    BY MS. SMITH:

4   Q    What were you referring to when you said my private

5   beliefs, personal beliefs, and keeping those to yourself?

6   A    I was explaining as a contractor, a contractor can be let

7   go at any moment for just about any reason, and that I wanted

8   to keep my beliefs -- I wanted to be as apolitical as possible,

9   so that I did not want to support one particular person over

10  the other, so that if I was making any sort of -- giving

11  anybody any money, I didn't want anybody tracing it back to

12  myself.

13  Q    Did Scott Jenkins seem to have a problem with you wanting

14  to hide where the money came from?

15  A    No, ma'am.

16           MS. SMITH:  If we could continue in Government's

17  Exhibit 29 to 5 minutes and 16 seconds, please.

18           (Audio playing.)

19   BY MS. SMITH:

20  Q    When Scott Jenkins says, there's nothing I'm doing for

21  you, you don't even live here, and laughs, what was your

22  impression of what he was saying?

23  A    The whole idea of this was -- it was just simply -- it was

24  kind of providing cash for the badge, and that there was

25  nothing legitimate about it.

Mike - Direct

1  Q    And what gave you that impression?

2  A    Just by the preponderance of everything that was

3  happening.  There was no expectations, I did not live in the

4  area, I wasn't going to be trained, I had no background, and

5  that I was being deputized to carry a firearm as a felon.

6  Q    And what was your impression about whether Scott Jenkins

7  was serious when he says, I can't take a bribe?

8  A    I didn't expect him to say anything otherwise.  I think he

9  knew it was a bribe.

10 Q    What do you mean by that, you didn't expect him to say

11 otherwise?

12 A    Typically in my experience you just generally don't --

13         MR. ANDONIAN:  Objection, Your Honor.

14         THE COURT:  Sustained.  Rephrase.

15  BY MS. SMITH:

16 Q    You said you didn't expect anything.  You have -- how long

17 have you been an FBI agent?

18 A    26 years, ma'am.

19 Q    And so in your training and experience, have you met with

20 subjects and targets of investigations?

21 A    Yes, ma'am.

22 Q    And have you interviewed them?

23 A    Yes, ma'am.

24 Q    And based on all of that training and experience, why did

25 you not expect Scott Jenkins to say that it was a bribe?

Mike - Direct

1                MR. ANDONIAN:  Objection.

2                THE COURT:  It's an opinion.  So sustained.

3                MS. SMITH:  If we could move along to Government's

4    Exhibit 29 to the time stamp of 6:53.

5                (Audio playing.)

6    BY MS. SMITH:

7    Q    When he -- when Scott Jenkins says, you're giving it to

8    Kevin, what was Scott Jenkins referring to?

9    A    How I would get money -- I think Mr. Jenkins was referring

10   to how I'd get money from me to him without being directly

11   linked directly as a payment to him.

12   Q    So was he -- was it your impression that he was implying

13   you should give the money to Kevin Rychlik instead of him?

14   A    Yes, ma'am.

15   Q    And how do you know that's what he was implying?

16   A    In addition to the comments, Mr. Jenkins handed me back

17   the manila envelope, and made a motion that I would take that

18   money and then hand it to Kevin, and then Kevin would hand it

19   to him, so there was a visual depiction of exactly referring to

20   the comments.

21               MS. SMITH:  If we could continue at -- Government's

22   Exhibit 29 until 7:42, please.

23               (Audio playing.)

24   BY MS. SMITH:

25   Q    When Scott Jenkins says, that's yours, we'll talk after he

Mike - Direct

1   leaves, who is he speaking directly to?

2   A    To Kevin.

3   Q    And what was he talking about when he says, that's yours,

4   we'll talk after he leaves?

5   A    That was referring to me leave, and then when I left, the

6   $10,000 there.

7   Q    And what was your impression about whether he was being

8   genuine about trying to follow the law?

9   A    I don't believe he was because of the preponderance of the

10  situation.

11       MS. SMITH:  And if we could play Government's Exhibit

12  until the very end, please.

13       (Audio playing.)

14   BY MS. SMITH:

15  Q    When you said, did this go in the right direction, what

16  were you referring to?

17  A    At the time, we were doing the motion with the money, it

18  was more of a joking manner that I would give it to Kevin, and

19  make sure that he would pass it on and not keep it for himself.

20  So it was more or less a lighthearted joke.

21  Q    What was your impression as to whether or not Scott

22  Jenkins and Kevin Rychlik were aware of what you were referring

23  to?

24  A    I was under the impression that all three of us knew

25  exactly what we were talking about.

Mike - Direct

1  Q    And Mike, have you investigated bribery in the past?

2  A    Yes, ma'am.

3  Q    And has anyone expressly said to you, this is a bribe?

4  A    No, ma'am.

5  Q    How do bribery targets typically communicate about the

6  bribes?

7           MR. ANDONIAN:  Objection, Your Honor.

8           THE COURT:  It's an opinion.  He hasn't been

9  identified as an expert for rendering opinions.

10          MS. SMITH:  I think he can testify to his training

11 and experience what targets typically say about bribes, Your

12 Honor, based on the 26 years he's had.

13          THE COURT:  You all approach.

14          (Sidebar commenced.)

15          THE COURT:  How is it not an opinion that needs to be

16 identified?

17          MS. SMITH:  It's not an opinion because he's

18 discussing his training and experience and what has happened to

19 him in the past.  It's a fact-based statement, Your Honor.

20 It's not making an opinion as to whether or not Scott Jenkins

21 was making a bribe.  It's based on his training whether or not

22 they typically say that.

23          THE COURT:  So there's a Fourth Circuit case that

24 came out and it dealt with -- it goes more to mental capacity,

25 but it allowed opinion testimony of that type, but it was

Mike - Direct

1  opinion testimony.  That's what my issue is as to whether it's

2  opinion testimony.

3       MS. SMITH:  I think because we're drawing on his

4  experience it's not an opinion.  It's a factual situation about

5  what he -- he's describing what he's done as a federal agent

6  with the FBI in these types of situations.

7       MR. ANDONIAN:  Your Honor, it's either one of two

8  things.  It's either an opinion, which is improper under these

9  circumstances, or it's a specific instance in which he's

10 experienced other alleged bribery schemes which have no bearing

11 here, because they're not relevant to what was happening under

12 these circumstances that he was personally involved in

13 observing here.  So either way, it's not proper.

14       MS. SMITH:  Your Honor, it's a lay opinion if it is

15 an opinion that he can make, and we believe it's proper.

16       THE COURT:  Well, it's not a lay opinion because it's

17 based upon his experience.  It's not an opinion that any of us

18 could give, which is what lay opinion is based upon, your

19 observation of whatever the events were.  It's based upon his

20 experience.  So I'm going to exclude the question.

21       MS. SMITH:  I'll move on, Your Honor.

22       (Sidebar concluded.)

23  BY MS. SMITH:

24 Q   Now, Mike, after you received the badge and paid Scott

25 Jenkins $10,000, what happened?

Mike - Cross

1  A    Shortly after the conversation we talked about, then I

2  just left the area.

3  Q    Did you have any other interactions with Scott Jenkins

4  after that day?

5  A    No, ma'am.

6  Q    Did Scott Jenkins at any time reach out to you about

7  purchasing a firearm from him?

8  A    No, ma'am.

9  Q    Did he reach out to you in any capacity?

10 A    No, ma'am.

11 Q    And during that entire time you were in Culpeper and

12 meeting with Scott Jenkins on December 28th of 2022, was there

13 any discussion about purchasing a firearm from Scott Jenkins?

14 A    No, ma'am.

15 Q    And further, did anyone from the Culpeper County sheriff's

16 office reach out to you about any training or service

17 requirements you may have?

18 A    No, ma'am.

19        MS. SMITH:  No further questions, Your Honor.

20        THE COURT:  All right.  Thank you.

21        Any cross-examination?

22                    CROSS-EXAMINATION

23  BY MR. ANDONIAN:

24 Q    Good morning, sir.

25 A    Good morning.

Mike - Cross

1  Q    Sir, it's fair to say that --

2            MS. SMITH:  I'm sorry, Your Honor, can we approach

3  really quick just for a second?

4            THE COURT:  Yeah, sure.

5            (Sidebar commenced.)

6            MS. SMITH:  I'm sorry to interrupt, Phil.  The victim

7  witness coordinator just said that she just kicked two people

8  out of the courtroom that had cell phones.  So I don't know if

9  you want to make another comment.

10           THE COURT:  All right.

11           MS. SMITH:  Thank you.  Sorry.

12           (Sidebar concluded.)

13           THE COURT:  So ladies and gentlemen, I just want to

14 confirm the status of my order at this point.  Anyone in the

15 gallery cannot have any type of electronic device, computer,

16 cell phone, iPad, tablet, whatever, any device that has the

17 ability to be able to photograph and/or record.  If you do, if

18 I could ask you to remove that from the courtroom, I would be

19 much obliged.

20           Thank you very much.  Go ahead, Mr. Andonian.

21                      CROSS-EXAMINATION

22  BY MR. ANDONIAN:

23 Q    Good morning, again.

24 A    Good morning, sir.

25 Q    Sir, it's fair to say in your capacity as an undercover

Mike - Cross

1   employee for the FBI that you're dishonest, right?

2   A    In what way, sir, I'm not understanding the question.

3                    (Reporter clarification)

4   A    I'm sorry, sir, I don't understand how I'm dishonest.

5   Q    Your name is not Mike, right?

6   A    Correct, sir.

7   Q    You're not a wealthy businessman from northern Virginia,

8   right?

9   A    Correct, sir.  That's the nature of undercover work.

10  Q    Part of your backstory in this particular case was also

11  that you worked closely with Kevin Rychlik, correct?

12  A    I had met him or I had some knowledge, had some

13  interaction with him, yes, sir.

14  Q    And that you were one of his -- well, you're familiar with

15  the acronym VASARS, right?

16  A    A little bit maybe.  I'm not really familiar with that,

17  sir.

18  Q    But your backstory was you were, quote, one of Kevin

19  Rychlik's VASARS guys, right?

20  A    I'm not sure exactly what Kevin portrayed.  I did not have

21  a conversation with Mr. Jenkins with -- anything with VASARS.

22  Q    Well, I'm not asking about a conversation you had with

23  Mr. Jenkins and VASARS, but I'm asking you, sir, what your

24  backstory was.  And part of your backstory that you know is

25  that you were one of Kevin Rychlik's VASARS guys?

Mike - Cross

1  A    I'm not aware of that story, so I can't recall that, sir.

2  Q    You talked about before you inserted yourself into this

3  investigation you were briefed about the case, right?

4  A    I had some limited briefing, yes, sir.

5  Q    So the answer to the question is yes, you were --

6  A    Yes.

7  Q    -- briefed about the case?

8       And you were given some facts about what the investigation

9  was about?

10 A    Yes, sir.

11 Q    The person that introduced you to Mr. Jenkins was Kevin

12 Rychlik?

13 A    Yes, sir.

14 Q    When you met Mr. Jenkins, you told him, among other

15 things -- and we heard this in one of the clips -- that you

16 were a big supporter of his, right?

17 A    Yes, sir.

18 Q    You also told Mr. Jenkins that one of the ways that you

19 could be supportive would be to donate money, correct?

20 A    Yes, sir.

21 Q    And Mr. Jenkins actually said one of the ways that you

22 could be helpful would be to donate money?

23 A    Yes, sir.

24           MR. ANDONIAN:  The Court's brief indulgence?

25           THE COURT:  Yes, sir.

Carr - Direct

1              (Pause.)

2              MR. ANDONIAN:  Thank you.  Nothing further.

3              THE COURT:  Any redirect, Ms. Smith?

4              MS. SMITH:  No, Your Honor.

5              THE COURT:  May this witness be excused?

6              MS. SMITH:  Yes, Your Honor.

7              THE COURT:  Sir, you may be excused.  Thank you very

8    much for being here.  Please do not discuss your testimony as

9    long as the case is pending.

10             THE WITNESS:  Thank you, Your Honor.

11             THE COURT:  Thank you, sir.  Have a nice day.

12             All right.  The previous restrictions that I had with

13   respect to electronic devices in the courtroom for those who

14   have otherwise been allowed to bring them in, they can now

15   bring them back in.

16             All right.  Ms. Smith, call your next witness,

17   please.

18             MS. SMITH:  The government calls Harry Carr.

19             THE COURT:  Mr. Carr, come on up, please, sir.

20             HARRY CARR, CALLED BY THE GOVERNMENT, SWORN

21             THE COURT:  Mr. Carr, as you sit down, slide right up

22   to the microphone and bring the microphone up to you, and speak

23   into that so that we can pick up your conversation with

24   counsel.

25             THE WITNESS:  Thank you, Your Honor.

Carr - Direct

1          THE COURT:  Thank you, sir.

2          Go ahead, Ms. Smith.

3          MS. SMITH:  Thank you, Your Honor.

4                    DIRECT EXAMINATION

5   BY MS. SMITH:

6   Q    Good morning.

7   A    Good morning.

8   Q    Could you please introduce yourself by stating your name

9   and spelling your last name?

10  A    Yes.  My name is Harry Carr, C-A-R-R.

11  Q    And Mr. Carr, where are you from?

12  A    I live in New Jersey.

13  Q    And what is your highest level of education?

14  A    I have a Juris Doctor degree, a law degree.

15  Q    And what do you do for a living?

16  A    I'm the CEO of a software company called Vcinity,

17  V-C-I-N-I-T-Y.

18  Q    And you mentioned you live in New Jersey.  How long have

19  you lived in New Jersey?

20  A    Continuously since 1998.

21  Q    Do you know someone by the name of Kevin Rychlik?

22  A    I do.

23  Q    And just briefly, how do you know him?

24  A    I first met him roughly 20 years ago.  I was a part owner

25  of an aviation business at the Manassas airport, and he owned a

Carr - Direct

1  helicopter business and a security business that were located I

2  think at the building just sort of adjacent to where we were.

3  Q    What type of relationship did you two have?

4  A    So initially, we just knew him as a fellow business owner.

5  But then we had -- when we were trying to sell our aviation

6  business, it turned out these buyers came to us and said, you

7  have a problem with your books.  And we found out that the man

8  who was sort of managing the business day-to-day was basically

9  stealing from us.  So we terminated him, and we hired

10 Mr. Rychlik's security firm just to provide physical security

11 to our employees, because my partner lived in New York and I

12 lived in New Jersey, so we were not there on a regular basis.

13 Q    At some point in 2022, did Kevin Rychlik reach out to you

14 about becoming an auxiliary deputy?

15 A    He did.

16 Q    What did he tell you?

17 A    Well, he basically said that he was going to be able to

18 get me sworn in as a deputy again, and it turned out it was in

19 Culpeper, Virginia.

20 Q    Did he tell you what the process would be?

21 A    Well, initially, the process was I had to give him -- send

22 him like my license, and I don't remember if I had to fill out

23 a form, but something along those lines.  And you know, we went

24 back and forth.  He had kept -- he had promised me -- to help

25 me get that for multiple years.  In 2022, it seemed to be

Carr - Direct

1  coming to fruition.

2  Q    Do you recall the first time he kind of brought this to

3  your attention?

4  A    The first time?

5  Q    You said multiple years.  This is 2022.  Was it one or two

6  years prior to that?

7  A    So it was more than that.  I mean, way back when, I was a

8  sworn deputy in Chesapeake, Virginia, because when we had the

9  aviation business at Manassas Airport, we supported something

10  called Virginia Air Search and Rescue.  Mr. Rychlik was very

11  involved in that.  I think he was like an officer in that or

12  something, because I've seen him in uniform a couple of times

13  over the years.  And we -- we had a business that managed

14  aircraft and had what's called a fixed base operator.  And we

15  also had a small Cessna 172 that if someone went missing,

16  either a child or, you know, an elderly person with dementia,

17  or whatever, literally we would support law enforcement to look

18  for -- we'd send the plane up.  And I know Mr. Rychlik had a

19  helicopter business.  He would go up in helicopters and we

20  would support that.  And then we got introduced to the under

21  sheriff down in Chesapeake, Virginia who was very involved in

22  that, and he offered to make my partner and I sworn deputies.

23  Q    Do you remember approximately what year you were sworn in

24  as a Chesapeake auxiliary deputy?

25  A    I believe it was the fall of 2006.

52

Carr - Direct

1  Q    And when you were sworn in as an auxiliary deputy, did you

2  have to make a payment for that badge?

3  A    No way.

4  Q    You said no way?

5  A    No way.

6  Q    Now, and let's fast forward.  So in 2022, it seemed like

7  Kevin Rychlik could get you sworn in as a Culpeper auxiliary

8  deputy; is that right?

9  A    That's what he was leading me to believe.

10 Q    And when Kevin Rychlik approached you about this, had you

11 ever been to Culpeper County?

12 A    Have I ever been?  Not that I recall, no.

13 Q    Did you know the sheriff at the time, Scott Jenkins?

14 A    I did not.

15 Q    And -- but why did you want to be sworn in?

16 A    Well, I had a badge previously and, you know, I mean,

17 literally it was just kind of cool to have a badge.  And I

18 actually got pulled over one time, because I was talking on my

19 cell phone, by a police officer in New Jersey.  And when I had

20 my ID and he saw the badge, other than telling me I should have

21 a badge in New Jersey because I lived there, you know, he let

22 me go.  So I thought it was -- it would be something cool to

23 have again.  It was nothing more than that.

24 Q    Were you scheduled to be sworn in as an auxiliary deputy

25 in Culpeper County on October 28th of 2022?

Carr - Direct

1   A     I thought I was, yes.

2   Q     And as of late October of 2022, again, had you met Scott

3   Jenkins at that point?

4   A     I've never met him.

5   Q     Had you filled out any paperwork to be an auxiliary

6   deputy?

7   A     I believe I did.

8   Q     With very brief information; is that fair?

9   A     I believe so.  And I know I sent Mr. Rychlik a copy of my

10  driver's license as well.

11  Q     Did you end up getting sworn in as an auxiliary deputy?

12  A     I did not.

13  Q     And why not?

14  A     Because the night before I was supposed to fly down and go

15  to meet the sheriff, qualify with a handgun, and get sworn, I

16  was driving actually to my in-laws.  I remember this very

17  distinctly.  And Mr. Rychlik called me and said, we're all set

18  for tomorrow, there's just one thing I forgot to tell you.  And

19  I said, what's that?  He said, you have to bring a check for

20  $5,000.  I said, for what?  And he said, you have to make a

21  donation to the sheriff's re-election fund.  I'm like, that's

22  not going to happen.  And I said, I thought, Kevin, that we're

23  getting this done because of all the support you continue to

24  still do for the air search and rescue stuff.  And he said,

25  yeah, well, that doesn't work anymore.  If you don't -- if

                                    54

                            Carr - Cross

1    you're not making a donation, you're not getting a badge.  And

2    I said, I'm not coming, just pull the plug, I'm not coming to

3    Virginia tomorrow.  And I didn't go.  And when we hung up the

4    phone, I literally canceled.  I had flight reservations to fly

5    into Dulles Airport, and I canceled them immediately.

6    Q    And why did you push back on that $5,000 requirement?

7    A    Because it felt like a quid pro quo, and I had no interest

8    in being any part of it.

9    Q    And did you not go through with it?

10   A    I did not.

11   Q    And have you spoken with Kevin Rychlik since?

12   A    No, I have not.

13           MS. SMITH:  No further questions, Your Honor.

14           THE COURT:  Any cross?

15           MR. CALEB:  Just briefly, Your Honor.

16                         CROSS-EXAMINATION

17    BY MR. CALEB:

18   Q    Good morning, sir.

19   A    Good morning.

20   Q    All right.  Just a couple of things.  You were under the

21   impression that you could be sworn as a Culpeper County

22   auxiliary because Kevin Rychlik led you to believe that,

23   correct?

24   A    That's correct.

25   Q    And during your interactions in 2022 with Kevin Rychlik

Carr - Cross

1    about becoming an auxiliary deputy in Culpeper County, you

2    didn't speak to Mr. Jenkins; is that also correct?

3    A    I had never spoken to him, sir.

4    Q    Never spoken to him, never met him?

5    A    I have not.  Never met him.

6    Q    Never got any communication from him regarding that $5,000

7    that Rychlik told you you had to pay?

8    A    That's correct.

9    Q    And in fact -- well, moving on, you also said that at one

10   point you were a deputy auxiliary, and that was in Chesapeake?

11   A    Yes.

12   Q    And Chesapeake is in Virginia?

13   A    Yes, it is.

14   Q    And at the same time you were a deputy auxiliary in

15   Chesapeake, Virginia, you were living in New Jersey, correct?

16   A    That's correct.

17   Q    And you were able to be a deputy in -- an auxiliary deputy

18   in Chesapeake, even though you lived in Virginia, correct?

19   A    No --

20   Q    I'm sorry, in New Jersey, correct?

21   A    In New Jersey, correct.

22            MR. CALEB:  That's all I have.  Thank you.

23            THE COURT:  Any redirect?

24            MS. SMITH:  No, Your Honor.

25            THE COURT:  May Mr. Carr be excused?

Miesle - Direct

1          MS. SMITH:  Yes, Your Honor.

2          THE COURT:  Mr. Carr, thank you very much.  Please do

3    not discuss your testimony as long as the case is pending.

4    Have a nice day and thank you for being here.

5          THE WITNESS:  Thank you.

6          THE COURT:  All right.  Ms. Choy, call your next

7    witness, please.

8          MS. CHOY:  The government calls Dawn Miesle.

9          THE COURT:  Dawn Miesle.

10         Mr. Miesle, come on up and be sworn if you would,

11   please, sir.

12         DAWN MIESLE, CALLED BY THE GOVERNMENT, SWORN

13         THE COURT:  Step up over here.  As you sit down,

14   Mr. Miesle, slide yourself up to the microphone and then bring

15   the microphone to you so you can speak right into it.

16                      DIRECT EXAMINATION

17    BY MS. CHOY:

18   Q    Good morning, Mr. Miesle.

19   A    Good morning.

20   Q    Could you please introduce yourself to the jury and spell

21   your last name for the court reporter?

22   A    Sure.  My name is Dawn Miesle.  I work at Apple.  And my

23   last name is M-I-E-S-L-E.

24   Q    Mr. Miesle, what is your educational background?

25   A    I have an undergraduate degree in international studies

Miesle - Direct

1  from Marietta College, and then I have a master's degree in

2  forensic sciences focused in high-tech crime investigations

3  from George Washington University.

4  Q    And you mentioned you're employed at Apple?

5  A    Yes.

6  Q    What's your position at Apple?

7  A    I am a technical security analyst at Apple.

8  Q    How long have you held that position?

9  A    About nine years now, but I've been at Apple for over 16

10 years.

11 Q    And what previous positions have you held at Apple?

12 A    A technical analyst and then a security -- I forget the

13 title of it -- when I initially started, but essentially in

14 charge of our evidence room.

15 Q    And in your current position as a technical security

16 analyst, what are your duties and responsibilities?

17 A    Sure.  I work for our privacy and law enforcement

18 compliance group.  And I have several responsibilities,

19 primarily receiving, reviewing, and responding to law

20 enforcement requests, subpoenas, search warrants.  I also do

21 training, both internal and external.  So I train our team on

22 new technologies and new services that Apple produces, and then

23 I also train outside parties as well and how they can request

24 and get data from Apple.

25 Q    As part of your employment at Apple, have you become

58

Miesle - Direct

1  familiar with Apple's iMessage system?

2  A    Yes.

3  Q    And have you personally worked on the testing of Apple's

4  iMessage capabilities?

5  A    I haven't worked on testing of it, but I've run tests and

6  pulled logs to see what kind of activity happens when you send

7  an iMessage and receive iMessages.

8  Q    I see.  What is an iMessage?

9  A    An iMessage is basically just a digital message that you

10 can send, similar to a text message, or in the old days, the

11 AOL Instant Messenger.  You name it.  It's basically a message

12 you can send from one person to many people.  And that could be

13 both text -- it also could be pictures, videos, voice

14 recordings, any number of things.

15 Q    So what I'd like to ask you to do is walk through what

16 happens when an iPhone user attempts to send a message to

17 someone.  So what would be the first thing that your iPhone

18 would do if you try to put in someone's number and send a text

19 to someone?

20 A    Sure.  So the Messages apps on the iPhone and iOS devices

21 and also on Mac iOS devices -- so it's sort of across all of

22 our products -- the Messages app will reach out to our IDS

23 system, which is basically internet directory system -- to see

24 if the person you're trying to send the message to also is an

25 Apple user who has selected to use iMessage.

Miesle - Direct

1  Q    So let me pause you there.

2  A    Sure.

3  Q    So you mentioned the IDS system?

4  A    Yeah.

5  Q    Can you say, once again, what that was, because it went by

6  a little fast?

7  A    Oh, sorry.

8  Q    No problem.

9  A    It's a internet domain services, or directory services,

10 depending on which engineering team you talk to, but it's

11 essentially the same thing.  It's like a -- the easy way to

12 think about it is a phone book of everybody who's registered to

13 use that service.

14 Q    Okay.  So when the iPhone user goes to send a message, I

15 think you said the first thing the phone does is it reaches out

16 to IDS?

17 A    Yes.

18 Q    Is that right?

19 A    Yes.

20 Q    And the purpose of that reach-out was what?  Just tell us

21 one more time.

22 A    Sure.  To check to see if the person or people that you're

23 trying to send the message to also use iMessage.  So if you're

24 using iMessage and trying to send a message to somebody else,

25 it's going to go to this IDS system and say, hey, is this

60

Miesle - Direct

 1  person also an iMessage user.

 2  Q    And does --

 3  A    Sure.

 4  Q    -- and does the IDS system then send a message back to the

 5  cell phone?

 6  A    Yes.  So essentially what it does, it says, yes, this is

 7  an iMessage user, and it will then also query the system to get

 8  encryption keys in order to facilitate sending messages back

 9  and forth between the sender and recipient.

10  Q    So if it turns out that the recipient is also an iMessage

11  user, then how will the sender's iPhone send the message to the

12  recipient?

13  A    Sure.  So if they're an iMessage -- if both users are

14  iMessage users, they'll get the encryption keys through the IDS

15  query, and then it will generate a message and send it over our

16  Apple push notification system.

17  Q    What is that?

18  A    So it's another thing that facilitates communication.  So

19  essentially what it does is it's like the postman who, like,

20  takes a message, brings it somewhere, and makes sure it gets

21  delivered.  It's not just iMessage that uses that service.  So

22  it's any time there's a notification, someone rings your

23  doorbell, Door Dash is on its way delivering your food, you

24  name it.  Any of -- if any app is using the push notification

25  system, those messages all flow through what we call the APNS,

Miesle - Direct

1  which is just an acronym for push notification.

2  Q    And if the IDS server tells the sender's iPhone, no, the

3  recipient is not an iMessage user, will the message get sent in

4  a different way?

5  A    Yes.  So if they are not -- if both users are not using

6  iMessage, the message will then be sent via the carrier, the

7  cell phone carrier, internet carrier, whoever it happens to be

8  that is that contact.

9  Q    And when the sender's iPhone receives that information

10 about the recipient that is, for example, an iMessage user,

11 does it cache or save that information?

12 A    Yes, it saves it for about eight hours.  There are a

13 couple of variables there, but sort of -- within eight hours

14 it's not going to check again, but after that eight hours

15 expired, it's then going to again re-query the IDS server when

16 you go to send your next message after that time has expired.

17 Q    So if the sender's iPhone has cached or saved the

18 information about the recipient, then it doesn't need to query

19 the IDS server; is that right?

20 A    Yes, up until eight hours.  So basically when it gets --

21 when it gets confirmation that the recipient is also using

22 iMessage, and it does the encryption key exchange, it will then

23 store that and basically say, hey, the last time I checked was

24 this time.  And every time you go to send that message again,

25 it locally will check, is this still a good encryption key, is

Miesle - Direct

1  this still a good contact.  And then after eight hours, it's

2  going to go, oh, it's been too long, I need to check again.

3  Q    And so based on what you've said, is it fair to say that

4  if the sender's iPhone has not sent a message to the

5  recipient's iPhone within the previous eight hours, then the

6  sender's iPhone will necessarily have to query that IDS server

7  before sending a message?

8  A    Yes.

9  Q    And is that true regardless of whether the message

10 ultimately gets sent as either an iMessage or another type of

11 message like an SMS?

12 A    So it doesn't matter.  It can actually query the IDS

13 system and never send a message.  There's a lot of background

14 stuff that it's trying to do proactively for you.  But yeah,

15 you could definitely set up that query and then never send a

16 message, or send it like a day later.  But when you send it a

17 day later, again, it's going to have to do another query of

18 that system.

19 Q    This IDS, this phone book, is it located on servers?

20 A    Yeah, it's located on servers throughout the country and

21 throughout the world in order to facilitate that, yeah.

22 Q    In the course of your employment at Apple, have you become

23 familiar with where those servers are located?

24 A    Yes.

25 Q    Are any of those IDS servers located within the

Miesle - Direct

1  Commonwealth of Virginia?

2  A     No.

3  Q     Has Apple ever had an IDS server, during the course of

4  your employment, that was located within the Commonwealth of

5  Virginia?

6  A     No.

7            MS. CHOY:  Thank you.

8            THE COURT:  Thank you.

9            Any cross-examination?

10           MR. CALEB:  May I have the Court's indulgence?

11           THE COURT:  Yes, sir.

12           (Pause.)

13           MR. CALEB:  Your Honor, we don't have any questions.

14           THE COURT:  All right.  Very well.

15           May this witness be excused?

16           MS. CHOY:  Yes, Your Honor.

17           THE COURT:  Mr. Miesle, thank you very much for being

18 here today.  Please do not discuss your testimony as long as

19 the case is pending.  Safe travels back to your home.

20           THE WITNESS:  Thank you.

21           THE COURT:  All right.  Who is the government's next

22 witness?

23           MS. CHOY:  Special Agent Scott Medearis.

24           THE COURT:  That's going to take a little bit of

25 time, I would imagine; is that right?

Miesle - Direct


1          So ladies and gentlemen, why don't we take our

2   mid-morning break a little bit early this morning and we'll

3   break until 10:30.

4          I again remind you, please do not conduct any

5   independent research, discuss the case among yourselves, or

6   begin to form any thoughts about the case until after

7   everything is completed.

8          I'll release the jury.

9   (*Jury out, 10:16 a.m.*)

10         THE COURT:  So we'll have Mr. Medearis -- or Special

11  Agent Medearis.  Is that likely to conclude the government's

12  case?

13         MS. CHOY:  Yes, Your Honor.

14         THE COURT:  Okay.  All right.  So that will take us

15  up to close to around lunch.

16         What does the government anticipate, or do you know

17  yet?

18         MR. ANDONIAN:  The defense?

19         THE COURT:  Excuse me.

20         MR. ANDONIAN:  We anticipate calling Mr. Jenkins I

21  guess after lunch.

22         THE COURT:  Okay.  All right.  So I'll have just the

23  standard remind him of his right to remain silent and so forth.

24         Okay.  All right.  Well, let's stand in recess until

25  10:30.  Thank you.

Medearis - Direct

1        (Recess.)

2        THE COURT:  We're back on the record in *United States*

3  *v. Jenkins*.  Let the record reflect the government is present

4  by its counsel.  The defendant likewise is present along with

5  the benefit of counsel.

6        Before we bring the jury in, anything we need to

7  address from the government's perspective?

8        MS. PENG:  Not from the government.

9        THE COURT:  Defendant?

10        MR. ANDONIAN:  No, Your Honor.

11        THE COURT:  All right.  Let's go ahead and bring the

12  jury in, please.

13  (*Jury in, 10:33 a.m.*)

14        THE COURT:  Ladies and gentlemen, please have a seat.

15        All right.  Ms. Peng, call your next witness, please.

16        MS. PENG:  The United States calls Special Agent

17  Scott Medearis.

18        THE COURT:  All right.  Special Agent Medearis, come

19  on up and be sworn, please, sir.

20        SCOTT MEDEARIS, CALLED BY THE GOVERNMENT, SWORN

21                    DIRECT EXAMINATION

22   BY MS. PENG:

23  Q    Agent Medearis, would you please introduce yourself to the

24  jury and spell your last name?

25  A    Good morning.  My name is Scott Medearis, M-E-D-E-A-R-I-S.

Medearis - Direct

1  Q     How are you currently employed?

2  A     I'm a special agent with the FBI.

3  Q     How long have you been a special agent with the FBI?

4  A     Almost 16 years.

5  Q     What kind of training do you receive prior to becoming a

6  special agent?

7  A     We attend the FBI academy.  It's approximately 20 to 21

8  weeks at the academy.  We go over basic legal principles,

9  firearms training, defensive tactics, investigative techniques.

10 Q     Did you say that was a 20 to 21-week training?

11 A     Yes.

12 Q     Do you also receive ongoing training?

13 A     We do.  We have regular training throughout our career,

14 legal training specific to certain types of investigations.

15 Q     And in your 16 years, can you just briefly describe for us

16 what kinds of cases have you worked on?

17 A     Primarily worked on white collar fraud cases and public

18 corruption cases.  I did two years detail to the Drug

19 Enforcement Administration investigating dirty doctors and

20 criminal enterprises that would press counterfeit pills.

21 Q     Have you also worked on cases involving bribery?

22 A     Yes.

23 Q     Approximately how many of those would you say you've

24 helped or worked on?

25 A     At least ten.

Medearis - Direct

1  Q    And how many cases overall would you say you've worked on?

2  A    In some capacity, well over 100.

3  Q    Now, you're the case agent into the bribery investigation

4  of Scott Jenkins?

5  A    Yes.

6  Q    Can you tell the jury what a case agent is?

7  A    A case agent is -- in this case, we have two co-case

8  agents, but we are the ones that are making decisions about

9  which way the investigation will go, what techniques we'll use,

10 what witnesses we'll interview, kind of overall bringing the

11 case on behalf of the Bureau, I guess.

12 Q    So is it fair to say that you're the agent who is

13 primarily responsible for gathering the evidence in this case?

14 A    Yes.

15 Q    And you described this a little bit already, but

16 generally, what are some of the responsibilities a case agent

17 has on an investigation?

18 A    Lots of different things, from writing reports of

19 interviews, conducting surveillance, drafting affidavits,

20 meeting with and operating with sources.

21 Q    Things of that nature?

22 A    Yes.

23 Q    Now, I want to direct your attention to this current

24 investigation -- or this investigation.

25      How did it first come to the attention of the FBI that

Medearis - Direct

1  Scott Jenkins was involved in a possible bribery scheme?

2  A    In approximately late summer of 2021, Mr. Rychlik brought

3  information to the FBI regarding the scheme with Mr. Jenkins.

4  Q    How did Kevin Rychlik come to the attention of the FBI?

5  A    He was under investigation for tax fraud, and as part of

6  meeting with the government, he brought the information forward

7  at subsequent meetings that were set up with FBI agents in

8  Washington.

9  Q    In those initial meetings with Kevin Rychlik after he came

10 forward, what did he report about what was going on with Scott

11 Jenkins?

12 A    He identified a scheme by which Mr. Jenkins was accepting

13 payments in exchange for deputizing people as auxiliary

14 deputies.

15 Q    And prior to Kevin Rychlik coming forward with that

16 information, did the FBI know about the bribery scheme?

17 A    No.

18 Q    And just generally speaking, does the FBI receive lots of

19 information from people reporting possible crimes?

20 A    Yes.

21 Q    And so when the FBI receives a report like that, how does

22 it generally determine which reports are worthy of further

23 follow-up?

24 A    Well, we conduct initial investigation to see if we can

25 substantiate the allegations that were made.

Medearis - Direct

1  Q    And in terms of the actions taken once Kevin Rychlik

2  reported that information, what sorts of general steps were

3  taken to try to corroborate his report?

4  A    We reviewed campaign finance records to see if the

5  individuals he identified as having made payments to

6  Mr. Jenkins did, in fact, make payments.  We reviewed NCIC logs

7  to see if the individuals who were identified by Mr. Rychlik

8  had been queried by the Culpeper County sheriff's office,

9  meaning had a background check been run on them.  We reviewed

10 financial records to see if we could corroborate some of the

11 allegations of the financial transactions Mr. Rychlik brought

12 forward.  We reviewed toll records from phone companies to

13 establish that Mr. Rychlik and Mr. Jenkins had been, in fact,

14 in contact.  And we ultimately got search warrants to

15 independently verify the text messages that Mr. Rychlik had

16 provided us, showing the ongoing communications regarding their

17 scheme.

18 Q    So is it fair to say that you obtained a whole bunch of

19 records from different places in order to try to corroborate

20 Kevin Rychlik's initial account?

21 A    Yes.

22 Q    And so we looked at some of these records already in the

23 trial, and we're going to go through some more of them, but can

24 you tell me a little bit more about what types of search

25 warrants you were able to obtain?

Medearis - Direct

1   A    We obtained search warrants for iCloud and e-mail accounts

2   to review text messages and e-mails.  We obtained search

3   warrants for historical location information to see where

4   certain devices were at certain times.  We obtained search

5   warrants for physical devices that we later seized from

6   Mr. Jenkins.  There may be others.  Those are the ones I'm

7   remembering off the top of my head.

8   Q    We've seen in this trial some of the text messages that

9   were the results of those search warrants?

10  A    Yes.

11  Q    At some point, did Kevin Rychlik become an active

12  cooperator with the FBI?

13  A    Yes.

14  Q    What does it mean to be an active cooperator?

15  A    The distinction active being he was taking -- carrying out

16  assignments or tasks that we provide to him, as opposed to just

17  giving us information.  We are proactively tasking him to

18  conduct investigation.

19  Q    So an active cooperator gathers new evidence as opposed to

20  providing information about things that have already happened?

21          MR. CALEB:  Objection to the leading, Your Honor.

22          THE COURT:  Let's rephrase.

23   BY MS. PENG:

24  Q    What steps, if any, does the FBI take to monitor active

25  cooperators?

Medearis - Direct

1    A     We -- so for in-person meetings, we will routinely meet

2    with the cooperator ahead of time, provide them the recording

3    devices, turn them on in our presence, provide a preamble so we

4    know it was on.  They go in and do their activity, and then

5    when the activity is done, we meet with them afterwards and

6    collect the devices so that we know they were active and they

7    weren't turned off or anything like that while the meeting was

8    happening.  We surveil the meeting so we know that they

9    actually took the tasks they were tasked to do.  We have -- in

10   this case, we have location data to know where he was during

11   the meetings, so everything kind of corroborated each other.

12   And we reviewed phone records after the fact to ensure that

13   when he said he was making a phone call he was, in fact, making

14   a phone call, or we weren't missing phone calls that he wasn't

15   recording.  So we do what we can to corroborate that he's

16   following the instructions.

17   Q     Do you also write reports of contacts with him?

18   A     Absolutely.  We document every contact, whether it's

19   substantive where he's providing information, or reporting

20   about a meeting, or if it's even just simply logistical, we'll

21   meet you tomorrow, without any substance, we document all that.

22   Q     And does the FBI provide directions to active cooperators

23   as to what they should do?

24   A     Yes.  Cooperators are admonished -- at the time they're,

25   quote, signed up, so to speak, we provide them admonishments

Medearis - Direct

1   about what they can and cannot do.  And then when they are

2   tasked to specifically engage with subjects, we give them

3   directions on how to communicate and how to use the devices and

4   topics to engage on with the subject.

5   Q    So you mentioned a word admonishments.  What specifically

6   are the admonishments that the FBI gives to active cooperators?

7   A    There are many, depending on the types of cooperation.

8   There's a few basic ones which are that their cooperation will

9   be voluntary, that they must be truthful when they're providing

10  information to us, and that they cannot go take separate

11  independent action as a government agent.  So just because

12  you're working with us doesn't mean you can go out and conduct

13  your own investigation on something else.  And then there are

14  specific additional admonishments when the source is tasked to

15  take other actions.

16  Q    How often are those admonishments given?

17  A    The admonishments are given at the time we start working

18  with them.  They're given annually thereafter, and then they're

19  given at the -- if the source is engaged in additional -- we

20  call it otherwise illegal activity, so if we are giving them

21  authorization to facilitate a bribe payment, we admonish them

22  about what can be done in that and specific rules surrounding

23  that.

24  Q    Now, in your 16 years as an FBI agent, have you handled

25  many informants or sources?

Medearis - Direct

1    A    Yes.

2    Q    Including active cooperators?

3    A    Yes.

4    Q    And in your experience, do they always follow the

5    instructions of the FBI?

6    A    No.

7    Q    Why not?

8    A    Generally the best sources are criminals.  That's what

9    makes them good sources.  They have access to criminals and the

10   networks that criminals operate.  If I were to go as an FBI

11   agent and approach a subject of an investigation, not only

12   would it then be overt, I'd have a hard time penetrating the

13   network.  So by the very nature, the best sources are criminal.

14   Sometimes you know, by their nature, they will sometimes make

15   mistakes or not follow instructions.

16   Q    Can you tell us a little bit more about why you say the

17   best sources are criminals themselves?

18   A    Criminal subjects and the inner circles of their networks

19   will take steps to protect themselves to avoid detection by law

20   enforcement.  They kind of keep a close trusted circle.  And as

21   an FBI agent, that's one of the most difficult things is to

22   access them or their network.  When somebody is a criminal,

23   they can kind of show a little street cred and say, hey, you

24   can trust me, I'm a criminal too, I won't rat you out -- or if

25   they're part of the network itself, they're obviously already

Medearis - Direct

1  engaged in that activity, so they're trusted by those

2  criminals.

3  Q    So do criminals have access to information that law

4  enforcement otherwise would not have access to?

5  A    Generally, yes.

6  Q    Now, you talked about this already a little bit, but what

7  specific steps did the FBI take to monitor Kevin Rychlik?

8  A    So as I mentioned, we surveilled the in-person meetings

9  when he met with Mr. Jenkins and some other people.  We would

10  cross reference phone records so that we would know if there

11  was calls showing up in his phone records that weren't being

12  recorded, we would know that.  We had location information

13  about where the devices he was using were located so we could

14  know if he didn't go to the meeting location.  And then

15  obviously all the meetings were recorded so we could hear what

16  was happening, and whether or not, you know, he was being

17  truthful about what was happening during those meetings.

18  Q    Was Kevin Rychlik provided a phone by the FBI?

19  A    Yes.

20  Q    What capabilities did that phone have?

21  A    The phone had software on it that could record -- record

22  audio and visual.  It could broadcast real time, and also had

23  location information so we could track where it was.

24  Q    And so we've seen some of the evidence from the phone and

25  from the recording devices that Mr. Rychlik was wearing in this

Medearis - Direct

1  trial?

2  A    Yes.

3  Q    Now, in addition to the active cooperation that

4  Mr. Rychlik did, did he also provide historic information about

5  bribe payers dating back to 2015?

6  A    Yes.

7  Q    Generally speaking, what information did he provide about

8  those bribe payers dating back to 2015?

9  A    He provided their identity so we knew who they were, and

10 he provided text messages surrounding the topics of their

11 payment and being sworn in.

12 Q    Did you take steps to try to corroborate that information?

13 A    Yes.

14 Q    What did you do?

15 A    As I mentioned, we reviewed Mr. Jenkins's campaign finance

16 reports going back to 2015, which corroborated that the

17 individuals Mr. Rychlik had identified had, in fact, made

18 contributions.  We reviewed, like I said, the NCIC query logs

19 to see if criminal histories had been pulled for these

20 individuals by the Culpeper County sheriff's office.  We

21 reviewed financial records to attempt to corroborate some of

22 the transactions Mr. Rychlik had referenced.  And then we

23 looked at toll records to establish the communication between

24 Mr. Rychlik and Mr. Jenkins.  And then we independently

25 verified the legitimacy of the text messages that Mr. Rychlik

76

Medearis - Direct

1  had provided himself, to make sure he hadn't omitted text

2  messages, to make sure that he couldn't somehow make them up or

3  fabricate them, make them look just like iMessages.  We went to

4  Apple to actually get the underlying text messages.

5  Q    So I just want to be clear.  He provided -- Rychlik

6  provided information about bribe payments prior to him becoming

7  an active cooperator with the FBI?

8  A    Yes.

9  Q    And based on the information you gathered, did you prepare

10  summary charts in order to summarize the information relevant

11  to this investigation that you've prepared for the trial?

12  A    Yes.

13  Q    And do those summary charts accurately reflect information

14  that's voluminous in nature?

15  A    Yes.

16  Q    Did you prepare a summary chart regarding contributions to

17  Scott Jenkins for Sheriff for the period January 2015 to August

18  2019?

19  A    Yes.

20        MS. PENG:  If I could have use of the device, please?

21  BY MS. PENG:

22  Q    And is -- I'm showing you what's been marked as Government

23  Exhibit 801.

24        Do you recognize what this is?

25  A    Yes, I do.

Medearis - Direct

1    Q    What is it?

2    A    This is a chart that I created that reflects information

3    about certain individuals Mr. Rychlik identified as having made

4    payments to Mr. Jenkins in exchange for being deputized as an

5    auxiliary deputy.

6            MS. PENG:  Move to admit and publish Government

7    Exhibit 801.

8            THE COURT:  801?  You said 801?

9            MS. PENG:  Yes.

10           THE COURT:  Any objection?

11           MR. CALEB:  No additional objection, Your Honor.

12           THE COURT:  All right.  It may be admitted and

13    published to the jury.

14           (Government Exhibit 801 marked and admitted.)

15     BY MS. PENG:

16    Q    Agent Medearis, can you just walk us through what this

17    summary chart is depicting?

18    A    So this is summarizing certain information about the

19    individuals -- some of the individuals Mr. Rychlik identified.

20    It covers the time period of January '15 through August '19.

21    The left -- furthest left column, date of contribution, is the

22    date the contribution as reported by Scott Jenkins For Sheriff,

23    the second column is the amount of that contribution, third is

24    the contributor, fourth is whether or not that individual

25    listed as the contributor was sworn as an auxiliary deputy with

Medearis - Direct

1  Culpeper County, and then the last column is whether or not

2  that individual was a resident of Culpeper County.

3  Q    So looking at the contributor column, were these names

4  identified by Kevin Rychlik?

5  A    Yes.

6  Q    Now, and then looking at the amount of contribution, is

7  this -- are these the amounts taken from campaign finance

8  reports?

9  A    Yes.

10  Q    I'm just going to show you an example of that.  These next

11  exhibits have already been admitted.

12       So is this an example of the campaign finance report that

13  you derived the information on that chart?

14  A    Yes.

15  Q    And what period is this for?

16  A    It's for the period ending in March 31, 2015.  It doesn't

17  specify a start, but I believe it's from January 1, 2015

18  through March 31, 2015.

19  Q    And this is the information that we see reflected in the

20  chart?

21  A    Yes.

22  Q    And this as well?

23  A    Yes.

24  Q    And so the numbers we see on that chart came from these

25  campaign finance reports?

Medearis - Direct

1    A    Yes.

2    Q    All right.  So let me direct you to the checkmark under

3    auxiliary deputy column.  What is this checkmark representing?

4    A    It represents that these -- that the individuals listed

5    there were in fact sworn in as auxiliary deputies in Culpeper

6    County.

7    Q    How did you determine that they were sworn in as

8    auxiliaries?

9    A    We obtained their oaths from the clerk of court.

10   Q    And how about the last column, Culpeper resident?

11   A    That just shows whether or not they are residents of

12   Culpeper County.

13   Q    And how did you determine whether they were residents or

14   not?

15   A    I interviewed all of them at their residence.

16   Q    Now, did you also conduct an investigation into Scott

17   Jenkins's financial records?

18   A    Yes.

19   Q    Can you tell me what records you obtained in order to

20   conduct that financial investigation?

21   A    We obtained records for Mr. Jenkins's personal accounts,

22   his credit cards, mortgages.  We obtained records for his

23   brother, some of his family members' accounts.  We obtained

24   records for the sheriff's campaign accounts.  There may be a

25   couple other ones, but those are the main ones.

Medearis - Direct

1   Q    How many credit cards does Scott Jenkins have?

2   A    I'm aware of three that he had at the time.

3   Q    How many bank accounts did he have in his personal name?

4   A    I'm aware of two, one checking and one savings account.

5   Q    Was that a joint bank account?

6   A    The checking account was joint with his wife.  There was a

7   savings account that I believe was in his own name only, but I

8   don't recall specifically.

9   Q    Did you also obtain records for his campaign account?

10  A    Yes.

11  Q    And that's in the name of Scott Jenkins For Sheriff?

12  A    Yes.

13  Q    And you mentioned you obtained records for mortgages?

14  A    Yes.

15  Q    Can you explain what those were?

16  A    There was Mr. Jenkins's refinance -- or got mortgages in I

17  believe it was December of 2019 and December 2020, or close to

18  there.

19  Q    As a general matter, what is the purpose of conducting a

20  financial investigation in a case such as this?

21  A    Generally, we're trying to understand where the money

22  went.

23  Q    Now, did you also prepare a summary chart summarizing the

24  voluminous financial documents you obtained?

25  A    Parts of it, yes.

Medearis - Direct

Q    And did you prepare a summary chart that's now marked as
Government Exhibit 804?

A    Yes.

          MS. PENG:  Your Honor, I would move to admit and
publish 804 at this time.

          THE COURT:  Any objection?

          MR. CALEB:  No objection.

          THE COURT:  All right.  So admitted and may be
published to the jury.

          (Government Exhibit 804 marked and admitted.)

  BY MS. PENG:

Q    Agent Medearis, could you tell us what we're looking at
here in this chart?

A    So this is a chart summarizing some of Mr. Jenkins's
accounts around September of 2019.  On the left half, under the
heading account balances, AUB, which stand for Atlantic Union
Bank, account ending in 2712.  In the light yellow is the
statement date.  So that's the date that the account's monthly
statement was cut each month.  The dark yellow is the average
balance listed on that statement.  So on August 11th, the
statement was cut and the average balance in the account for
the preceding 30-ish days was $3,886.39.  The dark gray column
is the lowest balance on that statement.  So going through the
30 days that were included on the August 11th statement, the
lowest balance during that time was $199.89, and the date of

Medearis - Direct

1  that lowest balance was July 29, 2019.

2  Q    So before you go on, so on the left-hand side where it

3  says account balance, AUB 2712, what are these balances

4  reflecting?

5  A    Balances in that account.

6  Q    So in his checking account?

7  A    Yes.

8  Q    And so the statement date obviously is the date of the

9  statement?

10 A    Correct.

11 Q    And tell us what -- why does it have an average balance

12 here?

13 A    That's calculated and presented on the bank statement,

14 just kind of generally shows average balances in the account,

15 the average assets that Mr. Jenkins had in that account.

16 Q    Okay.  You can continue.  What about the right-hand side?

17 A    So this is the approximate credit card balances.  The

18 three right columns, VACU is Virginia Credit Union, BOA is Bank

19 of America, and Cap One is Capital One.  And then the dark red

20 is the total of those three cards.  And then the numbers listed

21 below each is the balance on that card at approximately the

22 date on the statement date.  When I say approximately, because

23 the credit card statements don't match up with the bank

24 statement dates.  So I had to go in and try and calculate --

25 you know, if the statement was cut say August 1st instead of

Medearis - Direct

1    August 11th, I'd have to go in and calculate additional

2    purchases to get the exact balance on that date.

3    Q    So you basically made adjustments to account for -- to

4    account for the same time period as the bank account statement

5    and the credit card statements?

6    A    Correct.

7    Q    So on the right, you have the three credit cards you

8    identified Scott Jenkins had?

9    A    Yes.

10   Q    And the total amount in the dark red, those are the

11   balances being carried on those credit cards?

12   A    Yes.

13   Q    As in he owed that much on the total credit cards?

14   A    Correct.

15   Q    And now just generally speaking, what is the state of

16   Scott Jenkins's personal finances around September of 2019?

17   A    So kind of coming into August, September, October, you can

18   see his lowest balance is towards the end of the month.  He is

19   getting close to living paycheck to paycheck.  So you can see

20   the balance is going close to 0 there at the end of the month.

21   Simultaneously, he has growing credit card balances.  So I'd

22   say the state of affairs is he's living beyond his means --

23              MR. CALEB:  Objection.

24              THE COURT:  Sustained.  Calls for an opinion.

25    BY MS. PENG:

Medearis - Direct

1  Q    Based on what you know about the investigation, what else

2  was happening around September/October of 2019?

3  A    Mr. Rahim had made payments on July 31st, and I believe

4  the second was around September 18 or 19.  And you can see the

5  average balances in Mr. Jenkins's checking account 2712

6  increase significantly shortly after Mr. Rahim made his

7  payments, and then simultaneously you can see Mr. Jenkins's

8  credit cards going down significantly about the same time.

9  Q    And again, these are Mr. Jenkins's personal credit cards?

10  A    Correct.

11  Q    And his personal bank account?

12  A    Correct.

13  Q    And now, can you explain to us what is being shown now in

14  terms of the summary in this exhibit?

15  A    This is just to kind of widen the angle a little bit and

16  show records going from January 18 to September 22, across that

17  entire period, the average balance during that entire time on

18  his credit cards was $33,000 owed, and the average balance in

19  his bank account was approximately $13,000 over that time

20  period.  His annual net salary was approximately $84,000.

21  Q    How did you determine what his salary was?

22  A    I added all of the direct deposits into his bank account

23  from Culpeper County and divided it by that time frame.

24  Q    All right.  Before -- I just want to walk through one

25  entry here.  So if you look at January 2020, can you just walk

Medearis - Direct

1  us through what the figures are showing in terms of the balance

2  he had in his bank account and the credit card statements?

3  A    So the average balance for the 30 days leading up to

4  January 12 was $3,103.89, and the amount he owed on his credit

5  cards collectively was a little over $38,000.

6  Q    Now, I want to talk to you a little bit about Rick Rahim.

7  How did Rick Rahim first come to the attention of the FBI?

8  A    He was identified in this investigation by Mr. Rychlik.

9  Q    Based on the investigation, what did Rick Rahim give to

10 Scott Jenkins in terms of monetary value?

11 A    There were two payments of cash, one for $15,000, one for

12 $10,000, and then there was a loan of approximately $35,000,

13 and then he also provided -- we call it in-kind contributions

14 to Mr. Jenkins's campaign.

15 Q    Based on the investigation, what did Rick Rahim get in

16 return from Scott Jenkins?

17 A    He received his restoration of firearms rights.  He

18 received a concealed handgun permit.  And then he was sworn in

19 as an auxiliary deputy.

20 Q    Did you obtain records, as you previously described,

21 summarizing the events with respect to Rick Rahim?

22 A    Yes.

23 Q    Is that what we're looking at here right now on Government

24 Exhibit 805?

25 A    Some of them, yes.

Medearis - Direct

1          MS. PENG:  Your Honor, I'm going to admit the exhibit

2    at the end, but just use this as a demonstrative for now, so if

3    it can be published to the jury.

4          THE COURT:  This is 805?

5          MS. PENG:  Yes, but it will -- the exhibit is --

6          THE COURT:  It's going to grow?

7          MS. PENG:  Yes.

8     BY MS. PENG:

9    Q    Okay.  So looking at Rick Rahim, can you tell us what --

10         MS. PENG:  Oh, so it should be published.

11         THE COURT:  No objection to publishing it, Mr. Caleb?

12         MR. CALEB:  No objection.

13         THE COURT:  It can be published to the jury.

14   BY MS. PENG:

15   Q    Okay.  Can you tell us what is being depicted in the first

16   column, payment date?

17   A    These are the dates of payments made by the individual in

18   the name column.  So in this case, these are the dates of Mr.

19   Rick Rahim's payments to Mr. Jenkins.

20   Q    And the next column, NCIC, what is that referring to?

21   A    That's referring to whether or not Mr. Rahim was queried

22   in NCIC by the Culpeper County sheriff's office.

23   Q    What is NCIC?

24   A    It's the National Crime Information Center.  It's a

25   database of criminal information, stolen property, whether or

Medearis - Direct

1  not somebody has an outstanding warrant, criminal history.

2  There's many different components.  It's accessed daily by

3  local, state, federal law enforcement agencies to check various

4  records, criminal records.

5  Q    And so when you say this -- in the chart it's showing

6  whether NCIC was queried, what does that mean?

7  A    Every time an agency queries information in the NCIC

8  database -- so runs a criminal history, or checks to see if the

9  VIN on the car comes back as stolen -- there's a log made of

10  the agency that queries it, what information was queried, the

11  date and time stamp.  I think that's it.

12  Q    So did you obtain the NCIC query records for Rick Rahim?

13  A    Yes.

14  Q    And that's what led to the summary chart information here?

15  A    Yes.  He indicated he was queried by the Culpeper County

16  sheriff's office.

17  Q    Okay.  So I'm showing now what's been admitted as

18  Government Exhibit 745.

19       Do you recognize what this is?

20  A    Yes.

21  Q    What is it?

22  A    This is a log indicating the queries that were made by

23  either the Culpeper County sheriff's office or the Culpeper

24  Commonwealth's Attorney's office for Rick Rahim between January

25  of '18 and October 2024.

Medearis - Direct

1  Q    So this is the NCIC query records you were talking about?

2  A    Yes.

3  Q    So what can you tell us about when Rick Rahim's name was

4  first queried in NCIC?

5  A    He was first queried on July 31st, 2019 by the Culpeper

6  County Sheriff's office at approximately 12:16 p.m. which is

7  the same day that he first met Mr. Jenkins.

8  Q    What information would have been obtained through this

9  query by Culpeper County?

10 A    It would -- any criminal history that existed would have

11 been returned.

12 Q    And based on what you know about this investigation, what

13 can you tell us about these other queries that were done for

14 Rick Rahim?

15 A    They match up to other actions that were taken regarding

16 Mr. Rahim.  So the next one up on November 14th was the day he

17 applied for his restoration of firearms rights, I believe.  And

18 you can see the query was conducted by the Commonwealth's

19 Attorney's office.  The kind of middle one there was April 24,

20 which is within a couple days of Mr. Owens's memo to the file.

21 Mr. Owens, the Assistant Commonwealth's Attorney that was --

22 wrote the memo about questioning Mr. Rahim's residence, it

23 shows that his office in fact queried Mr. Rahim that day.  And

24 then the August 18th, I believe is close in time to shortly

25 after he -- Mr. Rahim applied for his handgun -- handgun

Medearis - Direct

1   permit.  And then the top two, May '21, are close in time to

2   when he was sworn in as an auxiliary deputy.

3   Q    So each time one of these agencies queried Rick Rahim,

4   would they have received information about his prior felony

5   conviction?

6   A    Yes.

7   Q    Did you also try to conduct an investigation or obtain

8   records from DCJS with respect to Rick Rahim?

9   A    Yes.

10  Q    What is DCJS?

11  A    It's the Virginia Department of Criminal Justice Services.

12  Q    Just generally speaking, what do they oversee?

13  A    They oversee policy and training requirements for law

14  enforcement officers throughout the Commonwealth.

15  Q    Did you get any responsive documents or records returned

16  based on your request to DCJS for records pertaining to Rick

17  Rahim?

18  A    No.

19  Q    Did you receive any records back from DCJS regarding a

20  record of a waiver with respect to Rick Rahim?

21  A    No.

22  Q    So going back to this chart, I want to direct you to the

23  next column, which is the Jenkins appointment order.  What date

24  is that depicting?

25  A    That is the date that is on the appointment order that's

Medearis - Direct

1  signed by Sheriff Jenkins and countersigned by the judge at the

2  time.

3  Q    So I'm showing you this exhibit which has already been

4  admitted.   This date corresponds to the appointment order for

5  Rick Rahim signed by Scott Jenkins?

6  A    Yes.

7  Q    And what about the first meeting date -- first Jenkins

8  meeting, what is that date depicting?

9  A    That is the date that the individual named, in this case,

10  Mr. Rahim, first met Mr. Jenkins.

11  Q    How did you determine the date to put in that column?

12  A    Based on some of the historic text messages and testimony

13  from Mr. Rahim and Mr. Rychlik.

14  Q    And what about the oath date, what date is that?

15  A    That's the date that Mr. Rahim swore his oath to become an

16  auxiliary.

17  Q    And you determined -- did you determine that date based on

18  the oath and qualification records we've seen?

19  A    Yes.

20  Q    And so this is the date that an auxiliary actually signs

21  the appointment -- or takes the oath in the clerk of office

22  [sic]?

23  A    Correct.

24  Q    And then the payment amount here is $25,000.  How did you

25  determine that?

Medearis - Direct

1   A    That is the sum of the two payments Mr. Rahim made, the

2   $15,000, the initial payment on July 31, and the $10,000 at the

3   dinner on September 19.

4   Q    What about this last column, reported by SJFS, what is

5   that referring to?

6   A    It's indicating whether or not the payments made by

7   Mr. Rahim were reported as campaign contributions or in-kind

8   contributions in the Scott Jenkins For Sheriff campaign finance

9   reports.

10  Q    So you looked in the same campaign finance reports we've

11  previously looked at?

12  A    Correct.

13  Q    And what is -- for example, Government Exhibit 624, which

14  has already been admitted, covers the period of the Rahim

15  payments?

16  A    Correct.

17  Q    And did you determine whether Rick Rahim appeared on any

18  of the reported donations for that period?

19  A    He did not appear on any donations for any period.

20  Q    Does this cover also the Rick Rahim donation period?

21  A    Yes.

22  Q    And does his name appear on any of these reported

23  donations for the period?

24  A    No.

25  Q    Okay.  So looking at -- directing your attention back to

Medearis - Direct

1  that first column, when was the date of the first payment,

2  based on what you know from the investigation, that Rick Rahim

3  provided to Scott Jenkins?

4  A    July 31st, 2019.

5  Q    Did you review financial records for Scott Jenkins after

6  that date?

7  A    Yes.

8  Q    I'm showing what's been admitted already as 304.  What is

9  it that we're looking at here?

10 A    That is the first page of the bank statement for Atlantic

11 Union Bank account 2712 in the name of Patricia and Scott

12 Jenkins.

13 Q    And what period does this cover?

14 A    It covers the 30 days leading up to August 11, 2019.  So I

15 think it says July 11 to August 11, 2019.

16 Q    And is this one of the statements from that bank

17 statement?

18 A    This is the next month's statement, same account.

19 Q    But it shows a record from the same account from these

20 dates?

21 A    Yes.

22 Q    I'm going to direct your attention to this.  What is this

23 entry here?

24 A    That is a $915 deposit into the account that posted on

25 August 22, 2019.

Medearis - Direct

1   Q    And can you describe what we're looking at here in

2   Government Exhibit 322, which has already been admitted?

3   A    Those are the offset tickets for the deposit.  So the bank

4   received in a $15 check made payable to Patricia Jenkins and

5   then $900 in cash.

6   Q    What is it about this $900 deposit that drew your

7   attention?

8   A    It was subsequent to the payment Mr. Rahim had made.  It

9   was also the first cash deposit into the account I think since

10  October of 2018.

11  Q    Since October of 2018?

12  A    So almost a year prior.

13  Q    And is this additional bank statements from that same bank

14  account?

15  A    Yes.

16  Q    What is it that we're looking at here?

17  A    That's a $6,000 deposit made on September 9.

18  Q    Why did this deposit draw your attention?

19  A    Because it was made in cash.

20  Q    And the amount?

21  A    The amount was larger than Mr. Jenkins's monthly paycheck,

22  $6,000.

23  Q    And the date on this one is September 9th, 2019?

24  A    Correct.

25  Q    What is it that we're looking at here in Government

Medearis - Direct

 1  Exhibit 322?

 2  A    This is again the offset indicating that $6,000 was

 3  deposited in cash.

 4  Q    How can you tell that this was deposited in cash?

 5  A    Because there is no check associated with the deposit.

 6  Q    And is this a continuation of the bank statement?

 7  A    Yes.

 8  Q    What is it that we're looking at here on September 18th?

 9  A    That is a $5,000 payment made to Scott Jenkins's personal

10  Bank of America credit card.

11  Q    Why did this draw your attention?

12  A    Again, it was significant in size, and it was subsequent

13  to the cash deposit that was made nine days ago -- nine days

14  prior.

15  Q    Now, we've been talking about the July 31st, 2019 meeting

16  and those records.  Did you prepare a summary chart summarizing

17  the records we just looked at?

18  A    Yes.

19            MS. PENG:  I move to admit and publish 802.

20            THE COURT:  802?  Any objection?

21            MR. CALEB:  Court's indulgence, please.

22            MS. PENG:  It's already stipulated to, I believe,

23  actually.  It's already in evidence.  So it can be published.

24            MR. CALEB:  No objection.

25            THE COURT:  Yeah, 802 is already in.  It may be

Medearis - Direct

1  published to the jury.

2   BY MS. PENG:

3  Q    Could you just walk us through again what the summary

4  chart depicts?

5  A    So this depicts certain transactions across certain bank

6  accounts.  So on the left column is the date of the

7  transaction.  The first column is Michael and Faith Jenkins's

8  accounts.  This is Mr. Jenkins's brother and sister-in-law.

9  The middle account is Mr. Jenkins's and his wife's account that

10  we've been reviewing.  And the last column is the bank account

11  for Scott Jenkins For Sheriff.

12  Q    Does this summarize the financial transactions we just

13  looked at from the bank accounts -- in the Scott Jenkins

14  account?

15  A    Yes.

16  Q    And is this noting what you summarized for us earlier

17  regarding the frequency of cash deposits previously?

18  A    Correct.

19  Q    So based on your investigation, when was the second

20  meeting with Rick Rahim and Scott Jenkins?

21  A    September 19th, 2019.

22  Q    Are these the text messages confirming that that meeting

23  occurred?

24  A    Yes.

25  Q    It's already in evidence in Government Exhibit 124.

Medearis - Direct

1      Now, did you do the same financial analysis regarding the

2   Scott Jenkins bank account after September 19, 2019?

3   A    Yes, I did.

4   Q    This is the first page of those financial records?

5   A    This is.  This is Mr. Michael Jenkins and his wife's

6   account, so Mr. Jenkins's brother and sister-in-law's bank

7   account.

8   Q    Why did you notice the financial transactions we're about

9   to discuss in the Michael Jenkins and Faith Jenkins account?

10  A    Because the loan checks that Mr. Rahim gave to Mr. Jenkins

11  were not deposited in his account.  They were deposited into

12  his brother's account.

13  Q    Is this the deposit that you're talking about?

14  A    Yes.

15  Q    The $35,000 loan?

16  A    Yes.

17  Q    And what about the next deposit here -- or rather the

18  withdrawal?

19  A    That's a withdrawal of $9,000, the same day of the $35,000

20  loan -- or the two 17,500 checks totaling $35,000 were

21  deposited into Mr. Michael Jenkins's account.  Shortly

22  thereafter, there was a $9,000 withdrawal in cash.

23  Q    So what is it that we're looking at in Government Exhibit

24  314 and 323?

25  A    These are -- so the top left is the deposit ticket showing

Medearis - Direct

1  a $35,000 deposit, and then the two checks are what was

2  deposited.  You see the one check on the right from BV

3  Management, Mr. Rahim's business, and then the check on the

4  left is from his partner, James Newberry, both for 17,500, made

5  out to Scott Jenkins.  And then the endorsements on both checks

6  show what is Scott Jenkins and what I believe to be Mike

7  Jenkins's signature on them.

8  Q    So BV Management, how is that associated with Rick Rahim?

9  A    He is the owner of that company.

10 Q    And then James Newberry, what is his connection to Rick

11 Rahim with respect to this loan to Scott Jenkins?

12 A    He was a partner in the transaction that co-funded the

13 loan.

14 Q    So the two of them together financed the $35,000 loan?

15 A    Correct.

16 Q    And this is the deposit slip showing that they were

17 deposited into Mike Jenkins's account?

18 A    Correct.

19 Q    And you were talking about a cash out ticket.  Can you

20 explain to us what we're looking at here?

21 A    This is just a document to memorialize that $9,000 was

22 taken out from Michael Jenkins's bank -- the account just

23 received the 35,000; $9,000 cash was withdrawn shortly

24 thereafter.

25 Q    Did you prepare a summary chart summarizing the

98

Medearis - Direct

1    transactions we just looked at?

2    A    Yes.

3    Q    Can you talk to us about what we're looking at here in

4    this first few column -- rows?

5    A    So again, the left column is the date.  It shows the date,

6    and in this case, the time.  So on September 20th, 2019 at 3:16

7    p.m. the two checks we just saw totaling $35,000 were deposited

8    into Michael Jenkins's bank account.  And then two minutes

9    later, the same account, same day, $9,000 cash was withdrawn.

10   Q    Now, I'm going to -- now, are we looking back at the

11   Jenkins bank account, Scott Jenkins?

12   A    Yes.

13   Q    And what date period are we looking at in this particular

14   statement?

15   A    This is covering September 19 to September 23.

16   Q    What is it that's being highlighted?

17   A    That is a $7,200 cash deposit into Mr. Jenkins's personal

18   bank account on September 20th.

19   Q    And how about here?

20   A    That's another cash deposit a few days later on the 23rd,

21   $7,600.

22   Q    Why did these deposits draw your attention?

23   A    Again, because they were cash and because of their size.

24   Q    Is this a continuation of the bank statements?

25   A    Correct.

Medearis - Direct

1  Q    Can you describe what is depicted on September 24th here?

2  A    That is a $7,600 payment to Mr. Jenkins's Bank of America

3  credit card.

4  Q    That's his personal credit card?

5  A    Yes.

6  Q    What about this transaction?

7  A    That's a $7,200 payment to Virginia Credit Union credit

8  card that's in both I believe Patricia and Scott Jenkins's

9  name.

10  Q    And how about on September 26?

11  A    That is a $12,000 deposit.

12  Q    What is it that we're looking at here on Government

13  Exhibit 303 and 324?

14  A    These are checks written from Michael Jenkins's bank

15  account.  The top one is a check to Scott Jenkins dated --

16  September 24 in the amount of $9,000.  The bottom one is dated

17  September 23rd in the amount of $12,000.  And that one is made

18  out to Patricia Jenkins.

19  Q    So these are checks made out of the Michael Jenkins

20  account to Patricia and Scott Jenkins?

21  A    Correct.

22  Q    And this is after the $35,000 loan that was deposited into

23  the Michael Jenkins account?

24  A    Correct.

25  Q    And what about this on the right here?

Medearis - Direct

1   A     That indicates that the check written to Scott Jenkins of

2   $9,000 was cashed and not deposited.  I was going to say the

3   date I think was -- on there was September 26.

4   Q     Are we back in the Scott Jenkins bank account?

5   A     Yes.

6   Q     What is happening here?

7   A     That is a $5,000 deposit on September 27.

8   Q     And can you describe for us what this entry is on

9   September 30th?

10  A     That is just an example of one of the direct deposits

11  into -- of Mr. Jenkins's salary into this bank account.

12  Q     Was this a monthly deposit?

13  A     Yes.

14  Q     What is happening on October 1st highlighted here?

15  A     That is a $9,000 payment again to the Virginia Credit

16  Union card in both Scott and Patricia Jenkins's name.

17  Q     And how about here?

18  A     Another $5,000 payment to that same Virginia Credit Union

19  card.

20  Q     This is a continuation of the summary chart we were

21  looking at?

22  A     Yes.

23  Q     Okay.  Can you just walk us through what happens after

24  September 20th and the $9,000 cash being withdrawn from the

25  Michael Jenkins account?

Medearis - Direct

1  A    So after the $9,000 cash is withdrawn, 20 minutes later,

2  $7,200 cash is deposited into Scott Jenkins's account.  Then a

3  few days later, there's $7,600 cash deposited into Scott

4  Jenkins's account, and then over the next two days, there is

5  matching payments made to credit cards in Scott Jenkins's name.

6  Q    And then this is a continuation of those financial

7  transactions?

8  A    Correct.

9  Q    Okay.  Can you summarize for us again and walk us through

10 what is going on here?

11 A    So on September 26th, 2019 at 9:03 a.m., the $12,000 check

12 from Michael Jenkins to Patricia Jenkins is deposited into

13 Scott and Patricia Jenkins's account, and then one minute

14 later, the $9,000 check from Michael Jenkins to Scott Jenkins

15 is cashed.  And then the next day, there's a little more cash,

16 $2,000 withdrawn from Michael Jenkins's account.  And then you

17 can see on September 27th, $5,000 deposited to Scott Jenkins's

18 account, and then two payments, one on September 30th, $9,000

19 to Scott Jenkins's personal credit card, and on October 3rd,

20 $5,000 to his credit card.

21 Q    What is this document that we're looking at here on 7/29?

22 A    The is part of the promissory note memorializing the loan,

23 the $35,000 loan from Mr. Rahim to Mr. Jenkins.

24 Q    And that was the $35,000 loan we just looked at that was

25 deposited into Michael Jenkins's account?

Medearis - Direct

1   A    Correct.

2   Q    And can you just summarize for us the terms of the loan

3   under purpose, and what this loan is supposed to have been?

4   A    This is referencing the fact that Mr. Jenkins was nearing

5   completion of a residential construction at that address,

6   identifying the value of the house, and that an upcoming

7   refinance of the house would be based on that value, and that

8   at the time that the refinance with Federal Savings Bank is

9   closed, this loan, the $35,000 loan, will be listed in the HUD

10  sheet and paid off with the proceeds of that loan.

11  Q    So this references a mortgage from the Federal Savings

12  loan?

13  A    Yes.

14  Q    And it says the proceeds of that loan will pay back this

15  loan from Rahim?

16  A    Not necessarily that, but if it's not paid off before,

17  that from the closing of that loan, the Rahim loan will be paid

18  off from the new mortgage.

19  Q    Okay.  Now, were you able to obtain statements from the

20  Virginia Conflict of Interest and Ethics Advisory Council --

21  A    Yes.

22  Q    -- in the course of the investigation?

23  A    Yes, I was.

24  Q    So I'm showing you what's been admitted as Government

25  Exhibit 601.  Is that one of those statements of conflict of

Medearis - Direct

1    interest you obtained?

2    A    It is.

3    Q    Can you just describe to us generally what these forms are

4    for?

5    A    These are forms that are required to be filed annually by

6    certain elected officials within the State of Virginia.  It

7    identifies certain financial interests, whether they've

8    received gifts, or have loans outstanding, or been treated to a

9    trip, or have investments in certain companies, and supposed to

10   identify potential conflicts of interest that that elected

11   official might have.

12   Q    And do you see that the agency name at the top is the

13   Culpeper County sheriff's office?

14   A    Yes.

15   Q    And who signed this form?

16   A    It was electronically signed by Scott Jenkins.

17   Q    The -- what does it require to be filled out in schedule B

18   right here?

19   A    The filer in this case, Mr. Jenkins, needs to state

20   whether or not they owe $5,000 to any one creditor, including

21   any contingent debt to any one creditor.

22   Q    What period does this disclosure statement cover?

23   A    It covers the calendar year preceding.  So this was filed

24   on January 3, 2020, so it would cover the 2019 calendar year.

25   Q    So it would have covered loans in the 2019 period?

Medearis - Direct

1    A    Correct.

2    Q    And based on your knowledge of the investigation, was the

3    Rahim portion of that loan ever repaid?

4    A    No.

5    Q    Is this -- I'm showing you what's been admitted already as

6    Government Exhibit 602.  Is this another conflict of interest

7    form?

8    A    Yes.

9    Q    The same one that we've been looking at?

10   A    The same type of form.

11   Q    Same type of form?

12   A    Filed the following year, 2021.

13   Q    And what period does this form cover?

14   A    It covers the calendar year of 2020.

15   Q    Does it also have a requirement to disclose any amount

16   owed more than $5,000?

17   A    Yes.

18   Q    And what is the answer here?

19   A    No.

20   Q    Just like the prior form?

21   A    Yes.

22   Q    Now, were you able to obtain the mortgage documents for

23   Mr. Scott Jenkins that was referenced in the loan document from

24   Rick Rahim?

25   A    Yes.

Medearis - Direct

1   Q    I'm showing you what's been admitted already as Government

2   Exhibit 315.  Can you tell us what we're looking at here?

3   A    This is the Uniform Residential Loan Application; it's the

4   standard mortgage loan application.

5   Q    Generally speaking, what kind of information is required

6   on a loan application?

7   A    Generally speaking, an applicant will need to provide

8   basic information about employment, what their income is, how

9   long they've lived at their residence, and then make -- they

10  need to disclose what their assets are, and what their

11  outstanding liabilities are.

12  Q    So they need to provide information for the bank to assess

13  whether they qualify for a loan?

14  A    Correct.

15  Q    What is the date of this application?

16  A    It's signed and dated December 23rd, 2019.

17  Q    And the borrower on the left is Scott Jenkins?

18  A    Yes.

19  Q    All right.  So what is it that we're looking at in terms

20  of this portion of that application?

21  A    This is the section of the application in which the

22  applicant needs to list the liabilities and what they have --

23  outstanding debts that they have.

24  Q    Just looking at what's filled out here, what types of

25  liabilities are listed?

Medearis - Direct

1  A    The credit cards we referenced, there's some other like

2  department store credit cards, there is a SunTrust bank loan at

3  the bottom there.  That's -- you would have other mortgages,

4  but that's what we're looking at here.

5  Q    Is the $35,000 loan listed here in terms of liabilities?

6  A    It is not.

7  Q    Is this the second page of the liabilities part of the

8  form?

9  A    It is.

10  Q    And no disclosure of the $35,000 loan?

11  A    That's correct.

12  Q    And is this the last page of the loan document?

13  A    Of the application, yes.

14  Q    Of the application.  And his signature appears there,

15  Scott Jenkins?

16  A    It does.

17  Q    Did you obtain another loan application for Mr. Scott

18  Jenkins from Federal Savings Bank?

19  A    Yes.

20  Q    And that's what's been admitted as Government Exhibit 316.

21       Can you tell us what this document is?

22  A    These are the records from the loan application and

23  refinance that Mr. Jenkins did in December of 2020.

24  Q    And again, as far as you know from this investigation, the

25  Rahim portion of the loan he gave Scott Jenkins was never

Medearis - Direct

1  repaid?

2  A    Correct.

3  Q    And what is it that we're looking at here on the top of

4  the page?

5  A    This is the first page of that application.

6  Q    Does this application also require the disclosure of any

7  outstanding liabilities by the applicant?

8  A    Yes.

9  Q    Are we looking at the liabilities page of that loan

10 application?

11 A    Yep.

12 Q    And generally speaking, what is listed here?

13 A    Various credit cards, mortgages, not Mr. Rahim's loan.

14 Q    The Rahim loan is not included?

15 A    Correct.

16 Q    And when is this application signed by Scott Jenkins?

17 A    December 11, 2020.

18 Q    So I'm going to switch gears a little bit and talk to you

19 about interstate wires.  Did you investigate whether the crimes

20 committed here involved interstate wires?

21 A    Yes, I did.

22 Q    So this has already been admitted as Government Exhibit

23 112.

24      Do you recognize what these text messages are?

25 A    Yes.

Medearis - Direct

1  Q    What are they?

2  A    This is part of the text messages exchanged between Scott

3  Jenkins and Rick Rahim.

4  Q    Now, the green bubble is a text message from Scott

5  Jenkins; is that right?

6  A    It is.

7  Q    And it says, I'm headed over to catch Paul.

8       Based on your understanding of the investigation, who is

9  Paul?

10 A    That is Paul Walther, the Culpeper Commonwealth Attorney

11 at the time.

12 Q    Where is Paul's office located, based on what you know in

13 the investigation?

14 A    Downtown Culpeper.

15 Q    And this message says, I'm headed over to catch Paul?

16 A    Correct.

17 Q    Does that indicate to you that Mr. Jenkins was in Culpeper

18 at the time he sent this message?

19 A    Yes.

20 Q    And that number here, do you recognize that as the number

21 for Scott Jenkins?

22 A    His personal cell phone, yes.

23 Q    Now, the message that is directly preceding the message we

24 were just talking about, when is that message sent?

25 A    July 4th, 2020 at 4:24 p.m. Universal Time, which is

109

Medearis - Direct

1   approximately 12:24 Eastern Time.

2   Q    So that was the message that Scott Jenkins sent before the

3   July 7th message?

4   A    Correct.

5   Q    And you were here when Dawn Miesle from Apple was

6   testifying about querying of Apple servers?

7   A    I was.

8   Q    And so is this prior message more than eight hours before

9   the July 7th message?

10  A    Yes.

11  Q    And so that means that Scott Jenkins's phone would have

12  had to query an Apple server outside of Virginia?

13          MR. CALEB:  Objection.

14          THE COURT:  Sustained.  It's leading.

15   BY MS. PENG:

16  Q    Do you understand about -- do you have an understanding as

17  to whether Scott Jenkins's phone, while sending the July 7th

18  message, would have had to query a server outside of Virginia?

19          MR. CALEB:  Objection.

20          THE COURT:  Still leading.  Sustained.

21   BY MS. PENG:

22  Q    So again, the July 7th message is more than eight hours

23  after the July 4th message?

24  A    Yes.

25  Q    Did you obtain records from cell phone companies and also

Medearis - Direct

1   a report of Mr. Jenkins's phone?

2   A    Yes.

3   Q    What is it that we're looking at here?

4   A    This is part of a Cellebrite report.  Cellebrite is the

5   software that law enforcement agencies use to extract data from

6   cellular devices and kind of organize and review what's on

7   somebody's phone.

8   Q    Is this the Cellebrite extraction of Mr. Jenkins's phone?

9   A    It's part of it.

10  Q    Or the first page rather of that extraction?

11  A    It's the first page of part of the report from

12  Mr. Jenkins's phone.

13  Q    And what does this report say about what the call number

14  is for this device?

15  A    The number associated with the device at the time was --

16  well, you can see it highlighted there.  It's Mr. Jenkins's

17  personal cell phone number.

18  Q    And that's the same number that sent the messages we're

19  looking at on the prior page?

20  A    Correct.

21  Q    What does the report say about what kind of device that

22  call number was associated with?

23  A    It was an iPhone 11.

24  Q    And did you obtain records from the phone company

25  regarding this call number?

Medearis - Direct

1   A     Yes.

2   Q     That's the same number that appears in those phone

3   records?

4   A     That's the number highlighted there, yeah.

5   Q     And what date range did he have this number for, according

6   to these records?

7   A     For the time period of January 1, 2018 through July 7,

8   2021, this number, the 9617 number, was subscribed to Scott

9   Jenkins.

10  Q     And does the serial number from the phone records match

11  the serial number of the device that the FBI looked at?

12  A     It does.

13  Q     What does that demonstrate to you about whether those

14  devices were the same device?

15  A     They are, in fact, the same device.

16  Q     All right.  Can you just summarize for us here the first

17  line of what we walked through with respect to Rick Rahim?

18  A     Mr. Rahim made payments to Mr. Jenkins on -- one on July

19  31, '19, one on September 19, '19.  He was queried by the

20  Culpeper County sheriff's office in the NCIC database.

21  Mr. Jenkins signed an appointment order to appoint him as a

22  deputy -- auxiliary deputy on May 18, 2021.  Mr. Rahim first

23  met Jenkins on July 31, 2019.  The oath that Mr. Rahim swore

24  took place on May 27, 2021 to become an auxiliary deputy.  The

25  total amount he paid Mr. Jenkins was $25,000.  The form of that

Medearis - Direct

1  payment was cash.  And none of that was ever reported by Scott

2  Jenkins For Sheriff.

3  Q    So during this time, had Kevin Rychlik started working

4  with the FBI yet?

5  A    Not at any of the dates referenced in this chart.

6  Q    Now, did you compile similar information as what we're

7  seeing in this first row for the other bribe payers in this

8  case?

9  A    I did.

10 Q    So let's go to Mr. Fred Gumbinner.  Can you tell us what

11 -- can you summarize for us what is depicted in this chart?

12 A    So Mr. Gumbinner's payment was made on October 2nd, 2019.

13 He was, in fact, queried in the NCIC database.  Mr. Jenkins

14 signed the order appointing him as an auxiliary deputy sheriff

15 on March 2, 2020.  Mr. Gumbinner first met Mr. Jenkins on

16 January 25, 2023.  He swore his oath on March 6, 2020.  The

17 amount of his payment was $20,000.  The form of that payment

18 was cash, and it was never reported by the Scott Jenkins For

19 Sheriff campaign.

20 Q    So the information that's depicted in this row is sourced

21 from much of the same documents we went through for Mr. Rick

22 Rahim?

23 A    Yes.

24 Q    All right.  So what is it that we're looking at here in

25 terms of Exhibit 706?

Medearis - Direct

1   A     This is the --

2   Q     307, sorry.

3   A     This is the $20,000 check Mr. Gumbinner wrote to Rick

4   Rahim's company, Food Truck Company, LLC on October 1, 2019.

5   Q     And what is this on the right?

6   A     This is the appointment order where Mr. Jenkins appointed

7   Mr. Gumbinner as an auxiliary deputy sheriff on March 2, 2020.

8   Q     All right.  And this is a copy of the same check we were

9   just looking at?

10  A     Yes.

11  Q     And what is it that we're looking at in Government Exhibit

12  308 with respect to what happened to that check?

13  A     That check was deposited into Mr. Rahim's bank account for

14  BV Management.  It was deposited on October 2, 2019, and the

15  total deposited amount was $21,000.

16  Q     So this is Mr. Rahim depositing the Fred Gumbinner check?

17  A     Yes.

18  Q     Now, are you aware that there was a meeting between Rick

19  Rahim and Scott Jenkins based on the investigation on October

20  2nd, 2019?

21  A     Yes.

22  Q     And these are the text messages from Government Exhibit

23  125 supporting that meeting?

24  A     Yes, they are.

25  Q     This is them confirming that meeting on October 2nd, 2019?

114

Medearis - Direct

1    A    Yes.

2    Q    All right.  So what happens on October 3rd, 2019, a day

3    after that meeting?

4    A    Mr. Rychlik and Mr. Jenkins exchanged text messages about

5    the meeting the previous day with Rick.

6    Q    So on the right-hand side we have messages from

7    Mr. Rychlik?

8    A    Correct.

9    Q    And the left-hand side are messages from Mr. Jenkins?

10   A    That's correct.

11   Q    And so Mr. Rychlik says, I heard another 21K?

12   A    Yes, he does.

13   Q    What is Mr. Jenkins's response to that?

14   A    Response to the whole text there:  It was good, wish you

15   could have made it, talked a lot about ideas and he even

16   suggested a few things I'm trying to do on campaign.

17   Q    So this was one day after the meeting between Scott

18   Jenkins and Rick Rahim?

19   A    It's the very next day.

20   Q    Now, we're moving to February 26, 2020.  That's a couple

21   of months after?

22   A    Yes.

23   Q    And this is Government Exhibit 106.  Can you tell us

24   what's going on in this exhibit that's already been admitted?

25   A    These are text messages from Mr. Rychlik to Mr. Jenkins

Medearis - Direct

1  discussing the fact that Rick was getting frustrated that he

2  had provided Fred's money to Mr. Jenkins, but Fred has not been

3  sworn yet.  And Mr. Rychlik is relaying the frustration in

4  trying to figure out what he should -- asking Mr. Jenkins what

5  Mr. Rychlik should tell Mr. Rahim about why Mr. Gumbinner is

6  not sworn in yet.

7  Q    And these are messages that Kevin Rychlik sent to Scott

8  Jenkins?

9  A    Correct.

10 Q    And do you see this forwarded message from Rick Rahim, I

11 would have to give him the 20K back now, in the second message?

12 A    Yes.

13 Q    And now, is this the same text messages we're looking at

14 just in a slightly different format?

15 A    Yes, showing the date and time stamp associated with each

16 message.

17 Q    Okay.  And can you explain to me what is the -- what has

18 been added in terms of the date and timing of these messages?

19 A    When the specific message was actually sent.

20 Q    That was in the phone records that you obtained?

21 A    The messages were time stamped I believe in the Apple

22 production.

23 Q    And so looking -- walking through these messages, so you

24 have on the right-hand side on the text from Rick, that's a

25 message from Kevin Rychlik?

Medearis - Direct

1  A    Yes.

2  Q    And then so who sends the message, give me 10 to 15 to

3  call?

4  A    That's Mr. Jenkins responding.

5  Q    And then you see the license of Fred Gumbinner sent to

6  Scott Jenkins by Kevin Rychlik?

7  A    Yes.

8  Q    And then what does Scott Jenkins say at approximately 8:35

9  a.m.?

10 A    He says, thanks, a few more minutes.  I'm with state

11 police.

12 Q    And then what is the last message that Kevin Rychlik sends

13 here in this chain at 9:26 a.m.?

14 A    It says, Rick good now/happy.  I told him next week

15 midweek to get back -- get back with me with date.

16 Q    Did you obtain records from AT&T to try to see whether

17 phone calls occurred between Kevin Rychlik and Scott Jenkins in

18 connection with these chain of text messages?

19 A    Yes.

20 Q    Are we looking at the records that you obtained from AT&T?

21 A    Yes.

22 Q    Can you just briefly explain what these records are?

23 A    These are time stamps of calls that are made and received

24 by, in this case, Mr. Rychlik.

25 Q    Are they call -- are they referred to as call detail

Medearis - Direct

1  records?

2  A    Yes.

3  Q    What are call detail records?

4  A    They show the date, the time, duration of phone calls, and

5  the originating party, and the receiving party, and in some

6  cases what types and device numbers were used to make those

7  calls.

8  Q    So what do these records show occurred at around 9:09

9  a.m.?

10  A    This shows an 11 minute and 55 second call at 9:09 Eastern

11  Time from Mr. Jenkins's work number, the sheriff official cell

12  phone number ending in 5813 to Mr. Rychlik's personal cell

13  phone number.

14  Q    And what does it show occurred at 9:21 a.m.?

15  A    Almost immediately after the call with Mr. Jenkins ended,

16  there was a 4-minute call from Mr. Rychlik to Mr. Rahim.

17  Q    And looking back at the text messages, can you explain to

18  us how these phone calls fit in with these messages?

19  A    So at 8:35 Mr. Jenkins responded, thanks, a few more

20  minutes, I'm with the state police.

21       And Mr. Rychlik said, okay, thanks buddy, I'm holding off

22  on jumping in the shower for your call.

23       So essentially, I'm waiting for your call.

24       About 30 minutes later, Mr. Jenkins called Mr. Rychlik,

25  and they had an almost 12-minute conversation.  And then as

Medearis - Direct

1  soon as -- almost as soon as that was done, Mr. Rychlik in turn

2  called Mr. Rahim and had about a 4-minute conversation.

3      And then almost as soon as that call with Mr. Rahim was

4  done, Mr. Rychlik texted back to Mr. Jenkins and said, Rick

5  good now, he's happy.  I told him next week midweek to get back

6  with me with date.

7  Q    So now I want to talk to you about Jim Metcalf.

8      What did the investigation reveal about what Jim Metcalf

9  did with respect to Scott Jenkins?

10 A    He made a payment in exchange for being deputized as an

11 auxiliary deputy.

12 Q    So what did he give Scott Jenkins?

13 A    He gave him a $5,000 check.

14 Q    What did Scott Jenkins do for Jim Metcalf?

15 A    He deputized him as an auxiliary deputy and gave him a

16 badge and credentials.

17 Q    Can you walk us through the timeline with respect to what

18 happened for Jim Metcalf?

19 A    So Mr. Metcalf made his payment to Mr. Jenkins on

20 September 7, 2022.  He was queried by the Culpeper County

21 sheriff's office in the NCIC database.  Mr. Jenkins signed

22 Mr. Metcalf's appointment order on September 6.  They first met

23 on August 2nd, 2022.  Mr. Metcalf swore his oath as an

24 auxiliary deputy on September 7th, and he wrote a $5,000 check

25 as payment, and that check was reported by the Scott Jenkins

Medearis - Direct

1  For Sheriff campaign.

2  Q    What about for Tom Cooper, what did he do?

3  A    On October 26, 2022, Mr. Cooper made a payment of $5,000

4  in exchange for being deputized as an auxiliary deputy.

5  Q    Do you notice that the first time -- what do you notice

6  about the first time that Scott Jenkins met Tom Cooper?

7  A    It was the same day he was sworn in and the same day he

8  made the payment.

9  Q    And was this check given by Tom Cooper reported by the

10 Scott Jenkins campaign account?

11 A    Yes, it was.

12 Q    Is this the check that Tom Cooper gave to Scott Jenkins?

13 A    Yes.

14 Q    Okay.  How about this next person, Jerry McKee?

15 A    Jerry McKee made his payment, $5,000 in cash, on November

16 14, 2022.  He was queried in the NCIC database.  His --

17 Mr. Jenkins signed the appointment order to make Mr. McKee an

18 auxiliary deputy on November 9th.  They first met on November

19 14th, which again, was the date of the payment and the day that

20 Mr. McKee took his oath.  This $5,000 cash payment was not

21 reported by Scott Jenkins For Sheriff.

22 Q    What do you notice about the first time Jerry McKee met

23 Scott Jenkins?

24 A    It was the same day that he made his payment and the same

25 day he swore his oath.

Medearis - Direct

1  Q    Is this the cash that the FBI gave to Undercover Agent

2  Jerry McKee?

3              MR. CALEB:  Objection.

4              MS. PENG:  This is a demonstrative, Your Honor.

5              THE COURT:  Is this a question for Mr. Medearis?

6              MR. CALEB:  I objected, Your Honor.

7              THE COURT:  Oh.  I'll sustain the objection.  I mean,

8  he's -- let him lay a foundation -- or lay a foundation with

9  him as to what he knows about the picture.

10   BY MS. PENG:

11  Q    As the case agent on this case, do you recognize what's

12  depicted here in terms of the photograph?

13  A    Yes.  The undercover agent sent photos of the money that

14  he used, and those photos were serialized in our case file.

15  Q    And that's a photograph of Mr. Jerry McKee getting a

16  badge?

17  A    Yes.

18  Q    Okay.  Walk us through Mike, the second undercover agent.

19  What happened with him?

20  A    So Mike made a $10,000 cash payment on December 28th,

21  2022, which was the same day he first met Scott Jenkins.  It

22  was also the same day he swore his oath as an auxiliary deputy.

23  Mr. Jenkins swore the appointment order the day prior to

24  meeting Mike the first time.  Mike was never run in the NCIC

25  database, and his cash payment was never reported in the Scott

Medearis - Direct

1    Jenkins For Sheriff campaign records.

2    Q    So as the case agent for the case, you're familiar with

3    the backstory that the FBI created for the undercover agent

4    named Mike?

5    A    I am.

6    Q    So can you tell us what was included in his backstory with

7    respect to his criminal record?

8    A    A felony conviction.

9    Q    And if the NCIC system had been queried, did the FBI

10   ensure that the felony conviction would have been retrieved?

11   A    Yes.

12   Q    And so as part of the backstory created for him, a sort of

13   fake felony record was placed in his criminal background?

14   A    Yes.

15   Q    But based on what you received from NCIC, the Culpeper

16   sheriff's office never ran a query on Mike?

17   A    That's correct.

18   Q    And as part of the backstory for Mike, did the FBI ever

19   create a record that he had restored his firearms rights?

20   A    No.

21   Q    And under federal law -- well, under federal law, is it

22   against the law for a felon to possess firearms?

23   A    Yes.

24   Q    So it would have been illegal for Mike to have a firearm?

25              MR. CALEB:   Objection.

Medearis - Direct

 1          THE COURT:  Sustained.  It's leading.  It's asked and

 2    answered as well.

 3    BY MS. PENG:

 4    Q    Based on your experience as an FBI agent investigating

 5    federal laws, if somebody had a felony conviction and did not

 6    restore their firearms rights, would they legally be allowed to

 7    possess a gun?

 8    A    No.

 9    Q    And we're looking at the money that was given to the

10    undercover agent, Mike, to provide to Scott Jenkins?

11    A    That's correct.

12    Q    And that's a picture of him being sworn in, right?

13    A    Receiving his badge.

14    Q    Sorry, receiving his badge.

15         Okay.  Can you walk us through what happened with Phil

16    Howell?

17    A    Mr. Howell first met Scott Jenkins on December 29, 2022,

18    which was the same day that he made his payment, and the same

19    day that he swore his oath.  The appointment order for

20    Mr. Howell was signed almost a month prior, on November 30th,

21    2022.  Mr. Howell was queried in the NCIC database by the

22    Culpeper County sheriff's office.  His payment was in the

23    amount of $5,000 in cash, and that was not reported by the

24    Scott Jenkins For Sheriff campaign.

25    Q    Okay.  So you just stated -- can you -- you're saying that

Medearis - Direct

1    he signed the appointment order a month before first meeting

2    Phil Howell?

3    A    Correct.

4    Q    Okay.  So what are we looking at on the left here?

5    A    This is a still frame from the recording device that

6    Mr. Rychlik was wearing on December 29th, and it captures

7    Mr. Howell handing over a white envelope containing $5,000 cash

8    to Mr. Jenkins.

9    Q    And that's Mr. Howell receiving his badge?

10   A    Correct.

11   Q    Now, you were here for the testimony of Mr. Phil Howell?

12   A    I was.

13   Q    Do you recall him saying that he had taken out the money

14   that he gave to Scott Jenkins that day from the bank?

15   A    Yes.

16   Q    And that they were in $100 denominations?

17   A    Yes.

18   Q    Now, after December 29th, 2022, did the FBI conduct

19   surveillance on Scott Jenkins on December 31st?

20   A    Yes.

21   Q    So that's two days after Phil Howell handed over the

22   envelope of cash to Scott Jenkins?

23   A    Yes, it is.

24   Q    Can you tell us what you observed on December 31st, 2022?

25   A    I observed Mr. Jenkins attend the -- a gun show at the

Medearis - Direct

1  Dulles Expo Center.  I observed him remove a white envelope and

2  take out $100 bills to purchase a $3,000 handgun.

3  Q    So these are the photographs that you took while

4  conducting surveillance that day?

5  A    I did not take these photographs.

6  Q    Oh, I'm sorry.

7  A    I was there, but a different FBI employee took these

8  photographs.

9  Q    And you recognize them as fair and accurate depictions of

10  the scene that day?

11  A    Yes.

12          MS. PENG:  Government moves to admit Government

13  Exhibit 412.

14          THE COURT:  Any objection?

15          MS. PENG:  And publish.

16          MR. CALEB:  We object.  Objection.

17          THE COURT:  On what grounds?

18          MR. CALEB:  May I approach, Your Honor?

19          THE COURT:  Yeah, you all approach.

20          (Sidebar commenced.)

21          THE COURT:  Who conducted the surveillance?

22          MS. PENG:  Mr. Medearis, along with other FBI agents.

23          MR. CALEB:  Just in its current form -- and now I'm

24  looking over the courtroom deputy clerk's shoulder -- in its

25  current form -- she took it down -- with the narrative --

Medearis - Direct

1          THE COURT:  Kelly, put that picture back up.

2          It's the narrative at the bottom.

3          MS. PENG:  These were provided to defense a while ago

4     and they didn't object to the narrative.  I mean, we could just

5     show the photographs, but this is how we prepared the

6     presentation at this time, and I don't think the narrative is

7     prejudicial in any way.  It would summarize what Agent Medearis

8     is expected to testify to.

9          MR. CALEB:  The narrative has -- first of all, as a

10    general matter, the way that the exhibits are being displayed,

11    they're essentially leading the witness by putting the

12    testimony up before asking the question.  That's the first

13    thing.  And that's consistent with how this exhibit was

14    presented as well.  There's no reason for the narrative or for

15    the testimony to be included on the exhibit.  And to the extent

16    we didn't object before, we're objecting now.  It's just

17    inappropriate to have his testimony pasted on copies of the

18    pictures and admitted as evidence.

19          THE COURT:  Last word, Ms. Peng?

20          MS. PENG:  I think all of the exhibits we've shown so

21    far have already been admitted or their summary exhibits or

22    demonstratives.  As the case agent, he's permitted to testify

23    about what he knows in terms of the investigation.

24          THE COURT:  Right.  The issue with this in particular

25    is that it summarizes essentially what his testimony is from

Medearis - Direct

1  pictures that are not otherwise in evidence.

2          So here's what I'm going to do.  I will -- what

3  exhibit number is it?  412?  I'll admit 412, but the narrative

4  has to come off the bottom.

5          MS. PENG:  Okay.

6          THE COURT:  If you go through as to who did --

7  establish that Agent Medearis knows who did -- I think he did

8  the surveillance -- what he saw and what the pictures depict

9  and I'll submit it.

10          MS. PENG:  That's fine.  We'll have to switch over

11  from Trial Director to the legal assistant.  There will just be

12  a little switching back and forth.

13          THE COURT:  That's fine.

14          And you are leading.  So try to -- I know Mr. Caleb

15  is trying not to object, but especially with the new exhibits,

16  let's not lead.

17          MS. PENG:  Okay.

18          (Sidebar concluded.)

19          (Government Exhibit 412 marked and admitted.)

20          MS. PENG:  Ms. Fastenau, could you pull up Government

21  Exhibit 412 for just Agent Medearis, please?

22          THE COURT:  Well, he's identified the photograph.  No

23  objection to the photographs coming in; is that right?

24          MR. CALEB:  No objection to the photographs.

25          THE COURT:  So I'll admit the photograph and they may

Medearis - Direct

1  be published to the jury.

2            MS. PENG:  Okay.  Is there a next page?

3   BY MS. PENG:

4  Q    Okay.  So Agent Medearis, what is it that we're looking at

5  here in photograph -- in this photograph?

6  A    This is Mr. Jenkins counting out $100 bills that he

7  removed from a white envelope and used to purchase a $3,000

8  handgun.

9  Q    Were you part of the surveillance that day?

10 A    I was.

11 Q    And what did you observe Mr. Jenkins do -- which you

12 partially just summarized for us -- but could you tell us

13 again, what did you observe him do that day on December 31st,

14 2022?

15 A    I observed him remove an envelope, a white envelope, and

16 take out $100 bills in cash and -- well, from where I was

17 standing, I couldn't see they were $100 bills.  I later learned

18 they were $100 bills.  And I saw him purchase that gun in the

19 gray bag there in front of him.

20 Q    And so after you observed him making this purchase, did

21 you do anything to try to confirm what is it that he used to

22 pay for those firearms?

23 A    Yes.  I went and talked to the gentleman there in the ball

24 cap, the seller of the firearm, and he showed me the money that

25 had been used by Mr. Jenkins.  I took photos of it.  And Mr. --

Medearis - Direct

1    I believe his name was Spellman, was the name of the dealer,

2    and he provided me with paperwork related to the transaction.

3              MS. PENG:  Ms. Fastenau, could you pull up for Agent

4    Medearis Government Exhibit 413.

5    BY MS. PENG:

6    Q    Do you recognize what Government Exhibit 413 is depicting?

7    A    Yes.

8    Q    And what is it?

9    A    These are photos I took of the cash that was used to

10   purchase -- that Mr. Jenkins used to purchase the handgun.

11             MS. PENG:  Your Honor, I move to admit Government

12   Exhibit 413, and then I'm going to publish using my device.

13             THE COURT:  Any objection?

14             MR. CALEB:  No objection.

15             THE COURT:  So admitted and may be published to the

16   jury.

17             (Government Exhibit 413 marked and admitted.)

18    BY MS. PENG:

19   Q    So Agent Medearis, what do --

20             MS. PENG:  Is it -- is it being published?

21             THE CLERK:  Just to him.

22             MS. PENG:  Oh.  It's already been admitted.

23             THE COURT:  413 is in.  It can be published.

24    BY MS. PENG:

25   Q    So Agent Medearis, what is it that we're looking at in

Medearis - Direct

1  Government Exhibit 413?

2  A    Those are the $100 bills that Mr. Jenkins used to purchase

3  the handgun.

4  Q    Is this another picture you took that day?

5  A    Yes.

6  Q    And how soon after did Mr. Jenkins leave that counter did

7  you go and take these pictures?

8  A    Minutes.

9  Q    So another photograph you took that day?

10 A    Yes.

11 Q    And is this a composite of all those photographs that we

12 just looked at in Government Exhibit 413?

13 A    It is.

14 Q    Can you summarize now for us what happened with Rubar

15 Sandi?

16 A    On January 4th, Mr. Sandi made a $5,000 cash payment to

17 Mr. Jenkins.  He -- which January 4th was also the date he

18 first met Mr. Jenkins, and the day he swore his oath as an

19 auxiliary deputy.  His appointment order was signed about a

20 week prior on December 27, 2022.  Mr. Sandi was run -- queried

21 in the NCIC database.  His $5,000 cash payment was not reported

22 by the Scott Jenkins For Sheriff campaign.

23 Q    What is it that we're looking at on the left here?

24 A    That is a photo of Mr. Jenkins, Mr. Cooper, Mr. Rychlik,

25 and Mr. Sandi taken outside after they had lunch.

Medearis - Direct

1  Q    And how about on the right?

2  A    That's Mr. Sandi receiving his badge from Jenkins.

3  Q    Did you conduct any financial inquiry into Scott Jenkins's

4  bank account after this January 4th, 2023 meeting?

5  A    Yes.

6  Q    What is it that we're looking at here?

7  A    This is a deposit ticket into Mr. Jenkins's personal

8  checking account on January 4, 2023.  And then the bottom right

9  is a slip memorializing that the $7,000 deposit was made in

10 cash.

11 Q    And this has already been admitted as Government Exhibit

12 306.

13      What do you notice about the timing of this deposit?

14 A    It's shortly after the meeting with Mr. Sandi ended.

15 Q    Can you describe for us how you know what the timing of

16 the meeting was between Scott Jenkins and Sandi Rubar -- Rubar

17 Sandi?

18 A    Because I was able to review the recordings made by

19 Mr. Rychlik's devices, which were time stamped, and I was able

20 to go kind of calculate on the recording when they left and

21 look at that time, and it was approximately 3:21 p.m.

22 Q    Did you conduct an investigation into the interstate wire

23 connection for Count Four of the indictment in this case

24 against Scott Jenkins?

25 A    Yes.

Medearis - Direct

1  Q    Now, this has already been admitted as Government Exhibit

2  130.  I want to ask you about this particular wire.  So can you

3  describe for us what these text messages are?

4  A    These are text messages exchanged between Mr. Rychlik

5  using the phone that the FBI gave him and Mr. Jenkins on his

6  work phone, the 5813 number.

7  Q    So you recognize the 5813 number as Mr. Jenkins's phone?

8  A    Correct.

9  Q    And what is the timing of this message?

10 A    The message sent by Mr. Rychlik was on January 3rd at

11 12:11 Universal Time, which again, is about -- I think at that

12 time of the year -- 7:11 a.m.

13 Q    So on the left is a message that Kevin Rychlik sent to

14 Scott Jenkins?

15 A    Yes.

16 Q    And on the right in the green is a message that Scott

17 Jenkins sent to Kevin Rychlik?

18 A    It was the next text in the series.  It was Mr. Jenkins's

19 response.

20 Q    And based on what you know about the investigation, in

21 Mr. Rychlik's message, Tom is coming too.  Who is that Tom

22 referring to?

23 A    Mr. Cooper -- Tom Cooper.

24 Q    And Mr. Jenkins's message back, what does it say?

25 A    See you a little later this morning.

Medearis - Direct

1  Q    When is this message sent by Mr. Jenkins?

2  A    January 4th, 2023 at 1:23 p.m. Universal, which again, I

3  think it's like 8:23 a.m. Eastern.

4  Q    Is that more than eight hours after the message that Kevin

5  Rychlik sent to him?

6  A    Yes.

7  Q    What is it that we're looking at on this exhibit?

8  A    This is part of the extraction report for Mr. Jenkins's

9  work phone, the number ending in 5813.

10 Q    Is that the number that we were just looking at?

11 A    Yes.

12 Q    And does this report tell you what type of device this

13 was?

14 A    Yes, it was an iPhone 11.

15 Q    Did you also obtain records from Sprint?

16 A    Yes.

17 Q    Is that the record that you obtained?

18 A    Some of them specific to this phone, yes.

19 Q    And what number does this record show it's for?

20 A    It's for the 5813 number.

21 Q    And did the equipment device number match the device that

22 was downloaded by the FBI that was seized from Scott Jenkins?

23 A    Yes.

24 Q    Can you tell us what's being highlighted here?

25 A    That's essentially the serial number on the phone, and on

Medearis - Direct

1    the left from the iPhone physical device serial number, and

2    then on the right is the serial number associated with Sprint's

3    records as being assigned to that telephone number.

4    Q    Going back to the text message, based on what you know

5    about this investigation, when Scott Jenkins says, see you a

6    little later this morning, where was he located?

7    A    He was in Culpeper.  He was meeting -- that day he met

8    with Mr. Rychlik, Mr. Cooper, and Mr. Sandi in Culpeper.

9    Q    Was that the day that one of them was sworn in?

10   A    Yes.

11   Q    And who was that?

12   A    Mr. Sandi.

13   Q    Did you create a summary chart of the investigation into

14   payments after Phil Howell made a payment and after Sandi Rubar

15   [sic] made a payment?

16   A    Yes.

17   Q    Have you summarized that in Government Exhibit 806?

18   A    Yes.

19   Q    Can you walk us through what is being depicted on 806?

20   A    On December 29th --

21           MS. PENG:  I'm sorry, I thought this was already in

22   evidence.

23           THE CLERK:  I've got 801, 804, 805.

24           MS. PENG:  Okay.  Move to admit and publish 806.

25           THE COURT:  Any objection?

Medearis - Direct

1           MR. CALEB:  No objection.

2           THE COURT:  All right.  So admitted and may be

3    published to the jury.

4           (Government Exhibit 806 marked and admitted.)

5     BY MS. PENG:

6    Q    Can you walk us through what this chart is summarizing?

7    A    So these are transactions that happened around the time of

8    Mr. Howell and Mr. Sandi's payments.  So on the left column is

9    the date.  You see in the first row December 29, Mr. Howell

10   made a $5,000 payment, the second row, December 31, 2022,

11   Mr. Jenkins spent $3,000 cash at the Dulles Expo Center to buy

12   the handgun.  On January 4, Mr. Sandi gave $5,000 cash to

13   Mr. Jenkins.  The same day, Mr. Jenkins deposited $7,000 cash

14   into his personal bank account.

15   Q    What, if anything, do you notice about the total amounts

16   being depicted in this chart?

17   A    The total amount received in cash by Scott Jenkins from

18   Mr. Howell and Mr. Sandi was $10,000, and there was $10,000

19   either spent by Mr. Jenkins or placed into his personal bank

20   account.

21   Q    Now, we just discussed the money that Scott Jenkins used

22   to purchase those firearms.  Can you tell for sure that that

23   was the same cash that he received from Phil Howell two days

24   prior?

25   A    I cannot.

Medearis - Direct

1  Q    Now, this is the full chart of Government Exhibit 805 that

2  you had just been discussing; is that right?

3  A    It is.

4  Q    And this summarizes all of the information we've covered

5  in terms of the records you've obtained and the evidence

6  obtained in this case?

7  A    This does summarize all that.

8          MS. PENG:  Your Honor, I move to admit Government

9  Exhibit 805 into evidence.

10          THE COURT:  Any objection?

11          MR. CALEB:  No objection.

12          THE COURT:  So admitted and may be published -- I

13  think it's already being published in any event as a

14  demonstrative, but now it's in evidence.

15          (Government Exhibit 805 marked and admitted.)

16   BY MS. PENG:

17  Q    So I want to ask you about one last person who doesn't

18  appear on this chart, Harry Carr.

19          MS. PENG:  Are we able to pull up Government Exhibit

20  718?

21          Can we switch it to Ms. Fastenau, please?

22   BY MS. PENG:

23  Q    718 is already in evidence.

24      Mr. Medearis, can you just tell us what this document is?

25  A    This is an appointment of auxiliary deputy sheriff

Medearis - Direct

1   pertaining to Mr. Harry John Carr, signed by Mr. Jenkins on

2   November 17, 2022.

3          MS. PENG:  Thank you.  You can take that down.

4    BY MS. PENG:

5   Q    So can you tell us when the FBI concluded its

6   investigation in this case?

7   A    Mr. Jenkins was charged in approximately June of 2023.

8   Q    In connection with that work, did you obtain a seizure

9   warrant?

10  A    Yes.

11  Q    What is a seizure warrant?

12  A    A seizure warrant is a warrant that law enforcement

13  agencies can apply for to a federal judge to get authorization

14  to seize assets.

15  Q    What was the target of the seizure warrant you obtained?

16  A    Mr. Jenkins -- or the Scott Jenkins For Sheriff campaign

17  account.

18  Q    When was that warrant executed?

19  A    Approximately January 31, 2023.

20  Q    And what was seized from that account?

21  A    $10,000.

22  Q    Based on what you know, what was the source of that

23  $10,000 that was permitted to be seized?

24  A    The bank records show that that $10,000 was the $10,000

25  that came from Mr. Metcalf and Mr. Cooper.

Medearis - Direct

1   Q    How do you know that?

2   A    Because I reviewed the bank account for the Scott Jenkins

3   For Sheriff campaign, and based on the transactions in the

4   account, there was no other transactions -- maybe some interest

5   posting, but no other substantial transactions after

6   Mr. Jenkins deposited those checks.  And I think prior to the

7   deposit, the balance was only about $1,500 or so.

8   Q    So when was the check, the $5,000 check from Mr. Metcalf,

9   deposited into the Scott Jenkins For Sheriff account?

10  A    I'd have to look at a record to refresh me, but it was

11  shortly after Mr. Metcalf made the payment to Mr. Jenkins.

12            MS. PENG:  Can we pull up Government Exhibit 805 and

13  publish it?

14  BY MS. PENG:

15  Q    Does this refresh your recollection as to when Mr. Metcalf

16  gave Scott Jenkins that check?

17  A    Yes.  The payment date was September 7.  I don't recall

18  the exact deposit date, but he gave the check to Mr. Jenkins on

19  September 7th.

20  Q    But your recollection is that it would have been deposited

21  shortly after that?

22  A    Yes.  I know either Mr. Metcalf or Mr. Cooper was

23  deposited maybe a week or two after.  I don't remember which

24  one, but they were both I'll say within a month of the days

25  that Mr. Jenkins received the check.

Medearis - Direct

1  Q    And so based on the timing of those deposits and when the

2  seizure warrant was executed, can you tell us again why you

3  believe that money was from Jim Metcalf and Tom Cooper?

4  A    Just based on the sequencing of transactions, there was no

5  other deposits into the account to fund that.  So it was

6  absolutely directly related and sourced by these checks from

7  Mr. Metcalf and Mr. Cooper.

8  Q    And when did the investigation go in -- in the bribery

9  case go overt?

10 A    It was either January 30 or 31, 2023.

11 Q    What happened on January 30 -- 31st that made the

12 investigation overt?

13 A    We interviewed several individuals in the case, executed

14 search warrants, and seized the funds from the campaign's bank

15 account.

16 Q    What does it mean for an investigation to go overt?

17 A    That's when we take investigative actions that are

18 directly attributable to the FBI.  So we go in true name and

19 approach people and discuss the existence of the investigation.

20 Q    So that's -- is that when the investigation goes from

21 being covert to then known to people outside of the

22 investigative team?

23 A    Generally speaking.

24 Q    And was an interview conducted of Scott Jenkins on January

25 31st, 2023?

Medearis - Direct

1  A    Yes.

2  Q    Now, prior to January 31st, 2023, did you have any

3  indication that Scott Jenkins might have been aware that the

4  FBI was starting to look into the conduct involving Rick Rahim?

5  A    Yes.

6  Q    Why do you think that?

7  A    So prior to June of 2022, the Washington field office of

8  the FBI started investigating Mr. Rahim relative to some sort

9  of fraud scheme unrelated to Mr. Jenkins's investigation.  At

10 some point during their investigation, they learned that Mr.

11 Rahim was claiming to be an auxiliary deputy with Culpeper

12 County sheriff's office.  The agents in the Washington field

13 office, through a task force officer -- a task force officer is

14 an individual with an outside agency that works with the FBI

15 investigations.  So through an outside task force officer,

16 reached out to someone within the Culpeper County sheriff's

17 office to confirm that, and there were text messages exchanged

18 in which --

19              MR. CALEB:  Objection.

20              THE COURT:  We're getting into hearsay now.  I mean,

21 he can't say what the text messages say.

22  BY MS. PENG:

23 Q    Can you explain to me again without going into the

24 contents of any text messages, why it is that you believe that

25 Scott Jenkins may have been aware that the FBI was looking into

Medearis - Direct

1    the conduct involving Rahim prior to when he was interviewed in

2    the case on January 31st, 2023?

3    A    On June 2nd, 2022, a task force officer communicated with

4    people within the Culpeper County sheriff's office and

5    learned --

6            MR. CALEB:  Objection.

7            THE COURT:  Well, I'll let him testify about

8    communications.  He's not offering the substance of the

9    communication.  He can't testify what the task force officer

10   learned.  That's hearsay.

11           Rephrase your question.

12    BY MS. PENG:

13   Q    So you can answer again.  Just don't tell me the -- don't

14   state the content of the text messages, but to the extent that

15   you know what occurred, you can talk about that.

16   A    Okay.  The task force officer learned that Mr. Jenkins had

17   been advised that the FBI had an investigation into Mr. Rahim,

18   and was inquiring to know whether Mr. Rahim was, in fact, an

19   auxiliary deputy.

20   Q    So did then that task force officer reach out to the

21   Culpeper sheriff's office?

22   A    Through a contact, but yes.

23   Q    So -- okay.  So tell me more about that.

24   A    So on June 2nd, the task force officer communicated with

25   people -- I can't remember whether it was directly or

Medearis - Direct

1    indirectly through another task force officer, but reached out

2    to the Culpeper County sheriff's office to determine whether or

3    not Mr. Rahim was an auxiliary deputy, and -- because he was

4    the subject of an FBI investigation in Washington.

5        On June 24th, 2022, Mr. Jenkins met with Mr. Rychlik, and

6    Mr. Jenkins stated he had been contacted by the FBI -- been

7    alerted to the fact that the FBI was investigating Mr. Rahim.

8            MS. PENG:  Thank you.  And Your Honor, I neglected to

9    move into evidence Government Exhibit 803, so I'm going to move

10   it into evidence at this time.

11           THE COURT:  Any objection?  Do you need to see it?

12           MR. CALEB:  Yeah.

13           THE COURT:  Can you pull up 803, Ms. Fastenau?

14           MR. CALEB:  No objection.

15           THE COURT:  So admitted and may be published to the

16   jury.

17           (Government Exhibit 803 marked and admitted.)

18           MS. PENG:  That's all I have for now.

19           THE COURT:  All right.  Ladies and gentlemen, why

20   don't we take our lunch break at this point in time, come back

21   about 1:15.  I will remind you not to have any discussions

22   amongst yourself or discussions with anyone about the case.

23   Don't begin to make a decision at all.  And why don't you be

24   back here at 1:15, and then we'll get through the

25   cross-examination of Special Agent Medearis.

Medearis - Direct

1              So I'll allow the jury to be excused.

2    (*Jury out, 12:17 p.m.*)

3              THE COURT:  You all have a seat for a second.

4    Special Agent Medearis, you can step down.  I will just remind

5    you since you are still on the stand, you cannot have any

6    discussion over lunch about your testimony, even with your own

7    lawyers.

8              THE WITNESS:  Yes, Your Honor.

9              THE COURT:  Otherwise, Ms. Peng, do we need to

10   address anything on behalf of the government at this point?

11             MS. PENG:  No, Your Honor.

12             THE COURT:  Mr. Caleb, Mr. Andonian?

13             MR. ANDONIAN:  Nothing from us, Your Honor.

14             THE COURT:  Very well.  We'll come back at 1:15 and

15   we'll get through the cross-examination of Mr. Medearis and

16   we'll go from there.

17             Thank you very much.  Stand in recess.

18             (Recess.)

19             THE COURT:  Back on the record in *United States v.*

20   *Jenkins*.  Let the record reflect the government is present by

21   its counsel.  The defendant likewise is present by counsel.

22   I'm sorry I'm a couple of minutes late.  As I was wrapping up,

23   Judge Wilkerson stuck his head in to see Judge Connelly.  So I

24   looked at the letterhead, knew where I stood, and so I came up

25   a little bit late.

Medearis - Direct


 1              So anything we need to address from the government's

 2   standpoint before we begin, Ms. Peng?

 3              MS. PENG:  No, Your Honor.

 4              THE COURT:  How about from the defendant's

 5   standpoint.

 6              MR. ANDONIAN:  Your Honor, just a matter of

 7   logistics.  We don't expect to have any cross for Special Agent

 8   Medearis.  I understand the government will be resting at that

 9   point.  So we want to make our motion outside the presence of

10   the jury.

11              THE COURT:  Sure.  Right.  Yeah, I mean, I think that

12   -- I mean, technically the jury -- they need to rest in front

13   of the jury.

14              Not so fast, Special Agent, he may change his mind.

15              So why don't we do that and then I'll send them out,

16   and we'll make a motion, and then we'll see where we are, and

17   what we tell the jury for the rest of the afternoon.

18              Ms. Choy?

19              MS. CHOY:  The only thing left from us is to enter

20   those two stipulations into evidence after Special Agent

21   Medearis steps down.

22              THE COURT:  Okay.  Yeah, so there will be one -- a

23   couple of pieces of evidence.  We'll go ahead and bring the

24   jury in.  And I'll instruct the jury about the stipulations as

25   well.

Medearis - Direct

1          Let's go ahead and bring the jury in.

2    (*Jury in, 1:24 p.m.*)

3          THE COURT:  Ladies and gentlemen, please have a seat.

4          All right.  Mr. Andonian or Mr. Caleb, any

5    cross-examination?

6          MR. CALEB:  No cross for this witness.  Thank you.

7          THE COURT:  All right.  Very well.  Special Agent

8    Medearis, you may step down.  I know you're in the courtroom,

9    but please do not discuss your testimony while the case is

10   pending.

11         THE WITNESS:  Yes, sir.

12         THE COURT:  Thank you very much.

13         All right.  Ms. Peng?

14         MS. PENG:  Your Honor, this witness is not excused.

15   We reserve him for any rebuttal case that --

16         THE COURT:  Okay.  Right.

17         Especially since you haven't been excused, Special

18   Agent Medearis, do not discuss your testimony.

19         THE WITNESS:  Yes, Your Honor.

20         THE COURT:  All right.  Any other evidence from the

21   government?

22         MS. CHOY:  Yes, Your Honor.  Your Honor, there are

23   two stipulations between the parties which have been marked as

24   Court's Exhibit 1 and Court's Exhibit 2.  The government

25   enters -- offers Court's Exhibit 1 and 2 into evidence.

Medearis - Direct

1            THE COURT:  All right.  I will offer those into

2    evidence.

3            Ladies and gentlemen -- and those may be published to

4    the jury as well, if they haven't already.

5            So ladies and gentlemen, the government and the

6    defendant have agreed or stipulated to the matters of fact that

7    are set forth in Court's Exhibit 1 and Court's Exhibit 2.  This

8    means that both sides agree to these facts, and you must

9    therefore treat these facts as having been proven.  I'll let

10   you read those.

11           (Pause.)

12           MS. CHOY:  With Your Honor's permission, I'll just

13   read them into the record?

14           THE COURT:  Oh, yes, that will be fine.

15           MS. CHOY:  Stipulation number 1, which is Court's

16   Exhibit 1, says that both Culpeper County, a local government,

17   and the Culpeper County sheriff's office, an agency thereof,

18   received benefits in excess of $10,000 under one or more

19   federal programs involving a grant, contract, subsidy, loan,

20   guarantee, insurance, or other form of federal assistance in

21   each of the fiscal years ending June 30th, 2019, June 30th,

22   2020, June 30th, 2021, June 30th, 2022, and June 30th, 2023.

23           And stipulation number 2, which is marked as Court's

24   Exhibit Number 2, states that Jack Henry and Associates does

25   not have any data centers or servers in the Commonwealth of

Medearis - Direct

1    Virginia.

2            THE COURT:  All right.  Thank you, Ms. Choy.  You may

3    take those down now, Kelly.

4            (Court's Exhibits 1 and 2 marked and admitted.)

5            THE COURT:  All right.  Ms. Choy, what's next?

6            MS. CHOY:  At this time, Your Honor, the government

7    rests.

8            THE COURT:  All right.  So ladies and gentlemen,

9    we're going to take a quick break.  We're going to take a break

10   at this point in time.  There are a couple of things I've got

11   to take up before we move forward.  So I'm going to ask you to

12   go back to the jury room, and I will -- I'm not exactly sure

13   how long it's going to be, but we'll get you back out here as

14   quickly as we can, or I'll send word back out as to when you're

15   -- when we'll be ready for you again.

16           So I'll recess the jury.

17   (*Jury out, 1:28 p.m.*)

18           THE COURT:  All right.  You all please have a seat.

19           All right.  Mr. Andonian?

20           MR. ANDONIAN:  Yes, Your Honor.  At this time, the

21   defense makes a motion for judgment of acquittal, we would

22   submit on the record presented to the Court at this time.

23           THE COURT:  Okay.  Do you want to offer anything in

24   addition to that?  I'm going to have the government, if they

25   want to offer anything -- you just submit it on the record?

Medearis - Direct

1          MR. ANDONIAN:  No, Your Honor.

2          THE COURT:  All right.  Any response from the

3   government?

4          MS. CHOY:  The government opposes that motion, Your

5   Honor.  We submit that every element of every charged offense

6   has been proven on the record as submitted.

7          THE COURT:  Okay.  So at this point -- and I'm going

8   to make more detailed findings later on -- I'm going to take

9   the motion under advisement at this point.  Understanding that

10  under Federal Rule of Criminal Procedure 29, the district court

11  on the defendant's motion must enter a judgment of acquittal on

12  any offense for which the evidence is insufficient to sustain a

13  conviction.  A Rule 29 motion focuses on both the elements of

14  the offense, the offenses charged, and the factual sufficiency

15  of the evidence.  On the motion for judgment of acquittal, the

16  question is whether the evidence viewed in the light most

17  favorable to the prosecution is such that the finder of fact

18  must find the defendant guilty beyond a reasonable doubt,

19  citing *United States v. Wooten*, 503 F.2d 65, Fourth Circuit

20  case, 1974.  A defendant who brings a sufficiency challenge

21  bears a heavy burden.  The court's review of the insufficient

22  evidence claims is sharply limited and defendant is entitled to

23  relief only if no rational trier of fact could have found proof

24  of guilt beyond a reasonable doubt.  The court neither weighs

25  the evidence nor assesses the credibility of witnesses and

Medearis - Direct

1  assumes that the jury will resolve all contradictions in the

2  favor of the government.

3         So that's where we are at this stage.  I'm going to

4  take the motion under advisement, and I'll probably rule on it

5  as we go through jury instructions as to whether all the counts

6  go to the jury.

7         So with that, Mr. Andonian, does the defendant intend

8  to present any evidence?

9         MR. ANDONIAN:  Yes, Your Honor.  We intend to call

10  Scott Jenkins.

11         THE COURT:  Okay.  All right.  So Mr. Jenkins, let me

12  get you to stand up here for just a second.  There's some

13  advisements I need to give you.

14         Mr. Jenkins, every defendant in a criminal case has

15  an absolute Constitutional right to testify at trial in their

16  own defense.  Similarly, every defendant also has an absolute

17  and equal Constitutional right not to testify.  The burden is

18  on the government to prove your guilt beyond a reasonable

19  doubt.  That burden never shifts throughout the trial.  The law

20  does not require a defendant to prove his innocence or to

21  produce any evidence at all.  If you decide not to testify, I

22  will instruct the jury that no inference or suggestion of guilt

23  can be drawn from the fact that you did not testify, and that

24  they cannot consider your decision in any fashion whatsoever in

25  their deliberations.

Medearis - Direct

1          Ultimately, it's up to you to decide whether to

2    testify on your behalf or not to testify.  Before you make that

3    decision, I want to make sure that you understand that if you

4    decide to testify, you'll be placed under oath before

5    testifying, and that testifying falsely could result in certain

6    penalties.  In particular -- in particular, I tell you that a

7    witness may be subject to prosecution for perjury under federal

8    law if the witness knowingly makes a false material declaration

9    under oath in a proceeding before a federal court.

10          Additionally, a defendant who provides false

11   testimony at trial and is ultimately convicted may be subject

12   to a sentence enhancement for obstruction of justice.  This

13   enhancement applies if the Court finds that the defendant gave

14   false testimony -- one, gave false testimony, two, concerning a

15   material matter, three, that is willfully made with an intent

16   to deceive.  Such an enhancement, if it applies, results in a

17   two-level increase in the defendant's total offense level under

18   the United States Sentencing Guidelines and produces a higher

19   range of imprisonment under those advisory guidelines.

20          I tell you that you have a right to testify if you

21   choose to do so.  You also have a right not to testify.  It's

22   up to you to decide which right to exercise in this case.

23          Do you understand these things?

24          THE DEFENDANT:  Yes, sir.

25          THE COURT:  And I presume that you have carefully

Jenkins - Direct

1  considered each of these matters, consulted with your attorney

2  in making a decision whether to testify; is that fair to say?

3           THE DEFENDANT:  Yes, sir.

4           THE COURT:  And it's your decision to testify in this

5  case?

6           THE DEFENDANT:  Yes.  I need to.

7           THE COURT:  All right.  Very well.

8           Okay.  With that, are we ready to bring the jury in?

9           MR. ANDONIAN:  Yes, Your Honor.

10          THE COURT:  Okay.  All right.  Let's bring the jury

11  back in.

12  (*Jury in, 1:34 p.m.*)

13          THE COURT:  Ladies and gentlemen, please have a seat.

14          Ladies and gentlemen, the government has rested its

15  case.  The defendant can present any evidence, if they choose

16  to do so.

17          Mr. Andonian, does the defendant wish to present any

18  evidence?

19          MR. ANDONIAN:  We do, Your Honor.  And we call Scott

20  Jenkins as a witness.

21          THE COURT:  Mr. Jenkins, come on up, if you would,

22  please, sir.

23          SCOTT H. JENKINS, CALLED BY THE DEFENSE, SWORN

24          THE COURT:  Mr. Jenkins, as you've heard us before,

25  as you sit down, slide up and bring the microphone to you and

Jenkins - Direct

1    speak into the microphone.

2              THE WITNESS:  Yes, sir.

3              THE COURT:  Mr. Andonian, go right ahead.

4              MR. ANDONIAN:  Thank you, Your Honor.

5                         DIRECT EXAMINATION

6     BY MR. ANDONIAN:

7    Q    Good afternoon, Mr. Jenkins.

8    A    Good afternoon.

9    Q    Could you please introduce yourself to the jury and state

10   and spell your name for the record?

11   A    Scott Howard Jenkins, last name Jenkins, J-E-N-K-I-N-S.

12   Q    Mr. Jenkins, where were you born?

13   A    Culpeper, Virginia.

14   Q    And where do you live now?

15   A    Culpeper, Virginia.

16   Q    Have you ever lived anywhere else?

17   A    No.

18   Q    Are you married?

19   A    Yes.

20   Q    Do you have kids?

21   A    Yes.

22   Q    Can you tell us a little bit about your educational

23   background?

24   A    I attended Culpeper County Public Schools and graduated

25   from Culpeper High School in 1989.  The only other education

Jenkins - Direct

1  formally would be Germanna Community College.  I took some

2  criminal justice courses in my early 20s as I was a deputy

3  sheriff.  Never received an associate's or any type of degree.

4  And of course, criminal justice classes and certifications as a

5  law enforcement officer.

6                    (Reporter clarification)

7  Q    And I'm sorry, were you done answering?

8  A    No.  That was it.  Criminal justice classes as a law

9  enforcement officer through 30, 40 years.

10 Q    Now, we've obviously -- you've heard throughout the course

11 of this trial testimony about your tenure as sheriff of

12 Culpeper County, and I want to get to that in a minute.  But

13 before that, can you just tell us a little bit about your law

14 enforcement background prior to becoming sheriff?

15 A    I graduated high school, as I said, at age 18, I became a

16 deputy sheriff in Rappahannock County working in the jail as an

17 officer for almost I think two years.  Then taking on a job

18 with Culpeper County sheriff's office at age 20, beginning in

19 the jail for a short period, and then into patrol.  To be

20 short, through the years, a patrol officer in Culpeper

21 sheriff's office, then a detective and patrol sergeant,

22 investigation sergeant, investigation lieutenant.  That would

23 have been under Sheriff Hart.  I rose to lieutenant of CID, the

24 fourth ranking spot in the office.

25      No need for detail, but at that point, 2004, my wife and I

Jenkins - Direct

1  were both employed there with Sheriff Hart and we resigned the

2  same day for corruption.  I went to work at the Culpeper Police

3  Department later as an entry level officer, became a sergeant

4  in patrol, and targeted investigations.

5       And in 2007, was approached by community leaders,

6  Commonwealth Attorney, and the chief of police, mayor, and many

7  others in the community, gathered together and asked me if I

8  would be willing to run against the sheriff to get him out of

9  office.  And I chose to do that, under -- unsuccessful.

10      When the election was over, a dear friend from many years

11 before that I'd worked with in Rappahannock was elected sheriff

12 in Rappahannock.  So January 1 of 2008, I took the job as her

13 number two person as chief deputy until the end of 2011, at

14 which time I'd won the election then for Culpeper sheriff, and

15 I took office as sheriff in Culpeper January of 2012, and

16 served until the end of 2023.

17 Q    Okay.  I want to ask just big picture now.  In your terms

18 as sheriff, so between 2012 and 2023, can you just describe for

19 us some of your agenda items or your platform?

20 A    Plenty of things online you could read, were things such

21 as cost savings, and more law enforcement on the street and so

22 forth, increased criminal justice services.  My first year in

23 office, proudly we saved over a half million dollars in the

24 jail area alone.  And one squad in our patrol division in six

25 months of 2012 made more drug and DUI arrests than the entire

Jenkins - Direct

1  sheriff's office had in the four years prior, not because of a

2  crime wave, just we created a proactive aggressive office.  And

3  I'm very proud of the work they did that year and the years to

4  follow.

5       That first term, it's no secret, when I took over, I

6  removed over 30 employees; I did not re-hire for January 1 of

7  2012.  Some of those officers had committed crimes and done

8  things they shouldn't.

9            MS. PENG:  Your Honor, I'm going to object at this

10 point.

11           THE COURT:  Sustained.  He can testify he removed

12 some folks, but it's conclusory as to the reasons why.

13           MS. PENG:  We also had a motion in limine on this,

14 Your Honor, regarding prior good acts.

15           THE COURT:  I'm going to let him give some

16 background, but you know the limits.

17           MR. ANDONIAN:  Very well.

18  BY MR. ANDONIAN:

19 Q   Mr. Jenkins, just staying very broad, just talking about

20 other agenda items.  So you've talked about some of the things

21 that you accomplished when you first took office.  What were

22 some other agenda items or platform items that you had?

23           MS. PENG:  Same objection, Your Honor.

24           THE COURT:  I'm going to let him give a broad picture

25 of his background as to his office, but let's move it along to

Jenkins - Direct

1  where we need to be.

2           THE WITNESS:  There was a second and third term.  You

3  know, in the second term -- each term we had certain goals,

4  such as national accreditation for the office.  We achieved

5  that in that next term, along with -- just for the sake of

6  brevity, I'll just say that, you know, that, along with in the

7  future, it's well-known my stance on protection of the Second

8  Amendment rights, and border security, and our cooperation with

9  ICE for 287(g) agreements to remove criminal illegal aliens.

10 We were only the second office in the State of Virginia to do

11 that, and we were the last to continue doing that a few years

12 ago when I was still in office.  No one else in the state was

13 cooperating with ICE.

14           MS. PENG:  Objection --

15           THE COURT:  Let's move it along.

16           MS. PENG:  -- and strike the evidence -- or the

17 testimony.

18           THE COURT:  I'll allow it, but let's move along.

19  BY MR. ANDONIAN:

20 Q    Just two follow-up questions on this.

21      Did you receive any media attention for any of these

22 views?

23 A    An enormous amount, especially for the Second Amendment

24 and those stances, there was an enormous amount of media

25 attention nationally and local.

Jenkins - Direct

1  Q    Now, as sheriff, did you have political opponents?

2  A    Numerous.

3  Q    Did you have what you would consider to be political

4  enemies?

5  A    Absolutely.

6  Q    Mr. Jenkins, you've been in this courtroom throughout the

7  duration of the trial thus far, and you've heard a lot of

8  discussion about some of your behavior with respect to

9  communications, putting cell phones away, not using text

10 messages.

11     Do you recall that testimony?

12 A    Yes, I do.

13 Q    Can you just explain to us why you acted that way?

14 A    A very good reason.  Multiple, multiple reasons.  One good

15 example is the Facebook page, Culpeper Deputies No Longer

16 Silent.  The current sheriff had one of my deputies secretly

17 record me behind closed doors, and they cut that tape into

18 three different pieces and made it appear I was saying

19 something different.  Then they posted it for the world to

20 attack me.  And that's just one.  But -- well, I don't know how

21 far I can go, but I'll just say that that was just simply a

22 political attack from one of the many political enemies that

23 had -- due to my actions as a sheriff.

24     There were many other reasons.  Electronic devices can be

25 used so easily, even back then in 2015, and especially today

Jenkins - Direct

1    with technology advancements.  I mean, we are a local office

2    that has a small budget, and we had apps that we used for

3    investigations where we could turn a cell phone on unbeknownst

4    to anyone and record what's going on in the room.  Obviously,

5    with some of the attacks I've had and the things I've been

6    involved with at the national level with border security and

7    other things -- I don't know how much I can say.  I want to get

8    one really good example of what I faced, but I don't know if I

9    can say it.

10   Q    Let me just ask you this:  Were you ever trying to hide

11   anything illegal?

12   A    No, that wasn't the purpose.

13   Q    I want to talk to you -- now, again, you've sat in here

14   throughout this trial and you've heard a number of witnesses

15   talk about your tenure as sheriff and powers that you had.  Let

16   me just start by asking:  When you were sheriff of Culpeper

17   County, how big was your department?

18   A    Well over 100.  As I recall, 119 I believe full-time, and

19   at any given time it fluctuated, two to three dozen part-time

20   employees, which they basically worked full-time hours to fill

21   slots at a cheaper budget price.  And then they did various

22   things, court security, civil process, and other things.  But

23   it took at least that many at any time to handle the volume of

24   calls for service, and management of the jail, and so forth.

25   Q    Okay.  Who oversaw ultimately all of those individuals?

Jenkins - Direct

1  A    In a sheriff's office in Virginia, everyone is appointed

2  by the sheriff, and the sheriff has the sole discretion.

3  Q    As the sheriff, did you have any individuals working under

4  you that were responsible for the day-to-day operations of the

5  office?

6  A    Many.  Starts with the chief deputy, the number two person

7  in charge, and then from there, a command staff of people at

8  various ranks, such as captain or lieutenant, down to sergeants

9  overseeing squads.

10 Q    What about Kevin Rychlik, was he -- did he have -- first

11 of all, let me just ask:  Did he have any rank within the

12 Culpeper County sheriff's office?

13 A    He was a lieutenant when I left, but before that, he was a

14 sergeant overseeing the auxiliary deputies.

15 Q    Okay.  And when you say overseeing the auxiliary deputies,

16 what do you mean by that?

17 A    Well, they were deputies that didn't have rank.  And as

18 far as structure, he was the one that was the first line

19 supervision above them, and then it would go from him up to --

20 up to the chief deputy and the sheriff, flow.

21 Q    What if any role did Mr. Rychlik have in the recruitment

22 of auxiliary deputies?

23 A    Just like other lieutenants and division heads in various

24 areas, they actively look for good personnel to bring into the

25 department.  So a patrol captain, for example -- one I can

Jenkins - Direct

1  recall, Sean Walters, was one of the greatest recruiters we

2  ever had.  He was constantly bringing new faces from other

3  agencies or other places that he found people that would be

4  good quality employees to bring on, and he would bring them

5  forward, vouch for them, and we would begin the process of

6  hiring them.

7  Q    Who ultimately had the final word over the daily

8  operations of the sheriff's office?

9  A    The sheriff.

10  Q    Are you familiar with the term Constitutional officer?

11  A    Certainly.

12  Q    What does that mean to you?

13  A    In Virginia, a Constitutional officer is one of five

14  offices stated in the Virginia Constitution that are elected by

15  the people directly on a platform that they campaign on.  And

16  they have the Constitutional authority to implement their

17  platform from day one, by choosing their staff as they wish.

18  At any given time during that four-year term they can fire,

19  hire at will in order to continue implementing their platform.

20  It's very different from a department of a government such as a

21  police department or other departments.

22      In Virginia, the Commissioner of Revenue, the

23  Commonwealth's Attorney, the Clerk of the Court, and Treasurer

24  are the other four besides Sheriff who are elected

25  Constitutionally to office and serve four-year terms.

Jenkins - Direct

1   Q    So the sheriff is a Constitutional officer in the

2   Commonwealth of Virginia?

3   A    Yes.  I'm sorry.  I went too long.  Trying to give you

4   background.

5   Q    Sheriff -- Mr. Jenkins, when you were sheriff, did you

6   know every single employee that worked for you?

7   A    Well, almost all of them I had met.  You know, the last

8   couple of years I was there, we had grown, and I wouldn't

9   always meet every employee.  It might be the chief deputy, or

10  -- you met Pete Siebel, people like that in command would do

11  the screening and interviews, backgrounds, and so on.  You

12  know, there were a number of them that, you know, I may never

13  meet for a few months or however long until I run into them in

14  the jail or somewhere.  I'm always told the name, sign the oath

15  order for Curtis, the chief deputy, or Pete, or someone who is

16  on basically a committee of two or three people that are

17  screening and doing final approval on hiring, they recommend

18  them to me.  But no -- you know, just a simple answer, no, I

19  don't know all of them.  I would run into people that had --

20  you know, had been working there three, four, five, six months

21  and I had never seen them before.

22  Q    And I guess a related question to that, and you might have

23  answered that in there, but have you -- did you -- at the time

24  you were sheriff, did you meet -- physically actually meet

25  every single employee that was employed by your office?

Jenkins - Direct

1  A    No.

2  Q    I want to shift gears.  Again, you've been in this

3  courtroom for the last handful of days, and you've heard a lot

4  of testimony about the auxiliary deputy program, or auxiliary

5  deputies at the Culpeper County sheriff's office.

6       Let me just ask you, was there an auxiliary deputy program

7  at the Culpeper County sheriff's office under your tenure?

8  A    Yes, from the start.

9  Q    And can you just describe for us what that program

10 entailed?

11 A    A sheriff in Virginia can hire any deputy he chooses,

12 appoint them at any time.  And that goes for full-time,

13 part-time, paid people, and then also an auxiliary or reserve

14 deputy staff who are not paid or compensated with money, much

15 like in old times -- and some people refer or title them as a

16 posse or other titles.  Sheriffs have wide latitude in how they

17 choose to run their office, structure it, and so forth.  But

18 you can swear in the average citizen as an auxiliary deputy and

19 have them available for call up at any time.  Some, such as

20 when I took over as sheriff, there were people that I retained

21 from the prior sheriff that were auxiliaries that worked in the

22 records office.  They would fingerprint applicants, file

23 records.  Some might do training, such as canine training.  I

24 know I had a master canine trainer I had sworn in.  I never met

25 him, for years, but he was a huge help to our canine instructor

Jenkins - Direct

1  staff and canine unit for years free of charge.  He helped a

2  lot of agencies.  But anyway, it varies for auxiliaries.  I

3  hope that answered what you're asking.

4  Q    We talked -- excuse me -- I hope that doesn't mean I'm

5  catching what's got the courtroom here.

6        We talked a minute ago about Kevin Rychlik.  Why did you

7  appoint Kevin Rychlik to oversee the deputy -- the auxiliary

8  deputy program?

9  A    I had known Kevin for several years -- well, several

10  years.  I can't remember exactly when we first met, but I had

11  known him -- I'd met him over in Rappahannock County when I

12  worked there as a chief deputy.

13  Q    And what were some of Mr. Rychlik's responsibilities in

14  his role as the lieutenant overseeing the auxiliary deputy

15  program?

16  A    Well, I'd say, you know, the greatest asset was the

17  VASARS, Virginia Airborne Search and Rescue helicopter.  It's

18  an all-volunteer program.  I know we've heard from them.  But

19  it's a service -- you know, they were based in Manassas, and

20  within 15 minutes they could be overhead in Culpeper helping a

21  deputy who is maybe chasing a fugitive or looking for an

22  autistic child that's lost on our Project Lifesaver program.

23  Kevin actually implemented that for us, with us, in the office.

24  Elderly Alzheimer's patients that get lost, they were -- they

25  ran a lot of missions and helped find a lot of people both, you

Jenkins - Direct

1  know, suspects or criminals, to the other people who were in

2  danger.  That was probably one of the greatest services.

3      And, you know, they provided support at events and things

4  as well, county fairs, parades, and other things where we

5  needed more hands on deck, more personnel to help.  Kevin or

6  others that worked with him at VASARS would come down and help

7  out with things such as that, and events.

8      You know, some of our auxiliaries -- for example, one guy

9  had been a great help as an auxiliary, owns a trucking company.

10 He simply comes out and drives our command bus to events or

11 scenes and things, or on the camera system, eight, ten hours at

12 an event for us, saves a deputy time doing that, or even an

13 armored vehicle --

14          MS. PENG:  Objection, Your Honor.

15          THE COURT:  Sustained.  He's starting to --

16          MR. ANDONIAN:  Very well.

17 BY MR. ANDONIAN:

18 Q   Let me focus you a little bit more with respect to the

19 program, the auxiliary deputy program.  What, if any, plans did

20 you have for the program's future?

21 A   The latest or most recent before I left office -- well, we

22 got stopped by COVID, actually -- but anyway, COVID hit early

23 2020.  Kevin was in charge of standing up an enormous search

24 and rescue program that would include people who bring to bear

25 horses, ATVs, drones, what have you, such as -- and the

Jenkins - Direct

1  helicopter -- to come out when called for large search areas,

2  provide training to people, so forth.

3      Kevin created a PowerPoint presentation that outlined,

4  briefed our command staff initially, then later all of our

5  supervisors.  And that would have been in 2022, because we were

6  hoping to get it going early 2023.  No secret, we got stalled

7  by COVID, and we were headed into an election year in 2023.

8  What better time than to kick off a new program that saves

9  lives?

10     So the intent -- Kevin was managing that and getting it

11 going.  We were going out to local fire and rescue first to

12 recruit our first 40, 50 people.  And we hoped to have 100 in

13 our first wave of training in the early spring 2023 ready to

14 go.  And that basically doubles the strength force multiplier

15 for the office, to double its capacity in the event of a

16 search.

17 Q    Did Kevin Rychlik have any role in recruitment with

18 respect to that plan to grow the auxiliary deputy program?

19 A    Certainly.

20 Q    Did auxiliary deputies -- were they required to reside in

21 Culpeper County?

22 A    No.  Our full-time weren't.  Over half the department my

23 entire tenure, over half the department lives in counties

24 outside Culpeper.  It's been made to appear that they don't,

25 but that's a fact.

Jenkins - Direct

1  Q    Even if a deputy, whether it's -- well, obviously a

2  full-time, but even if an auxiliary deputy resides outside of

3  Culpeper, was it -- what was your expectation with respect to

4  their provision of service to the office if called upon?

5  A    The same as anyone -- any other deputy.  And I had said on

6  national media repeatedly -- everyone knows what I said, that

7  they're available for call up.  If I were to swear in the

8  thousands I said I would as auxiliaries to keep their firearms

9  under an unconstitutional gun ban, they would be available --

10          MS. PENG:  Objection.

11          THE COURT:  Sustained.  Sustained.

12 BY MR. ANDONIAN:

13 Q    Let me keep going with the questions about the auxiliary

14 deputy program.  Again, you were in here in the courtroom and

15 you heard some testimony from a few witnesses on a general

16 order that related to the auxiliary program.  Do you recall

17 that?

18 A    Yes.

19 Q    Okay.  First of all, what is a general order in the

20 Culpeper County sheriff's office?

21 A    A general order is a rule or a procedure for how business

22 is done day-to-day.  And it would cover anything from maybe a

23 pursuit policy, to use of force, to uniforms and equipment, any

24 number of things.

25 Q    Okay.  At the end of the day, whose authority are those

166

Jenkins - Direct

1  general orders issued under at the Culpeper County sheriff's

2  office?

3  A    In my office and any sheriff's office, the sheriff alone,

4  they are the ones responsible.  And they may choose not to have

5  general orders or any policy if they so choose.

6  Q    With respect to the specific general order that has come

7  up in this trial regarding auxiliary deputies, did you draft

8  that general order?

9  A    No.  I don't ever remember seeing it.

10  Q    How, if you know, did that general order come about?

11  A    It would come from the training accreditation officer who

12  does draft the general orders.  And just so you understand, I

13  mentioned earlier national accreditation.  When I took over, we

14  were state accredited.  And they're very similar.

15  Accreditation is roughly 160-plus standards of best practices

16  for law enforcement at state accreditation or national.  And

17  you are reviewed by peers and tested to see that you meet those

18  standards day-to-day in your operations.  So for accreditation,

19  our accreditation officer, that is his job to work to see that

20  all of those general orders, day-to-day policies and procedures

21  meet those standards.

22  Q    Okay.  Was it ever your intention to have a policy within

23  your office that limited your ability to appoint auxiliary

24  deputies?

25  A    Absolutely not.

Jenkins - Direct

1  Q    Mr. Jenkins, there are a lot of specific things I want to
2  go over with you, but one that I want to start with is this:
3  And I'll just say it -- ask it bluntly.  Why is it -- you sat
4  in this trial, you've looked at exhibits.  Why is it that you
5  were accepting payments and giving people badges?
6  A    Accepting donations for your campaign is perfectly okay.
7  Swearing in auxiliaries or full-time deputies is what a sheriff
8  does.  And they have complete latitude to select whoever they
9  choose.  What you're seeing and hearing during this trial is a
10 culmination of years of that process being -- I'm searching for
11 the word -- but speeded up, crunched down to multiple things
12 happening for the sake of time because, you know, my staff saw
13 from the fall -- the end of 2019 on, with -- starting with my
14 15 minutes of fame, I guess, on the gun issue, to other things
15 -- that alone, for example, it crashed the servers for my
16 e-mail.  We had to create multiple --
17           MS. PENG:  Objection, Your Honor.
18           THE COURT:  Sustained.  I'll strike the last part of
19 that answer.
20           So Mr. Jenkins, focus on the question that's asked,
21 and you know the areas that I have not allowed this trial to go
22 to.  And so stay within those parameters.
23           THE WITNESS:  Yes, sir.
24  BY MR. ANDONIAN:
25 Q    Sir, just to get back to the question.  Again, you've sat

Jenkins - Direct

1    in this courtroom.  You've looked at exhibits.  You've seen

2    video clips.  And I'm just asking you about these and why it is

3    that you're on video taking money and then giving badges to

4    auxiliary deputies?

5    A    Those same actions have happened many times for me and any

6    sheriff as far as receiving donations, hiring or appointing an

7    auxiliary deputy or a regular deputy.

8         Kevin, as well as other staff, handles backgrounds or

9    screening or what have you, was simply bringing those

10   activities together to meet my schedule, because on any given

11   day, my captain or lieutenant or chief deputy may have me pop

12   in to meet a full-time deputy who maybe is hired for the jail,

13   and I have a two-minute conversation to say hello, and they're

14   on their way to get sworn in and do other things.  And it's for

15   an average deputy.  Some I may never meet.  I try to meet them

16   all, but I don't always do that.  And you're seeing what

17   happens with a regular deputy hire or an auxiliary deputy hire,

18   whether they give a donation or they don't.  I may meet them.

19   I may not meet them.  It's logical, if someone is giving a

20   donation -- and Kevin has told me they are -- then certainly

21   you would want to try, if you're an elected official with a

22   brain, you would want to try to meet anyone who's going to --

23   especially a large donation -- want to meet them and say thank

24   you.

25   Q    Was at any point in time your intent to give a badge away

Jenkins - Direct

1  solely in exchange for the payment of money?

2  A     No.

3  Q     So why was it happening at the same time, again, as we've

4  seen in many of the exhibits throughout this trial?

5  A     The fact that it was happening at the same time, I

6  understand in hindsight, you know, how it appears and is being

7  presented.  But if you don't feel you're doing anything wrong,

8  you're just speeding through daily activities like so many

9  other things.  My staff could tell you, I mean, from the time

10 you hit the door, it's jump from one thing to the other.

11 That's why you have an assistant, a chief deputy, that are

12 constantly moving you on to the next thing.  You pop in -- I

13 mean, the videos and witnesses you've heard this week are proof

14 of that.  I mean, I might go to lunch with that new potential

15 auxiliary deputy, and not even have time to go to the

16 courthouse to see them sworn in.  I'm trying to go to another

17 quick meeting with someone waiting on me at the office.  And

18 then I pop in, take a photo, and so forth.

19       Understanding the whole picture is what's important of

20 what my day would be like, and what -- I mean, it's like the

21 text messages.  I mean, anyone can tell you -- I mean, they had

22 my records.  There's thousands of text messages a week.  I

23 don't necessarily even see them all --

24            THE COURT:  Let's go to the next question.

25            And Mr. Jenkins, can you slide up to the microphone

Jenkins - Direct

1  and bring that microphone in?  I'm having a hard time hearing

2  you.  Thank you.

3            THE WITNESS:  I'm sorry.  I'll speak up.

4            THE COURT:  Thank you.

5   BY MR. ANDONIAN:

6  Q    Did you tell Kevin Rychlik to tell individuals that they

7  had to pay $5,000 or some amount of money in order to get a

8  deputy auxiliary badge?

9  A    No.  There were multiple that he brought to me through the

10  years that never paid a dime or never asked for anything.

11            MS. PENG:  Objection, Your Honor.

12            THE COURT:  Sustained.

13            MS. PENG:  Move to strike the testimony.

14            THE COURT:  The question was -- Mr. Jenkins, answer

15  the question as asked of you.  The question was, did you tell

16  Mr. Rychlik that people had to pay?  So just answer that

17  question that was asked.

18            So I'll strike the last part of the answer.

19            THE WITNESS:  I'm sorry, sir.

20   BY MR. ANDONIAN:

21  Q    I want to turn to a gentleman named Rick Rahim.  Again, we

22  heard Mr. Rahim's name a number of times throughout this trial.

23  And I want to go back to when you met Mr. Rahim, and in the

24  months following.  How would you describe your relationship

25  with Mr. Rahim at that time?

171

Jenkins - Direct

1    A    We quickly became friends.

2    Q    Why did you provide all of the help that you did in

3    helping Mr. Rahim try to get his firearms rights restored?

4    A    From the time I became sheriff, I've never opposed a

5    nonviolent felon getting their rights restored.  Local

6    attorneys have asked my opinion to support.  I've done that

7    from 2012.  So it was nothing unusual for a man to come to me,

8    especially vouched for or brought to me by a friend and

9    lieutenant of the auxiliaries, and say to me -- you know, to be

10   brief, things such as, you know, I'm a father of an 11 and

11   12-year-old boy -- boys, I should say -- who -- you know, I had

12   made a mistake 30 years ago, and it's been a lifelong goal to

13   get my rights restored, to own a gun, to be able to target

14   shoot, take them hunting, and so forth.

15   Q    And let me just stop you right there.  Is this what you're

16   describing something Mr. Rahim said to you?

17   A    Yes, sir.  That's what he said.  Sorry.  I'm trying to be

18   short.  There was so much, you know.  But that -- this was a

19   hope, a dream of his that he had had, and he knew -- my stance

20   was well-known on that issue for my entire period of sheriff.

21   Other counties in the state obviously are not as favorable.

22        Is that enough?  I can say a lot more, but I don't want to

23   --

24            THE COURT:  Just wait for the next question.

25            THE WITNESS:  Yes, sir.

Jenkins - Direct

1   BY MR. ANDONIAN:

2   Q    Did your relationship with Mr. Rahim have anything to do

3   with your desire to help him?

4   A    Yes.

5   Q    Did you help Mr. Rahim get his firearms rights restored

6   simply because he provided you money?

7   A    No.

8   Q    Let me ask you some questions about what you knew about

9   Mr. Rahim's residency in 2019 around the time -- and 2020, I

10  should say, as well.

11       What did you know, if anything, about Mr. Rahim's

12  residency in Culpeper?

13  A    I don't know how much background -- obviously, that's a

14  requirement, being a resident, to apply with the court.  So

15  that said, he entered into a lease with my brother to rent the

16  farmhouse property there in Culpeper.  And --

17  Q    And let me just stop you there.  Were you aware that

18  Mr. Rahim and your brother had executed a lease for the

19  farmhouse?

20  A    Yes.

21  Q    Is the farm -- we've talked about it.  I think we might

22  have seen a picture.  But is the farmhouse an actual physical

23  building?

24  A    Yes.

25  Q    Does it have bedrooms in it?

Jenkins - Direct

1   A    Yes.

2   Q    Does it have running water?

3   A    Yes.

4   Q    Plumbing?

5   A    Uh-huh.

6   Q    What was your understanding --

7   A    And just to be clear -- I'm sorry, let me add this.  I

8   know in this past recent months or summer, I know that my

9   brother has been having people do remodeling on it.  So I don't

10  want anyone saying I'm making up -- you know, it may not be

11  running water right now, but back then in the years up until

12  now -- I just want to make sure that's clear.

13  Q    Fair enough.

14       Did you understand that the lease between Mr. Rahim and

15  your brother to be a real lease?

16  A    Yes.  I think he's the one that wrote it.

17  Q    What was your understanding of Mr. Rahim's voter

18  registration status in 2019-2020?

19  A    He told me he was registering to vote there, registering

20  his $100,000 vehicles he had there, multiples, everything you

21  would do.

22  Q    Did you know that Mr. Rahim also had a home in northern

23  Virginia?

24  A    More than one.

25  Q    What was your understanding of how many homes Mr. Rahim

Jenkins - Direct

1  had?

2  A    I can't swear more, but I do know he had a very large

3  house that he lived in with his family when I met him in Great

4  Falls.  I know he had a beach house somewhere in Carolina, and

5  at least one other really nice home in northern Virginia, I

6  think Fairfax.  I remember that because of some of the -- a

7  lease or something he had an issue with, he mentioned.

8  Q    What was your understanding, given that you were aware

9  that he had other homes, including homes outside of Culpeper --

10 what was your understanding of what -- what it meant to be a

11 resident of Culpeper?

12 A    Well, you know, I'm not a lawyer, and I don't know any

13 official definition.  I mean, there are many people that have

14 multiple homes.  And to my knowledge, what I know to be

15 proper -- and I use one example -- was from an attorney in

16 Culpeper, from her mouth, was that --

17          MS. PENG:  Objection, Your Honor.

18          THE COURT:  Calls for hearsay.

19  BY MR. ANDONIAN:

20 Q    Just based on your understanding.

21 A    Okay.

22 Q    And only your understanding of what residency in Culpeper

23 meant?

24 A    A person can choose to live in whichever home they want as

25 their primary residence, is how I understood it.  And they

Jenkins - Direct

1   choose to, you know, reside there, register vehicles maybe, pay

2   taxes there, register to vote there if they do vote, and so on.

3   Q    Why did you ultimately believe that Mr. Rahim was a

4   resident of Culpeper County?

5   A    Because he did all of that and he told me he was.  He was

6   going to, and he did.

7   Q    Now, staying on the topic of Rick Rahim, did there come a

8   point in time when Mr. Rahim gave you some sum of cash in some

9   dollar amount?

10  A    Yes.

11  Q    Can you just describe for us why he did that?

12  A    Rick was a businessman.  He did marketing and a lot of

13  things.  But we became friends.  We had -- well, from day one,

14  we had conversations on investments and other things.  He did

15  that with others besides me, my staff, and family as well.

16  Rick is someone always looking to make a dollar or help someone

17  make a dollar.  So it was a business investment.  That's what

18  the money was.  We talked about it and moved forward on it.

19  Q    What kind of business investments were -- are you

20  referring to?

21  A    Well, the biggest easiest one to point to would be the

22  Make Virginia Great Again logo that I had copyrighted.  There

23  was a -- Governor Northam had a faux pas.  And when that hit

24  the press that same week, I asked --

25          MS. PENG:  Objection, Your Honor.

Jenkins - Direct

1                THE COURT:  Sustained.

2    BY MR. ANDONIAN:

3    Q     Just -- if you could just focus on what the business

4    venture was that you're referring to?

5    A     Okay.  So I copyrighted the logo, Make Virginia Great

6    Again, thinking it would be a good investment for future

7    election campaigns by the Virginia Republican Party or whoever

8    wanted that phrase.  So I had -- I had done that, and Rick and

9    I's conversation quickly led to, you know, why haven't you

10   marketed that and made, you know, red shirts and hats and

11   whatever?  And that's what we did.  Thousands of dollars.  I'm

12   sorry.

13   Q     I didn't mean to cut you off.

14   A     Well, just -- I mean, we bought thousands and thousands of

15   dollars -- you know, there's probably a credit card bill if you

16   look back just for the first order of over $10,000 just in

17   shirts and hats.  And when you have to buy hundreds and

18   hundreds of small, medium, large, up to 4X, and baseball hats

19   and all that, I mean, I -- I mean, I could fill part of this

20   courtroom with the boxes in a storage area now that I still

21   have of those red shirts and hats.  COVID hit and we didn't --

22   you know, we didn't get -- I'm sorry.  I'm going too far.  I'm

23   sorry.

24   Q     So did the money that Rick Rahim gave you -- and I'm just

25   talking about kind of the cash payments.  We'll talk about the

Jenkins - Direct

1   loan in a minute.  But the cash payments, is that where the

2   money went?

3   A    Well, that's one, but I mean, yes, to business

4   investments, yes.

5   Q    Was any of the cash that Mr. Rahim ended up giving you

6   intended for the campaign at all?

7   A    No.

8   Q    We've also -- you heard testimony -- and obviously, you

9   know about a loan that you entered into, a loan agreement you

10  entered into with Rick Rahim; do you recall that?

11  A    Yes.

12  Q    And can you just tell us a little bit about what that loan

13  was for?

14  A    It was written up as a -- I think he called it a bridge

15  loan.  I was building a house in 2019, and it was nearing

16  completion.  There were overruns and costs and things.  And I

17  had put out a lot of money or borrowed money from family or

18  friends to cover things to work towards getting that completed

19  on time.  Builders have overruns and things come up, or you add

20  things, if all that makes sense.  And so anyway, that was

21  primarily one of the reasons I was -- you know, as far as

22  getting cash in to cover various things.  But that money

23  actually was -- I guess you'd say when it had come to fruition

24  and I had the money -- was part of the same thing, you know,

25  business investment for what we talked about doing.

Jenkins - Direct

1  Q    Let me ask you this:  Just a minute ago -- well, a little

2  while ago before you took the stand and Special Agent Medearis

3  was on the stand and was showing all the bank records and

4  documents, the financial documents, and he indicated that some

5  of that loan proceeds -- or all of it, maybe -- was deposited

6  into your brother Mike's bank account.  Do you recall that?

7  A    Yes.

8  Q    Why -- can you explain that?

9  A    I can't sit here right now and swear exactly.  I'm telling

10  you the best I know.  And that is -- I mean, I'm trying to

11  think how to prove it.  But I mean, it's well-known, all my

12  family, friends, everyone that knows me knows we -- my brothers

13  and I, for example -- or my parents, will share -- you know,

14  loan each other money short-term, whatever, help each other.  I

15  mean, the way that I got my property to build my first home

16  wasn't from my money.  My parents sold their home, gave my

17  brothers and I property to build on, and then from there we --

18  you know, so I'm trying to paint a picture to understand that

19  what looks like something they're painting as bad -- I can't

20  swear exactly how much I might have owed my brother at the time

21  or what I needed to pay Mike Russell, the builder, or the

22  people that I was owing -- or loader work and things I was

23  paying for.  When you're not doing anything wrong, you don't

24  try to create some paper trail to cover things.

25          MS. PENG:  Objection.

Jenkins - Direct

1           THE COURT:  Sustained.  Strike the last portion.

2    BY MR. ANDONIAN:

3    Q    While we're on the topic of money that Rick Rahim gave

4    you, do you recall the testimony from Mr. Rahim about a time

5    that you and he were in your pickup truck talking and he gave

6    you some amount of cash?

7    A    I don't remember it like that.  He gave me cash, but this

8    thing -- one of them says we were in the truck --

9    Q    Well, let me ask you -- let me ask a question about that.

10   Who was in the truck at that time?

11   A    According to him, it would be him.

12   Q    Yeah, I just want to ask your recollection based on what

13   you remember, who was in the car with you -- if anyone -- with

14   you and Mr. Rahim?

15   A    I can't swear that he gave me money in the car.  I don't

16   remember that.  The way they both -- they claimed a little

17   different --

18           MS. PENG:  Objection, Your Honor.

19           THE COURT:  Sustained.

20           Testify from your recollection, Mr. Jenkins.

21   BY MR. ANDONIAN:

22   Q    What do you -- tell us, then, what you recall about the

23   interaction with Mr. Rahim in the truck.

24   A    I know we were in the truck at some point.  I know we've

25   had many -- you know, the first meeting and others, we've had

Jenkins - Direct

1    many meals together and gone to lunch.  You know, Kevin was

2    present at some point.  I don't remember Kevin being in the

3    back of the vehicle either.  I know that was said.  I don't

4    remember it the way either of them testified.

5                 MS. PENG:  Objection, Your Honor.

6                 THE COURT:  Sustained.

7                 Strike the last response.  The answer is

8    nonresponsive.

9     BY MR. ANDONIAN:

10   Q    How do you remember that interaction?

11   A    Do I remember being in a vehicle?

12   Q    Yeah, well, I can break it down like that.  Do you

13   remember -- do you have a memory -- I want you to forget about

14   what other people have testified to here.

15        Do you have a memory of being in the truck with Rick

16   Rahim?

17   A    I was in the truck with him at multiple points, yes.

18   Q    And do you have a recollection of Rick Rahim giving you

19   money at any point in time when you were in the truck with him?

20   A    I don't remember that.

21   Q    When did Rick Rahim give you money, if not when you and he

22   were in the truck?

23   A    I'm sorry.  Say it --

24   Q    Sure.  If you don't remember Mr. Rahim giving you money

25   while you were in the truck with him, when is it that Mr. Rahim

Jenkins - Direct

1  did give you money?

2  A    Well, once standing, you know, with each other handing me

3  the money directly, not seated in a truck.  And then another

4  time at a restaurant.

5  Q    Do you recall the testimony in the exhibit that we saw

6  about Mr. Rahim's civilian helicopter pilot ID that was made up

7  from the Culpeper County sheriff's office?

8  A    Yes, sir.

9  Q    Can you just explain for us why you had that

10 identification card made up for Mr. Rahim?

11 A    No secret.  He wanted to be part of the office, just like

12 he was part of VASARS at one point with Kevin as a pilot.  I

13 knew him to be a pilot and own his own helicopter at the time.

14 As I said, we had become friends.  You know, it's just no

15 surprise.  You know, he -- he wasn't at a point where I was

16 ready to swear him in as a deputy, obviously, but I looked at

17 that as something very kind or good to do for someone who is --

18 they're your friend, you know.

19 Q    You said that you understood that Mr. Rahim had a

20 helicopter at the time you made that identification.  Did I

21 hear that correctly?

22 A    Uh-huh.

23 Q    When you gave Mr. Rahim that identification card and

24 knowing he had a helicopter, was it your expectation that he

25 would use that helicopter if you needed him to use it for the

Jenkins - Direct

1  office?

2  A    Yes.

3  Q    Mr. Jenkins, I want to jump to a different topic.

4  A    I'm sorry, could I add about that ID?

5  Q    Let me ask -- let me just ask a question.  Is there

6  something else about the identification card that we're talking

7  about for Mr. Rahim that you would like to add?

8           MS. PENG:  Objection, Your Honor.

9           THE COURT:  Well, he can answer the question.

10           THE WITNESS:  The ID card is just a standard format.

11  We're a small agency.  We make our own ID cards with a machine;

12  buy it at Staples maybe.  But Bernie Feaganes and others were

13  ones that made IDs for the office.  So Bernie and Rick had

14  become quick friends and flown together.  Bernie is a pilot.  I

15  recall, you know, Bernie was the one that was like, look, you

16  know, making this ID, there's a stock sample ID that says

17  whatever it does, deputy sheriff, what have you, on the

18  signature line, and the photo area on the ID card, for every

19  employee.  You may be -- I don't know, a jail cook or a records

20  clerk or something in the office and have an ID card that looks

21  the same as that format with a star and things as the other

22  deputy cards.  I know it seemed the other day when testifying

23  like it was odd, but it's not odd.

24           MS. PENG:  Objection, Your Honor.

25           THE COURT:  Sustained.  So it's become more of an

Jenkins - Direct

1  area of discussion, so let's move on.

2   BY MR. ANDONIAN:

3  Q    I want to turn your attention to a different topic.  And

4  this is the -- again, you sat in here and you listened to

5  witnesses, you've seen exhibits, and there's been testimony and

6  video clips of you yourself talking about channeling money

7  that's coming to you through your brothers, for example, or

8  other sources.

9       Do you recall that evidence and that testimony?

10 A    Yes.  I saw that.

11 Q    Can you explain for us why it is you would be telling

12 anybody that they could take money that was intended for you

13 and your campaign and give it through your brothers?

14 A    I think unfortunately the way -- as you're pointing to

15 those videos, I guess we all say things quickly or respond to

16 things at times and wish we had said it in a different way, but

17 nonetheless, maybe poor choices of words or phrasing, but

18 what's in my head and what I know to be proper or correct, as I

19 -- I don't have any campaign or finance training or education;

20 I'm not saying that.  But what I know and understand to be

21 right, to be legal, to be proper, and what I learned from my

22 whole life as a sheriff and as a deputy working under sheriffs

23 on their campaigns, was just that, that if you, or you and a

24 couple other people want to support a campaign, you can do so.

25 You may do so individually, you may recruit others to do

Jenkins - Direct

1    fundraisers and things of that nature, but it's up to you to

2    choose -- I guess that's what I'm trying to say -- it's up to

3    you to choose how you want to go about that donation.  If it's

4    you taking out $20 that you have, or together creating a

5    fundraiser and you make $600, and you want to create a donation

6    from six different names or the Scott Jenkins For Sheriff

7    chicken dinner proceeds -- you know, you have to document when

8    it's over a certain amount, you know, names and so forth.  I

9    hope that -- I don't know how far I can --

10   Q    But let me dig into this more.  But why would you be

11   talking about people making payments through other people

12   instead of just simply giving you money directly and declaring

13   it as a direct donation?

14   A    Well, I understand what you're asking better now, I think.

15   That's -- any politician or people who are in campaigns quickly

16   learn there's a couple of reasons.  Like if you have someone, a

17   business person or a business, for example, wants to donate --

18   it's two reasons primarily.  One is if someone wants to donate

19   $10,000 to a campaign in 2024, if you write that $10,000 check

20   in January, for example, to a small-town sheriff's campaign who

21   doesn't maybe have that many donors, well, very quickly, you

22   know, Delegate Whoever -- Bryce Reeves, Nick Freitas, whoever

23   -- is going to see that, and poach your donors, is the way, you

24   know, candidates see that.

25        So for one reason, if the person wants to donate a large

Jenkins - Direct

1    amount, then me personally and most candidates would tell you

2    they would rather they do it in smaller amounts maybe to be

3    less on the radar for people to try to plead to them for money,

4    money that you would hope to maybe get later in the year if

5    they only donated a few thousand and so on.  I hope that's

6    making sense.

7         And you know, the other thing is, too, we all know that,

8    you know, we as humans in the public reading a newspaper or

9    looking at a finance report quarterly on these campaigns, we

10   have short memories.  And if we see, you know, Tom Smith

11   donated $2,000 in January, then the quarterly report is like a

12   90-day period, then that next time they read a report in like

13   May or June, and they see there's another 2 or 3,000 by Tom

14   Smith, a lot of people looking at that -- and the media doesn't

15   even pick up and do stories either on it -- they just don't

16   notice it.  Well, it may look like Scott or whoever's campaign

17   it is is getting a lot of people donating all year long when it

18   might be the same person.  So it can give you a momentum or

19   view that, you know, more and more people are jumping on the

20   bandwagon of the campaign, and that encourages more donations

21   or more support, or just people looking to decide who to vote

22   for, see who's raising what, that you know --

23            MS. PENG:  Your Honor, I'm going to object at this

24   point.  It's nonresponsive to the original question.

25            THE COURT:  I'll sustain the objection.  It became

Jenkins - Direct

1  more of a narrative, so --

2   BY MR. ANDONIAN:

3  Q    I'll focus the question.  And what I'm hearing you

4  describing is perhaps why people might want to split donations

5  up into different amounts.  But I wanted to go back to the

6  question of why it is you would be talking about people -- if I

7  had money and I wanted to donate it to you, why you would be

8  telling me, hey, you can give it to my brother instead, instead

9  of just giving it to you directly.  Why go through your

10 brother?

11 A    I'm sorry, I thought I explained where I was coming from.

12 Q    Well, I'm just trying to -- again, we saw a number of

13 clips where you're saying something to the effect of if

14 somebody wanted to just give my brother a check and then my

15 brother could donate to the campaign, but I would know where it

16 came from -- do you recall those video clips?

17 A    Yes.  Uh-huh.

18 Q    Why is it that you were suggesting that people instead of

19 donating directly to you could give money to your brother

20 instead, and have your brother make the donation, instead of

21 them making the donation directly -- or is the answer that you

22 gave previously, is that your answer to that question?

23 A    I mean, I guess I could add to my answer that I already

24 gave, because that was accurate.  But you know, in addition to

25 that, as I understand and have always known to be the legal

Jenkins - Direct

1    standard, if I'm not the one, you know, doing that, you are

2    perfectly free to go talk to whoever you would like about

3    donating together, individually, what have you.

4        Some people don't want their name or their business -- a

5    lot of times it's a business -- tied to something.  So, you

6    know, constantly all the time -- I mean, God knows how many

7    people do that every day -- and it has nothing to do with me as

8    a candidate.  You can choose at any time to give someone money.

9    If you talk to them, if that person wants to later take that

10   money and give it to a stranger or a campaign, that's -- that's

11   something people do.  I know they do that a lot.  That's the

12   only other thing I can tell you that -- I'm not -- I don't know

13   how else I can explain that part, if that's what the question

14   is.

15   Q    Let me ask it this way.

16            THE COURT:  Let's move on from this.

17            MR. ANDONIAN:  Can I just -- one more?

18            THE COURT:  Yeah.  Yeah.

19    BY MR. ANDONIAN:

20   Q    One more question.  Let me just ask it this way:  When you

21   were making a suggestion that people could give money to your

22   brothers instead of directly to you, were you trying to suggest

23   that anybody do anything illegal?

24   A    No.

25   Q    You also saw video clips of you -- or maybe it was an

Jenkins - Direct

1    audio clip of you -- in which case you heard -- discussing with

2    Kevin Rychlik having payments come in in different amounts.

3        Do you recall that?

4    A    Yes.  I saw that.

5    Q    Can you explain what it was you meant by that when you

6    were telling Mr. Rychlik that maybe it would be better to have

7    payments come in in different amounts?

8    A    Repetitive here, but it's basically what I was just saying

9    a few minutes ago.  It's helpful to a campaign to generate

10   support, a positive impression in the community, to have more

11   donors, more donations coming in, even if it's from the same

12   person multiple times.  A lot of people do that.  And again, my

13   preference would be, unless you need the money for something

14   right away, it would be better politically, looking at a

15   campaign, to receive 1,000 or 2,000, and then again a month

16   later, whenever, another 1,000, you know, or 100, whatever it

17   is, and have multiples, because it's -- you're getting the

18   money, but getting it that way, it helps you politically.

19   Q    Was there ever any intent when you told Mr. Rychlik about

20   potentially having people split payments up into different

21   amounts to have people do something unlawful?

22   A    No.

23   Q    Was it ever your intent when you asked Mr. Rychlik about

24   having people split payments up into various amounts, to have

25   -- to help somebody conceal money in any way?

Jenkins - Direct

1    A    No.

2    Q    Mr. Jenkins, I want to turn now to another -- another

3    aspect of the trial, and I'll call your attention to a phone

4    call that we heard yesterday, I believe, between you and

5    Mr. Rychlik -- or it was a recorded conversation between you

6    and Mr. Rychlik in the parking lot of a Target in Gainesville.

7        Do you remember that?

8    A    Yeah.

9    Q    And in that conversation -- I'm just orienting you to

10   it -- in that conversation, you and Mr. Rychlik were discussing

11   a potential gun -- sale of several guns.

12       Do you recall that?

13   A    Yes.

14   Q    Mr. Jenkins, I just have to ask:  What was that

15   conversation about?  Why were you having that conversation with

16   Kevin Rychlik?

17   A    Basically to correct a problem.

18   Q    And what was that problem?

19   A    As short as I can make it, it was the dawn of an election

20   year, 2023.  I had taken donations in.  To my knowledge, first

21   reports are never due until after the first month at least,

22   February 1st, for example, at least in my brain that's what I

23   thought.  The whole time I'd been sheriff, every campaign, I've

24   always had David Myers -- or in earlier years maybe another

25   person, another assistant -- but they would always ding me,

Jenkins - Direct

1  text me, or message me to say, hey, you've got a campaign

2  report due two weeks from now, or one week from now, so that I

3  would know that if there was any deposits to be made or

4  anything -- new information to give to the treasurer, which is

5  David Jones you heard from, or one of the ladies.  In the

6  latter years, it wasn't David directly, but one of his ladies

7  like Donna or Jenny that David would communicate directly with

8  for me.  But I hadn't gotten one of those messages from David.

9  I know -- I don't know exactly the reason.  It's just -- he had

10 been out injured, a line of duty incident.  And I guess for

11 whatever reason in December, whenever that report was due, it

12 had been missed.  And you know, I had gotten checks from a

13 couple of people you heard from this week, and they were

14 deposited.  But it was -- after those checks, I had gotten

15 these cash donations.  And I had those.  I took them home, put

16 them in the vault.  So they weren't deposited and, I mean,

17 just -- it looks horrible, but it was me trying to fix -- to

18 legally fix a problem where one of a couple of things had to

19 happen:  When I realized, okay, you know, past time and there's

20 a report due, then I can try to do this to be a legal process

21 of that, and --

22 Q    Well, let me ask you this:  Why didn't you just amend the

23 report that you had missed and include the cash donations that

24 you had received?

25 A    Politics, and --

Jenkins - Direct

1  Q    What do you mean by that?

2  A    Being attacked.  I mean, I'm -- the media, the political

3  opponents, I'm constantly under attack.  So it would just -- it

4  would be like red meat for them to just come after me.

5  Q    Why -- help us understand.  Why would it be like red meat

6  by just simply filing an addendum or an amendment?

7  A    In my mind -- maybe I made too much of it, but you know,

8  panicked, whatever you want to call it.  In my mind, that's the

9  way I looked at it at that time, and that's what brought me to

10 do that, because I was -- I was trying to do something that

11 would be legal and proper to -- because, you know, that's the

12 world I've always worked in with law enforcement.  You know,

13 there were lines and things you -- when you file or sign the

14 document, that's where it matters is what goes on record.  And

15 that's what I was trying to accomplish.

16 Q    So talk us through this.  You never had a conversation

17 with anybody, those four individuals, about selling them a gun.

18 Why is it that you came up with that idea, and what was that

19 particular idea going to accomplish?

20 A    Well, it was the fastest way to solve the problem quickly

21 to do that.  Something needed to be done then, and you know,

22 Kevin is the one that knew -- they were VASARS guys or whatever

23 that came to me from him and so forth.  So, you know, Kevin

24 being a licensed gun dealer for years, and me knowing that,

25 then -- and that's the only way legally you could do it,

Jenkins - Direct

1    because the law had changed, where, you know, it used to be you

2    could sell a gun to someone with -- used with no paperwork if

3    it's not through a dealer.  But at that time, it's required.

4    So in order to make that transaction, Kevin being a licensed

5    federal firearms dealer, he was just the perfect logical

6    solution to go to, and of course to communicate directly with

7    them about, you know, making it happen.

8    Q    So were you -- is it fair to say that you were essentially

9    changing the money they gave you from a donation to a purchase?

10   A    Yes.

11   Q    Did you bring firearms to that meeting with Mr. Rychlik in

12   the Target parking lot?

13   A    I did.

14   Q    And I think we saw them in the courtroom the other day,

15   and we saw pictures of them as well.  Are those the firearms

16   that you brought with you?

17   A    I saw the pictures.  I didn't see them.  But yes, they

18   were the ones that I owned.

19   Q    And my next question was going to be, those were, in fact,

20   your guns?

21   A    Yes.  I have a large, large collection.  Collected all my

22   life.

23   Q    Were those guns valuable?

24   A    Very.

25   Q    And I should be more particular.  Were they valuable in

Jenkins - Direct

1    terms of their monetary worth?

2    A    Oh, yes.  Yes.  Thousands of dollars.

3    Q    At the end of that conversation with Mr. Rychlik in the

4    parking lot -- and we saw, it was an exhibit -- a handwritten

5    receipt that had the different guns on them, and you and

6    Mr. Rychlik signed it.  Do you recall that?

7    A    Yes.

8    Q    At the end of that meeting, did you, in fact, leave the

9    guns with Mr. Rychlik?

10    A    I did.

11    Q    What was your intent that Mr. Rychlik would do with those

12    guns?

13    A    At some point after that night, he would complete the

14    actual transaction of signing the guns over to each of those

15    people.

16    Q    And what, if anything, would become of the money, the cash

17    that they gave you at that point?

18    A    Well, it would be simply a sale of a gun.  So it would be

19    my money to keep and do as I wish, I guess, at that point.

20    Q    Were you trying to do anything illegal by suggesting that

21    you convert these, at one point, donations, into just a sale of

22    guns?

23    A    No.  The opposite.  I was trying to make it legal.

24    Q    And again, what were you worried about if you didn't do

25    the gun sale that you had talked to Mr. Rychlik about -- what

Jenkins - Direct

1  were you worried would happen if you otherwise kept the cash

2  that was given to you by those individuals?

3  A    Well, it has to be documented.  I couldn't -- you know, it

4  would be a crime if I just kept the money.  Then it would be

5  what they're trying to say, a bribe, or whatever it would be --

6  what it is.  I was trying to do just that, and if that was not

7  completed or successful, I've only got two options, and that is

8  it's a donation into the campaign, which paperwork has to be

9  done and, you know, public reporting and so on.  The only other

10 alternative is it could be a loan, which again, I would have to

11 contact them, get a change from them verbally or something to

12 ask could it be created as a loan, which, you know, that's

13 probably more headache than doing what I did with the sale of

14 the firearms.  But those are the only options to do it legal,

15 is one of those ways.

16 Q    Is the reason -- so let me -- sorry, let me orient you

17 again.  And again, this is going back to Special Agent

18 Medearis's testimony before we broke for lunch.  And you saw

19 that he had a chart up about what happened to the cash

20 donations that were made by a certain number of individuals,

21 and that those donations were not reported on the Scott Jenkins

22 For Sheriff financial disclosure report.

23       Do you recall that?

24 A    Yes.  Yeah, the spreadsheet.

25 Q    The spreadsheet.

Jenkins - Direct

1        Why is it that the cash payments that you received from

2   the individuals that we're talking about -- I believe it was

3   Mr. Howell, Mr. Cooper, Mr. Sandi, or Mr. McKee and Mike -- why

4   is it that those cash payments were not reported on the Scott

5   Jenkins For Sheriff financial reporting documents?

6   A    I think I understand what you're asking as far as the

7   timing.  Why it wasn't was I didn't realize there was a report

8   due prior to when I went to Kevin.  And then I discovered that

9   there was one that had been missed.  Again, David would

10  normally text me and let me know.  And so I had missed -- you

11  know, in off years -- '20, '21, and '22 were not election

12  years.  2023, which is when this happened in January, was the

13  election year.  And to my brain, I just assumed -- I mean, no

14  one had called or told me -- I thought February 1 or March 1 or

15  something would be the first report for the year when it's due.

16  And, you know, that's when we want to deposit what we can, the

17  war chest -- you know, it sounds like it's a bad thing.  It's

18  -- you know, you deposit a bunch of money and show, you know,

19  support.  I just thought, you know, that's when it was due, was

20  it was coming soon.  But as it turns out, there was one -- from

21  the time they had given me that money, there was -- I don't

22  know, sitting here right now, I can't say when it was, but at

23  some point prior to that.

24  Q    In your understanding, would you have to report a private

25  gun sale on a campaign finance disclosure document?

Jenkins - Direct

1   A    A gun sale?  No.

2   Q    While we're on the topic of reporting, again, you were in

3   the courtroom during Mr. Rahim's testimony, and you heard

4   Mr. Rahim talking about a number of things he did for your

5   campaign -- or at least tried to do for your campaign.  One

6   thing that came up were paying for billboards, there were some

7   fliers or postcards that were made, and maybe some other

8   objects.  And you saw -- do you recall that testimony?

9   A    Yes.

10  Q    And you -- also we were shown some exhibits of campaign

11  finance disclosure documents for your campaign.  And none of

12  those items appeared anywhere on those documents.  Can you

13  explain why that is?

14  A    Because they shouldn't.

15  Q    Well, why is --

16  A    They weren't campaign material -- because he runs with an

17  idea and goes and makes these little trinket knives that say

18  Culpeper Sheriff Scott Jenkins.  Doesn't say For Sheriff.  It

19  doesn't say paid for by Scott Jenkins For Sheriff.  That's not

20  campaign materials.  It was totally done -- that was just one

21  example of things he'd run and do -- you know, some -- I guess

22  a Chinese company made these little pocket knives, and you

23  know, he probably ordered a couple hundred of them.  That's

24  just clear one example where I remember he -- because he was

25  told, well, we can't use those, that's -- you know, and he'd

Jenkins - Direct

1  probably rather throw them in the trash than start handing them

2  out to people.  But it could be an ink pen or anything.  But

3  like you mentioned, fliers, that one I remember too because

4  David Myers and his wife Patty have worked on campaigns for me

5  multiple times and done a lot of leg work with laying out

6  fliers and things on the computer.  And there was this batch of

7  fliers -- I remember my brother, David, his wife, and others in

8  the campaign were upset that --

9            MS. PENG:  Objection.

10           THE COURT:  Sustained.

11  BY MR. ANDONIAN:

12  Q    Let me just ask again.  Why -- I mean, the question is why

13  none of these items showed up on the campaign finance reports

14  as -- we heard the term in-kind donations?

15  A    It was something he went and did, and he didn't do it

16  right, without asking anybody.  He wanted to do good things.

17  His intent was right.  I'm not bad-mouthing him about that.

18  It's just he runs and would do things like these fliers.  They

19  didn't have paid for by Scott Jenkins For Sheriff.  So you can

20  throw them in the trash or start a fire with them, but they're

21  no good.  And nothing like that is anything -- if it's not used

22  for the campaign, then it's not an in-kind donation.

23  Q    Well, that is going to be my question, then.

24       Did you use any of those items for the campaign?

25  A    No.  When you mentioned a billboard, I don't know the

Jenkins - Direct

1   details of that.  I mean, I -- I've never had any -- I don't

2   get my fingers in that because I don't know anything about --

3   I'm not tech savvy.  So whether he laid out the billboard on

4   his -- he did marketing and things, and had the ability to --

5   like I said, he set up this web page and did sales marketing to

6   Make Virginia Great Again stuff.  Same thing for this.  He may

7   have -- he may have laid out this billboard, did things for

8   that.  I don't know.  I never -- I didn't get in the weeds, but

9   you know, he and David and other people that handle the

10  campaign stuff, it's up to them if they use something to get it

11  reported to Donna or Jenny and have it on the list.  But I

12  wouldn't know.

13  Q    Okay.  So I just want to make sure I'm understanding.

14  What you're saying is that David Myers, who we heard from

15  obviously in this courtroom, you were relying on -- were you

16  relying on him to make a report of, for example, the billboards

17  or anything else that was used for the campaign?

18  A    Yeah.  I always did.  I mean, I never -- I never did those

19  things.  That was something I greatly appreciate, but that's

20  what they always did.

21  Q    I'm going to turn your attention to a different topic

22  again.  Another one that we just heard about before we broke

23  from lunch when Special Agent Medearis was testifying, and it

24  was your purchase of a gun at a gun show at the Dulles Expo

25  Center or wherever it was.

Jenkins - Direct

1       Do you recall that?

2   A   Yeah, sure do.

3   Q   And there was testimony from Special Agent Medearis about

4   how you purchased that gun, specifically that you used cash for

5   that.

6       Do you recall that?

7   A   Yes.

8   Q   Can you talk us through a little bit about the

9   circumstances of you buying that gun?

10  A   Yes.  And I hope I can say this.  It's a simple process.

11  Yes, I paid cash for the gun.  That was on a Saturday afternoon

12  at the Dulles gun show.  I constantly, my whole life, go to gun

13  shows constantly throughout the year.  I buy, trade, swap guns

14  since I was a teenager in high school.  So this is a normal

15  week of the Chantilly gun show.  Friday afternoon they're open

16  3 to 8.  I go there, I discovered this gun that I want to buy.

17  Friday afternoons are times when you just kind of go, have

18  dinner with friends, whatever, look and see what's there,

19  before the crowd hits on Saturday.  So I identified this gun

20  that I wanted.  It's $3,000.  Talked to the older gentleman

21  that had it, said you know, I left, came down here, don't have

22  that cash on me right now.  Huge line over at the ATM, but I

23  couldn't get that much out of the ATM then anyway.  So he said,

24  you know, I'll hold it, I'll have it in the morning.  I'm

25  coming back Saturday morning to get it first thing when they

Jenkins - Direct

1  opened at 9.

2       In Amissville that morning we had a barricade stand-off

3  with a man having his --

4              MS. PENG:  Objection, Your Honor.

5              THE COURT:  Focus on what happened, so -- as to why

6  he spent the $3,000 in cash.

7              MR. ANDONIAN:  I think he's trying to explain what --

8  the circumstances around why he came back.

9              THE COURT:  Let's focus on that.

10             THE WITNESS:  I couldn't get there when they opened

11 to buy the gun at 9.  I was -- I was detained.  I was working

12 until noon when the bank's closed.  So, you know, in my gun

13 vault where I had taken that money they gave me, and it was

14 still sitting there -- I mean, I have silver and things I

15 collect.  There's other money of mine in the safe.  But when

16 you have an envelope that's all hundreds as opposed to, you

17 know, your other -- I just -- I grabbed an envelope because

18 again, nothing illegal about that.  Nothing wrong.  The fact

19 that it may have been the same dollars that was out at one of

20 the -- you know, multiple envelopes where they should be since

21 the time I got them right there, I took money out of my --

22 that's the simple answer.  I took money out of my safe,

23 hundreds, smallest bundle you can carry in an envelope, and I

24 went and bought the gun.  And money -- you know, none of that

25 money was missing from their donations around the safe.  You

Jenkins - Direct

1  know, one moves -- for reporting for donations, there is no

2  requirement that if you --

3           MS. PENG:  Objection, Your Honor.

4           THE COURT:  Sustained.  Move on.  Next question.

5  BY MR. ANDONIAN:

6  Q    I want to go back to another scene, if you will, with you

7  and Mr. Rychlik, and you were outside standing near some

8  vehicles, and you were -- this could be an audio recorded call.

9  Your recollection controls over mine.  But you were having a

10 conversation with Mr. Rychlik about preferring to do your part

11 of things first, and then maybe sometime later a donation were

12 to come in.

13      Do you remember that?

14 A    I think so.

15 Q    And in this conversation, you're saying to Mr. Rychlik --

16 you said to Mr. Rychlik -- and again, it was an exhibit that

17 was played -- I would rather do my part, being swearing them in

18 first, and then maybe the money comes in at some other point in

19 time.

20      What did you mean by that?

21 A    That's just repeating the same thing I've said many times.

22 It's just that.  It's appearances, why we're sitting here now,

23 when we got to the point where multiple things are happening at

24 one time, it looks like something that it isn't.  It's

25 perfectly okay, but appearances, perspective; if you do one

Jenkins - Direct

1   thing one day and another another day or week or whatever,

2   month later, then you don't get attacked.

3   Q   Okay.  So are you saying that you were -- I'm just trying

4   to make sure I'm understanding you -- that you were looking at

5   it from a political optics perspective, that it might look

6   better to not have everything happening in this

7   abbreviated way?

8            MS. PENG:  Objection, Your Honor.  Leading.

9            THE COURT:  It's leading.  Rephrase.

10  BY MR. ANDONIAN:

11  Q   I think you answered it.  I'll move on.

12       Going back to Kevin Rychlik, we've talked about his role

13  as a lieutenant, his role with the auxiliary deputy program.  I

14  just want to make sure I'm understanding clearly.  What, if

15  any, role did Kevin Rychlik have with respect to recruiting

16  auxiliary deputies for the Culpeper County sheriff's office?

17  A   Well, obviously as the head of that division, like a

18  lieutenant over another division, patrol, jail, or whatever,

19  he's working directly with those people, and those are the

20  supervisors of -- a jail group, for example, are going to be

21  the best people to know the right fit and what they're looking

22  for at any given time for their division.  For example, he

23  might need -- we were going to stand up -- he was working on

24  standing up a new big search and rescue division of

25  auxiliaries.  So we would want drones.  It's in his outline,

Jenkins - Direct

1    his PowerPoint he gave to the office multiple times in his

2    plans.  We would want drones, canines.  Rick Rahim had a SHERP,

3    amphibious vehicle, all-terrain vehicle, ATVs, horses, things

4    of that nature.  So Kevin, as the one that's going to be

5    heading that program, is the main guy to scan and look and

6    interact with people that would be bringing to bear what we

7    need, the best resources, not just the person themselves,

8    like -- you know, like Kevin being a pilot and owning a SHERP

9    that is an amphibious vehicle, he had that available for us.

10   Q    Did you trust Mr. Rychlik to bring you qualified

11   candidates to be auxiliary deputies?

12   A    Yes.  He did it for years.

13   Q    What, if any, role did Mr. Rychlik have in helping you

14   raise money for your campaign?

15   A    We talked, you know, from early on years.  You know, Kevin

16   was great.  I mean, we had -- you know, there's other people

17   that help you with your campaign, fundraising and things, of

18   course.  You know, some people throw dinners or, you know,

19   silent auctions, and all kinds of things for local elections,

20   but Kevin, you know, was just one of those people -- but

21   certainly as big as anyone, because he had the contacts for his

22   VASARS unit.  And as I already explained, you know, the VASARS

23   unit was part of our office, because it came and supported our

24   operations.

25        So I hope I'm explain -- you know, Kevin -- Kevin is one

Jenkins - Direct

1  of the best we'd ever had at finding people because they

2  already donate to VASARS.  It's a very expensive volunteer

3  rescue service.  It's hundreds of thousands of dollars a year

4  to run it.  So he had lots of donors and people -- they did an

5  annual gala to raise money, and we would help with that.  You

6  know, I've attended that multiple times, that dinner.

7       So I don't want to say too much.  I mean, there's so much

8  I could say.

9  Q    And I know.  I'll focus you, that when Kevin would bring

10  you individuals and recommend them to the auxiliary deputies

11  and also indicate that they wanted to make a donation, was it

12  your understanding that the donation -- or them becoming

13  auxiliary deputies was entirely dependent on them giving a

14  donation?

15  A    Absolutely not.

16  Q    Why did you ultimately swear in the individuals that

17  Mr. Rychlik had brought to you to become auxiliary deputies?

18  A    Because Kevin brought them.  He brought his brother, his

19  wife, and others who I'd never asked, never received a dime

20  from.  I don't know how many -- I mean, I can go on, but I

21  mean, that's not -- it wasn't a requirement.  Some did, some

22  didn't.  We're talking about the ones that did, but there

23  were --

24            MS. PENG:  Objection, Your Honor.

25            THE COURT:  Sustained.

Jenkins - Direct

1          MS. PENG:  Move to strike.

2          THE COURT:  I'll strike the last portion of that.

3   BY MR. ANDONIAN:

4   Q    Was your intent to take a bribe at any point in time in

5   exchange for giving out a deputy auxiliary badge?

6   A    No.

7          MR. ANDONIAN:  Your Honor, may I just have one moment

8   to consult?

9          THE COURT:  Yes, sir.

10         (Pause.)

11         MR. ANDONIAN:  Thank you, Mr. Jenkins.  That's all I

12  have.

13         THE COURT:  All right.  Ladies and gentlemen, we've

14  been going for about an hour and a half.  Let's take a break

15  until about 3:15, and then we'll come back as well.  Please do

16  not discuss the case amongst yourselves or begin to make any

17  decisions at all.  And with that, we'll allow you to be

18  recessed until 3:15.

19  (*Jury out, 3:01 p.m.*)

20         THE COURT:  You all please have a seat.

21         So Mr. Jenkins, during the break, you cannot have any

22  discussion at all about your testimony, including with your

23  lawyers, since you're still on the stand.

24         Otherwise, Ms. Peng, anything we need to address from

25  the government's standpoint before we recess?

Jenkins - Cross

1              MS. PENG:  Not at this time, Your Honor.

2              THE COURT:  Mr. Andonian?

3              MR. ANDONIAN:  No, Your Honor.

4              THE COURT:  All right.  Very well.  We'll stand in

5    recess until 3:15.

6              (Recess.)

7              THE COURT:  You all please have a seat.  We're back

8    on the record in the matter of *United States v. Jenkins*.  Let

9    the record reflect the government is present by its counsel.

10   The defendant likewise is present along with the benefit of

11   counsel.

12             Ms. Peng, anything we need to address before we bring

13   the jury in?

14             MS. PENG:  No, Your Honor.

15             THE COURT:  Mr. Andonian?

16             MR. ANDONIAN:  No, Your Honor.

17             THE COURT:  All right.  Let's bring the jury in.

18   **(***Jury in, 3:16 p.m.***)**

19             THE COURT:  Ladies and gentlemen, please have a seat.

20             All right.  Ms. Peng, any cross-examination?

21             MS. PENG:  Yes, Your Honor.

22             THE COURT:  Yes, ma'am.

23                        CROSS-EXAMINATION

24    BY MS. PENG:

25   Q    Hello, Mr. Jenkins.

Jenkins - Cross

1    A    Hello, ma'am.

2    Q    You served as sheriff of Culpeper County for 12 years; is

3    that right?

4    A    Yes, ma'am.

5    Q    And before that, how many years did you spend in law

6    enforcement?

7    A    I began in 1990.

8    Q    So you've been in law enforcement, say, for over 30 years?

9    A    Yes, ma'am.

10   Q    And so you understand the importance of good law

11   enforcement as much as anyone, right?

12   A    I would say so.

13   Q    And you agree that it's important for law enforcement to

14   be honest?

15   A    Yes.

16   Q    To have integrity?

17   A    Yes.

18   Q    Because the public relies on them?

19   A    Yes.

20   Q    Places their trust in their law enforcement officers?

21   A    Yes.

22   Q    And your main duty as the sheriff of Culpeper County was

23   the uphold the law for the citizens of Culpeper, correct?

24   A    Yes.

25   Q    You were the top law enforcement officer for Culpeper

Jenkins - Cross

1    County?

2    A     Yes.

3    Q     And in order to uphold the law, you have to know what the

4    law is, right?

5    A     Correct.

6    Q     And would you agree with me that a law enforcement

7    officer, let alone the top law enforcement officer for a

8    county, should know more than the average citizen the

9    importance of following the law?

10   A     Yes.

11   Q     And not ways to get around it, right?

12   A     Yes.

13   Q     Because upholding the law is their job, right?

14   A     Yes.

15   Q     And would you agree with me that it's also important for

16   law enforcement officers to tell the truth?

17   A     Yes.

18   Q     That there are many criminal proceedings that depend on

19   the truthful testimony of law enforcement officers?

20   A     Yes.

21   Q     Testimony that could land people in prison, right?

22   A     Yes.

23   Q     And given your 30 years of law enforcement experience, you

24   know that the Constitution has special rules governing the

25   truthfulness of testimony by law enforcement officers, right?

Jenkins - Cross

1  A    Yes.

2  Q    And that a finding of untruthfulness by a court of a

3  police officer is a really big deal?

4  A    Yes.

5  Q    Because that's a record that could follow around that

6  officer for the rest of their career?

7  A    Yes.

8  Q    And you also understand that taking an oath to tell the

9  truth means that you're obligated to tell the truth, right?

10  A    Yes.

11  Q    And you just took an oath today to tell the truth before

12  this jury?

13  A    Yes.

14  Q    And you agree with me that it's really important not to

15  lie when you've taken an oath?

16  A    Yes.

17  Q    Isn't it true that a federal court has previously found

18  you had lied under oath?

19  A    Are you asking that there was a trial and I was able to

20  defend myself?

21        MR. ANDONIAN:  Your Honor, I'll object to this.

22        THE COURT:  She's on cross.  I'm going to let her

23  explore.

24  BY MS. PENG:

25  Q    My question is, not in this trial, but previously in your

Jenkins - Cross

1  law enforcement career, isn't it true that a federal court has

2  previously found that you had lied under oath?

3  A    The inmate --

4  Q    That's a yes or no question.

5  A    Then no, because the inmate told the truth.  It's a

6  deposition.  It's on record.  We were exonerated, Mack and I

7  both, Lightfoot said I never threatened him.  We didn't do

8  anything of the sort.

9  Q    Isn't it true that a federal court had previously found

10  you had engaged in outrageous misconduct?

11  A    That was a hearing held with no input from us before we

12  ever heard of it.

13  Q    And in fact, because of your untruthful testimony and your

14  outrageous misconduct, that led to the wrongful conviction of

15  an innocent man, a 15-year-old boy; isn't that accurate?

16  A    No, that's not.  That's a finding without us defending

17  ourselves, and later the truth was found.  I'd love to get into

18  the details, and let's get the depositions.  This would be

19  amazing.  I hope we can dig at this.  This will show -- Gary

20  Close, James Mack, and I, did nothing wrong, and it's on the

21  depositions.  I'd love -- let's bring all that out.  We were

22  exonerated.  We didn't do what they accused us of.  This is

23  wonderful.  It shows my honesty.

24  Q    So you disagree that there was a court finding that found

25  that a prior conviction --

Jenkins - Cross

1   A    The --

2            THE COURT:  Mr. Jenkins, allow Ms. Peng to finish her

3   question.

4    BY MS. PENG:

5   Q    So you disagree with me that there's a federal court order

6   that vacated the conviction of someone who you had put in

7   prison?  You disagree with that fact?

8   A    Are you not going to say what happened after it?

9            THE COURT:  Answer the question, please.

10            THE WITNESS:  Yes, sir.  That occurred.

11            I'm sorry, Your Honor.

12  BY MS. PENG:

13  Q    I'm sorry, that was a yes, that did occur?

14  A    That occurred.

15  Q    And you weren't on trial in that case, correct?  You were

16  not on trial in that case?

17  A    No.

18  Q    But you're on trial in this case?

19  A    I'm not following you on that case.  I was not on trial.

20  What do you mean?

21  Q    You were not the defendant on trial in that case we were

22  just discussing where the conviction was vacated.  You were a

23  witness in that case, correct?

24  A    Correct.  It was our case that we prosecuted, the

25  Commonwealth's Attorney and us as detectives.

Jenkins - Cross

1  Q    But you are the defendant on trial in this case, right?

2  A    Yes.

3  Q    And you've taken an oath to testify truthfully, correct?

4  A    Yes.

5  Q    All right.  Now, in your 30 years as a law enforcement

6  officer, you have to deal with a whole host of people

7  committing all kinds of crimes; isn't that true?

8  A    Yes.

9  Q    How many criminal cases, ballpark, would you say you have

10  handled in your long experience as a law enforcement officer?

11  A    Criminal cases -- I mean, I spent ten years as a

12  detective, patrol a lot of years.  Hundreds.  I guess it could

13  be thousands.  I don't know.

14  Q    It could be thousands?

15  A    Could be.

16  Q    So it's fair to say that you're very familiar with how

17  people commit crimes?

18  A    Yes.

19  Q    That means you're also very familiar with how people who

20  commit crimes try to avoid getting caught?

21  A    Say that again.

22  Q    That means you're also familiar with how people who commit

23  crimes try to avoid getting caught?

24  A    Oh, yes.  Yes, I'd say so.

25  Q    So they might -- you've seen examples of people evading

Jenkins - Cross

1    arrest?

2    A    Yes.

3    Q    They would try to destroy or hide evidence?

4    A    Yes.

5    Q    They would try to blame other people?

6    A    Yes.

7    Q    They'll try to lie?

8    A    Yes.

9    Q    So you've seen up and close many, many examples of how

10   people try to avoid getting caught for the crimes that they've

11   committed?

12   A    Yes.

13   Q    Now, in addition to being an experienced law enforcement

14   officer, you're also an experienced politician, right?

15   A    Yes.

16   Q    You were elected to sheriff of Culpeper County three

17   times?

18   A    Yes.

19   Q    Elected means that, you know, the people of Culpeper voted

20   for you to represent them as the chief law enforcement officer?

21   A    Correct.

22   Q    You were elected to serve and protect them?

23   A    Yes.

24   Q    And each time you were elected, you had to take an oath of

25   office?

Jenkins - Cross

1    A    Yes.

2    Q    In fact, you took an oath three times?

3    A    I taken oaths more than that.

4    Q    And what did you swear to when you took that oath three

5    times?

6    A    Paraphrasing, to uphold the Constitution of the United

7    States and the Commonwealth of Virginia.

8    Q    Did it also include to faithfully and impartially

9    discharge all your duties?

10   A    Yes.

11   Q    And in the course of being elected as sheriff, you ran

12   several campaigns?

13   A    Yes.

14   Q    And in running those campaigns as a politician, you

15   understand the importance of keeping up a good public persona,

16   right?

17   A    Yes.

18   Q    In fact, you just testified that you were concerned about

19   people attacking you?

20   A    Yes.

21   Q    So you understand that you really want to paint a good

22   picture for the public in order to be elected; isn't that true?

23   A    Yes.

24   Q    And you understand in order to do that, you have to paint

25   a good picture and tell a good story for them?

Jenkins - Cross

1  A    Yes.

2  Q    And you understand the value of a good spin on something

3  because you want to get elected?

4  A    Yes.

5  Q    And so when you told Kevin Rychlik that you leave yourself

6  two to three avenues out in tough situations, I mean, that's

7  just you drawing on your experience as a politician, right?

8  A    I'm drawing a blank on the quote, but that sounds

9  accurate.

10  Q    That's accurate?

11       And when you told Kevin Rychlik about the Rahim situation

12  and said, you know, you could spin that and say that with a

13  straight face to anybody I want, that's you talking about how

14  you're able to spin that so that you can sell a good story to

15  the public if you had to, right?

16  A    What was it referring to?

17  Q    When you were talking to Kevin Rychlik about Rahim and you

18  said you could spin that and say that with a straight face.  Do

19  you remember that?

20  A    I guess I don't know -- spin what?  I'm not --

21  Q    But you're familiar with the idea of spin?

22  A    Yes.  Yes.

23  Q    And you agree with me that as a politician, as an

24  experienced candidate, you understand the value of a good spin?

25  A    Yes, certainly.

Jenkins - Cross

1  Q    Now, I want to talk to you a little bit about the office

2  that you led as sheriff.  You were the only one with the

3  authority to appoint auxiliary deputies, right?

4  A    To appoint any staff member of the sheriff's office.

5  Q    Okay.  To appoint any staff member.

6       So as the sheriff, you had the final say on who would get

7  hired, right?

8  A    Yes.

9  Q    Who would get fired, right?

10 A    Yes.

11 Q    Nobody else had the authority to do that, right?

12 A    No.

13 Q    And you would agree with me that it's an important

14 responsibility to oversee a sheriff's office?

15 A    Yes.

16 Q    And you took that responsibility seriously, didn't you?

17 A    Yes.

18 Q    And you kept track of what was going on in your office,

19 right?

20 A    I tried.

21 Q    You liked to be informed, because you are the ultimate

22 authority over that office?

23 A    Yes.

24 Q    Kevin Rychlik was someone that you hired, right?

25 A    Everyone is hired by the sheriff, yes.

Jenkins - Cross

1  Q    And so Kevin Rychlik did not have the authority to appoint

2  auxiliaries, right?

3  A    Well-established, no.  No one does but the sheriff.

4  Q    And you agree with me that you tried to do a good job as

5  sheriff, which meant that you kept track of what was going on

6  in your office?

7  A    I tried, but no one can when you have 150 employees, 200

8  inmates, and you know, 60, 70,000 citizens.  You do your best,

9  yes, if that's what you're asking.

10  Q    You tried your best to keep track?

11  A    I tried, but obviously I can't keep up with everything.

12  Q    And I think I heard you say with respect to the

13  auxiliaries on direct that your expectation for those deputies

14  was that they would be like any other deputy if called upon; is

15  that right?

16  A    Could you say that once more?

17  Q    I thought I heard you say on direct testimony that your

18  expectation for an auxiliary deputy is the same as any other

19  deputy if you call upon them?

20  A    I don't know that I said the same expectation, because

21  there's not the same expectation for every deputy.  But to be

22  called upon, yes, any employee expects to be called upon -- if

23  they're called upon by the sheriff, they serve at the pleasure

24  of the sheriff.  So if they're called upon, they're expected to

25  respond if needed, yes.  Is that what you're asking?

Jenkins - Cross

1    Q    Well, let me ask you this:  What was your expectation of

2    what auxiliary deputies would do for Culpeper County?

3    A    It all depends on the auxiliary.  They're subject to call

4    upon for whatever it may be.  As I said in the media, thousands

5    of people --

6    Q    No, the question was directed.  What did you expect the

7    auxiliaries in your office to do?

8    A    What I said.

9    Q    Which is?  Which is what?

10   A    It's all different.  It depends on the auxiliary.  There's

11   no standard, you know, one size fits all for any of them.  They

12   all bring various things to the table.  I mean, I tried to go

13   into some of those earlier and got stopped.  Do you want me to

14   list as many as I can?

15   Q    So could an auxiliary be called to respond to a criminal

16   violent situation?

17   A    Even a citizen can.  The Code of Virginia allows us to

18   call upon a citizen, and they must assist us if we need help.

19   Q    Can you please answer the question that I asked?  Is that

20   could an auxiliary -- so the answer is yes, right?

21   A    Can you ask me again?

22   Q    Could an auxiliary deputy be called on a call for service

23   to respond to a 911 call?

24   A    Yes.

25   Q    Could an auxiliary carry a firearm?

Jenkins - Cross

1    A    Yes.  Whatever the sheriff chooses.

2    Q    So they could perform any duty that a regular deputy could

3    be called upon to perform; is that right?

4    A    If a sheriff chooses.

5    Q    That would be you?

6    A    Yes.

7    Q    Now, you also stated that you had wide latitude to appoint

8    auxiliary deputies on direct examination; do you remember that?

9    A    Yes.

10   Q    Do you understand that wide latitude to include appointing

11   them in violation of the law?

12   A    No, not in violation of the law.

13   Q    So you understand that wide latitude does not mean that

14   you could appoint them in exchange for bribes, right?

15   A    Correct.

16   Q    Are you familiar with the Culpeper ordinance -- the

17   Culpeper ordinance?

18   A    The Culpeper County Ordinance Book?

19   Q    Yes, the Culpeper County ordinances?

20   A    I'm familiar with them, but I mean, I don't have any

21   recall of particular ordinances, but I know they exist.

22   Q    Do you recall the exhibit that was the Culpeper ordinance

23   governing auxiliary deputies that was shown in this courtroom?

24   A    I saw it, yes.

25   Q    So are you familiar with that ordinance?

Jenkins - Cross

1   A    Only what we've seen.

2   Q    So you were not familiar with it before you saw it in the

3   courtroom today -- in this trial?

4   A    I became familiar with it during this investigation, but

5   not before.  I can say more, but again, I don't want to --

6   Q    Okay.  So -- but you understand that the Culpeper

7   ordinances are laws passed by the Board of Supervisors for

8   Culpeper County, right?

9   A    Right.

10  Q    And the Board of Supervisors are the governing body for

11  the County of Culpeper and responsible for enacting laws.

12  They're kind of like the legislature for Culpeper County,

13  right?

14  A    County ordinances, not state law.

15  Q    Okay.  So if there's a Culpeper ordinance, it applies

16  within the County of Culpeper?

17  A    And the sheriff enforces many of those ordinances as he

18  chooses.  He has the authority and discretion of assigning

19  resources and enforcing ordinances, state law, and so forth.

20  Q    My question was:  If there's a Culpeper ordinance on the

21  books, it applies within the County of Culpeper, correct?

22  A    It should.

23          MS. PENG:  Can we pull up the Culpeper ordinance 725,

24  please.

25   BY MS. PENG:

Jenkins - Cross

1  Q    Have you seen this before?  I'll direct you to the top

2  where it says auxiliary deputy force.

3       Do you see that?

4  A    I see it.

5  Q    Would you agree with me that this applies to the Culpeper

6  sheriff's office?

7  A    When you're saying applies, are you asking me is a sheriff

8  required to abide by that or enforce that?

9  Q    I'm asking you -- you just agreed with me -- that this is

10 a Culpeper ordinance that governs -- that applies in Culpeper

11 County.  And so yes, I'm asking you, does this apply to your

12 particular sheriff's office as you ran it?

13 A    No, it did not.

14 Q    So you did not follow this ordinance?

15 A    No, we did not.

16 Q    So you didn't follow, you know, any of the definitions or

17 the appointment and training of auxiliary deputies set forth in

18 this ordinance?

19 A    No.  I wasn't even aware it existed.

20 Q    You were not aware that this existed?

21 A    No, ma'am, not until the investigation brought it forth to

22 my attention.  I stood -- if it helps you to understand, I

23 stood in a public meeting in December of 2019 --

24 Q    If you -- if I could ask the questions, that would be

25 good.

Jenkins - Cross

1  A    Yes, ma'am.  I'm trying to help you understand where --

2  what I --

3                    (Overlapping speakers.)

4  Q    I appreciate that.  Okay.  So you had never seen this

5  before -- before this case came to light?

6  A    No, ma'am, I had not.

7  Q    And you ran a sheriff's office in Culpeper County?

8  A    Correct.

9  Q    And you had an auxiliary deputy program, as you called it,

10 in your sheriff's office?

11 A    Correct.

12 Q    And your understanding is that your sheriff's office did

13 not have to abide by this ordinance?

14 A    Are you looking for a yes/no type answer, or do you want

15 me to --

16 Q    I think it's a yes or no question, sir, if you can answer

17 yes or no.

18 A    Okay.  Ask it once more.

19 Q    I'm sorry?

20 A    Ask it once more.

21 Q    Oh, so your understanding is that this ordinance did not

22 apply to the sheriff's office when you were running it?

23 A    As the elected Constitutional sheriff of Culpeper County,

24 no, I am not required to abide by that ordinance made by the

25 Board of Supervisors that a Constitutional officer does not

Jenkins - Cross

1   answer to.  And that is established law.  And if we're aware of

2   what could be an unconstitutional law, then we can act in that

3   capacity as well to address those, if it's enacted by the state

4   legislature even.

5   Q    We can take that down.

6        Now, can we pull up the general order, which is Exhibit

7   723.

8        Sir, I think I heard you say on direct -- I think I heard

9   you say on direct that you never have seen this before --

10  before this trial; is that right?

11  A    Not that I know of, no.

12  Q    Okay.  So -- I'm sorry, what was that?

13  A    Absolutely not.

14  Q    You've never seen this before?

15  A    If I saw it, it would be maybe as a manual, might have

16  been flipped -- I never read it or comprehended anything to do

17  with that, no.

18  Q    Okay.  So you agree with me that it says Culpeper County

19  Sheriff's Office General Order?

20  A    Certainly.

21  Q    And then it says approved by Scott H. Jenkins?

22  A    Correct.

23  Q    But you're saying you never approved this?

24  A    No.  The whole manual has my name on it.  It's my manual.

25  Q    Oh, so you agree with me this was in place when you were a

Jenkins - Cross

1  sheriff at Culpeper?

2  A    I would assume, because that's what I've been told by the

3  investigation, and what's been presented in recent days.

4  Q    But you've never read this prior to the trial?

5  A    No, ma'am.  My staff can tell you that my --

6                        (Overlapping speakers.)

7  Q    But you just never read this before?

8  A    No, ma'am.

9  Q    Okay.  But would you -- you agree with me that was in

10 place -- or most likely in place, because you don't know one

11 way or the other?

12 A    I am confident one of my accreditation officers, either

13 Chad McKnight or one before him -- most likely one of them

14 wrote that general order and had it placed in the manual.  I

15 would -- I can't swear to that, but yes, that's their job.

16 Q    Okay.  But we just agreed that you were the person elected

17 to the office, right?

18 A    Certainly.

19 Q    And you're the one with the authority to implement

20 internal policies such as this general order, right?

21 A    Yes, but I can't know every page, every word, and every

22 subject.  And that's not what other sheriffs do either.

23 Q    And so your testimony here today is that even though it

24 says that it was approved by Scott Jenkins, that somebody on

25 your staff approved it without you knowing?

Jenkins - Cross

1  A    Certainly.  I have a chief deputy and others that had that

2  authority to screen and recommend those for implementation to

3  meet accreditation standards.  The accreditation process

4  requires every division to work up the ranks from sergeant

5  through captain to establish the final drafts of every policy,

6  to send up the ladder to the major and chief deputy, to then

7  sign off saying, sheriff, you know, every I is dotted, every --

8  you know, the final draft that goes.  And I would have been

9  here either in a staff meeting, it might be them coming to my

10 office with the latest three or four policies that were

11 finalize.  And you know, they would sit it in front of me, they

12 may read part of it.  Like for example, the pursuit policy was

13 one that was very touchy.  And they -- I don't know how many

14 drafts they had to go through before they said they were

15 comfortable with it, and then it was entered in as one of the

16 policies in the manual.

17 Q    I'm sorry, so your testimony is that you would have

18 approved this once a final draft was presented to you?

19 A    Most of them, yes.

20 Q    So you did approve this policy?

21 A    You're not listening.  I didn't say every one.  I just

22 said most of them.  There is over 160-plus standards for

23 accreditation, and each standard has God knows how many

24 policies within that.

25 Q    Sir, my question is:  Did you or did you not approve this

Jenkins - Cross

1  policy?

2  A    No, I -- if you're asking me if I saw --

3                    (Overlapping speakers.)

4  Q    That's a yes or no question.

5  A    No.

6  Q    So then my next question is:  You're saying someone on

7  your staff put your name next to the approved line without you

8  knowing about it?

9  A    Absolutely.  They did lots of times.

10  Q    So would you agree, though, that this policy was in place

11  when you were there?

12  A    You're telling me it was.  I only know what I've seen --

13                    (Overlapping speakers.)

14  Q    It's your policy, sir.  You were running that office,

15  right?

16  A    Well, you answered then, because I can't tell you any more

17  than that.  You answered.  I told you what I know.

18  Q    Okay.

19  A    I told you I have not seen it.

20  Q    Okay.  So let's go to the next page.  Do you see the

21  procedures listed under reserve deputies?

22  A    Yes.

23  Q    Do you see that there are various requirements for

24  selection for qualifications and for training?

25  A    I do.

Jenkins - Cross

1  Q    Do you also see that under training requirements there's

2  at least a 40-hour requirement in-service every two years, and

3  a semi-annual firearms qualification?

4  A    It says that.

5  Q    And do you see under number 3 that all auxiliaries will

6  serve at the discretion of the sheriff, and the auxiliaries

7  will have the status of volunteers?

8  A    I see that.

9  Q    This policy was never actually followed in your office,

10 right?

11 A    Well, since I didn't know about it, I wouldn't expect it

12 to be.

13 Q    And you just testified on direct examination that you were

14 really trying to build up the auxiliary program, right?

15 A    Yes.  Well known.

16 Q    I'm sorry?

17 A    Well known.

18 Q    So if you were trying to build up an auxiliary program,

19 wouldn't you -- wouldn't it be important for you to understand

20 what policies were in place with respect to that program in

21 your own office?

22 A    Me as a sheriff have to know every detail of a policy --

23 do you understand management and how the executive of the

24 office or division department, what their roles are?  You have

25 staff that handle, delegate various duties like policy and so

Jenkins - Cross

1  forth.

2  Q    My question was:  You just testified that you were trying

3  to build up an auxiliary program.

4  A    Correct.

5  Q    Would you think it was important to review policies or

6  even be aware that your office had a policy on auxiliary

7  programs if you, in fact, were trying to build up that program?

8  A    Would it be important for me to --

9         THE COURT:  Answer the question.  Answer the

10 question.

11        THE WITNESS:  No.  I wouldn't.  A sheriff can change

12 a policy any day he chooses, or delete all policies any given

13 morning when he gets to work.  A sheriff has the authority to

14 do so.  So he does not have to be familiar with any policy,

15 because any policy when he arrives at the office each day can

16 be written anew.  And I'm not trying to be disrespectful.

17 BY MS. PENG:

18 Q    There's not a question pending.  I'm sorry.

19 A    I'm sorry.  I'm trying to explain.

20        THE COURT:  Well, just wait for the next question,

21 please, Mr. Jenkins.

22        THE WITNESS:  Yes, sir.  I'm sorry.

23  BY MS. PENG:

24 Q    So you could have changed the policy.  You could have done

25 anything with respect to the hiring process of auxiliaries,

Jenkins - Cross

1   right?

2   A    At any time.

3   Q    And the process that you chose was to go through Kevin

4   Rychlik and take money and then deputize them; isn't that true?

5   A    Go through Kevin and take money -- in what way do you mean

6   that?  I don't understand the question.

7   Q    Well, what we've been talking about this entire trial,

8   sir.

9   A    If you're asking me do I accept donations for a campaign,

10  and do I choose as I see fit to swear in anyone as an

11  auxiliary, yes, that's what I do -- or did as a sheriff for 12

12  years.

13  Q    So what you did as a sheriff is to accept money from

14  people who wanted to be auxiliaries and then give them a badge?

15  A    No, ma'am.  The new orders are -- Tony was an auxiliary

16  deputy for me.  Never got a dime from me, we're friends, he was

17  a good man to appoint as an auxiliary, available for calls --

18                     (Overlapping speakers.)

19           MS. PENG:  Your Honor, I would object at this point.

20  He clearly knows the order in place, and he's violating it.

21           THE COURT:  Answer the question that is asked,

22  Mr. Jenkins.

23           Strike the last answer as nonresponsive.

24           THE WITNESS:  I'm sorry, could you --

25           THE COURT:  Hang on a second.  Repeat your question

Jenkins - Cross

1    or move on to a new question, Ms. Peng.

2              MS. PENG:  I'll move on.

3    BY MS. PENG:

4    Q    In fact, you told the public that you would properly

5    screen auxiliary deputies, didn't you?

6    A    In relation to what?

7    Q    To the auxiliary deputies in your office.  You told the

8    public that you would properly screen them?

9    A    When did I tell them that?

10   Q    And in fact, you told them that you would give them

11   psychological evaluations; isn't that true?

12   A    In relation to what program?

13   Q    To the auxiliary deputy program?

14   A    Not the whole program.  See, you don't understand, and I

15   want to explain, but I keep getting shut down.  You don't

16   understand what you're talking about.

17   Q    How many auxiliary programs do you have, sir?

18   A    Programs or divisions, if you want to get technical -- if

19   that's what we're trying to do here, parse words.  I'm trying

20   to tell you.

21   Q    Let me ask --

22   A    It's a division oversaw by Kevin Rychlik.  People

23   appointed in there are appointed by me as I see fit.  If I walk

24   out the door today as a sheriff, interact with someone and want

25   to appoint them, I can do that the next day.  I can remove

Jenkins - Cross

1  them.  So I hope you understand that part.

2  Q    I do understand.

3  A    They're not paid.  They're volunteer.  They can be titled

4  auxiliary in reserve or other titles, posse and others, but for

5  me, reserve and auxiliary are two categories.  If you're

6  talking about the new program we were trying to kick off when

7  COVID hit, and we were delayed for a couple of years, they were

8  going to be reserve and auxiliary.  The records show we bought

9  50 or 100 reserve badges, brand new badges, for that purpose to

10 separate them.  The auxiliaries would be one category of

11 deputy, and reserves would be the other, available for call up.

12 I'm sorry, I'm --

13         THE COURT:  Ask the next question.

14  BY MS. PENG:

15 Q    The auxiliary deputies that you deputized that Kevin

16 Rychlik brought in, they were known as auxiliary deputies;

17 would you agree with that?

18 A    Yes.  At that time.

19 Q    Okay.  And you had told the public with respect to

20 auxiliary deputies that you would undergo a psychological

21 evaluation for them; did you not?

22 A    If the legislature enacted that law, that's what I was

23 speaking about when you're referencing that.  I'm trying to

24 stick to just your question.  You're not asking it right and I

25 can't answer.  What you're referring to, you don't understand.

Jenkins - Cross

1   You're referring to something in the public -- and you're right

2   about that, but it's not to do with these.

3   Q    Okay.  So let me ask you this, then.  For the auxiliaries

4   that you did swear in through Kevin Rychlik, none of them went

5   through any training, any psychological evaluation --

6   A    They were not required to.

7         THE COURT:  Let her ask her question, please.

8   BY MS. PENG:

9   Q    -- any training, any psychological evaluation, any of the

10  firearms requirements, correct?

11  A    Never my intent, nor dozens of others before any of that

12  time.

13  Q    I see.  So you never intended to give them any training --

14  A    Not for those, no.

15  Q    -- any firearms training, any qualifications?

16  A    Not for those, no.  That's a responsibility a sheriff can

17  take.  By law, if we want to accept the responsibility, we

18  don't have to require -- I don't have to require it for a

19  full-time deputy, if a sheriff wants to accept the liability,

20  which most will not.  I get it.  They send them to the academy.

21  But if you choose as a sheriff, you're not bound by the same

22  rules and laws for DCJS standards as a police department or

23  other agency.

24  Q    So I understand.  So my question to you, though, is then

25  you chose for the auxiliaries that Kevin Rychlik brought in not

Jenkins - Cross

1  to train them, correct?

2  A    Not just Kevin Rychlik.

3  Q    Just answer the question I'm asking.  Not to train them,

4  correct?  You chose not to train any of the auxiliary deputies

5  that Kevin Rychlik brought to you, all the people that we've

6  been talking about in this trial?

7  A    I can't say all of them, no.

8  Q    You chose to train some of them?

9  A    He's brought in a lot of people through the 12 years, yes.

10 Q    The ones that we've been talking about here?

11 A    You didn't say that.

12 Q    I did -- okay.

13 A    I'm trying to answer completely.

14 Q    Let me ask the question again.

15 A    Yes, ma'am.

16 Q    For all of the auxiliary deputies that we've been talking

17 about in this trial, the ones that paid you money and then you

18 swore them in, you did not require them to have any training,

19 correct?

20 A    Them or dozens before them from -- brought by other

21 people, no.

22 Q    And you did not vet them in any serious way according to

23 the requirements in your general order?

24 A    No, we never reached the --

25 Q    I'm not saying that -- is that --

Jenkins - Cross

1  A    We hadn't gotten to the point to do that.  The search and

2  rescue --

3  Q    To vet them in a certain way before they were given a

4  badge?

5  A    That's a preference of the sheriff, how they choose to do

6  that.  We have that authority.

7  Q    No, I understand that your testimony is that it's --

8  A    We don't have to do it right then.

9          THE COURT:  Let her finish her question, please.

10 BY MS. PENG:

11 Q    I understand that your testimony is that you were allowed

12 to do that as sheriff.  My question is whether or not you did

13 it for those people we've been talking about.  And the answer

14 is no?

15 A    Not to my knowledge, no.

16 Q    And you just agreed with me that those auxiliary deputies

17 could have been called in to serve, right?

18 A    Any citizen, but especially them, since they had already

19 been sworn in, yes.

20 Q    And once they got that badge, they could legally carry

21 firearms and concealed carry in all 50 states?

22 A    As well as a posse sworn in by the sheriff at any time for

23 an emergency, to quell a riot, or do a search and rescue.  A

24 sheriff has authority -- people -- they don't like it.  We are

25 the only law enforcement in America, a sheriff elected by the

Jenkins - Cross

1    people, who can do that at will because we respond directly to

2    the voters who put us there.

3    Q    Sir, I'd appreciate it if you could listen to my question

4    and answer it.

5    A    I'm trying.  I swore to tell the whole truth.  And

6    that's what I --

7              THE COURT:  Mr. Jenkins, wait for a question, please.

8     BY MS. PENG:

9    Q    So my question was:  The auxiliary deputies we've been

10   talking about, they could be called upon to respond to a call

11   for service, correct?

12   A    (No verbal response).

13   Q    To make arrests?

14   A    Oh, they could if I chose to.

15   Q    And they could do a whole host of things, right, that

16   regular law enforcement could do?

17   A    They could if I chose to.

18   Q    Well, once you gave them the badge, they could, right?

19   A    No.

20   Q    So you decided it was not important in your discretion as

21   sheriff to give these people any training, correct?

22   A    Did you understand my last answer?

23              THE COURT:  Answer the question, please, Mr. Jenkins.

24              THE WITNESS:  No.  I need to explain the reason, but

25   if that's all I can say.

Jenkins - Cross

1   BY MS. PENG:

2   Q    Okay.  Let us move on to a different subject.  Let's talk

3   about Rick Rahim.

4        Now, you met Rick Rahim for the first time in July of

5   2019, correct?

6   A    I can't swear to the date, but I know it was warm weather.

7   I believe from what I've seen in this trial that that would be

8   accurate.  That's -- I don't want to be saying it wrong.

9   Q    So you did meet him in July 2019, or you can't recall?

10  A    I can't give you a date.

11  Q    And when you were introduced to Rick Rahim, you were

12  introduced to him by Kevin Rychlik, right?

13  A    Correct.  Yes.

14  Q    And when Kevin Rychlik introduced you to Rick Rahim, he

15  told you that Rick Rahim was a, quote, big fish; isn't that

16  true?

17  A    I think so, yes.

18  Q    And you knew from the very beginning when Kevin Rychlik

19  introduced you, that Rick Rahim had a criminal history and he

20  wanted a gun?

21  A    I sure did.

22  Q    You met with him upon the recommendation, I guess, of

23  Kevin Rychlik?

24  A    Yes.

25  Q    And you knew that Rick Rahim -- the reason why Kevin

Jenkins - Cross

1    Rychlik said he was a big fish is because he had lots of money

2    and he was willing to give you that money, right?

3    A    I knew he had lots of money.

4    Q    Well, that's what was meant by big fish.  That's how you

5    understood it, right?

6    A    I knew he -- what Kevin said was he had a lot of money, he

7    was wealthy, but the second part of that, no, you're not going

8    to put words in my mouth that aren't true.

9    Q    Which part wasn't true?

10   A    Continue to ask questions.

11   Q    All right.  And then you met him in your office in July of

12   2019, right?

13   A    I think it -- I don't know the date.  I can't swear to

14   that and I'm not going to.  I'm not sure.

15   Q    And in that meeting, you agreed to do a number of things

16   for Rick Rahim, right?

17   A    In that meeting?

18   Q    In that first meeting when you met him for the first time?

19   A    I can't say that was part of the first meeting, but yes,

20   we had conversations numerous times.

21   Q    You agreed to help his -- to help him get his firearms

22   rights restored, right?

23   A    Yes, at some point.  Are you talking about that first day

24   or the subsequent conversations?

25   Q    I'm talking about that first meeting.  Did you agree at

Jenkins - Cross

1 that first meeting to help him get his firearms rights

2 restored?

3 A    I don't know what you mean when you say did I agree.  As I

4 testified, he told me his desires, his wishes, his status in

5 life, how he had -- I don't know how much you want me to say.

6 He had a 30-year prior --

7 Q    Did you agree to help him get his firearms rights

8 restored?

9 A    I did, but if you're --

10 Q    And did you agree to then get him a concealed carry

11 permit?

12 A    Agree to?  Saying I would do it?  No.

13 Q    What did you say about it?

14 A    As I said, we had multiple conversations.  We became

15 friends quickly.

16 Q    Well, I'm talking about that first meeting, though.  So my

17 question is, in that first meeting, isn't it true that you

18 agreed to help him get a concealed carry permit?

19 A    I can't say that I absolutely agreed I would do it, but I

20 told -- I mean, I talked freely with him about the fact that,

21 yeah, I agreed with where he's coming from, his situation.  And

22 I've never -- never opposed a nonviolent felon wanting to get

23 their gun rights restored.  It's happened many, many times in

24 Culpeper.

25 Q    And at that first meeting, you also agreed that you would

Jenkins - Cross

1  swear him in -- or try to swear him in as a deputy?

2  A    Again, I can't say at the first meeting I said that, but

3  as I said, I need -- I mean, his best friend like a brother was

4  the chief deputy of Arlington, and that was what he initially

5  told me that his goal -- he intended to go work with his

6  brother, Dave Kidwell, the chief deputy of Arlington, after he

7  got his --

8  Q    Sir, if you could just answer my question, I'd appreciate

9  it.

10        So in that initial meeting, did you agree to swear him in

11  as a deputy?

12  A    I can't say I did in the first meeting.  I mean, it's

13  years ago.  But I don't want to say that I didn't if I did.  I

14  can't remember.  I can't swear to that.

15  Q    Okay.  But eventually you did?

16  A    Eventually, yes.  But again, we became friends.  He -- I

17  knew what he wanted to achieve, and there's nothing wrong

18  with -- I mean, I've had multiple people -- and every sheriff

19  does --

20  Q    I'm not asking you whether it's right or wrong.  If you

21  could just --

22  A    Okay.

23  Q    So at that first meeting, your testimony is that you don't

24  recall specifically whether you agreed to swear him in as a

25  deputy?

Jenkins - Cross

1   A     I can't swear to it, no.

2   Q     But at some point, your testimony is, that you did agree

3   to do that?

4   A     I can't say agree, because you're making it sound like

5   there's some promise or what -- I mean, I'm paraphrasing,

6   because I can't swear like what I exactly had said, but I'm

7   going to paraphrase, if you want me to --

8   Q     Okay.  Well, did you tell him that you would deputize him?

9   A     No, because I didn't even know if it was possible at that

10  juncture.  Again, I don't know all the laws.  I'm not a lawyer.

11  I had to get it researched through DCJS, and we had lawyers in

12  the office.  I had a part-time and a full-time lawyer that --

13  Q     I'm not talking about that right now.  My question is:

14  Did you tell Rick Rahim that if you got elected as sheriff you

15  would swear him in as a deputy?

16  A     I didn't even know if I could because of his prior

17  history.  I learned --

18  Q     You would try?

19  A     I learned that I could after research.  I can't say,

20  because I wouldn't -- I wouldn't do things like what you're

21  trying to parse it as.  Multiple conversations openly talking

22  between men who, like I said, we became friends.  But when you

23  hit it off and you're talking, and one person expressing their

24  desire and their goal, and you respond to that, you're making

25  it sound like there's this -- well, it's clear what you're

Jenkins - Cross

1   trying to make it sound like, but I can't -- I can't -- I can't

2   sit here today and say that what you're saying is how that was

3   said.  I can paraphrase what I think is the easiest --

4   Q    Do you remember what my question was?

5   A    You asked did I tell him that I would swear him in as a

6   deputy; is that not your question?

7   Q    Once you got elected?

8   A    I was already in office.

9   Q    I'm talking about that first meeting in July 2019.  Were

10  you elected -- were you in office then?

11  A    Yes, I was sheriff since 2012.  You don't remember?

12  Q    But you were telling him that you -- so why is it that you

13  could not have swore him in right then?

14  A    I wouldn't have even -- I've tried to say I have -- I

15  mean, I don't know all the laws.  I think it's pretty clear,

16  you know --

17  Q    So you were trying to figure out whether you could swear

18  him in because he had a felony conviction, correct?

19  A    That would be what you'd have to check first, obviously.

20  Q    Okay.  But then eventually you did swear him in, right?

21  A    The next year.  I don't remember when, but yeah, it was

22  way later.

23  Q    And he still had that felony conviction?

24  A    I don't know how to -- again, I don't know how that's

25  classified when you've got your rights restored by the governor

Jenkins - Cross

1    years before, and then --

2    Q    He still had a felony conviction at the time you swore him

3    in; isn't that right?

4    A    You're a lawyer.  I don't know how you categorize that.

5    Does that mean it's not on your record, or it is, when they've

6    had their rights restored?  Does that mean it's expunged or

7    whatever you call it?

8    Q    Sir, it's your testimony and you're the one with 30 years

9    of law enforcement experience.

10   A    I'm not a lawyer.  I'm a cop with ten weeks of training in

11   1992.  And most of that was use of force, driving.  I had three

12   weeks of legal training on false arrests and search and seizure

13   in 1992.  That's my legal training.  That's it.

14   Q    So you don't know whether to tell if somebody has a felony

15   conviction on their background?

16   A    Yes, I know how, because we can run criminal histories in

17   our office.  I mean, that would tell you.  But I can't sit here

18   today and say that if you ran a criminal history of anyone

19   sitting here that had their rights restored, does it still show

20   up on a criminal history?  I never did that.  I was never a

21   dispatcher.  I wasn't certified in running those.  I don't

22   know, and I'm not trying to give you the wrong answer here.

23   I'm scared to say the wrong thing.  I'm trying to tell you what

24   I know.

25   Q    You were not at all concerned that you swore in Rick Rahim

Jenkins - Cross

1  even though he was a felon?

2  A    I don't have to be.  I'm the sheriff.  Whoever I choose to

3  swear in, I can do that.  Every sheriff can.  Jelly Roll is now

4  a deputy sheriff up in the northern state of Michigan or

5  somewhere now.  He's a former prison inmate.  Sheriffs --

6  Q    Sir, can you please just answer the question that I'm

7  asking?

8  A    I'm trying to explain to you.

9        THE COURT:  Just let her ask the questions, please,

10  Mr. Jenkins.

11   BY MS. PENG:

12  Q    So you did make an agreement with Rick Rahim to help him

13  get all of those things, didn't you, at that initial meeting?

14  A    I can't say I did at the initial meeting, no, but we

15  did --

16  Q    Well, you were here when the jury saw all of those text

17  messages, right, saying that you would reach out to the

18  Commonwealth's Attorney, the judge, the clerk's office, all for

19  Rahim?

20  A    Yes, I saw all of that.  Uh-huh.

21  Q    So you did all of that for Rick Rahim because you agreed

22  with him that you would do those things for him at those

23  meetings, right?

24  A    At what meeting?

25  Q    At the meeting that you had with him when you first met

Jenkins - Cross

1  him?

2  A    No, I can't say at that meeting, but you know, through

3  getting to know him, yes.

4  Q    So you went to the Commonwealth Attorney's office to try

5  to help him, right, your friend Paul?

6  A    Yes, Paul is a friend.  Been a friend for many years, yes.

7  Q    You tried to get him to help with his restoration of

8  firearms?

9  A    There's no try to get him to.  The role of a

10  Commonwealth's Attorney and a sheriff, we have that discretion,

11  and it happens every --

12  Q    No, no.  I'm talking about you talking to the Commonwealth

13  Attorney, Paul, on behalf of Rick Rahim.  You did that, right?

14  A    Yes, we have that discretion; he does and I do, in

15  recommendations and what we do to carry out our duties.  For me

16  to have a --

17                    (Overlapping speakers.)

18  Q    My question is, did you do it, not whether it was right or

19  wrong.  I'm not asking that.  I'm asking, did you go to the

20  Commonwealth Attorney on behalf of Rick Rahim to help with his

21  firearms restoration?

22  A    I didn't go specifically for that.  I brought it up when I

23  was there for other matters.  But yes, to answer your question.

24  Q    And you also did that with respect to the Circuit Court

25  judge, Judge Durrer?

Jenkins - Cross

1  A    I heard testimony about a phone call, but if you're --

2  you're asking me did I go to him.  I can't remember anything

3  like that, but I can tell you Dale Durrer, I highly respect.

4  And if Dale says I came to him in person or anything, Dale is

5  honest.  He's telling you the truth.

6  Q    So you did go to the judge to try to help Rick Rahim on

7  his restoration petition?

8  A    I don't remember going, but if Dale says I did, I did.

9  Q    Would looking at a text message refresh your recollection

10  about that, or will you just testify that you did do that?

11  A    That last part was a little -- I'm sorry, can you say that

12  again?

13  Q    Will looking at a text message when you're saying that you

14  did go to the judge to ask for assistance help you refresh your

15  recollection, or will you just testify that you did go to the

16  judge to help Rick Rahim?

17  A    A text message to Kevin or Rick saying that I went to the

18  judge, no, then I can't say that's true.  I bullshit, you know,

19  say things, whatever, to pacify people any given day.  You walk

20  in -- it's like your child when you're walking in the office

21  and one needs your attention.  You know, you may say, okay, I

22  just did this, give me five minutes, whatever.  That text

23  message, as I saw it the other day, looking at it, I kind of

24  chuckled.  And that's most likely me just pacifying Rick or

25  Kevin or whoever it was to, saying oh, I'm trying hard, when in

Jenkins - Cross

1  reality, I don't know, I may have never even called him yet and

2  was going to get to it later.  But the point -- and I want to

3  make sure I'm clear with you on that -- I'm not denying that I

4  did call or text or whatever Dale says I did to ask him to get

5  it on the docket, sure.  But no, I mean, sitting here, I do not

6  ever remember asking Dale for a favor, like would you do this

7  or that, just it needed to get on the docket.  And what I heard

8  the other day, all that sounds to be reasonable and what I

9  probably did as far as a phone call or visit to Paul or what

10  have you.  I can't sit here and hold my hand -- you know, I

11  can't sit here and swear, whether it's Paul or Dale,

12  specifically what I did.  I truly don't remember exactly, but I

13  know my recall the other day when this was coming up thinking,

14  you know, about that.

15      So I'm trying to tell you as best I can that those men are

16  honest.  And if they said a certain thing, then you can believe

17  Paul and Dale.

18  Q    Because those men are honest?

19  A    Yes.

20          MS. PENG:  Okay.  Can we pull up Government Exhibit

21  112, please.

22          THE COURT:  And this can be published to the jury.

23  It's already in evidence.

24          MS. PENG:  It's already in evidence.

25          Can we go to page 17, and then blow up the message

Jenkins - Cross

1  that says, no, this def needs to get done ASAP, and it's good

2  while I got the judge's attention.

3  BY MS. PENG:

4  Q    Did you send this text message to Rick Rahim?

5  A    I don't know how to answer it other than to say, you all

6  say this is from my phone, and I see all the words and

7  characters here.  And I have no reason to dispute that you

8  didn't get it legally from, you know, a search of my phone.

9  But if you're asking me -- if I've got to say under oath that I

10  know I sent that, I can't say that.  But I'm not disputing that

11  you -- you know, if you say you got it off my phone, then

12  that's fine.  And again, it doesn't shock me that it's -- you

13  know, jumps out as something I could have never said.  I

14  just -- I don't know what else to tell you.

15  Q    But you were saying earlier that sometimes you bullshitted

16  Rahim, right?

17  A    Oh, sure.  He was a pain in the butt a lot of times.

18  You've got recordings I'm sure of Kevin and I where we're

19  laughing and talking about how, you know, Rick's a -- you know,

20  pushy, you know, go ahead and get it done kind of thing.  It

21  showed in other things he did.

22  Q    That means you lied to him about something you might have

23  done, but you didn't actually do it, right?

24  A    I would say -- I'm not going to argue with you.  You can

25  say lie, but that's what we all do to pacify someone or get

Jenkins - Cross

1  them off of us at the moment until we can get around to

2  something or what have you.  You know, I'll just leave you with

3  if you want to call it that, that's fine.

4           MS. PENG:  Can we go to page 23, please, the one that

5  says, I feel horrible every day.

6           No, not that one.  The one that says, I feel horrible

7  every day it's been taking -- page 23.

8           That's fine.  You can take it down.

9  BY MS. PENG:

10  Q    Now, you did talk to Travis Owens, right?  And that's the

11  Commonwealth Attorney.

12  A    He's an assistant or deputy or something.  Your question,

13  I heard him testify the other day.  And again, whatever he says

14  I'm certain is true.  I have no reason to believe it isn't.

15  But I -- you know, this was years ago.  I can't swear.  I mean,

16  it just wasn't something that sticks in your mind.

17  Q    It doesn't stick in your mind that you lied to Travis

18  Owens about where Rick Rahim really lived?

19  A    I didn't lie to Travis about where he lived.  So no, it

20  wouldn't stick in my mind.

21  Q    So your testimony is that Rick Rahim really lived in

22  Culpeper?

23  A    Are you asking at that time when we first rented the

24  property, or 2023, or --

25  Q    At the time he filed his firearms restoration petition,

Jenkins - Cross

1  your testimony is you thought he really lived in Culpeper?

2  A    Are you asking me if he was a resident and legally doing

3  what he was doing, or if --

4  Q    I'm asking you if he lived in Culpeper.  It's a simple

5  question.

6  A    No, it's not.

7  Q    It's not a simple question whether Rick Rahim lived in

8  Culpeper?

9  A    I wouldn't have a clue if he lived there.  That house is

10  three miles out of town past where I lived.  I never had a

11  reason to even go that way or visit the property in all that

12  time frame of many months.  I couldn't say if he was there or

13  not.  But I do know that he did rent the property from my

14  brother.  He even talked about later raising the rent to rent

15  the whole property, wanted to bring his kids out, da da da,

16  other things.  And I know that he told me himself personally

17  and there was a later time where -- I can't remember when, but

18  I remember somehow I came to know he definitely had registered

19  his vehicles there, because he had multiple Lamborghinis and

20  others.  And anyway, he registered to vote there.  So I knew --

21  Q    You know Rick --

22  A    -- yes, he was a legal resident of Culpeper to my

23  knowledge.

24  Q    But you knew he never set foot inside of that house that

25  he leased from your brother, right?

Jenkins - Cross

1  A    I knew that?  No.  How could I know for sure?  He talked

2  about buying a million-dollar RV and bringing it out to the

3  property, bringing the kids -- you know, you don't understand,

4  and I can't talk enough.  I'm restricted to tell everything,

5  the whole truth.  We were friends.  We talked -- you know,

6  there's so much here to tell that paints the clear picture of

7  what was happening over time.  But I can't sit here years later

8  and tell you --

9  Q    You -- in fact, you knew that Rick Rahim never even set

10 foot inside your brother's farmhouse; isn't that true?

11 A    At what point?

12 Q    At any point?

13 A    In 2023, or --

14 Q    At the time of his firearms petition, you knew that Rick

15 Rahim had never even been inside your brother's farmhouse;

16 isn't that right?

17 A    I wouldn't have any need to know it, because it wouldn't

18 matter.

19 Q    It's a yes or a no question, sir.

20 A    I wouldn't know.

21 Q    So you did not send a text to him describing the property

22 so he could have plausible deniability?

23 A    See, that's how you're trying to frame it.

24        THE COURT:  Answer the questions, please,

25 Mr. Jenkins.

251

Jenkins - Cross

1          THE WITNESS:  I may have sent the text.  Let's say I

2     did.  There's nothing wrong with it.  It was -- I read it the

3     other day.

4      BY MS. PENG:

5     Q    So you did send a text to him describing the property so

6     Rick Rahim could have plausible deniability, because you knew

7     he never had been inside that farmhouse; isn't that true?

8     A    Well, I don't know if I sent that text.  What phone did it

9     come from?

10          MS. PENG:  Can we pull up Government Exhibit 112,

11     please, page 46, the last bubble, if you can blow it up.

12     BY MS. PENG:

13     Q    You sent this text message to Rick Rahim, right?

14     A    You said I did, so if it was on my phone, then I did.

15     Q    That's your number, right?

16     A    It makes sense to me.  Yes.  Rick would have no way of

17     knowing the acreage or details.  If he's under oath, got to

18     tell information, he shouldn't have the wrong information.  So

19     logically -- again, like I said, we're friends.  We talked

20     tons.  That's a perfectly logical text to me.

21     Q    You gave this information to Rick because you knew he had

22     never set foot on that property, right?

23     A    I've already answered you once.  How would I know?

24     Q    And so this was a fake address that you helped him set up

25     on your brother's farmhouse so you could leverage your

Jenkins - Cross

1  connections in Culpeper so he could get his firearms rights

2  restored, right?

3  A    No.

4  Q    And you did that because it was a trade-off for the deal

5  that you agreed to in that very first meeting; isn't that true?

6  A    No.

7          MS. PENG:  Can we play Government Exhibit 36 and

8  start at 40 till the end?

9          (Audio playing.)

10 BY MS. PENG:

11 Q    Did you hear yourself say that you kind of did it as a

12 trade-off on the other stuff on that recording?

13 A    Yes, I think so.

14 Q    So you helped Rick Rahim lie to the court; isn't that

15 true?

16 A    No.

17 Q    And you lied directly to Judge Durrer, didn't you?

18 A    No.

19 Q    I mean, you went as far as telling Judge Durrer that the

20 Commonwealth Attorney's office consented to the petition in

21 order to expedite his hearing; isn't that true?

22 A    If he says I said that, then yes.  And if I said that,

23 then yes, the Commonwealth Attorney did.  Where's Paul?  Ask

24 him.  He's the Commonwealth Attorney.

25 Q    But you were here when you heard Travis Owens say that in

253

Jenkins - Cross

1  fact the Commonwealth Attorney did object to the petition,

2  correct?

3  A    You just said the Commonwealth Attorney.  Travis Owens --

4  Q    The Assistant Commonwealth Attorney, I apologize.  The

5  Assistant Commonwealth Attorney, Travis Owens?

6  A    There's a big difference.

7  Q    You were here when Travis Owens, the Assistant

8  Commonwealth Attorney, said that they did not consent to the

9  petition because they had questions about Rick Rahim's

10 residency?

11 A    If I talked to Paul Walther, the Commonwealth Attorney, as

12 you said just earlier I did about this matter, I have no clue

13 what Paul said to Travis, an employee, and then Travis may have

14 somehow said to Dale about whether they were in support.

15 Clearly there can be breakdowns, but again, you're trying to

16 make it look like it's not the same.  Paul is the Commonwealth

17 Attorney, my friend.  Travis, I wouldn't say he was my friend.

18 I worked with him, and knew of him as an acquaintance and

19 business connection-wise, but Travis --

20 Q    You saw that -- I'm sorry, you saw that memo to file to

21 Paul from Travis Owens where the Commonwealth Attorney had

22 issues with the residency, right?

23 A    I saw it here at trial, yes.

24 Q    And so when you were telling Judge Durrer that the

25 Commonwealth Attorney's office did not object to the petition,

Jenkins - Cross

1  that wasn't true, was it?

2  A    Again, I don't know what you're talking about, if I was

3  talking to Dale.  Was this a phone call, in person?  I

4  certainly wasn't in the courtroom.  When did this occur?

5  Q    And after you got Rahim his firearms rights restored, you

6  immediately returned to the second thing you promised him, the

7  concealed carry permit, right?

8  A    Again, I don't -- I can't answer that.  Can you ask it

9  again or clarify?

10  Q    You sent your deputies repeatedly to the clerk's office to

11  check on the status of Rahim's concealed carry permit, right?

12  A    Again, I can't swear it was me.  It might have been the

13  chief deputy, or someone around me, or an assistant that was

14  checking on something.  Maybe I asked them to, maybe they took

15  the initiative themselves, but I'm not saying they didn't.

16  Bernard Feaganes is an honest man, and he was here the other

17  day, and he said that he was checked with multiple times.

18  And in turn, he followed up with the judge.  And I'm sure --

19  Q    You're the only one that got money from Rahim, though,

20  right?

21  A    I don't know.  A lot of people might have gotten money

22  from Rahim.  Kevin might have gotten money from -- Kevin said

23  he got hundreds of thousands from Rick.

24  Q    Out of the -- you think that Kevin Rychlik got hundreds of

25  thousands of dollars from Rick Rahim?

Jenkins - Cross

1  A    He told me he has.  Through the years, he borrowed money,

2  he would go in business ventures.  So your question, be

3  specific, because you're tearing me apart over the least little

4  thing I try to explain, and yet I don't --

5  Q    But you sent your deputies, who you controlled, to the

6  clerk's office to check on the status of Rick Rahim's concealed

7  carry permit, right?

8  A    No.  And I didn't hear that the other day.  I didn't say I

9  did.  Did Bernie say I sent them?  No.  You don't understand --

10                    (Overlapping speakers.)

11            MS. PENG:  Can we pull up Government Exhibit 119,

12 please, page 5.  Can you blow up the top?

13 BY MS. PENG:

14 Q    Did you send this text message?

15 A    It was on my phone, according to what you all are saying,

16 so I agree that if it's from my phone, I sent it.

17 Q    Can we pull up the next message, please.

18       Is this a text message sent from your phone?

19 A    It appears so, yes.

20            MS. PENG:  Can you take that down.

21  BY MS. PENG:

22 Q    But despite you sending multiple deputies on multiple days

23 to check on the application status, the clerk's office refused

24 to grant you any favors, right?

25 A    I don't know how to answer that if I don't know.  I mean,

Jenkins - Cross

1   is there another text or something?

2   Q    They didn't expedite the application, right?

3   A    If you're asking me to recall from years ago, I can't

4   answer that just from memory.

5   Q    The clerk's -- the clerk's office did their job, right?

6   A    Uh-huh.

7   Q    Now, you testified on direct that Rahim, in fact, did give

8   you money, right?

9   A    Uh-huh.  Yes.

10  Q    How much money did he give you?

11  A    The initial he testified to was 15, and then another 10,

12  but --

13  Q    Is that how much money he gave you?

14  A    I'm sorry?

15  Q    Is that how much money he actually gave you?

16  A    Not total.  That was the initial.  Later there was another

17  20.

18  Q    So he did give you $15,000 in cash and then subsequent to

19  that $10,000 in cash?

20  A    I can't swear to the initial being 15, but the following

21  10, yes.

22  Q    And in total $25,000 in cash?

23  A    In total, no, it was more.

24  Q    What else did he give you?

25  A    Again, I'm going from what I know, not their testimony the

Jenkins - Cross

1    other day.  There was a time where he gave money for our

2    business ventures, as I already explained.  And he gave

3    thousands of dollars in those different meetings, whether it be

4    at the restaurant or in person.

5    Q    So but -- I'm sorry.  The $25,000 in cash that we just

6    discussed, you're saying that's separate from any business

7    ventures you had with him?

8    A    I don't -- separate?  What do you mean?

9    Q    Well, I asked you, right, did he give you $25,000, and you

10   said yes.  Then I said, did he give you any other money, and

11   then you started talking about the business ventures, right?

12   A    No.  That initial money -- that's what all the money that

13   I got from him was for, the things that we were doing together,

14   trying to make money.  That's what Rick does.

15   Q    So now your testimony is that $25,000 was for a business

16   venture; is that your testimony?

17   A    Yes, that's what I said.

18   Q    And so what other money did he give you beyond the

19   $25,000?

20   A    The money later on -- I don't know what time -- but in the

21   time after that initial money was when I got the other $20,000

22   total.

23   Q    What form did that $20,000 take?

24        What form was that $20,000 given to you in?

25   A    You mean denominations, or just cash or check?

Jenkins - Cross

1  Q    Cash or check, let's start there?

2  A    Cash.

3  Q    So in total, you're saying Rick Rahim gave you $45,000 in

4  cash?

5  A    Are you leaving out the loan that I took out that was

6  testified to the other day, the two checks that came from --

7  Q    The loan is separate.  I haven't gotten to the loan yet.

8  I'm just trying to keep track of how much cash you're saying

9  Rick Rahim gave you.

10 A    That would be accurate.

11 Q    So $45,000 in cash?

12 A    Yes.  Uh-huh.

13 Q    And your testimony here today is that it's for a business

14 venture?

15 A    Yes, it was.

16 Q    Do you recall being interviewed by the FBI about this case

17 in January 31st, 2024?

18 A    I do.  Oh, of '24?

19 Q    Sorry, 2023, apologies.

20      In that interview, you didn't say anything about a

21 business venture, did you?

22 A    I don't know.  I mean, I don't -- I remember we talked for

23 a couple of hours.  I don't know what I talked about other than

24 what they were asking me.

25 Q    And you had lots of time since January 2023 to think about

Jenkins - Cross

1  this case, right?

2  A    Sure.

3  Q    Now, let's talk about this business venture.  Were there

4  any contracts establishing this business venture?

5  A    No.

6  Q    It was just a hand shake deal?

7  A    Not even a handshake.  I mean --

8                      (Overlapping speakers.)

9  Q    He just --

10 A    -- friends.

11 Q    He just gave you the money as a friend?

12 A    Yeah; my brothers, other people I know, we do things --

13 the guy I live near that's a friend that does loader work, we

14 -- you know, it could be $10,000, don't even require a hand

15 shake.  There's a level of trust with a lot of men in this

16 world that we don't break those bonds and we do things

17 together.  And it's word of mouth, and you trust each other,

18 and it gets done.  I mean, it happens all the time.  I

19 contracted a guy to build my barn, and we never wrote a single

20 thing, and we're talking tens of thousands.  And he laughed and

21 said, I can't believe you just trust a hand shake.  And he

22 worked for months on that project for just us agreeing --

23 Q    So you testified that Rick Rahim is a sophisticated

24 businessman, right?

25 A    I didn't say sophisticated, but --

Jenkins - Cross

1              (Overlapping speakers.)

2    Q    Okay.  He has lots of businesses, and he was wealthy?

3    A    Yes, he's a go-getter.

4    Q    He enters into lots of business transactions?

5    A    Uh-huh.  As far as I know.  I mean, that's what he told

6    me.  Certainly appeared to be, from what I observed, yes.

7    Q    He owns lots of businesses?

8    A    I don't know about lots, but he has multiple, yes.

9    Q    So your testimony is that Rick Rahim, a businessman, just

10   gave you $45,000 in cash on a hand shake?  That's your

11   testimony?

12   A    Not all at once, but just as I said.

13   Q    Okay.  But you did have a contract with him when it came

14   to the loan he gave you, right?

15   A    Correct.  Uh-huh.

16   Q    And that was for how much?

17   A    35,000.

18   Q    In fact, that loan agreement was all written out.  It was

19   a full contract, right?

20   A    Correct.

21   Q    You didn't do that on a hand shake?

22   A    No.  He was having another person join him to make the

23   loan.

24   Q    And you told Rahim in that contract that the proceeds --

25   that that loan would be paid back from proceeds at the

Jenkins - Cross

1   refinancing mortgage after your loan construction, right?

2   A    Yes, initially when we talked, that was the intent.

3   Q    But that was a lie, right?

4   A    What was a lie?

5   Q    That you were going to pay him back based on the proceeds

6   of the mortgages?

7   A    No.  Certainly I was going to pay him back.

8   Q    In fact, you never paid him back up until today, right?

9   A    I don't know how you expect me to pay him back if that's

10  part of what we did with our business investments, as I've

11  tried to explain what we were doing, multiple things that took

12  a lot of money to try to make money.  And we weren't

13  successful, but you know, we did multiple things.  So you tell

14  me what you want me to talk about.

15  Q    In fact, you did not disclose this Rahim loan to the

16  Federal Savings Bank when securing your refinancing mortgage,

17  right?

18  A    I didn't have to, because by then we had had the other

19  conversation, but I don't know what you want me to say.

20  Q    You lied to the bank about having this outstanding

21  obligation; isn't that right?

22  A    Not if it's not outstanding.  And that's determined by

23  Rick.  Again, you just don't understand.

24  Q    Well, you were here when Rick Rahim testified that he

25  thinks you still owe him for the loan, right, that he never got

Jenkins - Cross

1  paid back?

2  A    Right.  I didn't get to say anything.  That's just him

3  saying that.

4  Q    And you didn't disclose this loan on your application to

5  Fulton Bank, right?

6  A    I didn't have to because of the status at that time.

7  Whatever the dates are, take a look.

8  Q    Sir, you're really good at deciding when the rules apply

9  to you and when they don't, aren't you?

10 A    I know when they apply to me, yes.

11 Q    And the real reason you had no intention of paying back

12 this loan to Rick Rahim is because you thought Rahim owed you

13 for all the favors that you bestowed upon him; isn't that

14 right?

15 A    Rick and I owed each other back and forth at any time with

16 what we did with business stuff and other things as friends.  I

17 mean, I would love to tell more of all the things he and my

18 brothers -- Dave and him, this game of chance business they

19 opened and wanted us to join them in with these machines they

20 put in the local markets and things.  That was one of his

21 businesses that he came out trying to --

22 Q    You understand that a loan document, that's a legal

23 document, right?

24 A    Correct.

25 Q    And it's binding on you?

Jenkins - Cross

1  A    Yes.

2  Q    And you also lied about having that loan on your Virginia

3  conflict of interest filings; isn't that right?

4  A    No.  It only -- if it applies when that is filed, and

5  you'll see the date when that's due.

6  Q    Well, you didn't report it on the report in 2020 covering

7  2019, right?

8  A    Correct.  When is that due?  When is that filed?

9  Q    Sir, you're the elected officer who is supposed to file

10 those reports.

11 A    And it was not relevant.  It didn't -- it wasn't --

12 Q    My question is, you did not report the loan in the ethics

13 report dated 2020, covering 2019?

14 A    Because it didn't exist then.  So you don't report

15 something that doesn't exist.

16 Q    And you didn't report it in 2021, correct?

17 A    It didn't exist then.  You're not -- I don't know what

18 you're not understanding, and I can't explain because I get

19 shut down.

20 Q    You're saying that the loan agreement you had the Rahim

21 did not exist?

22 A    I don't know what to say.  What happens when a person who

23 gives a loan forgives it, or says, we're going to do X,Y, and Z

24 with this now?  I don't know how to explain it better than

25 that.  He --

Jenkins - Cross

1  Q    So you did not think that you had to report the loan,

2  correct?

3  A    Absolutely not, if you didn't owe the money.  I didn't --

4  you -- I don't know how else to say it.  I mean, I didn't owe

5  the money, so why would I report something that I don't owe if

6  it does -- I'd be lying, if I don't owe the money anymore.

7  Rick was doing things with his partner, Newberry, and --

8  Q    Are you aware that Rick Rahim is garnishing your pension

9  from Culpeper County because you still, in fact, owe him that

10  money?

11  A    Oh, I'm well aware.  I got served with it months ago.  And

12  now it's been withdrawn for some reason just before court.  Are

13  you aware of that?

14  Q    But your testimony is that Rick Rahim, prior to 2020 and

15  prior to 2021, forgave that loan in some way?

16  A    He did.

17  Q    And you're aware that the point --

18  A    He also told --

19  Q    I'm sorry.  You're aware that the point of the ethics

20  filings is so that the public can be aware of any conflicts of

21  interest that their elected official might have, right?

22  A    Yeah.

23  Q    And it's important to be accurate in reporting those

24  documents?

25  A    Yeah.

Jenkins - Cross

1   Q    And none of that money -- and you admitted to this

2   already, I think -- that the $45,000 that Rahim gave you was

3   reported on your campaign finance reports, right?

4   A    It wasn't to be reported.  He didn't just give me the

5   money.  We were taking the money and buying tens of thousands

6   of dollars of clothing articles.

7   Q    My question was, it was not reported on your campaign

8   finance reports, right?

9   A    There was nothing to report because he didn't give me the

10  money.  We -- I don't know how else to explain it if you don't

11  understand that.  How else can I explain that?  I've said it

12  over and over.

13  Q    You were here -- he didn't give you the money, you said?

14  A    If you're saying it was a gift, because you want to make

15  it sound like it was a bribe, it wasn't a gift.  His money was

16  part of what we both put into -- just like the firing range

17  part was $12,000 in -- the steel targets were thousands of

18  dollars, and other things that I did at the farm there, at the

19  home that I just sold this past year, those firing ranges are

20  another good example.  I could explain a lot of things if you

21  want to talk about them.

22  Q    If you could just answer the question, yes or no?

23  A    Okay.  What's the question?

24  Q    My question was, that you did not report any of the cash

25  that Rick Rahim gave you on the campaign finance reports,

Jenkins - Cross

1  correct?

2  A    It was not to be reported, no.

3  Q    So the answer is no?

4  A    No.

5  Q    You did not report any of the contributions -- in-kind

6  contributions he gave you on your campaign finance reports?

7  A    He gave no in-kind contributions that weren't reported.

8  Q    And your testimony earlier --

9  A    He gave items that were unrelated to a campaign.

10  Q    Your testimony is that you did not have to report those

11  items because they were not related to your campaign?

12  A    None.  I know of none.

13          MS. PENG:  Can we pull up our exhibit that shows the

14  billboard?  I think it's Exhibit 120.

15  BY MS. PENG:

16  Q    Your testimony is that this billboard that Rick Rahim paid

17  for was not related to your campaign?

18  A    No, that's not my testimony.  That is related to the

19  campaign and it should have been reported because that's

20  campaign material.

21      I was talking about the fliers, the knives, and these

22  other trinkets and things that he would run and do, and they

23  had nothing to do with the campaign.  One in particular said

24  Culpeper Sheriff Scott Jenkins.  That's all it said engraved on

25  these little knife trinkets.  I remember seeing --

Jenkins - Cross

1                    (Overlapping speakers.)

2    Q    This was not reported on your campaign finance report, was

3    it?

4    A    If it wasn't reported, then you would have to ask David,

5    Bernie, or whoever would be responsible for that.  I had

6    nothing to do with -- I mean, a governor or president or

7    anyone, they don't make the ads and the --

8    Q    Sir, my question is, this was not reported on your

9    campaign finance report, correct?

10   A    If you say so, but I --

11                   (Overlapping speakers.)

12   Q    Do you want to take a look at the campaign finance report

13   filed for your campaign?

14   A    Whatever you'd like.  I don't know, because I don't do

15   that.  That wasn't my job.  I had people that did that.  David

16   Myers and his wife, for example --

17                   (Overlapping speakers.)

18   Q    Well, you were here for the testimony of David Myers; were

19   you not?

20   A    Sure.

21   Q    And he said that he was a conduit between you and the

22   accountant, right?

23   A    One of the things that he --

24                   (Overlapping speakers.)

25   Q    And that he never provided any information to the

Jenkins - Cross

1    accountant unless it was at your direction.  You were here for

2    that testimony, right?

3    A    I'm not understanding how that relates to this.

4              MS. PENG:  You can take that down.

5     BY MS. PENG:

6    Q    And sir, you've run multiple campaigns, right?

7    A    Yes.

8    Q    In 2019, that was your third campaign?

9    A    Yes.

10   Q    And in each of those campaigns --

11   A    I'm sorry.  Yes.  I'm sorry.

12   Q    Okay.  And in each of those campaigns, you knew you had to

13   report political contributions, right?

14   A    Correct.

15   Q    Each of those campaigns filed multiple of these forms?

16   A    I did or someone else did, yes.

17   Q    And as an experienced politician and law enforcement

18   officer, you understand why these reporting requirements exist,

19   right?

20   A    Yes.

21   Q    So there can be transparency around campaign finance?

22   A    Yes.

23   Q    To prevent corruption?

24   A    Yes.

25   Q    So that the public can have some trust in the integrity of

Jenkins - Cross

1  the political system, right?

2  A    Yes.

3  Q    And that would only be true if the reporting is accurate,

4  right?

5  A    Yes.

6  Q    So you understand that if you try to hide the true name

7  behind a contribution, that would be a violation of these

8  rules, right?

9  A    The true name behind the contribution?

10 Q    The real person who made the donation?

11 A    How are you saying hide it?  I don't understand what

12 you're getting --

13 Q    If you don't report the person who really made the

14 donation on a campaign finance report, that would be a

15 violation of the rules, right?

16 A    Right.  You only report the person who did.

17 Q    So if you're trying to hide that name or put it in the

18 name of somebody else, that would be a violation of those

19 rules, right?

20 A    That's fair to say, yeah.

21 Q    Because then you'd be lying about who the donation really

22 came from?

23 A    Correct.

24 Q    Or if you try to hide a donation so you don't have to

25 report it, that would also be a lie that violates these rules,

Jenkins - Cross

1  right?

2  A    Yes.

3  Q    So you understand all of that?

4  A    I believe so, yeah.

5  Q    And these rules aren't really that complicated, right?

6  A    I wouldn't say they are.

7  Q    And you've ran multiple campaigns when you're familiar

8  with these rules?

9  A    Yes.

10 Q    And you know that anything over $100, whether it's cash,

11 check, in-kind, had to be reported, right?

12 A    Yes.

13 Q    And you even got a briefing from -- on that from your

14 accountant, David Jones; isn't that true?

15 A    In 2007, not '15, as he testified; eight years prior.

16 That was when we first met and he did my first campaign, and we

17 met for about 30 minutes.  It was a great conversation.  He

18 gave me advice about buying silver.

19 Q    But you would agree with me that it's not complicated to

20 understand that any contribution over $100, whatever form it

21 takes, needs to be reported?

22 A    Yes, I would agree.

23 Q    And I just want to make sure:  You did not report any of

24 the Rick Rahim cash that he gave you, right?

25 A    I did not have to report any of that, no.

Jenkins - Cross

1  Q    No, the answer is did you or did you not, so just yes or a

2  no, please?

3  A    No, I did not.

4  Q    And you did not report any of the in-kind -- anything that

5  he gave you as an in-kind contribution, correct?

6  A    I don't know if you're talking about these billboards.  I

7  just don't know anything about --

8  Q    Well, you didn't report anything from Rick Rahim on any of

9  your filings; isn't that true?

10 A    Again, I don't know, because you know, David and Bernie

11 and the other people, my brother, they all did work with

12 various materials like the billboard and other things.  So I

13 can't say that they didn't turn that in to Donna or Jenny or

14 somebody to put on the report, because I certainly can't

15 remember the reports.  I mean, it's multiple ones all year

16 long, and it's years ago, so I --

17 Q    Well, you were here when we went through those reports,

18 and Rick Rahim's name did not appear on any of them; isn't that

19 right?  That was just a few days ago?

20 A    The premise of the question is that you have them all

21 there, and I don't know that they're all there.  So I can't

22 answer that.  You're telling me that they're all there.  If

23 that's what you're saying, then what was presented I could --

24 Q    If I represent to you that they're not all there, and we

25 don't have to take the time to review them here, would you

Jenkins - Cross

1   agree that nothing from Rick Rahim was reported?

2   A    I would agree what you showed, that I didn't see it on

3   there, yes.

4   Q    Well, I mean, your counsel has an opportunity to come back

5   if there was something, so we can see about that.

6        And the reason why you didn't report any of these as

7   political contributions is because they're not political

8   contributions, right?

9   A    What items are you referring to?

10  Q    Any of these.

11  A    I don't know how to answer because they're not all the

12  same.  You say any.

13  Q    Well, none of them were recorded, right?  We can agree on

14  that.  So you did not report them.  So if there were any

15  political contributions he gave you --

16  A    I answered that already.  I don't know if the billboard or

17  other things were.  If they were campaign material, then one of

18  those guys that dealt with that should have put it on the list.

19  I had nothing to do with it other than driving down the road

20  and seeing it, and them telling me it's done.  I mean, I don't

21  know how to explain.  If I don't have anything to do with it, I

22  don't know.

23  Q    You don't have anything to do with it?

24  A    I --

25                        (Overlapping speakers.)

Jenkins - Cross

1  Q    And the reason why you did not report them as political

2  contributions is because they were bribes, right?

3  A    No.

4  Q    And in fact, you referred to your agreement yourself as,

5  quote, one hand scratches the other, which basically means quid

6  pro quo, right?

7  A    No, that doesn't basically mean that.  One means something

8  illegal, the other -- or at least the way you're intending it

9  -- and the other, one hand scratches the back, is like a friend

10 and a friend.  So no, I'm not going to let you put words in my

11 mouth that aren't accurate.

12         MS. PENG:  Can we play that clip, please, Government

13 Exhibit 32.

14         (Audio playing.)

15  BY MS. PENG:

16 Q    That was you on the recording, right, Mr. Jenkins?

17 A    Sounded like me.

18 Q    I'm sorry?

19 A    That sounded like me, yes.

20 Q    So you said those things?

21 A    I believe so.

22 Q    And in fact, you were worried about giving Rahim, a felon,

23 a badge, because you knew it was wrong, didn't you?

24 A    No, it's not wrong.  It's the discretion of the sheriff.

25 But I understand how you're phrasing it.

                                                                    274

                          Jenkins - Cross


1   Q    And you were worried that, you know, it would come back on

2   you?

3   A    Politically, or what are you referring to?

4   Q    I mean, you were -- but you were confident and you did it

5   anyway because if someone ever questioned you, you could spin

6   it, right?

7   A    Again, I ask in what way do you mean it, politically?

8   Q    Well, I'm using your word, sir, spin.

9   A    I can't answer unless you tell me which way you mean.

10          MS. PENG:  Let's play Government Exhibit 33-B.

11          (Audio playing.)

12   BY MS. PENG:

13   Q    That was you on the recording, right, sir?

14   A    Yeah.

15          MS. PENG:  And then can we play 33-A as well.

16          (Audio playing.)

17   BY MS. PENG:

18   Q    That was you on that recording, right?

19   A    Yes.

20   Q    There's no mention -- you didn't mention a business deal

21   of any kind, did you, on that recording?

22   A    No.

23   Q    Aside from Rick Rahim, you also took $20,000 in bribes

24   from Fred Gumbinner; isn't that true?

25   A    No.

Jenkins - Cross

1  Q    You never took $20,000 from Fred Gumbinner; that's your

2  testimony?

3  A    No -- yes.  Uh-huh.

4         MS. PENG:  Can we pull up Government Exhibit 105.

5         Can we zoom in on the bottom portion of that.

6   BY MS. PENG:

7  Q    Do you see this text message, sir?

8  A    I do.

9  Q    And it's dated October 3rd, 2019, right?

10 A    Yes.

11 Q    That's a day after you met with Rick Rahim?

12 A    I don't know.

13 Q    But it says -- this is Kevin Rychlik on the right here?

14 A    Wait, it says what?

15 Q    In the blue --

16        THE COURT:  Identify the -- show him the portion of

17 the text that will give the number so he can see who they are.

18        MS. PENG:  Is there a way to show the numbers of this

19 message?

20  BY MS. PENG:

21 Q    Do you recognize this, sir, as text messages that you

22 sent?  Do you see the message that says, sorry, Kevin, been

23 tied up.  I'd say technically no, but never hurts to ID and try

24 if needed?

25 A    I'm reading it.  And I'm sorry, I'm slow at reading.  It

Jenkins - Cross

1    appears to be what you say.

2    Q    Okay.  So then do you see -- so does it look like sorry,

3    Kevin -- those were messages directed to Kevin Rychlik from

4    you, and he's asking about your meeting with Rick Rahim?

5    A    I'm sorry, you said that really fast.  Would you mind

6    saying it one more time?

7    Q    So because you said, sorry, Kevin, does that allow you to

8    identify these messages as messages you had with Kevin Rychlik?

9    A    Yes, it appears to be so.

10   Q    Okay.  And so if we can zoom in on the bottom text

11   exchange.

12        And is Kevin Rychlik now asking you about a meeting with

13   Rick Rahim?

14   A    Yes, it appears so.

15   Q    And do you see where he says, I heard another 21K?

16   A    Yes.  Uh-huh.

17        MS. PENG:  Can we flip to the next page.

18    BY MS. PENG:

19   Q    Now, do you also see the message from Kevin Rychlik

20   saying -- starting with, I promise you 50K plus support?

21   A    I do.

22   Q    There's no mention of any business ventures in this text

23   message, right?

24   A    Not that I see.

25        MS. PENG:  Can you take that down.

Jenkins - Cross

1              Can we go to Exhibit 106.

2     BY MS. PENG:

3     Q     Do you recognize these messages, Mr. Jenkins?

4     A     I recognize them as, you know, what you're presenting

5     here.  And that picture obviously I know is of me and my family

6     and others, so I believe that to be accurate.

7              MS. PENG:  Can we flip to the next page -- page 4,

8     actually.

9     BY MS. PENG:

10    Q     Do you see the message that starts at the top that says,

11    Rick's dollar dollar guy, Fred?

12    A     Yes.

13    Q     That refers to Fred Gumbinner, right?

14    A     I would assume so.

15    Q     Go down to the last message.

16           Do you see here what this message says from Kevin Rychlik?

17    A     I do.

18    Q     Rick giving me crap about Fred not getting sworn yet after

19    putting up all that dollar sign, dollar sign?

20    A     Correct.

21    Q     You received this message?

22    A     I don't know if I did, but I mean, I'm looking at it, yes.

23           MS. PENG:  The next page, please.  Can you zoom in on

24    the top three.

25    BY MS. PENG:

Jenkins - Cross

1  Q    Do you see these messages?

2  A    Yes.

3  Q    That Kevin Rychlik forwarded you from Rick Rahim?

4  A    Yes.  I see what you're saying -- Kevin --

5  Q    And then do you see the text on the bottom which says,

6  we've had his 20K for six plus months, Kevin -- this is a

7  message from Rick -- he's gotten nothing.  He makes me millions

8  of dollars.  I have to maintain credibility.  That's my world.

9  I have to give the money back or set a date for him.  I was

10 sure you had at least put everything through by now and all we

11 needed was to get him sworn.

12        Do you see that?

13 A    Yes.

14 Q    And then you said give me 10 to 15 to call?

15 A    Uh-huh.

16 Q    And, in fact, you did call.  You did have a phone call

17 with Kevin Rychlik, right?

18 A    I would assume I did, but I can't say from memory.

19 Q    Well, you were here earlier when Agent Medearis testified

20 and showed you those AT&T phone records showing that there was

21 a call between you and Kevin Rychlik shortly after this text

22 message, right?

23 A    Again, I said yes.

24        MS. PENG:  Take that down.  Zoom out, please.

25  BY MS. PENG:

Jenkins - Cross

1   Q    And then Kevin Rychlik sent you Fred Gumbinner's driver's

2   license, right?

3   A    Yes.

4   Q    And then after your phone call, Kevin Rychlik says, Rick

5   good now/happy.  I told him next week midweek to get back with

6   me with date.

7        Do you see that?

8   A    Yes.

9           MS. PENG:  You can take that down.

10   BY MS. PENG:

11  Q    In fact, you met Fred Gumbinner for the first time after

12  you appointed him?

13  A    Yes, like many.

14  Q    You never even met him in person before you decided to

15  appoint him as an auxiliary deputy, right?

16  A    Correct.

17  Q    And you did not report the $20,000 Fred Gumbinner gave you

18  as a campaign contribution?

19  A    Fred didn't give me money.

20  Q    Did you review the messages we just looked at?

21  A    I don't care, and you won't let me talk, but it was

22  testified the other day.  He wrote Rick a check.  I get that

23  part.  But I don't know what I can say and can't.  So you asked

24  the question.

25  Q    Your testimony is that you did not receive $20,000 from

Jenkins - Cross

1  Fred Gumbinner?

2  A    I didn't get $20,000 from Fred Gumbinner, no.

3  Q    Did Rahim give you $20,000 you later understood to be from

4  Fred Gumbinner?

5  A    Rick Rahim gave me money, yes.  And he gave me 20,000,

6  yes.

7  Q    So -- sorry, go ahead.

8  A    No.

9  Q    So you didn't understand from the text messages that we

10  just reviewed that Fred Gumbinner had given you money?

11  A    I see what you're saying, yes.

12  Q    But you did not report any money from Fred Gumbinner on

13  your campaign finance reports?

14  A    No, I did not.

15  Q    You didn't give Fred Gumbinner any training, right?

16  A    No, I did not.

17  Q    You didn't ask him to do anything for Culpeper, right?

18  A    Well, he is an attorney.  We thought we may need him for

19  something.  But no, I didn't actually ask him for anything.

20  Q    You did not ask him to do anything for Culpeper, right?

21  A    I don't know that I did, but Kevin had planned to call on

22  him or friends of his -- attorneys -- as he developed a search

23  and rescue policy and things, but that's --

24  Q    Okay.  But my question is:  He never actually did anything

25  for Culpeper?

Jenkins - Cross

1   A    I don't know, because Kevin intended to use him for that

2   because that's what he does or can do, and I don't know if he

3   did or he didn't.  But Kevin provided a PowerPoint outlining

4   things that --

5   Q    Sir, if you could just answer the question I'm asking, I'd

6   really appreciate it.

7   A    I'm trying to.

8   Q    You were here when Mr. Gumbinner said he never did

9   anything for Culpeper County, right?

10  A    I heard that, yeah, but I don't --

11  Q    And you're aware, too, that Fred Gumbinner has admitted to

12  paying you a bribe, right?

13  A    I heard that, yes.

14  Q    And then you appointed James Metcalf as an auxiliary

15  deputy on September 6, 2022, right?

16  A    Correct.

17  Q    And you gave him a badge the very next day, September 7th,

18  2022?

19  A    I can't swear to the dates and things like that, but I

20  heard his testimony, yes.

21  Q    And besides one very brief encounter with Mr. Metcalf,

22  that was the only other time you met him, right?

23  A    Are you saying after that being a total of three times or

24  are you asking before?

25  Q    I'm asking at the time that you gave him the badge, that

Jenkins - Cross

1    was only the second time you had met him, aside from a very

2    brief meeting, right?

3    A    I believe so.  I don't remember meeting him before that.

4    Q    That's the same day that he gave you a $5,000 check,

5    right?

6    A    Correct.

7    Q    You knew a check could be traced.  So that's why you

8    reported it on your campaign finance report; isn't that right?

9    A    It's supposed to be reported, yes.

10   Q    And when Jim Metcalf told you he could get you, quote,

11   do-nothing guys, you didn't object to that, right?

12   A    Do nothing, yes, I remember hearing that in that

13   recording, yes.

14   Q    You didn't tell him:  No, I want people who will actually

15   do real work because I'm trying to build a real program.  You

16   didn't tell him that?

17   A    Again, I'm not trying to be difficult.  There is a

18   recording.  I heard it.  I'm not disputing what he said.  But

19   again, I cannot sit here and swear that I thought, said, or did

20   a particular thing because that's been a long time ago and

21   everyone -- I mean, it's common knowledge.  I get thousands of

22   texts.  If we're talking now that I'm sheriff, I'd be looking

23   at the phone --

24   Q    Sir, we can replay the recording, if you want, but my

25   question is --

Jenkins - Cross

1  A    That's fine.

2  Q    -- when Jim Metcalf told you he could get you do-nothing

3  guys, you didn't tell him, no, I want people who will do real

4  work because I'm trying to build a real program.  You didn't

5  say that to him, did you?

6  A    I didn't take do nothing to mean that.  I took it to mean

7  do nothing wrong as in causing you headaches.  Maybe I'm wrong.

8  Again, I can't remember being there.  I heard the tape, though.

9  Q    Instead, you told him about the need to, quote, cull the

10 herd and build up your war chest, right?

11 A    Yes, I heard that.  That certainly sounds like my words.

12 Q    You didn't give Jim Metcalf any training, right?

13 A    He wouldn't need any.  He rode motors in Prince William.

14 Q    You did not give him any training, correct?

15 A    No, uh-huh.

16 Q    And you didn't ask him to do anything for Culpeper, did

17 you?

18 A    Not that I recall, no.  No different than many others.

19 Q    And you're aware, too, that Jim Metcalf has admitted to

20 paying you a bribe for a badge, right?

21 A    Yeah, I was here.  I heard it.

22 Q    And you also appointed Tom Cooper as an auxiliary deputy

23 on October 24th, 2022?

24 A    Correct.

25 Q    And you gave him a badge on October 26, which is the same

Jenkins - Cross

1  day you met him for the first time?

2  A    Yes.  Uh-huh.

3  Q    And you told him that once he got the badge, he could

4  conceal carry in all 50 states, right?

5  A    Sounds accurate, yeah.

6  Q    And on the same day he also gave you a $5,000 check?

7  A    I believe so, yeah.

8  Q    And you knew that check could be traced, so that's why you

9  reported that one on the campaign finance report, right?

10 A    I reported it as I should, yeah.

11 Q    And even after he gave you that check, you tried

12 suggesting to him that it should come to you in cash, didn't

13 you?

14 A    If you say so.  I can't swear that I did.  If it's

15 recorded, then it is what it is.  Tom offered a lot of

16 different things and I never took him up on other things.

17 Q    Because you can't spin a recording, right, sir?

18 A    No.

19 Q    And in fact, you also suggested to him that he could give

20 you the donation of multiple people with different names; isn't

21 that right?

22 A    I don't know.  Maybe my memory is bad from the other day

23 listening.  I tried to listen to everything.

24 Q    You never gave Tom Cooper any training?

25 A    No.

Jenkins - Cross

1  Q    And you never called him to do any work for Culpeper,

2  right?

3  A    No.

4  Q    And then you appointed Undercover Officer Jerry McKee as

5  an auxiliary on November 9th, 2022?

6  A    I can't swear to the date, but at some point, yes.

7  Q    You gave him a badge on November 14th, 2022, the same day

8  he gave you $5,000 in cash, right?

9  A    Except the date, I can't swear what day, but that --

10 Q    Except the date, that's accurate?

11 A    Correct.  Uh-huh.

12 Q    And he told you he wouldn't have a lot of time to do

13 anything because he would be gone a lot, right?

14 A    I think he did.

15 Q    And you didn't say, no thanks, we want people who are

16 actually available to do work.  You didn't tell him that?

17 A    No.  They just have to be available for call-up, as I've

18 said.

19 Q    You basically told him:  Don't worry about it.  It's fine

20 that you're not available, right?

21 A    It would be fine.  They have to be available for call-up,

22 as I've said over and over, and publicly in the media.

23 Q    And the reason you weren't concerned is because you

24 weren't really trying to build a real program; isn't that

25 right?

Jenkins - Cross

1   A    I don't know how to answer that.  Kevin was building the

2   program.  There is literal proof.

3   Q    The only program you were really building was a very

4   streamlined badge for cash program; isn't that right?

5   A    Why didn't we see the PowerPoint in the program that was

6   being --

7                THE COURT:  Answer the question, please, Mr. Jenkins.

8                THE WITNESS:  I'm sorry, ask that again.  I wasn't

9   what?

10   BY MS. PENG:

11  Q    The only program you were really building through that

12  streamlined process over and over again was a badge for cash

13  program, correct?

14  A    No.

15  Q    You did not report that $5,000 in cash, did you?

16  A    No.

17  Q    You didn't report it because it was in cash and so it

18  could not be traced, or that's what you thought; isn't that

19  true?

20  A    No.

21  Q    You never called in Undercover Officer Jerry McKee as an

22  auxiliary to do anything; isn't that right?

23  A    No.

24  Q    And you never gave him any training whatsoever?

25  A    Correct.

Jenkins - Cross

1  Q    Then you appointed Undercover Officer Mike as an auxiliary

2  deputy on December 27, 2022?

3  A    I don't know the date.

4  Q    You did that before you even met him?

5  A    I don't understand how you're saying that.  I did that

6  before I ever met him?

7  Q    You signed the appointment order on December 27th, 2022.

8  A    Okay.  Yes, if it was dated before that date, but I don't

9  know what date I met him.  But yes, if it was signed before

10 that, then that's accurate.

11 Q    You didn't meet him for the first time until one day later

12 on December 28th, 2022, the same day that he gave you $10,000

13 in cash, right?

14 A    Again, I can't swear on dates, but, you know, I'm agreeing

15 generally with what you're saying.

16 Q    But besides the date, you agree that Mike gave you $10,000

17 in cash?

18 A    Again, I didn't count it that day when I was there, that

19 envelope of cash.  So yes, I agree.

20 Q    Well, you heard the recording, right, earlier when Mike

21 said that he would give you twice as much?

22 A    I'm just trying to tell you what I know and not say

23 something I don't know.  That's all.

24 Q    And that same day he gave you $10,000 in cash is when you

25 handed him his badge, right?

Jenkins - Cross

1  A    To my knowledge, yes.

2  Q    And you had known that Mike had a felony conviction; isn't

3  that right?

4  A    Yes.  I'll just say yes.

5  Q    Because Kevin Rychlik told you that before you met Mike?

6  A    As best I recall.

7  Q    And when you found out that Mike had a felony conviction,

8  you didn't say, no, thank you, I don't want to give a felon a

9  badge.  You said you would personally walk it through; isn't

10 that right?

11 A    Yes.  At that point I knew that you could do that as a

12 sheriff, having Rick's experience in the past I guess.

13 Q    You didn't ask Kevin Rychlik any questions about Mike,

14 this person with a felony conviction.  You just took his

15 $10,000 in cash, right?

16 A    Kevin brought him forward and vouched for him and wanted

17 him on, yes, exactly.

18 Q    And we just established that you never even met the guy

19 once you appointed him as a deputy, right?

20 A    As dozens of others I had never met.

21 Q    So there's -- you know, the story you were telling earlier

22 about some kind of friendship of Rick Rahim, you can't say that

23 about Mike, this person with a felony conviction?

24 A    Do I have to?

25 Q    And once you knew that he had a felony conviction, you

Jenkins - Cross

1  purposely did not run a criminal history check because you know

2  that his felony conviction would come back, right?

3  A    I've never run a criminal history check.  I mean, I don't

4  actually do that.  Others do.

5  Q    There was no criminal history check run on Mike because

6  you knew it would come back with a felony conviction?

7  A    Can you ask me a question?

8  Q    Isn't that true?

9  A    No.

10  Q    You ran -- every single person that we just discussed, you

11  ran that criminal background check, but you didn't do it for

12  Mike because you wanted a lack of a paper trail; is that true?

13  A    Again, I don't actually run them for anyone.  I have

14  people like Pete Siebel who do.

15       Did Pete say he did or didn't?

16  Q    So your testimony here is that Pete Siebel took it upon

17  himself to not run the criminal check for Mike?

18  A    I don't know.  Pete is not the only one that would do

19  that.  There are multiple people that could and did.

20  Q    And you're aware that Mike didn't live anywhere near

21  Culpeper, right?

22  A    Yeah, like most, uh-huh.  Most of my staff don't live in

23  Culpeper.  The majority of full-time staff do not live in

24  Culpeper at any time.

25  Q    You did not report that $10,000 from Mike?

Jenkins - Cross

1   A      No.

2   Q      You did not report $10,000 from Mike as a campaign

3   donation, did you?

4   A      No.

5   Q      And in fact, you're the one that sent the photo of Mike,

6   his driver's license, to Pete Siebel; isn't that true?

7   A      I don't know.  I mean, if you say so -- if it's in a text,

8   then yes.

9   Q      And you never called in Mike to do any work, did you?

10  A      Not that I recall.

11  Q      You never gave him any training?

12  A      No.

13  Q      And as far as you knew, Mike had not gotten his firearms

14  rights restored, right?

15  A      As far as I knew, I had no clue.  I mean, I didn't run

16  this stuff.  I wouldn't be able to verify that.  I relied on

17  other people to do that for me.  So I would have been trusting

18  it would have been done.

19  Q      Sir, you've been a law enforcement officer for over 30

20  years, right?

21  A      Uh-huh.

22  Q      So you know it's illegal for a felon to possess a firearm,

23  right?

24  A      Not if he's had his rights restored.

25  Q      So when you decided to deputize him as an auxiliary deputy

Jenkins - Cross

1   with all of the rights associated, including concealed carry in

2   50 states, and your testimony is that you didn't even bother to

3   check whether he had his firearms rights restored or not?

4   A    I don't check.  The staff does.  And I trust them to do

5   that.

6   Q    All right.  You signed an order next appointing Phil

7   Howell as an auxiliary deputy on December 27th, 2022, right?

8   A    I can look at a document.  But yes, if you say so, that's

9   the date.

10  Q    And that's before you even met Mr. Howell?

11  A    Yes.  Yes.

12  Q    And you gave him a badge on December 29th, 2022, the same

13  day that he gave you $5,000 in cash?

14  A    Yes.

15  Q    You did not report that cash as a campaign contribution,

16  did you?

17  A    No.

18  Q    And two days later you purchased firearms using $3,000 in

19  cash, right?

20  A    Correct.  Well, again, I can't swear on these dates, but

21  I'm trusting where you're leading me to.

22  Q    And I thought I heard you say on direct something about

23  that was the same money that you used to purchase the firearms

24  that you got from Phil Howell two days prior?

25  A    I'm sorry, say that once more.

Jenkins - Cross

1  Q    You were asked about the firearms purchase at the gun show

2  on direct testimony, right?

3  A    Correct.

4  Q    And do you recall -- I think you said that you had taken

5  it out of a safe and that it could have been the money from

6  Phil Howell; is that your testimony?

7  A    Certainly.

8  Q    So your testimony is that you did use the money that Phil

9  Howell gave you two days prior to make the gun purchases?

10 A    It's -- again, I can't swear it was Phil's money in a gun

11 vault that had other money in it, different denominations,

12 silver.

13     Again, they got a search warrant.  They could have come to

14 my house when they talked to me that day and looked for

15 themselves, but they didn't.

16 Q    So the gun vault was in your house?

17 A    Yes.

18 Q    And the money from Phil Howell was in that safe in your

19 house?

20 A    Again, it may have been all or some of it.  I can't swear

21 on, you know, the envelope or the particular bills.  Like I

22 said, it's been years and I'm telling you the best I know.

23 Q    The best you know, it could have been Phil Howell's money

24 that was in your house?

25 A    As best I know, it could have been, uh-huh.  I got cash

Jenkins - Cross

1   and went to the show, like I said, late.  Well, I can't talk

2   about -- you know, I went Saturday afternoon and bought the gun

3   with cash, yes, that I took out of the vault.

4   Q    So you used the cash that Phil Howell gave you two days

5   prior to go purchase the guns?

6   A    I can't swear it was Phil's cash or it was --

7   Q    Or it could have been Phil's cash?

8   A    It could have been, yes.  Uh-huh.

9   Q    And you signed the order appointing Rubar Sandi as an

10  auxiliary deputy on December 27th, 2022, correct?

11  A    Yes.

12  Q    And then you gave him a badge on January 4th, 2023, the

13  same day he gave you $5,000 in cash?

14  A    If the date is accurate, yes.  I can't swear to the date.

15  Q    You didn't report that cash as a campaign contribution,

16  did you?

17  A    No.

18  Q    And less than an hour after you leave the Rubar Sandi

19  meeting, you make a $7,000 cash deposit into your personal bank

20  account; isn't that true?

21  A    Correct.  Well, I mean, I'm trusting the documents.

22  Q    And you were a part of that phone recording, that

23  recording with Rubar Sandi where he's referencing, oh, you guys

24  do it so quietly here, ha ha.

25       Do you remember that?

Jenkins - Cross

1    A    Well, I listened to it, yes.

2    Q    And then you signed the appointment order for Harry Carr

3    without ever meeting him, right?

4    A    I believe so, yes.  I saw the document and that's my

5    signature, yes.

6    Q    Sir, would you agree with me that this is a pattern of you

7    taking money from people and then pretty much immediately

8    giving those same people a badge over and over again?

9    A    At that particular time in my administration, but not the

10   years going along.  It just got to that point for many reasons

11   that I can't get the opportunity to explain.

12   Q    And besides the two checks written to you by Jim Metcalf

13   and Tom Cooper, the money from Rick Rahim, Fred Gumbinner,

14   Jerry McKee, Mike, Phil Howell, Rubar Sandi, none of that was

15   reported on your campaign finance reports, right?

16   A    I'm trying to follow the names you just said really

17   quickly.  And to the best of what I think you said, I would

18   agree, yes, because I think those are all the ones -- I think

19   that's accurate, yes.

20   Q    And you just testified on direct that you didn't report

21   some of the cash because of a deadline issue.

22        Do you remember that?

23   A    Yes.  I didn't know when the filing deadline -- or filing

24   date was for, you know, the end of '22 and headed into '23.

25   Q    But the deadline didn't prevent you from reporting the two

Jenkins - Cross

1  checks on the report that you knew could be traced; isn't that
2  right?
3  A    No.  As best I know -- I mean, I don't know.  We'd have to
4  look at the dates, but the checks -- I mean, I assume I got the
5  checks, and the time came where I ran by and had time or might
6  have been at the bank for other reasons, but I clearly
7  deposited those.  There's a record.  But then the cash, if that
8  came in after that and I never had reason to think there was a
9  report, never had time -- I mean, you can look at my texts and
10 look at my daily schedule --
11 Q    But my question is, you reported the two checks --
12 A    Yes.
13 Q    -- on that report that you said --
14 A    And before that.  So after that when the cash came in --
15 I'm assuming.  I don't have the dates in front of me.  Look at
16 it and see.  But if they were after that, then I guess so.
17 Q    Well, they were before and after, sir.
18 A    They weren't reported.
19 Q    Okay.  And so some of these people who are giving you the
20 money, they had no idea that actually the money was not going
21 to your campaign account, right?
22 A    The people who gave me the cash had no idea that it wasn't
23 going in the campaign account?
24 Q    Those people thought -- some of them at least -- thought
25 they were actually giving you political donations; isn't that

Jenkins - Cross

1   right?

2   A    Correct.

3   Q    And so you were lying even to your bribe payers; isn't

4   that true?

5   A    No, that's not true.

6   Q    And just so I'm clear, Kevin Rychlik, he never got any of

7   the amounts that these people gave you, did he?

8   A    He never got any of these amounts, are you asking --

9        (Overlapping speakers.)

10  Q    The money that we just went through that came to you from

11  these various individuals we just walked through, they all went

12  into your accounts, right?

13  A    What money went into my account?

14  Q    Let's see, the $25,000 from Rick Rahim, the $20,000 from

15  Fred Gumbinner, the $5,000 from Jerry McKee, the $10,000 from

16  Phil Howell, $5,000 from -- $10,000 from Mike, sorry, $5,000

17  from Phil Howell, $5,000 from Rubar Sandi, none of that money

18  went to Kevin Rychlik; isn't that true?

19  A    You asked if it went in my account.  It went in my hand.

20  It went in my vault.  It went to other people I paid for

21  business stuff like the --

22  Q    None of that money went to Kevin Rychlik, correct?

23  A    Not that I know of, no.  I mean, I didn't -- I don't know

24  if I paid him for anything he did.

25  Q    Kevin Rychlik wasn't running for office, right?

Jenkins - Cross

1   A    Right.  Yeah.

2   Q    He was never sheriff, right?

3   A    No.

4   Q    He didn't need to raise funds for a war chest, right?

5   A    Correct.

6   Q    And he didn't get any of the money that I just went

7   through, right?

8   A    No.

9   Q    And we had talked earlier about how as a law enforcement

10  officer you're familiar with the ways that criminals try to

11  avoid getting caught, right?

12  A    Yes.

13  Q    And you agreed with me that in addition to being an

14  experienced law enforcement officer, you're an experienced

15  politician who is really good at spinning a story, right?

16  A    I like to think I'm good at it after all these years.

17  Q    I think you're pretty decent at it.

18        And so, because of that experience as a law enforcement

19  officer and politician, you told people like Kevin Rychlik not

20  to put things in text messages, right, and use the phone

21  instead because you know that texts could be preserved?

22  A    Could be preserved or are you talking about phone calls?

23  No, I can't say that I told him exactly that.  I can elaborate

24  and tell you conversations I did have and why.

25  Q    Well --

Jenkins - Cross

1   A    And what I've experienced and the reasons for it.  I can

2   tell you about that.

3   Q    Well, you would agree with me, though, right, that if you

4   didn't have the text messages or you didn't use text messages,

5   a prosecutor like me wouldn't be able to show you to them at

6   trial and say:  Isn't it true that you actually said this?

7   A    You're clearly going to do what you're going to do any

8   whether they're there or not.  You all have done it for a year.

9   Q    But you would agree that text messages are a record of

10  what actually happened?

11  A    Yes, but you will do what you're going to do.

12  Q    And you also told Kevin Rychlik to keep the circle of

13  people who knew about the auxiliary deputies that we talked

14  about small, right?

15  A    Are you asking about people like Tim Smith, the

16  moonshiner, and famous guys and others like this, because we

17  didn't want people to try to recruit them out to get money and

18  fame from them?

19  Q    I'm talking about --

20  A    Because I did do that.  But that -- you know, there's

21  reasoning is what I'm saying as to why.  So I may have said

22  something like that as well, but that would be --

23       (Overlapping speakers.)

24  Q    You didn't want -- you didn't want lots of people to know

25  about this program you were running with Kevin Rychlik because

Jenkins - Cross

1   you knew it was wrong, right?

2   A    Public knowledge, and everybody in the office knew about

3   it.  This program or division -- I don't know what you're

4   trying to refer to -- program as the new program we were --

5   Q    So you --

6   A    -- kicking off, search and rescue.

7   Q    So you never told Kevin Rychlik that only a specific

8   number of people could know about the auxiliaries that he was

9   bringing in to pay you money for a badge?  You never told him

10  that?

11  A    No, I can't say I didn't.

12  Q    So you did?

13  A    I could have, yeah, because it would stand to reason, the

14  conversation.  I may have said something like that, yeah.

15  Q    And you told Kevin Rychlik --

16       I'm sorry?

17  A    I'm sorry.

18  Q    You told Kevin Rychlik to vary the amount of money so it

19  wouldn't be obvious, right?

20  A    No.

21  Q    Because if these were true political donations from real

22  supporters, presumably they would be giving you donations in

23  different amounts, right?

24  A    No.

25  Q    So if everyone was giving you $5,000 and the next day they

Jenkins - Cross

1  were getting a badge, that would look suspicious, right?

2  A    That's the authority of the sheriff I've said over and

3  over.  It can look suspicious, whatever you want to term it.

4  Politically it can look bad or good.  There's a lot of looks or

5  perspectives, but the bottom line answer is that's the

6  authority of the sheriff to choose who, when, all of that.

7  Q    But you would agree with me that the authority of the

8  sheriff does not include giving out badges in exchange for

9  bribes, right?

10 A    I think it's clear about bribes.  I've answered that, yes.

11 Q    And you were also the one who told Kevin Rychlik that

12 people should give money to your brother instead so it doesn't

13 have to be reported on the campaign finance forms?

14 A    I can't agree with the way you're terming it, but -- no, I

15 can't agree with you on that.

16         THE COURT:  Ms. Peng, let me -- we've been going

17 about two hours.  I do want to get finished with Mr. Jenkins

18 this afternoon.  Let's take a ten-minute comfort break and come

19 back at 5:35 and see if we can get wrapped up this evening.

20         Ladies and gentlemen, please do not discuss the

21 testimony at all amongst yourselves or begin to any decision

22 until after all the evidence is in.  Stand in recess for ten

23 minutes.

24 **(Jury out, 5:26 p.m.)**

25         THE COURT:  All right.  While we're on break,

Jenkins - Cross

1  Mr. Jenkins, do not discuss your testimony with anyone at all,

2  and we'll stand in recess for ten minutes.

3            (Recess.)

4            THE COURT:  We're back on the record in the matter of

5  *United States v. Jenkins*.  The government is present by its

6  counsel.  The defendant is present along with the benefit of

7  counsel.

8            Ms. Peng, how much more do you have left?

9            MS. PENG:  I think five to ten minutes, not long.

10           THE COURT:  Any idea how long you think you'll be,

11 Mr. Andonian?

12           MR. ANDONIAN:  I think I'm going to probably be a

13 little while.  I mean, I don't think there's a reasonable

14 chance I'd be done by 6, and I'd be really nervous about being

15 the reason the jury is still lingering around after 6.

16           THE COURT:  Right.  Do you think you would be done by

17 6:30?  I mean, I can give the jury that chance.  Ms. Blair is

18 not going to like me.  I can let the jury decide.

19           Well, let's just see how long Ms. Peng takes.  But if

20 you think you're going to be -- do you think you'll go as long

21 as 6:30 if you were to go, or is it going to be longer than

22 that, do you think?

23           MR. ANDONIAN:  It could well be longer than that,

24 Your Honor.

25           THE COURT:  Let me just -- let's just think out loud.

Jenkins - Cross

1    I mean, Ms. Peng, it may be one of those things -- well, and

2    here's the practical problem just so that you all will know.

3    From Ms. Blair's standpoint, getting a same-day to you all

4    because we've been going this late and starting as early,

5    there's not enough time in between for her to be able to turn

6    that back around.  And if you want a same day -- which I'm sure

7    you probably do because you're going to want it for your

8    closing -- I don't see any way that I can keep us much past 6

9    for you all to expect to have a same day, from what I

10   understand.  Mr. Jenkins will just have to carry over.

11           I hate to bring the jury in -- because we still have

12   to have a charge conference -- bring the jury in to finish up

13   for an hour and then whatever -- I don't know whatever evidence

14   the defendant may still have and then any rebuttal the

15   government may have.

16           Ms. Peng, Ms. Choy, Ms. Smith?

17           MS. PENG:  Your Honor, I think we could just go and

18   see what it is, and if we have to adjourn, then we'll --

19           THE COURT:  If we have to adjourn, we'll have to

20   adjourn.  Anything else we need to address before we bring the

21   jury in?

22           All right.  Let's bring the jury in.

23   **(Jury in, 5:41 p.m.)**

24           THE COURT:  Ladies and gentlemen, please have a seat.

25   Let's continue on with the cross-examination of Mr. Jenkins.

Jenkins - Cross

1          Ms. Peng, go right ahead, please.

2          MS. PENG:  Thank you.

3   BY MS. PENG:

4   Q    I just have a few more questions for you, sir.

5        So before the break we were talking, and you agreed

6   that -- I think you agreed that you told Kevin Rychlik that

7   people should give money to your brother instead so it doesn't

8   have to be reported, right?

9   A    No.

10  Q    Because in your mind, if it comes to you, it has to be

11  documented, but if it's laundered through someone else first,

12  then it doesn't, right?  That's what you think?

13  A    No.

14  Q    And you also told Kevin Rychlik that you'd rather do your

15  part first and the money could come after, right?

16  A    No.

17  Q    You didn't say that in a recording?

18  A    Say it again.

19  Q    That you would rather do your part first and that the

20  money can come after?

21  A    If it's on a recording, then I did, but I'm -- I can't

22  swear, you know, I remember saying that.  But I'll go with what

23  you say.

24          THE COURT:  Can you speak up a little bit,

25  Mr. Jenkins.

Jenkins - Cross

1          THE WITNESS:  I'm sorry.  Yes, sir.

2    BY MS. PENG:

3    Q    Sir, is it fair to say if it's on a recording you can't

4    deny it, but if it's not, then you would try to?

5    A    No, but go ahead.

6    Q    And you also made up a fake tractor purchase for Rahim,

7    right?

8    A    No.

9    Q    You told Rahim, hey, you bought a tractor on a farm and

10   paid cash, but if my brother gets it, big deal, right?

11   A    The second part I don't even get.  But as far as a

12   tractor, you can go to the property today, it's still there.

13   Q    You're --

14   A    Still there sitting in the field.

15   Q    You were faking a tractor purchase as a way to conceal the

16   bribe money that Rahim gave you, right?

17   A    No.  It's there today.  We can go there and prove it or

18   send the agents.

19   Q    Rahim doesn't have that tractor, does he?

20   A    I don't know what to say.  I don't know what I can say or

21   can't say.  I'd love to expound.

22   Q    And you even --

23   A    He rented the property for four years.

24   Q    And even just like the tractor purchase, you made up fake

25   gun transactions to try to cover up the bribes, right?

Jenkins - Cross

1  A    A fake gun transaction by a licensed firearms dealer is

2  fake?  You don't --

3  Q    Sir, nobody --

4  A    -- like the circumstances and I understand how you're

5  attacking me, but that's not a fake purchase.

6  Q    Sir, nobody bought guns, right?

7  A    I understand what you're saying, but as far as --

8  Q    So that's a yes-or-no question.  Nobody actually bought

9  guns, correct?

10 A    Your question before, did you want me to answer it?

11 Q    I want you to answer the question.

12       THE COURT:  Answer the questions put to you,

13 Mr. Jenkins.

14  BY MS. PENG:

15 Q    Nobody actually bought guns, correct?

16 A    And I'm not trying to be smart.  I'm trying to answer that

17 accurately.

18 Q    Sir, it's a yes-or-no question?

19 A    There was a transaction actually done.  I mean, clearly I

20 went there and did that.  So in that sense, yes, there was a

21 transaction.  But what you're asking me -- I think getting

22 at -- then yes, I can agree with that.  I don't know how else

23 to say it.  I understand what you're saying, but I'm not trying

24 to get out of the fact that yes, there was a transaction with

25 an FFL that wrote that receipt.

Jenkins - Cross

1  Q    In fact, those fake gun transactions were so farfetched

2  that even Kevin Rychlik was laughing about it, right?

3  A    Yes.  I completely get the circumstances, yes.  I'm not

4  denying that.

5  Q    Did I hear you correctly on direct that you thought that

6  if you didn't report those donations you got, that it would be

7  a bribe?

8  A    I think that's the best way to characterize it.  If it's

9  not reported in one of those ways, yes, then it could be.

10 Q    It could be a bribe if it's not reported?

11 A    I'd say -- I'd say that's accurate if I don't report it as

12 a donation, as a loan, or as that sale itself.  That's what I

13 was trying to do is do something legal one way or the other.

14 If it was embarrassing politically by reporting an addendum,

15 fine, but, you know, it is what it is.  I knew -- and I said it

16 on the tape over and over -- one way or the other -- and I've

17 said before -- but I'll stop at that.

18 Q    Sir, the truth is, you did think that the sheriff could do

19 whatever he wanted, right?

20 A    Whatever he wanted related to what, the office?

21 Q    You thought that the sheriff actually was above the law;

22 isn't that true?

23 A    No.

24 Q    And so, instead of using your 30-plus years of law

25 enforcement experience to serve and protect, you used it to try

Jenkins - Cross

1  to get around the law and to line your own pockets; isn't that

2  true?

3  A    No.

4         MS. PENG:  That's all I have, Your Honor.

5         THE COURT:  All right.  Ladies and gentlemen, I

6  think -- correct me if I'm wrong, Mr. Andonian -- that if we

7  tried to go get through the redirect of Mr. Jenkins at this

8  point, I'd be keeping you to 6:30 or a little bit later, which

9  puts people getting home late.  So let's do this.  Counsel,

10  approach for a second.

11         (Sidebar commenced.)

12         THE COURT:  I can ask them whether they want to stay

13  to 6:30, but you don't know whether you're going to be done.

14         MR. ANDONIAN:  Right.

15         THE COURT:  What I was contemplating is bringing them

16  in at 10 and letting us use the early morning for jury

17  instructions.

18         MR. ANDONIAN:  That makes sense.  We don't have any

19  more evidence.  So once we're done with redirect, we'd be ready

20  to go.  So I don't think we'd lose anything by letting them get

21  home on time tonight.

22         THE COURT:  And then rebuttals will be short, if any?

23         MS. CHOY:  Yes, if any.

24         THE COURT:  The problem is with Ms. Blair.  I talked

25  to her a few times.  She's running on fumes at this point.  So

308

Jenkins - Cross

1    now if you want to waive your realtime -- not your realtime,

2    but your same-day, we might be able to stay.

3                MS. SMITH:  Ask what they prefer.

4                (Sidebar concluded.)

5                THE COURT:  All right.  Ladies and gentlemen, I was

6    talking to counsel trying to figure out kind of where we are.

7    We can begin to see the finish line of some things that need to

8    be done.

9                The first choice is -- I'm not positive Mr. Jenkins

10   will be done by 6:30.  We can go now, come back in the morning

11   and finish that up, and then I suspect the evidence is going to

12   be in at a decent hour at some point tomorrow.  So the first

13   question is:  Do you all just want to finish up Mr. Jenkins

14   first thing in the morning, or do you want to stay until 6:30

15   in hopes that it gets done by then?

16               JURORS:  Morning.

17               THE COURT:  So here's the better news.  Come in at

18   10:00 tomorrow.  We've got some work to do so that we can make

19   the rest of the day efficient for you.  So we're going to

20   use -- we're going to get here and be working early so that we

21   can be efficient for you all when you get in.  So come in at

22   10:00 tomorrow and then we'll start up with the redirect of

23   Mr. Jenkins and get whatever additional evidence we need to get

24   in, get in and be able to move forward fairly expeditiously.

25               Yes, ma'am?

Jenkins - Cross

 1          FEMALE JUROR:  Be here at 10:00 or be here at 9:45?

 2          THE COURT:  Be here ready to go at 10:00.

 3          So with that, ladies and gentlemen, I'll wish you

 4    safe travels to and fro.  Please do not discuss your testimony

 5    with anyone or allow anyone -- discuss the case with anyone.

 6    You all haven't testified at all.  Do not discuss the case with

 7    anyone or allow anyone to discuss it with you.  Don't do any

 8    independent research or begin to make any decisions at all

 9    until all the evidence is in and the instructions are given to

10    you.  But I thank you very much for your kind attention today,

11    and I wish you safe travels as you head home tonight and come

12    back tomorrow morning.

13    **(Jury out, 5:51 p.m.)**

14          THE COURT:  You all have a seat.  I'm trying to

15    figure out what time we need to start tomorrow morning so that

16    we can get our instructions done and be ready to go, because my

17    thought would be that we get our instructions done.  I'm going

18    to try to take a stab at an order tonight.  Well, let me ask it

19    this way:  I've got what you all sent to me.  Are there any

20    instructions -- I know the honest services is one of the things

21    that the government wants to talk about.  Are there any other

22    instructions the government wants to talk about other than just

23    kind of making sure that we clean out any instructions that the

24    evidence may not otherwise support?

25          MS. CHOY:  No, Your Honor, there are not.

Jenkins - Cross

1           THE COURT:  I'm sorry, I didn't understand, Ms. Choy.

2           MS. CHOY:  There are no other instructions from our

3    perspective.

4           THE COURT:  And Mr. Jenkins, you may step down.

5           Mr. Andonian, Mr. Caleb, are there any other

6    instructions?

7           MR. CALEB:  No, Your Honor.

8           THE COURT:  So really, I mean, if we start at 9:00 we

9    ought to be -- that's plenty of time to get the instructions

10   done.  The verdict form we sent out and we have sent the

11   forfeiture instructions.  They won't have a final look until we

12   know what the jury does.  And obviously they don't go back on

13   the forfeiture unless there is a conviction, and those final

14   instructions will need to have -- because they'll go back on

15   whatever counts there is a conviction on, if any.  So -- but

16   you can see what they would look like, given what we have.  And

17   I think that they are most of what the government sent over.

18   There may not be a lot of difference with those.

19           Okay.  So what I'll do -- I'll see if I can take a

20   stab at putting them in order.  There are just a couple of

21   instructions that I might move towards the back that kind of

22   wrap up everything.  That last instruction in there I'm going

23   to pull out completely because I'll give that after the

24   closings.  I do instruct before you close so you have the

25   benefit of the instructions beforehand.  I know different

Jenkins - Cross

1   judges do it different ways.  I like for you all to have heard

2   how the jury is instructed and for you all then to be able to

3   use it as you like.  I generally send one set of instructions

4   back.  I'm going to put them in a three-ring binder since there

5   are so many of them so they don't explode on the table back

6   there.  But other than that -- and what we'll do once we get

7   them finalized, Ms. Brown will have a PDF and she'll run it

8   through her system.  So I don't give them copies during, but I

9   show them on the screen so they can read along with me.  A lot

10  of times if they have copies they may flip, and that way I

11  don't have to give 12 or 14 copies of what they have there.  So

12  it will be on the screen.

13          You all work with Ms. Brown tonight and make sure we

14  have all the exhibits squared away because I know a lot came in

15  today.

16          That's all I've got on my list.  Anything else from

17  the government's perspective?

18          MS. CHOY:  We shared a few redlines on your proposed

19  verdict form with defense.  They're still reviewing those.

20  Those are in the works.

21          THE COURT:  If you all send that over to us, we'll

22  take a look at it.  As long as they're agreed, I'm probably not

23  going to have any problems with respect to that.

24          I am happy, if I brought it up here, to give you all

25  my thoughts just so that you'll understand where I am on honest

Jenkins - Cross

1  services.  Could you put -- what page is it on, do you know?

2  Just so you know what we did, Ms. Choy, and then -- we've given

3  you the instructions.  Page 54 is what I did with your honest

4  services.  Let me explain to you kind of where I was with

5  respect to government's proposed instruction number 25.  It

6  starts out with owing a fiduciary duty.  We haven't used that

7  word at all during this trial.  So the jury is going to --

8  they've heard nothing but honest services, duty, honesty and

9  loyalty.  So I took out fiduciary duty and simply said -- and I

10 think I captioned in the first sentence what you have in the

11 first -- the first sentence as well.  The second sentence is

12 pretty much your second sentence, and then I stop it from

13 there.  And the reason I stop it is twofold:  Your third

14 sentence is -- it begins, This is because.  It explains why the

15 honest services are what they are.  I don't like to give the

16 jury an instruction that explains why the law is what it is.

17 The law is what it is and they're directed they have to follow

18 the law.  And I think that it begins to put a thumb on the

19 scale that the Court is saying this is why the law is what it

20 is, and you should accept it in that regard.  And so that's the

21 reason I took that sentence out.

22          And I took the fourth sentence out because it defines

23 when the public is defrauded.  That's a jury question.  It says

24 the public is defrauded because the public is not receiving

25 what it expects.  That's a jury question.  You can argue it.

Jenkins - Cross

1   Absolutely 100 percent you can argue it.  But I think that it

2   begins to put the thumb on the scale that if you get up and

3   say, the Court instructed you that the public has been

4   defrauded if A, B and C occurred, and then it's put a thumb on

5   the scale with respect to what that is.  But you can argue it

6   110 percent.

7          Also, I think that many of the concepts that are

8   already in the government's instruction are captioned in the

9   instruction that is -- that follows, and that is the definition

10  of the term "bribery."

11         And then the only other instruction that I had is the

12  instruction -- and I was going to wait until after all the

13  evidence was in until we saw what it looked like.  It was the

14  one that dealt with if there are statements that are used as an

15  explanation and they turn out to be fraud that it looks like --

16  then you can take that as evidence of guilt -- not fraud.  If

17  they turn out not to be true once someone is aware of -- I

18  wanted to take a look at that.  I am going to eliminate at

19  least the last sentence or last paragraph of that.  The first

20  sentence of the last paragraph that begins, Ordinarily a person

21  doesn't act so-and-so unless they're guilty.  I think that

22  again begins to have the Court commenting on what the evidence

23  could be or what an ordinary person would do.  Argue it all you

24  like, but I think that that's probably not the role of the

25  Court to put that in there.

Jenkins - Cross

1              MR. CALEB:  Your Honor, off the top of your head, do

2    you have the page number for that instruction that you just

3    referenced?

4              THE COURT:  I do not.  We're going to get it.

5              MR. CALEB:  I can find it.

6              THE COURT:  We'll do a quick word search.

7              I also took out the word "innocent" in there because

8    the burden is not to prove innocence or not, and I substituted

9    in the term "not guilty," which I think is more consistent with

10   what -- so page 26 is pretty much the way you had it, Ms. Choy,

11   except for the fact that I took out -- I just made it one

12   paragraph.  And I took out the first sentence of the second

13   paragraph and just moved that second sentence up.

14             MS. CHOY:  Are you anticipating providing us with

15   your updated instructions before the conference?

16             MS. CURRY-LEDBETTER:  You should have them.

17             THE COURT:  I think we've given you a printed-out

18   copy.  And then -- in just a moment, we will have given you a

19   printed-out copy, and then we'll email that to you as well.

20             Is anyone particular about the order?  Some people

21   are.  I've had some lawyers when I was trying cases, I mean,

22   they would spend hours kind of tearing their hair out about the

23   particular order in which they go.  Some lawyers are like,

24   whatever you want.  Is anyone particular about the order?  And

25   if they are, what makes sense?  I was going to front load with

Jenkins - Cross

1  the general instructions, back load with the substantive

2  instructions.  Since there are so many, I'll probably -- I

3  suspect this is going to take about an hour to read is my

4  guess.  I'll probably -- so they don't hear me drone on for an

5  hour -- probably after 30 minutes, maybe we don't go anywhere,

6  but everyone stands up and stretches a little bit to kind of

7  reset their brain, and then we'll go and do the substantive

8  instructions.

9        MS. CHOY:  We're happy to defer to the Court.

10        THE COURT:  So I'll take these and see if I can put

11  them in an order that makes a little bit of sense.  When we

12  print them out, the final set, we'll take the page numbers off

13  the bottom, of course, so that you have them.  And then I'll

14  just put the instruction number on top.

15        Otherwise, anything else we need to address?

16        MS. CHOY:  Nothing from the government.

17        THE COURT:  Mr. Jenkins, the final instruction that I

18  will give you -- you know exactly what it is because you heard

19  me give it to -- you can sit down.  That's fine.  You've heard

20  me give it to others, is since you're still on the stand and

21  there's further testimony to come, you cannot have any

22  conversation at all about your testimony.  Here is the tricky

23  piece.  I anticipate you're going to talk to your lawyers

24  about -- well, your lawyers may want to talk to you about how

25  they're going to argue the case and so forth.  Absent a hue and

Jenkins - Cross

1  cry from the government, I don't restrict lawyers from being

2  able to talk to -- you can't talk to Mr. Jenkins about his

3  testimony, obviously.  That part is easy.  But to the extent

4  you need to discuss strategy with respect to your closings, I

5  think you're entitled to do that.

6            Ms. Choy?

7            MS. CHOY:  No objection, Your Honor.

8            THE COURT:  Okay.  I think you're entitled to do

9  that, and you know what the boundaries are.

10           MR. ANDONIAN:  Yes, Your Honor.

11           THE COURT:  But I'll also say this, Mr. Jenkins:  You

12  have a great deal of support in the courtroom and you've had a

13  great deal of support throughout in this courtroom.  And I know

14  people are going to want to -- they're going to want to give

15  you support tonight, and I appreciate that.  Talk about

16  anything other than what's going on in these four walls.  Not

17  even a discussion of:  You did great here, you could have done

18  better there, think about this type of -- whatever it may be.

19  Everyone wants to -- everyone wants to be a Monday morning

20  quarterback and give you some advice.  None of that, right?  It

21  just cannot happen at all.  That's the whole reason I didn't

22  want to take the break, but I also didn't want to keep the jury

23  here too terribly late, and also because we've got folks that

24  have things to do tonight as well.

25           Am I clear, Mr. Jenkins?

Jenkins - Cross

1           THE DEFENDANT:  You have my word.

2           THE COURT:  Very well.  So let's be here ready to go

3    at 9:00 tomorrow.  I'll try to get here early, put these in an

4    order that makes -- what I hope makes some sense to me, and

5    I'll see if I can't get them scanned in and emailed out to you

6    all from a PDF standpoint and -- I mean, they're in pretty

7    close to an order that works in any event.  And then we'll run

8    through them.  What I would propose we'll do, just to make sure

9    that we know what all the instructions are is:  This is

10   instruction 1, any objection?  We'll just go through them all

11   one by one to know whether there's an objection or not.  I

12   don't think there will be, but I at least want to get that on

13   the record, okay?

14          Thank you all very much.  You all have a wonderful

15   evening.  We'll stand adjourned.

16   (Proceedings adjourned, 6:08 p.m.)

17

18

19

20

21

22

23

24

25

Jenkins - Cross

1                    C E R T I F I C A T E

2        I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3    the United States District Court for the Western District of

4    Virginia, appointed pursuant to the provisions of Title 28,

5    United States Code, Section 753, do hereby certify that the

6    foregoing is a correct transcript of the proceedings reported

7    by me using the stenotype reporting method in conjunction

8    with computer-aided transcription, and that same is a

9    true and correct transcript to the best of my ability and

10   understanding.

11       I further certify that the transcript fees and format

12   comply with those prescribed by the Court and the Judicial

13   Conference of the United States.

14       /s/ Lisa M. Blair                Date: December 17, 2024

15

16

17

18

19

20

21

22

23

24

25