USA v. Jenkins, 3:23-cr-11, 12/18/2024

1                    UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF VIRGINIA
2                      CHARLOTTESVILLE DIVISION

3    *************************************************************

4    UNITED STATES OF AMERICA,     CRIMINAL CASE NO.:  3:23-CR-11
                                   DECEMBER 18, 2024, 9:06 A.M.
5                                  CHARLOTTESVILLE, VIRGINIA
              Plaintiff,           JURY TRIAL, DAY 6
6    vs.

7    SCOTT HOWARD JENKINS,         Before:
                                   HONORABLE ROBERT S. BALLOU
8                                  UNITED STATES DISTRICT JUDGE
              Defendant.           WESTERN DISTRICT OF VIRGINIA
9
     *************************************************************
10
     APPEARANCES:
11

12   For the Government:          CELIA RUTH CHOY, ESQUIRE
                                  LINA PENG, ESQUIRE
13                                DOJ-Crm
                                  Public Integrity Section
14                                1301 New York Avenue NW, 10th Floor
                                  Washington, DC 20530
15                                202-875-1557

16                                MELANIE SMITH, ESQUIRE
                                  DOJ-USAO
17                                Western District of Virginia
                                  255 West Main Street, Suite 130
18                                Charlottesville, VA 22902
                                  434-293-4283

19

20

21

22   Court Reporter:  Lisa M. Blair, RPR, RMR, CRR, FOCR
                       255 West Main Street, Suite 304
23                     Charlottesville, Virginia  22902
                       434.296.9284
24
             PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25   TRANSCRIPT PRODUCED BY COMPUTER.

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1  APPEARANCES CONTINUED:

2  For the Defendant:          PHILIP ANDONIAN, ESQUIRE
                               JOSEPH P. CALEB, ESQUIRE
3                              Caleb Andonian PLLC
                               1100 H Street, NW, Suite 315
4                              Washington, DC 20005
                               202-953-9850
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1                        I N D E X

2    WITNESSES ON BEHALF OF THE DEFENSE:                PAGE

3    SCOTT HOWARD JENKINS

4     Redirect Examination by Mr. Andonian                54

5    CHARGE TO THE JURY                                   72

6    CLOSING ARGUMENTS

7     By Ms. Choy                                         114
      By Mr. Andonian                                     143
8     By Ms. Peng                                         168

9    CONTINUED CHARGE TO THE JURY                         179

10   VERDICT                                              212

11   FORFEITURE CHARGE TO THE JURY                        216

12   FORFEITURE VERDICT                                   233

13

14

15

16

17

18

19

20

21

22

23

24

25

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1   (Proceedings commenced, 9:06 a.m.)

2          THE COURT:  Good morning, everybody.  We're back on

3   the record in *United States v. Jenkins*.  Let the record reflect

4   that the government is present by its counsel.  The defendant

5   likewise is present by counsel.

6          We're giving you -- they're the same instructions.

7   I've just reordered them.  And up through page 35 or so are the

8   general instructions.  Those are the only ones that I really

9   reordered.  The others are all in the same order, same

10  instruction.  I see that there are a couple of -- a couple of

11  other instructions -- couple of other matters that the

12  government has put up here.  So we'll address those as we go

13  along.

14         Before we get to the instructions, is there anything

15  we need to address from the government's standpoint, Ms. Choy?

16         MS. CHOY:  At some point, Your Honor, we would like

17  to address the juror note from last night.

18         THE WITNESS:  Okay.  I want to do that as well.

19         Mr. Andonian, anything else you think we have on our

20  list today?

21         MR. ANDONIAN:  Yeah, just addressing the juror note

22  at some point as well.

23         THE COURT:  Right.  Okay.  Let's do that now.  There

24  are fewer rather than more people in here at this point in

25  time.  I've received a number of notes from the jury.  Some of

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1  them are speak up, that kind of thing.  I haven't passed them

2  all along.  The ones that are substantive I've passed on to you

3  all.  I think that they're all -- I don't know whether they

4  come from the same person or not.  This one is not signed.  We

5  don't know who gave it.  My research last night really hasn't

6  shown that there's any type of protective order.  I think it's

7  all -- the law is well-settled that no one can take the

8  information that's in a juror questionnaire and use it for

9  mal-intent.  That's certainly for sure.  The juror

10 questionnaires are confidential.  We've told them they're

11 confidential.  When they go out, they are confidential.

12 Certainly they're intended for the parties to be able to

13 conduct the type of investigation that they need to be able to

14 have an efficient and an effective voir dire process and be

15 able to exercise your discretion with respect to the peremptory

16 strikes.

17         There wasn't a request here -- and I don't really

18 think necessarily we need to have -- you know, that we would

19 have needed to have any type of anonymous jury.  So I'm not

20 worried about -- you know, amongst the parties -- the

21 questionnaires being used for any type of mal-intent.  My

22 question is, what, if anything, do we tell the jury in response

23 to this.  So I'll take any guidance, recommendations from you

24 all.

25         Ms. Choy?

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1          MS. CHOY:  From our perspective, the first step would

2    be to find out more information about what the answer to the

3    juror's question is, whether the defendant did review those

4    jury questionnaires, and whether he has ongoing access to or

5    possession of those jury questionnaires.  And the answer to

6    that question would inform what, if anything, we could tell

7    that juror.  So our request would be that the Court first

8    determine the answer to those questions.

9          THE COURT:  Mr. Andonian, do you want to address

10   that?

11         MR. ANDONIAN:  I do, Your Honor.  And it's a little

12   tricky, because we're obviously trying to stay away from

13   attorney-client communications.

14         THE COURT:  Sure.

15         MR. ANDONIAN:  Here's what I can represent.  We

16   didn't give Mr. Jenkins the questionnaire -- the

17   questionnaires, I should say.  Mr. Jenkins was here and

18   actively engaged in the jury selection process, and was

19   reviewing materials here in open court that we were reviewing.

20   He doesn't have the questionnaires.  From our perspective, I

21   don't know that that necessarily -- I agree with Ms. Choy that

22   it gets us to step two, which is what do we tell the jurors?

23   And we have some fairly serious concerns about the implications

24   of that note, and whether or not -- was it from the entire

25   jury -- everybody in the box?  Was it one juror in particular

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1    that was expressing their own concerns, and is there now a

2    potential problem with the juror being able to be fair and

3    impartial if they are worried or they think there's some

4    repercussions coming, which seems to be the implication of that

5    note.  So I think obviously we agree, we have to -- we have to

6    say something about it, but it might be that we need more

7    information from the jury itself about who raised that concern

8    and whether or not we need to ask questions about whether there

9    is a problem now --

10              THE COURT:  Right.

11              MR. ANDONIAN:  -- with impartiality.

12              THE COURT:  And so at least from the standpoint of --

13    and maybe this is -- this is a starting point.  Let me address

14    it this way.  So my concern was that anything that I tell the

15    jury at this stage before they deliberate, I don't want to have

16    an impact on their deliberations.  I don't want the jury to be

17    told one thing or the other that then has a juror take that

18    into consideration as to whether they -- as to what decision

19    that they make, that they hear a response to this question, and

20    then they get mad at the defendant and therefore convict him,

21    or they hear a response to this question and they become

22    fearful and therefore acquit him.  Right?  We want the decision

23    that the jury makes to be based solely upon what happens in the

24    four corners of -- within the four walls of this courtroom.

25              And it sounds as though, one, Mr. Jenkins does not

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1   have copies of the questionnaires -- and certainly, you know, a

2   straightforward answer to the -- to the question is certainly a

3   defendant is able to participate with his counsel in the

4   selection of the jury process, but that -- and maybe the way to

5   formulate an answer to this -- and I'm thinking out loud as I

6   speak, which is probably a dangerous thing -- is along the

7   lines of the parties, both the agents for the government, as

8   well as the defendant, are able to participate actively with

9   their counsel with respect to the jury selection process,

10  including being aware of those people who are potential jurors.

11  The information that is provided during the voir dire process

12  through the forms of questionnaires is confidential, for use by

13  the parties, and use by the parties only for that purpose, and

14  that any use of that information outside of this -- of this

15  proceeding is absolutely prohibited.  And if there's any

16  violation of that, it's going to be brought to the Court's

17  attention promptly -- something of that ilk.

18          MS. CHOY:  So Your Honor, the case that we found that

19  may give some guidance is *United States v. Smith*, 919 F.3d 825.

20  And what that case says is that if a, quote, serious

21  non-speculative question of juror impartiality arises during

22  trial, the district court must determine whether the affected

23  juror has remained fair and impartial.

24          So -- and our front line position is that this

25  question that's been raised isn't serious and non-speculative.

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1  It's just a sort of general --

2           THE COURT:  It's a general question.

3           MS. CHOY:  It's not anything specific.  They didn't

4  express what their concern was about these jury questionnaires.

5  And so there's no reason to think that this jury is not fair

6  and impartial.

7           If Your Honor were to disagree with that conclusion,

8  I think *Smith* again gives some guidance, which is that any

9  instructions that are to be given, any response, should be kept

10 as narrow and as generic as possible so as to avoid tainting

11 the pool or suggesting that this is an issue that they should

12 give attention to, when maybe it isn't.

13          So if Your Honor disagrees that this is not serious

14 or non-speculative, then I think the first step would be to

15 determine whether that concern was raised by only one juror or

16 if it's the whole panel.  And if it's only one juror, then the

17 appropriate response would be to bring that juror in

18 individually and to ask very generic questions of them about

19 their ability to be fair and impartial without sort of directly

20 addressing this possible concern that was raised.

21          The questions that were asked in *Smith*, which our

22 Ms. Smith has sent to you by e-mail -- first of all, it was

23 question one:  When we last spoke during the jury selection

24 process, you told me that you believed you could be a fair and

25 impartial juror.  Has anything occurred since we last spoke

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1   that would cause you to change your answer to that question?

2           And then if we discover that this question has been

3   percolating through other members of the jury, also question

4   too:  Since you began to serve on the jury, has anything been

5   said or overheard by you in the jury room that would affect

6   your ability to be fair and impartial?

7           And if the answers to those questions are no, then

8   our view would be that resolves that issue, that we've -- that

9   jurors have reaffirmed that they can be fair and impartial, and

10  there's no further concern and nothing further would be

11  appropriate.

12          THE COURT:  All right.

13          MR. ANDONIAN:  Your Honor, I don't disagree.  I think

14  just having heard it right now with what Ms. Choy suggested

15  about the process of voir diring an individual juror, if that's

16  what we decide.

17          I do want to push back, though, on this notion that

18  this is not a serious note.  I mean, there's not a soul in this

19  courtroom who read -- who is hearing that note and is not

20  thinking about the implications behind it.  I mean, I doubt the

21  jury is concerned about what reading material Mr. Jenkins might

22  or might not have, you know, that he's perusing on a Sunday

23  morning.  I mean, they clearly -- whoever wrote that note and

24  whoever it's on behalf of clearly has concerns about whether or

25  not Mr. Jenkins has access to personal information that can

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1  identify them.  I mean, there's just not a logical, rational

2  way to explain that otherwise.

3        THE COURT:  Well, the question about the

4  questionnaires -- and so the personal information to where the

5  jurors can be identified, I mean, that's on the jury list and

6  so forth that -- I suspect it may be more -- because we were

7  asked -- we asked them some questions with the expectation that

8  they would be candid about any views that they had about

9  certain topics, and whether if a person came onto the jury that

10  had some views that were not -- that they worry that a

11  defendant or anyone could be -- would be contrary to whether

12  that would have any impact on them.

13        So maybe the way to do it is I reread the note.  It's

14  written in the first person, it's not written in the -- first

15  person singular.  It's not written in the first person plural.

16  It's using the word "I."  So my hope is that it is from a

17  singular juror.  I want to figure out the right way to identify

18  that person and then have them come out, because the CSO who

19  got the note is not here today, so I can't ask him.  And I'm

20  not sure that whoever -- I mean, it could have been someone who

21  is sitting all the way down at the end of the table who said,

22  you know, can you pass this up and give it to the CSO when they

23  come in.  So just because juror so-and-so gave the note to the

24  CSO doesn't mean it's that juror's note.

25        So would you all have any -- I guess I can bring the

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1   juror out and say, I got a note at the end of the day yesterday

2   raising a question from a specific -- what appears to be a

3   specific juror, and whether that note is -- is it a question

4   from the group or is it a question from an individual.

5           I mean, I think you agree, Mr. Andonian, that if

6   we're going to -- if it's a serious note, the right thing to do

7   is to try to voir dire that juror and make sure that --

8           MR. ANDONIAN:  Yes, Your Honor.

9           THE COURT:  And the only difference in you all's

10  positions is whether we need to go to that step, as I'm

11  understanding you, Ms. Choy?

12          MR. ANDONIAN:  I think the only -- the only question

13  I would add to what Ms. Choy suggested would be whether or

14  not -- if we are able to identify one juror, if that juror

15  shared any concerns with other members of the jury.  But

16  otherwise, I agree with Ms. Choy's --

17          THE COURT:  Ms. Choy?

18          MS. CHOY:  Our view remains that this isn't serious

19  and non-speculative, but we understand the defense has a

20  different view.  So if we are going forward, yes, we think we

21  should try to find out from the CSOs who that note was from and

22  then ask that person further.

23          THE COURT:  The problem is that CSO is not here.

24          MS. CHOY:  Well, perhaps the CSOs who are here could

25  pose that question to the jury.

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1          THE COURT:  All right.  Let me think about it, about

2     what's the right thing to do.  I think the safest thing to do

3     is to bring the juror out and voir dire them.  But even if I do

4     that, I mean, whether I bring him out and voir dire him and

5     assume -- regardless of what the juror says, if they don't

6     think they can be fair and impartial, we have two alternates.

7     It makes it easy.  If they think they can be fair and impartial

8     and can still sit, you know, do we then give any type of

9     instruction then to the jury as a whole as well?

10          Go ahead, Ms. Choy.

11          MS. CHOY:  I think the only issue that the Court

12     needs to determine is whether the jury remains fair and

13     impartial.

14          THE COURT:  Right.

15          MS. CHOY:  And I worry that giving some instruction

16     to the jury as a whole would taint the pool or put a question

17     into their mind where none needs to be.  So if we can assure

18     ourselves that they're fair and impartial, then that should be

19     the end of the story.

20          THE COURT:  Mr. Andonian?

21          MR. ANDONIAN:  I mean, I think that's right.  I mean,

22     I think if it's an individual juror, we can ask the questions

23     of that juror, make sure they haven't discussed the note with

24     the rest of the jury, and then make a decision about what to

25     do.  If that juror ends up not being fair and impartial

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1  anymore, I mean, the jury can get some generic, you know,

2  instruction, that you know, somebody had a personal issue come

3  up or whatever.  That could be dealt with easily enough.  But I

4  do -- I think I agree that we should just figure out what's

5  going on with hopefully this one juror and then that question

6  should resolve itself one way or the other.

7          THE COURT:  All right.  Let me think about how best

8  to do that, because the other thing that I could do -- and I

9  would only do it with the Court's permission -- is once the

10 jury is there, is I could step back into the jury room and say,

11 I got a note last night what appears to be from a single juror.

12 Can I talk to that juror?  And bring them out.  Or I could have

13 the CSO step in and say, there was a note given to the CSOs

14 last night from a juror, and the Court has some questions about

15 it.  That may be the best.  I don't want to bring the entire

16 venire out and then send all but one back in.

17          MS. CHOY:  We agree with that.  And if I wasn't clear

18 about -- that was what I was proposing earlier, that I don't

19 think it would be appropriate to sort of single someone out in

20 the jury box, but that that inquiry should be made back in the

21 jury room in a more informal basis that wouldn't call people's

22 attention to it so much.

23          THE COURT:  So I may -- okay.  Howard is here.  So

24 I'll talk to him when we get to the break as well.

25          All right.  So let's -- let's look at our jury

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1    instructions real quick.  So what I've given to you are

2    essentially, as I said, the same instructions that we had.  A

3    couple questions that we -- that are out there -- and I see the

4    government has given us some more information on honest

5    services.  And then I have removed from this group of

6    instructions the instruction that the defendant has a right to

7    remain silent, has no burden to put on any evidence, since the

8    defendant testified.  And then I've left the page numbers on

9    there, but I've reordered.  And then I've got a set of

10   instructions up here that as we go through, I'm just going to

11   put instruction numbers on them so that when we get done with

12   this process, we're going to have 1 through -- I think it's

13   about 60-some instructions.  And then we'll be able to make --

14   make copies of them for you with the instruction numbers on

15   them.  My thought would be that we'll then finish up the

16   redirect of Mr. Jenkins, go into any rebuttal, if any, that the

17   government may have, take a break for any motions that we may

18   have, let you all collect your thoughts.  I'll read the

19   instructions to the jury.  I'll then take a break before we go

20   into closings, and then go straight to closings.  Depending

21   upon what time it is, before we go to closings we'll either let

22   them break for lunch or we'll go straight to closings, and let

23   the jury deliberate, and we'll feed them lunch and we'll see

24   where they are for the rest of the afternoon.

25            MR. ANDONIAN:  Your Honor, can I ask just a quick

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1  logistic question while we're talking about the rest of the

2  day?  What is the Court's policy or procedures in terms of

3  deliberations and how late they go?

4          THE COURT:  They are the captain of the ship.  If

5  they want to stay here all night, they can stay here all night.

6  And if they want to go home at 6, I'll let them generally go

7  home at 6.  If -- you know -- what I -- if a jury goes out at

8  4:30, I don't necessarily let them go home at 6.  I kind of sit

9  on it and then I touch base with them around 7.  Do you want

10 dinner?  Do you want to keep going?  Do you want to go home, or

11 whatever.  I think letting the jury have control as much as

12 possible leads to more efficient deliberations to where they

13 don't feel like they've been completely just stuck in a room

14 and told they can't leave and they don't have any control over

15 when they can come and go.

16         MR. ANDONIAN:  And in terms of our kind of response

17 back to the Court if there were a verdict or a note, if that

18 happened at like 10:00 at night, is the expectation that we

19 would deal with it the next morning, or that we would --

20         THE COURT:  I'd take it that night, you know, because

21 the jury is there.  You don't want them to leave and come back,

22 and then someone have re-thought their verdict, and then you've

23 got to start back up again.

24         MR. ANDONIAN:  Okay.  We're just trying to figure

25 out -- Mr. Jenkins lives, you know --

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1          THE COURT:  Yeah.  So a lot of that we'll play it by

2     ear.  And it may be that, you know, if they've been going for

3     seven, eight hours and they think they can finish, great.  If

4     they don't think they can finish, then we'll play it by ear.

5          MR. ANDONIAN:  Very well, Your Honor.

6          THE COURT:  All right.  So let's go through the set

7     of instructions that I gave to you.

8          Members of the jury -- that will become instruction

9     number 1.  No objection from the government?

10          MS. CHOY:  No, Your Honor.

11          THE COURT:  No objection from the defendant?

12          MR. CALEB:  Your Honor, you're looking at the one you

13     just gave us this morning?

14          THE COURT:  What I just gave to you, yeah.

15          MR. CALEB:  Okay.  No objection.

16          THE COURT:  Okay.

17          MR. CALEB:  But I will have to go back and forth

18     because I made comments on the one we had yesterday -- if you

19     changed the page number.

20          THE COURT:  Okay.  There aren't many that are in

21     different orders.

22          MR. CALEB:  Okay.

23          THE COURT:  So instruction number 2 begins with:

24     There are three important rules.

25          No objection -- I'm hopeful there aren't a lot of

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1    changes to these, because what we got in red lines back from

2    you guys, so --

3              MR. CALEB:  There aren't a lot of changes.  I just

4    did notice a couple of things that may need to be tweaked,

5    but --

6              THE COURT:  All right.  Instruction number 2 will be,

7    there are three important rules.

8              No objection from the government?

9              MS. CHOY:  No, Your Honor.

10             THE COURT:  No objection from the defendant?

11             MR. CALEB:  No.

12             THE COURT:  Instruction number 3, the burden is on

13   the government to prove the defendant guilty beyond a

14   reasonable doubt.

15             No objection from the government?

16             MS. CHOY:  No, Your Honor.

17             THE COURT:  Any objection from the defendant?

18             MR. CALEB:  No.

19             THE COURT:  Instruction number 4, the government is

20   required to prove the defendant guilty beyond a reasonable

21   doubt.

22             Any objection from the government?

23             MS. CHOY:  No, Your Honor.

24             THE COURT:  Any objection from the defendant?

25             MR. CALEB:  No.

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1           THE COURT:  Okay.  This one may have been in a

2    different order.

3           MR. CALEB:  Yeah, it was.

4           THE COURT:  Instruction number 5 -- let me -- because

5    I have them -- I have the ones that were numbered.  I can help

6    you, Mr. Caleb, in that regard.  These things all become a

7    flurry of paper, don't they?

8           MR. CALEB:  Your Honor, if I could just make a

9    suggestion?

10          THE COURT:  Yes, sir.

11          MR. CALEB:  There were a couple of instructions that

12   I thought the language may need to be tweaked.  Maybe I could

13   point those out using the page number --

14          THE COURT:  Okay.

15          MR. CALEB:  -- of the version that was given to us

16   yesterday.

17          THE COURT:  All right.  Let me -- I think we're going

18   to be able to go through it fairly easily as well.

19          MR. CALEB:  Okay.

20          THE COURT:  So what is instruction number 4 was page

21   33.  What will become instruction number 5, you are here to

22   decide, was page 9, Mr. Caleb.

23          MR. CALEB:  Okay.

24          THE COURT:  Instruction number 5, any objection from

25   the government?

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1            MS. CHOY:  No, Your Honor.

2            THE COURT:  Any objection from the defendant?

3            MR. CALEB:  No.  No, Your Honor.

4            THE COURT:  Instruction number 6, if a defendant

5    elects to take the witness stand to testify in his own defense,

6    that was page 8.

7            MR. CALEB:  No objection.

8            MS. CHOY:  Your Honor, on this one, I apologize, I

9    may have neglected to red line this.

10           THE COURT:  Okay.

11           MS. CHOY:  But the government would request that the

12   last sentence be modified to say, you should judge and

13   determine the defendant's believability as you would any other

14   witness with an interest in the outcome of the case.  And the

15   reason for that, Your Honor, is that there are a series of

16   instructions commenting on the government's witnesses and their

17   interest in the case, and instructing the jury to evaluate

18   their testimony with heightened care and caution.  And given

19   that the defendant, of course, has an interest in the outcome

20   of the case, we think to have a balanced instruction, the jury

21   should be instructed that they should evaluate his testimony as

22   they would any witness with an interest in the outcome of the

23   case, similar to the government's witnesses.

24           THE COURT:  Mr. Andonian -- I'm sorry -- Mr. Caleb,

25   excuse me?

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1        MR. CALEB:  So I didn't hear the adjustment.

2        THE COURT:  That last sentence would read, you should

3   judge and determine the defendant's believability as you would

4   any other witness, and then it would strike, in this case, and

5   put, with an interest in the outcome of this case.

6        MR. CALEB:  Your Honor, we propose it just remain the

7   same.  And I think that's consistent with the presumption of

8   innocence.

9        THE COURT:  I'm looking for the witness credibility

10  instruction.

11        So why is this not addressed, Ms. Choy, with respect

12  to the instruction that's about five back -- because mine

13  doesn't have page numbers on it.  It's the three-page

14  instruction that deals with the credibility of witnesses and so

15  forth, and it says, in considering the testimony of witnesses,

16  you should ask yourself whether there is evidence tending to

17  prove -- I'm sorry --

18        MS. CHOY:  Which page are you on, Your Honor?

19        THE COURT:  It is -- I didn't print mine with --

20  since I was numbering them -- it's a three-page instruction.

21  So it's about four or five back from where we are.  It begins

22  with, the evidence in the case before you is consistent --

23  testimony from witnesses -- it's the credibility of witnesses

24  instruction.  You may consider the witness's ability to observe

25  the matters, blah, blah, blah.  And this is on the second page

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1  of it.  You may also consider his or her interest in the

2  outcome of the case and any bias or prejudice, and the extent

3  to which if any and all each witness is either supported or

4  contradicted by other evidence in the case in evaluating --

5  (Reporter clarification.)

6          THE COURT:  So in other words, it's that portion of

7  the instruction that tells you, take a look at the interest in

8  outcome in the case.

9          MS. CHOY:  Well, the reason being that as to the

10 government's witnesses, their interests are specifically called

11 out in the instruction, and we're not simply relying on the

12 blanket credibility instruction for our witnesses.  So in order

13 to be even handed, the same interest should be specifically

14 pointed out as to the defense.

15         THE COURT:  But that's only certain of the

16 government's witnesses.  It's not all of the government's

17 witnesses.  It's only those that have particular

18 characteristics, and that is that they have pled guilty to

19 crimes and are more than just a convicted felon.  They have

20 cooperating agreements, plea agreements, whatever they may be;

21 whereas here this defendant is no different than any other

22 party in the case.  And they're told -- the witnesses are

23 told -- I mean, I'm sorry -- the jury is told to take a look at

24 the evidence or listen to the witnesses and evaluate their

25 credibility based upon their interest in the outcome of the

23

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1    case.

2            MS. CHOY:  Well, our view is the defendant himself is

3    not just any old defense witness and it wouldn't be an

4    instruction that applies to all defense witnesses.  There is a

5    very, very specific concrete and obvious interest that the

6    defendant has in the outcome of this case.  And given that

7    we're singling out certain government witnesses based on the

8    same characteristic, that they have some interest in the

9    outcome, then that should be applied to both sides, if there is

10   a defense witness who has an interest in the --

11           THE COURT:  But isn't it a correct statement of

12   law -- I mean, what I'm worried about -- and this is what the

13   defendant says -- is that it is a correct statement of the law,

14   you evaluate them as any other -- as any other witness in the

15   case, taking into consideration their interest in the outcome,

16   right?

17           MS. CHOY:  That's correct.  And that would also apply

18   to the government's witnesses, that the jury has been

19   instructed they should take into account the interest they

20   have, the whole circumstances.  But as to the government's

21   witnesses, we're specifically calling them out, and we're

22   specifically drawing the attention to the jury to these

23   characteristics.  So there's an imbalance in --

24           THE COURT:  But the law treats that differently.  The

25   law treats those differently.  The law specifically says that

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1    we can instruct a jury certainly, for example, like with

2    respect to a convicted felon, you can -- how you can treat

3    that.  But I can't tell a jury -- because I don't tell the jury

4    anywhere else in the case that you treat the defendant any

5    differently than anyone else who may testify, other than

6    generally how they evaluate witnesses.  And so I'm putting my

7    thumb on the scale, am I not, because I'm suggesting to the

8    jury that they should treat Mr. Jenkins's testimony differently

9    than they would treat any other witness.

10            MS. CHOY:  Respectfully, I disagree.  And the

11   instruction that we had proposed originally that has that

12   instruction is a pattern instruction.  And it's not treating

13   the defendant any differently.  It's treating him the same in

14   that his interest in the outcome of the case, like any other

15   witness, should be considered by the jury.

16            THE COURT:  Okay.  Well, I'm going to overrule the

17   objection.

18            MS. CHOY:  Very well.  Thank you, Your Honor.

19            THE COURT:  Okay.  The next instruction begins with,

20   I instruct you to find the defendant guilty of the crimes

21   charged -- that if you find the defendant guilty of the crimes

22   charged.  And this will be instruction number 7.

23            Any objection from the government?

24            MS. CHOY:  No, Your Honor.

25            THE COURT:  Any objection from the defendant?

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1          MR. CALEB:  No, Your Honor.

2          THE COURT:  Next instruction, you've heard -- this is

3   your 404(b) instruction.  It would become instruction number 8.

4   Do we even need this instruction given the way in which the

5   evidence has come in in this case?  The instruction is, you've

6   heard evidence that the defendant committed certain acts which

7   may be similar acts charged in a superseding indictment.  There

8   is some suggestion that Mr. Jenkins may have taken some

9   campaign donations and sworn some folks in prior to 2019, which

10  I guess were near the 2015 election, but it wasn't really

11  focused on.  There is certainly no interim instruction.  Do we

12  even need this instruction?

13         Ms. Choy?

14         MS. CHOY:  I would agree that it could be stricken,

15  Your Honor, because I don't think that that evidence came in

16  under rule 404(b).  I think it's intrinsic evidence.

17         THE COURT:  Mr. Andonian -- or Mr. Caleb, excuse me?

18         MR. CALEB:  That was one of my edits, Your Honor.

19         THE COURT:  So let's take out that instruction.

20         All right.  So then what will become instruction

21  number 8 begins with, the evidence consists of -- 1 or A, the

22  sworn testimony of the witnesses.

23         Any objection from the government?

24         MS. CHOY:  Yes, Your Honor.

25         THE COURT:  Any objection from the defendant?

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1           MR. CALEB:  Just a slight edit just to be consistent

2  with the amount of stipulations.  That paragraph that starts, a

3  stipulation --

4           THE COURT:  Should be stipulations of fact?

5           MR. CALEB:  Yes.  And then maybe instead of certain

6  facts in this case may have been stipulated, replace that with

7  there were two stipulations, or just focusing in on the amount

8  of stipulations.

9           MS. CHOY:  I'm sorry, counsel.  I didn't quite follow

10  that.  Could you say that again?

11          MR. CALEB:  So that paragraph that starts with, a

12  stipulation to a fact, so that second sentence.  It says,

13  certain facts in this case may have been stipulated to.  If we

14  could just be specific and say, there were two stipulations

15  agreed to in this case, or something like that.

16          THE COURT:  So the way it would read is -- that first

17  full paragraph would read, stipulations to a -- stipulations of

18  fact -- or stipulations -- why don't we say, stipulations are

19  an agreement between the parties that a particular -- that

20  particular facts are true.  There were two stipulations in this

21  case, period.  Wherever the attorneys on both sides of the case

22  have stipulated and agreed, and continue on from there.

23          So let me read it again.  Stipulations are an

24  agreement between the parties that particular facts are true.

25  There were two stipulations in this case.  Wherever the

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1  attorneys on both sides of the case have stipulated or agreed

2  as to the existence of a fact, you must accept the stipulation

3  as evidence and regard the fact as proved.

4          MS. CHOY:  That's fine by the government.

5          MR. CALEB:  That's good.

6          THE COURT:  Okay.  So that will be instruction number

7  8 as modified.

8          Instruction number 9 would be, there are two types of

9  evidence.

10         Any objection from the government?

11         MS. CHOY:  No, Your Honor.

12         THE COURT:  Any objection from the defendant?

13         MR. CALEB:  No objection.

14         THE COURT:  Instruction number 10 will be, while you

15  should consider only the evidence in this case you are

16  permitted to draw reasonable inferences.

17         MS. CHOY:  No objection.

18         MR. CALEB:  No objection.

19         THE COURT:  Thank you.

20         Instruction number 11 is the credibility of witnesses

21  instruction.  The evidence in this case before you has

22  consisted in part of the testimony of the witnesses.

23         Any objection from the government?

24         MS. CHOY:  No, Your Honor.

25         THE COURT:  Any objection from the defendant?

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1          MR. CALEB:  No objection.

2          THE COURT:  Instruction number 12 will be, you have

3    heard evidence that several witnesses -- and this was page 19,

4    Mr. Caleb.

5          MR. CALEB:  Thank you.

6          THE COURT:  Any objection from the government?

7          MS. CHOY:  No, Your Honor.

8          THE COURT:  Any objection from the defendant?

9          MR. CALEB:  So just -- no objection, but I feel like

10   this one could be edited as well to, you have heard evidence

11   that several witnesses have been previously convicted, instead

12   of once.  There were several witnesses that were -- well, at

13   least one witness that was convicted multiple times of criminal

14   conduct.  So I would --

15         THE COURT:  Just say were previously convicted?

16         MR. CALEB:  Yes.  So my change would read, you have

17   heard evidence that several witnesses were previously convicted

18   of criminal conduct.

19         THE COURT:  Ms. Choy?

20         MS. CHOY:  Previously is fine, Your Honor.  I think I

21   like the wording of "a crime" better.

22         MR. CALEB:  Well, just the tense.  It says "a crime,"

23   and that's not really accurate.  It's -- at least Mr. Rahim was

24   convicted of two other crimes.  So maybe you could say

25   convicted of crimes.

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1              THE COURT:  Why don't we simply -- could we say one

2   or more crimes?

3              MR. CALEB:  That's fine.

4              MS. CHOY:  Yes, Your Honor.

5              THE COURT:  Okay.  So it will read, you have heard

6   evidence that several witnesses were previously convicted of

7   one or more crimes.

8              What will be instruction number 13 will be, you have

9   heard testimony from witnesses that have pled guilty to a crime

10  which arose out of the same events.  That was page 20.

11             Any objection from the government?

12             MS. CHOY:  No, Your Honor.

13             THE COURT:  From the defendant?

14             MR. CALEB:  No objection.  Just it should be edited

15  to change from guilty to a crime, to guilty to crimes.  So I

16  can't remember which witness it was, but there was one witness

17  that pled guilty to conspiracy and bribery, I want to say.

18             THE COURT:  Did any of the co-defendants plead guilty

19  to multiple counts?

20             MS. CHOY:  Mr. Rahim did.

21             THE COURT:  Mr. Rahim did?  So do you want to just

22  have it be consistent with the previous instruction and say,

23  have pled guilty to one or more crimes which arose out of the

24  same events?

25             MR. CALEB:  That's fine.

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1          THE COURT:  Okay.  What will be instruction number 14

2    will be, the government has presented testimony from one or

3    more witnesses who have entered into a plea agreement.

4          Any objection from the government?

5          MS. CHOY:  No, Your Honor.

6          THE COURT:  From the defendant?

7          MR. CALEB:  No.

8          THE COURT:  Instruction number 15 would be, the

9    government has presented exhibits in the form of charts and

10   summaries.  Any objection from the government?

11         MS. CHOY:  No, Your Honor.

12         THE COURT:  From the defendant?

13         MR. CALEB:  No.

14         THE COURT:  Instruction number 16 will be the

15   demonstrative aids.

16         Any objection from the government?

17         MS. CHOY:  No, Your Honor.

18         THE COURT:  From the defendant?

19         MR. CALEB:  No.

20         THE COURT:  The next instruction, I had a question.

21   And this is the question about -- it's the prior inconsistent

22   statements question, when a witness is questioned about an

23   earlier statement he or she may have made, or earlier testimony

24   he or she may have given.  Do we need this?

25         MS. CHOY:  I don't think so, Your Honor.

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1          MR. CALEB:  I didn't think so.

2          THE COURT:  Okay.  So we'll remove that one as well.

3          The next instruction is the co-conspirator.  So that

4   will become -- the next instruction will become instruction

5   number 17, the co-conspirator statements.

6          Any objection from the government?

7          MS. CHOY:  Not necessarily an objection, Your Honor,

8   but I question whether it's necessary, given the Court's

9   general credibility instruction.  It seems to be cumulative of

10  those other instructions.

11         THE COURT:  Well, I gave this cautionary instruction

12  on the first day of the trial.  And so -- Mr. Caleb, do we need

13  it?

14         MR. CALEB:  We didn't object.

15         THE COURT:  Well, I think what Ms. Choy is suggesting

16  is that we remove it, because it already has -- we already have

17  a credibility of the witnesses instruction.  Do we need -- do

18  we need the instruction?

19         MR. CALEB:  It might be redundant.

20         THE COURT:  Okay.  So why don't we remove it.  I'd

21  previously marked it as 17, but now I'll just remove it.

22         What will become 17 is, you may consider evidence and

23  consciousness of guilt a specific statement.

24         This is a revised instruction from what the

25  government had previously offered.  I made one other change to

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1  it.  You will see we used course of conduct for actions, and I

2  added in the last sentence the term, course of conduct --

3  explanation statement of course of conduct.  And so this --

4  this instruction, I presume, Ms. Choy, goes to the issue of the

5  gun sales, for example.  And so I think you're entitled to it.

6  You know, I'll hear any objections that there may be.  And I

7  just wanted -- I thought that the instruction as it was

8  proffered didn't really fit the facts of this particular case.

9  And so I tried to revise it to have it fit the facts of the

10 case.

11          MS. CHOY:  This instruction is fine by the

12 government, Your Honor.

13          THE COURT:  Mr. Caleb?

14          MR. CALEB:  We'll defer.

15          THE COURT:  All right.  I'm going to give it as

16 instruction number 17.

17          Instruction number 18 is the testimony of law

18 enforcement officers.  That was previously page 27, Mr. Caleb.

19          Any objection from the government?

20          MS. CHOY:  No, Your Honor.

21          THE COURT:  Any objection from the defendant?

22          MR. CALEB:  No objection.

23          THE COURT:  Instruction number 19 is the undercover

24 agents instruction.

25          Any objection from the government?

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1           MS. CHOY:  No, Your Honor.

2           THE COURT:  From the defendant?

3           MR. CALEB:  No, Your Honor.

4           THE COURT:  Instruction number 20 will be tape

5    recordings.  The government has offered evidence in the form of

6    tape recordings.

7           Any objection from the government?

8           MS. CHOY:  No, Your Honor.

9           THE COURT:  From the defendant?

10          MR. CALEB:  No, Your Honor.

11          THE COURT:  And I take it what is going to be going

12   back to the jury does not have the subtitles; is that correct?

13          MS. CHOY:  That's correct, Your Honor.

14          THE COURT:  Okay.  Instruction number 21 is that the

15   transcripts were displayed for the limited purposes of aiding

16   you in following the conversation.

17          Do we really need that?  Because, one, those

18   transcripts aren't going back; and two, we told them

19   throughout, you know, these transcripts are really just aiding

20   you here, you're to be guided by what you hear on the audio or

21   see on the video.

22          Do we need it?

23          MS. CHOY:  I think it would be appropriate to

24   reiterate that to the jury so that we can be sure that they

25   understand.

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1          THE COURT:  We're going to get a question:  Can we
2   have the transcripts?
3          MR. CALEB:  So I agree with the caveat that I think
4   we can strike the last paragraph.  Since they're not going to
5   have it, they're not going to -- that's going to be irrelevant.
6          MS. CHOY:  I do plan to show some of the transcripts
7   in my closing.  And so I would request that Your Honor give the
8   whole instruction.
9          THE COURT:  I'll probably give the whole thing since
10  they're probably going to see it.
11         MR. CALEB:  I just didn't hear that.
12         THE COURT:  She -- the government is going to play
13  some of the transcripts that's going to have the -- or play
14  some of the audio and video that's going to have the
15  transcripts.
16         MR. CALEB:  Okay.  I didn't know that.
17         THE COURT:  Yeah.  So I'll give it as instruction 21.
18         Instruction 22 will be the intent of a person who
19  possesses any -- the intent of a person or the knowledge of a
20  person who possesses any particular time -- that will be
21  instruction number 22.
22         Any objection?
23         MS. CHOY:  No, Your Honor.
24         THE COURT:  Any objection from the defendant?
25         MR. CALEB:  None.

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1        THE COURT:  Instruction number 23 is to sustain its

2   burden -- and this was previously 32, Mr. Caleb.

3        Any objection from the government?

4        MS. CHOY:  No, Your Honor.

5        THE COURT:  From the defendant?

6        MR. CALEB:  No, Your Honor.

7        THE COURT:  Instruction number 24 will be the

8   lawyers' objections are not -- and this was previously page 13.

9   I moved it.  It's hard to find the right place for that.

10       Any objection from the government?

11       MS. CHOY:  No, Your Honor.

12       THE COURT:  From the defendant?

13       MR. CALEB:  No.

14       THE COURT:  Instruction number 25 will be, there is

15   nothing different in the way that a jury should consider the

16   evidence in a trial.

17       Any objection from the government?

18       MS. CHOY:  No, Your Honor.

19       THE COURT:  From the defendant?

20       MR. CALEB:  No, Your Honor.

21       THE COURT:  And instruction number 26 is, your

22   verdict must be unanimous.

23       Okay.  So those are all our preliminary instructions.

24   So I did not change the order of the next -- all the

25   substantive instructions at all.  I thought they were kind of

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1   put in order already.

2           Okay.  Instruction number 27 will be the superseding

3   indictment charges that the offenses were committed on or

4   about.

5           Any objection from the government?

6           MS. CHOY:  No, Your Honor.

7           THE COURT:  From the defendant?

8           MR. CALEB:  No, Your Honor.

9           THE COURT:  28 is a separate crime was charged on

10  each count.

11          Any objection from the government?

12          MS. CHOY:  No, Your Honor.

13          THE COURT:  From the defendant?

14          MR. CALEB:  No.

15          THE COURT:  29 is the defendant, Scott Howard

16  Jenkins, is charged with crimes which I will instruct you

17  shortly.

18          Any objection from the government?

19          MS. CHOY:  No, Your Honor.

20          THE COURT:  From the defendant?

21          MR. CALEB:  No.

22          THE COURT:  Instruction 30 is Count One, charges

23  beginning no later than on or around April 2019; it's the

24  conspiracy description.

25          Any objection from the government?

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1          MS. CHOY:  No, Your Honor.

2          THE COURT:  From the defendant?

3          MR. CALEB:  No.

4          THE COURT:  Instruction 31, sustain its burden of

5   proof on the crime of conspiracy to commit bribery.

6          Any objection from the government?

7          MS. CHOY:  No, Your Honor.

8          THE COURT:  From the defendant?

9          MR. CALEB:  No, Your Honor.

10          THE COURT:  32, first element of the crime of

11   conspiracy is the existence of a conspiracy.

12          Any objection from the government?

13          MS. CHOY:  No, Your Honor.

14          THE COURT:  From the defendant?

15          MR. CALEB:  No objection.

16          THE COURT:  33 is the second and third elements of

17   the crime of conspiracy are the defendant knew the purpose of

18   the conspiracy.

19          Any objection from the government?

20          MS. CHOY:  No, Your Honor.

21          THE COURT:  From the defendant?

22          MR. CALEB:  No objection.

23          THE COURT:  33 -- I think that's right.  I keep

24   losing my place.

25          MR. CALEB:  Is that 34?

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1          THE COURT:  34, excuse me.  34, the fourth element of

2     the crime of conspiracy is that at some time during the

3     existence of the life of the conspiracy, blah blah blah.

4          Any objection from the government?

5          MS. CHOY:  No, Your Honor.

6          THE COURT:  From the defendant?

7          MR. CALEB:  No objection.

8          THE COURT:  35 is crimes the defendant allegedly

9     commit bribery concerning programs -- this is the object of

10    conspiracy charge.

11         Any objection from the government?

12         MS. CHOY:  No, Your Honor.

13         THE COURT:  From the defendant?

14         MR. CALEB:  No objection.

15         THE COURT:  36 is Count Two.

16         Any objection from the government?

17         MS. CHOY:  No, Your Honor.

18         THE COURT:  From the defendant?

19         MR. CALEB:  No objection.

20         THE COURT:  37 is Counts Three through Five, charge

21    the defendant committed honest services wire fraud through

22    bribery.

23         Any objection from the government?

24         MS. CHOY:  No, Your Honor.

25         THE COURT:  From the defendant?

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1              MR. CALEB:  No objection.

2              THE COURT:  38 sets out the description of the

3    particular wire charges in Three through Five.

4              Any objection from the government?

5              MS. CHOY:  No, Your Honor.

6              THE COURT:  From the defendant?

7              MR. CALEB:  No, Your Honor.

8              THE COURT:  39 is the use of mail in each

9    transmission by wire communication and interstate commerce --

10   should be 39.

11             Any objection from the government?

12             MS. CHOY:  No, Your Honor.

13             THE COURT:  From the defendant?

14             MR. CALEB:  No.

15             THE COURT:  40 is the first element of both honest

16   services mail fraud charged in Count Two and honest services

17   wire fraud in Three through Five.

18             Any objection from the government?

19             MS. CHOY:  No, Your Honor.

20             THE COURT:  From the defendant?

21             MR. CALEB:  No objection.

22             THE COURT:  41 is -- I know that the government wants

23   to talk about that.

24             Ms. Choy?

25             MS. CHOY:  Thank you, Your Honor.  So the

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1   government's request would be that the second sentence of this

2   instruction be revised to say when a public official devises or

3   participates in a bribery scheme, that official defrauds the

4   public of its right to the official's honest, faithful, and

5   disinterested services.  And that, Your Honor, is just the

6   straightforward law of honest services fraud.  And I appreciate

7   Your Honor's concern that you raised yesterday about whether

8   that may be a factual determination.  Respectfully, I think

9   that's a matter of law that is reflected in the honest services

10  fraud case law, that that's sort of the part of the theory of

11  honest services fraud, that when a public official who owes a

12  fiduciary duty to the public to render honest services secretly

13  takes bribes, that is a form of fraud, because the public is

14  cheated out of its right to honest services.

15         And so we think the jury needs to understand that,

16  because this is not a sort of straightforward, intuitive

17  concept, and they might be confused about why we're talking

18  about fraud when this is a bribery case.  And so the function

19  of the instruction is to explain to the jury this theory which

20  is reflected in the doctrine that a fiduciary who secretly

21  furthers their own interests using their official position

22  thereby commits a form of fraud.

23         And the instruction that we had proposed previously

24  that was given in the *McCabe* case that was recently affirmed by

25  the Fourth Circuit, it has the same concept in it.  And that's

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1    an instruction that's given as a matter of course in honest

2    services fraud cases.  And what we've passed up to Your Honor

3    -- and we've also provided copies to the defense -- are an

4    example that was recently prosecuted by our section in Puerto

5    Rico from *United States v. Charbonier*.  It's number 20-246 in

6    the District of Puerto Rico.  And the same instruction that was

7    given in the *McCabe* case was given in that case.

8           And then the second document that we passed up are

9    the pattern instructions from the Eleventh Circuit, which also

10   had a similar instruction that when a public official takes a

11   bribe, he or she thereby defrauds the public.

12          So these are instructions that reflect the case law

13   and that explain to the jury the somewhat obscure point of law,

14   which is that taking a bribe as a fiduciary is a form of fraud.

15   So we just request that the instruction be edited to reflect

16   that for the jury.

17          THE COURT:  Mr. Caleb?

18          MR. CALEB:  Yes.  Just as an initial matter, can I

19   have the exact language?

20          THE COURT:  So I think what Ms. Choy is suggesting is

21   that the first sentence would remain as is.  The second

22   sentence would read, when a public official devises or

23   participates in a bribery scheme, that official defrauds the

24   public's right -- I'm sorry --

25          MS. CHOY:  Defrauds the public of its right.

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1        THE COURT:  Defrauds the public of its right to the

2  official's honest, faithful, and disinterested service.

3        MR. CALEB:  And that's it?

4        THE COURT:  Yes.

5        MR. CALEB:  We defer in that case, Your Honor.

6        THE COURT:  Okay.  I'll accept the government's

7  changes, and that will be instruction number 41 as amended.

8        Instruction number 42 defines bribery.

9        Any objection from the government?

10        MS. CHOY:  No, Your Honor.

11        THE COURT:  From the defendant?

12        MR. CALEB:  No objection.

13        THE COURT:  Any objection -- 43 is bribery involves

14  the exchange of a thing of value for an official action by a

15  public official.  The official act -- and it goes on.

16        Any objection from the government?

17        MS. CHOY:  No, Your Honor.

18        THE COURT:  From the defendant?

19        MR. CALEB:  No objection.

20        THE COURT:  Instruction 44 is, because people rarely

21  act for a singular purpose.

22        Any objection from the government?

23        MS. CHOY:  No, Your Honor.

24        THE COURT:  From the defendant?

25        MR. CALEB:  No objection.

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1              THE COURT:  45 is the government need not prove that

2    a thing of value caused a public official to change his

3    position.

4              Any objection from the government?

5              MS. CHOY:  No, Your Honor.

6              THE COURT:  From the defendant?

7              MR. CALEB:  No objection.

8              THE COURT:  46 is the second element of honest

9    services fraud charged in Count Two, and goes on and talks

10   about that.

11             Any objection from the government?

12             MS. CHOY:  No, Your Honor.

13             THE COURT:  From the defendant?

14             MR. CALEB:  No objection.

15             THE COURT:  47 is the third element of honest

16   services mail and wire fraud.

17             Any objection from the government?

18             MS. CHOY:  No, Your Honor.

19             THE COURT:  From the defendant?

20             MR. CALEB:  No objection.

21             THE COURT:  48 is the fourth element of honest

22   services mail fraud.

23             Any objection from the government?

24             MS. CHOY:  No, Your Honor.

25             THE COURT:  From the defendant?

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1         MR. CALEB:  No objection.

2         THE COURT:  49 is the fourth element of honest

3    services wire fraud.

4         Any objection from the government?

5         MS. CHOY:  No, Your Honor.

6         THE COURT:  From the defendant?

7         MR. CALEB:  No objection.

8         THE COURT:  50 is Count Six through Twelve, and it

9    defines each of those particular actions.  It's the three-page

10   instruction.

11        Any objection from the government?

12        MS. CHOY:  No, Your Honor.

13        THE COURT:  From the defendant?

14        MR. CALEB:  No objection.

15        THE COURT:  51 is to prove the crime of bribery

16   concerning programs receiving federal funds.

17        Any objection from the government?

18        MS. CHOY:  No, Your Honor.

19        THE COURT:  From the defendant?

20        MR. CALEB:  No objection.

21        THE COURT:  52 defines agent.

22        Any objection from the government?

23        MS. CHOY:  No, Your Honor.

24        THE COURT:  From the defendant?

25        MR. CALEB:  No objection.

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1           THE COURT:  53 is a phrase, business or transaction

2   or series of transactions refers to the business of the covered

3   entity here in the Culpeper County sheriff's office.

4           Any objection from the government?

5           MS. CHOY:  No, Your Honor.

6           THE COURT:  From the defendant?

7           MR. CALEB:  No objection.

8           THE COURT:  All right.  54, the government must prove

9   the value of the business, transaction, or series of

10  transactions was $5,000 or more.

11          Any objection from the government?

12          MS. CHOY:  No, Your Honor.

13          THE COURT:  From the defendant?

14          MR. CALEB:  No objection.

15          THE COURT:  55 is the government does not have to

16  prove that federal funds were involved in the bribery

17  transaction.

18          Any objection from the government?

19          MS. CHOY:  No, Your Honor.

20          THE COURT:  From the defendant?

21          MR. CALEB:  No objection.

22          THE COURT:  56 is *quid pro quo* instruction.

23          Any objection from the government?

24          MS. CHOY:  No, Your Honor.

25          THE COURT:  From the defendant?

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1          MR. CALEB:  No objection.

2          THE COURT:  57 is the last instruction, and that is,

3    to influence means that a payment was made before the official

4    action.

5          Any objection from the government?

6          MS. CHOY:  No, Your Honor.

7          THE COURT:  From the defendant?

8          MR. CALEB:  No objection.

9          THE COURT:  All right.  And I received the verdict

10   form with the joint edits on it.  That looks fine to me.  We'll

11   finalize that.  What I do is -- there's one last instruction

12   behind there that I pull out, and I read that to the jury after

13   you all have closed and right before they go back.

14          It tells them, elect a foreman, conduct your

15   deliberations in a business-like fashion.  Send questions out

16   to us in written form, all that kind of basic stuff.  And then

17   I will read the verdict form to them and try to demonstrate

18   that to them as best as possible.

19          So we'll finalize those.  We'll give you all -- we'll

20   give you copies of them.  You'll have one last time -- I'll

21   take a little bit of a break.  You'll have one last time to go

22   through them, and I'll ask if there are any objections to the

23   instructions 1 through 57.  I don't intend to go through them

24   individually again, but -- just to make sure if anything has

25   changed.  Do you all want to see -- I don't know if

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1  Ms. Curry-Ledbetter has done these final changes in red line or

2  not -- do you all want to see the instructions with red line to

3  make sure we did it correctly, or do you trust us to edit

4  correctly?

5          MS. CHOY:  We trust the Court, Your Honor.

6          THE COURT:  Since I'm not doing it, it's probably a

7  good idea.

8          All right.  Does Howard know which juror?

9          Do we want to do this in a closed courtroom, the

10  discussions with the juror?

11          MS. CHOY:  No, Your Honor.  We think it should be

12  open court.

13          THE COURT:  In open court?  Okay.

14          (Off-the-record discussion.)

15          THE COURT:  Why don't we take a break.  I want to

16  read the *Smith* case first as well.  So why don't we stand in

17  recess for ten minutes.

18          (Recess.)

19          THE COURT:  All right.  So I am going to bring in --

20  I do think that -- first of all, we're back on the record in

21  the *United States v. Jenkins*.  The government is present by its

22  counsel.  The defendant is present along with the benefit of

23  counsel as well.

24          I do think that we ought to bring the juror in, chat

25  with her.  Howard is here.  And what I'm told is that the note

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1   that was written was written in the hallway as the juror was

2   retiring for the evening, and the juror then gave it to him.

3   So it didn't filter out of the jury room, if you will.

4          And the question -- so reading *Smith* more

5   carefully -- and I appreciate the government providing that --

6   Judge Bredar -- a concern was raised by a juror, and Judge

7   Bredar questioned that juror more directly, because there were

8   some concerns that were raised by that juror regarding

9   particular issues that came out.  And he addressed those more

10  specifically with her, you know, what prompted it, and then

11  whether that juror believed that those concerns were a

12  consequence of the jury service and so forth.

13         And then the more general questions that are talked

14  about in the case were then questions -- because there was some

15  discussion back in the jury room -- were questions that were

16  asked of the jurors that came out.  It did prompt the release

17  of I think a total of three jurors, kept the one alternate,

18  denied a motion for a mistrial, and the case went on from

19  there.

20         So what I think I'm going to do is bring the juror

21  out.  The script that I have is -- just so you all will know,

22  to tell her that we have her note, ask her what motivated her

23  to send the note, whether she believes whatever -- we'll listen

24  to her answer.  If it's a consequence of -- realistic

25  consequence of her jury service, whether any of those concerns,

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1  if any, have been shared in the jury room, and then whether --

2  the key question then is whether she believes that she can be

3  fair and impartial.

4           Any other thoughts before we proceed, Ms. Choy?

5           MS. CHOY:  No, Your Honor.

6           THE COURT:  Mr. Andonian?

7           MR. ANDONIAN:  No, Your Honor.

8           THE COURT:  All right.  Very well.  And I don't know

9  who the juror is yet, but let's go ahead and bring her on out.

10          (Juror enters courtroom.)

11          THE COURT:  Come on over here.  The people that have

12  been sitting in the witness box all the time -- we'll let you

13  have a seat.

14          Good morning.  How are you today?

15          FEMALE JUROR:  Good morning.  I'm good.

16          THE COURT:  I know you all by face, but not by name.

17          Can you give us your name, please?

18          FEMALE JUROR:  Lisa Choi.

19          THE COURT:  Lisa Choi?

20          Ms. Choi, thank you very much for being here.  We do

21  have your note, and I appreciate you sending that out, but I

22  wanted to follow back up just on a couple of things.

23          First of all, what motivated you to send the note?

24          FEMALE JUROR:  I mean, nothing in particular about

25  this case.  It was more just like just wondering about privacy

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1    and information, just wanting to know who has what information.

2            THE COURT:  Who has what information?

3            FEMALE JUROR:  Yeah.

4            THE COURT:  All right.  I get it.

5            FEMALE JUROR:  I think also -- can I add something?

6            THE COURT:  Yes, ma'am.

7            FEMALE JUROR:  There were some other jurors that

8    expressed that they were -- I don't know what normal procedure

9    is, but they were surprised that our names were called out on

10   the first day.  That didn't take me, you know, aback, but --

11   yeah, just curious.

12           THE COURT:  It's not an anonymous jury.

13           FEMALE JUROR:  No, that's fine.  A lot of us are not

14   familiar with how things -- so it's just curiosity.

15           THE COURT:  Is there -- and I guess really the

16   question -- you know, as I went through the entire voir dire

17   process on -- now I guess a week ago, the question I would

18   always come back to is:  Can you be fair and impartial in

19   making a decision in this case based upon the law that I give

20   you when I instruct you all a little bit later in this case,

21   and the evidence that you've heard over the past several days.

22   And that's the question that I'll put to you now.

23           FEMALE JUROR:  Oh, yes.

24           THE COURT:  Okay.  Do you have any concerns at all

25   about -- not about the evidence and so forth, but do you have

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1    any concerns that -- other than just wondering who has the

2    information from the questionnaires -- at all?

3            FEMALE JUROR:  No, I really don't.  It was just

4    wanting to know for my own personal knowledge, really.  There's

5    no like fears or -- yeah, it was just wanting to understand.

6            THE COURT:  All right.

7            FEMALE JUROR:  How everything is working.  I don't

8    know.  Does that make sense?

9            THE COURT:  No, that's perfectly fine.  Great.  Thank

10   you very much.  So we're going to have you all back out here in

11   just a few minutes.

12           FEMALE JUROR:  Okay.  Thank you.

13           MS. PENG:  Your Honor, if you could instruct the

14   juror not to discuss this conversation with the rest of the

15   jury.

16           THE COURT:  Yeah, I think that's probably fair.

17           They're going to ask you what you were asked and just

18   simply say, just like you tell your folks in the evening, I

19   can't talk about it.

20           FEMALE JUROR:  Okay.  All right.

21           THE COURT:  Thank you.

22           (Juror left the courtroom.)

23           THE COURT:  Ms. Choy, anything we need to address?

24           MS. CHOY:  I think that cleared up any potential

25   concern with that juror, Your Honor.  I don't think any further

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1   action is necessary.

2           THE COURT:  Mr. Andonian, Mr. Caleb?

3           MR. ANDONIAN:  I think that took care of it.

4           THE COURT:  Okay.  I do think that -- only after this

5   case is over when we dismiss the jury, you all ponder whether

6   we say anything to the jury that -- you know, the information

7   that is gathered during the course of voir dire for purposes of

8   voir dire that you all gather through questionnaires is

9   confidential and is to be used only for -- solely for the

10  purposes of this case, whether we tell them that.  But that

11  would be only after the case is over.  And we don't need to

12  cross that bridge at this point in time.

13          All right.  So what we'll do is we'll bring the jury

14  in.  We'll finish the redirect -- or we'll have the redirect of

15  Mr. Jenkins.

16          Does the government anticipate any rebuttal?

17          MS. CHOY:  We're going to wait and see what happens

18  on redirect, Your Honor.

19          THE COURT:  And then we'll -- once all the evidence

20  is in, we'll take a break and collect our thoughts, make sure

21  our instructions are where they want to be.  We'll need to

22  print out the verdict form as well.  And then we'll instruct

23  the jury and go from there.

24          Are we ready for the jury?

25          All right.  Let's bring the jury in.

Jenkins - Redirect

1  (*Jury in, 10:42 a.m.*)

2              THE COURT:  Ladies and gentlemen, please have a seat.

3  Good morning to you.  And I apologize we're running a little

4  bit late this morning, but we have been working on other

5  matters that I believe are going to make our day more efficient

6  for us.  So I appreciate your patience back in the back.

7              So where we were when we left off yesterday afternoon

8  is Mr. Jenkins -- Mr. Jenkins, I'll have you come on up -- was

9  still testifying, and we're here for his redirect.

10             Mr. Jenkins, since it's a new day, I'll go ahead and

11  get you re-sworn, if I could, please.

12            SCOTT H. JENKINS, CALLED BY THE DEFENSE, SWORN

13             THE COURT:  Please have a seat.  Slide on up and

14  you'll need to bring that microphone over to you and make sure

15  you speak up so that we can get your conversation.

16             Go ahead, Mr. Andonian.

17             MR. ANDONIAN:  Thank you, Your Honor.

18                      REDIRECT EXAMINATION

19   BY MR. ANDONIAN:

20  Q    Good morning, Mr. Jenkins.

21  A    Good morning.

22  Q    Mr. Jenkins, you were asked a lot of questions on

23  cross-examination yesterday, and I want to go over a handful of

24  things that you talked about.  And I'm just going to start with

25  the general order regarding auxiliary deputies.

Jenkins - Redirect

1    Do you recall those questions?

2  A    Yes, sir.

3  Q    Did you delegate the power to create that general order to

4  anyone in your department?

5  A    Yeah.

6  Q    Who was that?

7  A    The training accreditation officer, but we had multiples.

8  The most recent was Chad McKnight.  But I believe that was

9  created prior to him by maybe Dennis Holmes.

10  Q    And why did you delegate that power to create a document

11  that was purporting to govern the operation of your department?

12  A    It's all directed to be able to have a general order

13  manual, meeting the standards for the accreditation process.

14  Q    If that general order had come across your desk and you

15  read every word of it carefully, and you read what it did and

16  what it said, would you have approved it, given that it limited

17  your ability to appoint auxiliary deputies as you chose?

18         MS. PENG:  Objection, leading.

19         THE COURT:  Sustained.

20  BY MR. ANDONIAN:

21  Q    What if anything would you have done if that general order

22  had come across your desk and you had read it carefully and

23  really fully digested it?

24  A    Rejected it and had it redrafted.

25  Q    You testified on cross-examination yesterday -- or I

Jenkins - Redirect

1   should say you were asked questions about the training of the

2   auxiliary deputies that Kevin Rychlik brought you.  Do you

3   recall those questions?

4   A    Yes.

5   Q    Why is it that you didn't require any training of the

6   individuals Mr. Rychlik brought you?

7   A    No different than dozens and dozens of other auxiliaries.

8   I was being the same.

9   Q    Do auxiliary deputies need to be trained in order to be

10  appointed?

11  A    No.  No deputy does if the sheriff decides not to.

12  Everything is totally at his discretion.  And I think that's

13  not known by most people, including the government.

14  Q    You were shown a text message or a text thread between you

15  and Mr. Rahim yesterday on cross-examination in which you were

16  describing the farmhouse and the land that it sits on.

17       Do you remember that?

18  A    Yes.

19  Q    Can you just explain to us why it is that you were

20  explaining to Mr. Rahim the property and the land that he was

21  renting?

22  A    I can only tell you what I said before, which is, if I

23  know that he's having to talk about it in detail, he probably

24  would want to know details that he may not know specifically.

25  I don't know if he knew the exact acreage of how big the

Jenkins - Redirect

1   property was.  He originally was renting the house, and then

2   later, it changed to the whole property.  He went up from $500

3   to $1,500 a month he agreed to to have the property for his

4   sons and him to, you know, ride ATVs or do what they want.  I

5   don't know how much more I can say.  I can tell a lot more,

6   but, you know --

7              THE COURT:  Mr. Jenkins, can you -- I'm going to get

8   you to slide up.  I'm having a hard time hearing you.

9              THE WITNESS:  I'm sorry, sir.  I'll speak up.

10             THE COURT:  That's great.  Your voice carries away

11  from me.  So thank you very much.  I appreciate it.

12             Go ahead.  I'm sorry to interrupt, Mr. Andonian.

13   BY MR. ANDONIAN:

14  Q    There were questions on cross-examination yesterday about

15  how much cash Mr. Rahim ultimately gave you.

16       Do you recall those questions?

17  A    Yes.

18  Q    How much cash did Mr. Rahim ultimately give you, as best

19  as you can recall?

20  A    As best as I can recall, there was the initial, as he had

21  told, 25 -- I'm sorry, total -- and then at a later point --

22  again, I don't know the date exactly, there was 20 later,

23  totaling the 45.  Then as you saw the documents showed there

24  was a loan that was two separate checks, but it was from him to

25  me for the 35.

Jenkins - Redirect

1    Q    Why did you not report any of the cash you got from

2    Mr. Rahim on your campaign finance disclosure forms?

3    A    Because it didn't apply.

4    Q    Why didn't it apply?

5    A    We spent thousands -- tens of thousands of dollars on the

6    things I tried to describe yesterday.  I can elaborate as much

7    as anyone would like.  I mentioned yesterday the biggest

8    example is clear, and there's plenty of proof online or in

9    person -- I mean, we have hundreds upon hundreds of those

10   shirts and hats left still unsold of the Make Virginia Great

11   Again logo.  And I think I also tried to mention -- I tried to

12   mention about the firing range.  I taught concealed carry

13   classes for years, and had other instructors come and teach

14   many classes on my property and my ranges.  And that was a goal

15   to have as a business venture.  I understand COVID hit and

16   things changed, and there was -- you know, but anyway -- and I

17   mentioned the other business he was trying with Dave Kidwell

18   and so forth.  They were starting the game of chance or

19   whatever you call those machines.  That was a huge blunder for

20   them, but I actually didn't spend money on that.  That was --

21   he was -- well, it doesn't matter if it wasn't spent on that.

22   But there was -- all of that money did not apply -- any of that

23   money did not apply for campaign donations.  It wasn't reported

24   because it wasn't supposed to be.  It wasn't a donation.

25   Q    Now, you mentioned the loan that you had between you and

Jenkins - Redirect

1   Mr. Rahim for the $35,000.  And you were shown yesterday on

2   cross-examination the loan document.  Why is it that you had a

3   loan agreement with Mr. Rahim for the $35,000, but no written

4   agreement for the cash that he gave you?

5   A    I can't speak for, you know, anyone with his finances, but

6   basically I guess at the moment, you know, he would explain --

7   he was really wealthy, or at least he appeared to be from what

8   I saw.  But basically, it's cash flow, I guess, how much he has

9   in I guess liquid or in whatever accounts that he's going to

10  get money from instead of cash at any given moment.  And then

11  also he said he has this business -- whatever the name of it

12  is -- B or something investments.  But anyway, that's a

13  business where they loan money all the time, interest and so

14  forth.  And that's how it was initiated, the first

15  conversation.  That's what I was asking him for.  But obviously

16  when we continued on with our business ventures -- and I don't

17  have a date -- but anyway, we did that.  Very quickly it was,

18  well, we're going to do this now, and okay, just take that

19  cash, let's -- you know, he didn't need to go to the bank or

20  get more money.  It was like, okay, take that, we're going to

21  use that.  With your other money, we're going to do this, and

22  so forth, if that makes sense.

23  Q    Did Mr. Rahim ever tell you that any of the cash came from

24  an individual named Fred Gumbinner?

25  A    I don't want to say what's not true.  I've heard the

Jenkins - Redirect

1   testimony.  I've seen --

2   Q    Well, I'm just asking from your recollection based on what

3   you know, did Mr. Rahim tell you --

4   A    He was giving me his money.  Now, I understand Fred says

5   he gave him -- but the 20 that I got later from him was him

6   giving me money to put into our ventures.

7   Q    Is Mr. Rahim garnishing your wages as you sit here today?

8   A    I know you had the paperwork a couple -- I don't know, a

9   few months ago, whenever it was this year.  He did file that

10  paperwork, a judgment, and then a garnishment.  And it was in

11  effect until just before this trial started.  Miraculously, I

12  get a notice from the Fairfax court that he's withdrawing.  And

13  I hadn't paid him anything.  He did have it served at my banks

14  to draw funds.  But the money he was claiming -- again, I don't

15  understand a lot of the things that he -- I know we fell out.

16  We were close at one point.  He's a good family man.  I

17  respected that, and thought a lot of him.

18  Q    I want to turn your attention to some questions -- or a

19  question at least that you got about your statement to the FBI

20  agent back in January of '23.  Do you remember those questions?

21  A    I mean, I remember sitting there a long time, yes.

22  Q    Well, let me ask you about that.  Do you remember speaking

23  with the FBI agents back at the end of January 2023?

24  A    Oh, yes.

25  Q    Was that a conversation you were expecting to have, or was

60

Jenkins - Redirect

1  that something that just happened one day?

2  A    No.  They just called me up that morning and I drove down

3  and met them.

4  Q    Can you describe how you were feeling during that

5  interview?

6  A    Well, initially it was pitched as it was about Rick or

7  something else.  That's how you do those things, I guess.  And

8  then it turned quickly against me.  And I guess the easiest way

9  in words -- say shocked, scared, all of the above.

10 Q    As you were talking to the FBI agents at that time, did

11 you remember every detail of everything that had happened over

12 the past year or so?

13 A    No.  I mean, if you're me, I mean, that's kind of the

14 worst day of your life when that's happening.  It was

15 definitely -- I mean, if you listen to the tape, you can hear I

16 just -- it was -- no, I mean, I'm sure my mind wasn't

17 completely clear and able to recall everything, but I did my

18 best.  I told them what I knew.  I didn't ask for a lawyer.  I

19 didn't stop the interview.  I didn't stop them if they wanted

20 to go to my house and look for the cash.  It was there.  They

21 had a warrant, too.  And I gave permission.  And that would

22 have shown that I hadn't done something with it.  But I can't

23 change that now.

24 Q    I want to talk to you about some of the questions you got

25 about the individual named Mike, who you swore in as an

Jenkins - Redirect

1   auxiliary deputy.

2       Did you know that Mike had a felony conviction on his

3   record?

4   A    I'm swearing to tell the whole truth, and I can't sit here

5   today from recall and remember that conversation.  And yes, I

6   knew that when I went in the room, but I'm going by what I've

7   heard on the stand, and what I best can recall from what I've

8   seen this week.  And I'm saying that it does not conflict with

9   what I would think was happening, because I wouldn't have -- I

10  didn't run the information myself.  I just entrusted -- just

11  like with Rick and other -- the information is handled, they're

12  okay as far as the process.  You know, that's what caused the

13  whole problem, me rushing and doing the things like that

14  jumbled together at one time, and me assuming, because I trust

15  my staff, just like I trusted Kevin too, but I trust my staff

16  to do the things they're supposed to do.  So to my knowledge

17  going into that, knowing he was a felon was not an issue.  Like

18  I mentioned, you know, whether it's Rick, who was a felon, had

19  his rights restored -- this guy was no different than him or --

20  I mean, I can name 100 others auxiliaries for me -- or other

21  places, like I mentioned, Jelly Roll.

22           MS. PENG:  Your Honor, objection at this point.

23           THE COURT:  Sustained.

24           MR. ANDONIAN:  Let me just ask a follow-up question.

25           THE COURT:  Focus on the people involved in this

Jenkins - Redirect

1    case.

2              THE WITNESS:  Yes, sir.

3     BY MR. ANDONIAN:

4    Q    Was it an issue to you that Mike had a nonviolent felony

5    on his record and that you were swearing him in?

6    A    No.  I supported -- I've never objected to a Culpeper

7    citizen getting their gun rights back from a nonviolent felony

8    in the past years prior.

9    Q    I want to go back now to some of the questions you got

10   about the gun sale transaction that you and Mr. Rychlik

11   discussed in the Target parking lot.

12        Do you remember those questions?

13   A    Yes.

14   Q    Why is it that you just didn't amend the report that you

15   believed to have been filed without the cash being on it,

16   instead of creating this gun sale agreement?

17   A    I tried to explain yesterday -- and I won't bore you --

18   but in short, it's politics, and the appearance, perception,

19   and the attack that you get when any kind of mistake is made.

20   And you know, we're always -- you're always in the light and

21   under attack.  And I've had my share through the years, and

22   that was just -- you know, as I said, that was a decision of,

23   you know, one of several options to legally do what's right.

24   And that was the one that I chose.

25   Q    You were asked questions yesterday on cross-examination

Jenkins - Redirect

1  about a prior court finding that you had been untruthful under

2  oath; do you recall that?

3  A    I do.

4  Q    Were you ever untruthful under oath in getting an innocent

5  person convicted, as the government suggested?

6  A    Absolutely not.  And it was proven.

7        MR. ANDONIAN:  The Court's brief indulgence?

8        (Pause.)

9        MR. ANDONIAN:  Your Honor, that's all that I have.

10        THE COURT:  Very well.  Thank you very much,

11  Mr. Jenkins.  You may step down.  Please do not discuss your

12  testimony at all while the matter is pending.

13        Mr. Andonian, Mr. Caleb, any other evidence?

14        MR. ANDONIAN:  Not at this time for the defense, Your

15  Honor.

16        THE COURT:  Defense rests?

17        MR. ANDONIAN:  Yes, Your Honor.

18        THE COURT:  Very well.  Any redirect from -- any

19  rebuttal from the government?

20        MS. CHOY:  No, Your Honor.

21        THE COURT:  All right.  Ladies and gentlemen, all of

22  our evidence is in.  At this point in time, my job is to

23  finalize the jury instructions.  That's what we've been working

24  on.  And they're about 98 percent there.  I just need to make

25  sure I put them in the right order for you all, make sure that

Jenkins - Redirect

1    I go over them with the lawyers.  And so I'm going to take a

2    break for -- let's hope it's no more than 15 minutes, come

3    back, and our order of business will be I'll instruct you, and

4    then depending on what time it is, we'll either go to lunch,

5    come back, and have closings, and you all will begin to

6    deliberate, or I'll instruct you, we'll have closings, and will

7    begin to deliberate, and we'll get lunch brought in for you.

8    So we'll see where the clock is at the right time.

9          So for now, it's not time to start talking to each

10   other about the case.  You have to wait until you get

11   instructed and go through closings.  So please do not have any

12   discussions with each other.  Please do not share any

13   information with each other or begin to draw any conclusions at

14   all one way or the other.

15         With that, we'll stand in recess for 15 minutes.

16         We'll excuse the jury for 15 minutes.

17   (*Jury out, 11:01 a.m.*)

18         THE COURT:  You all please have a seat.  Okay.  So

19   our instructions, we're getting those finalized.

20   Ms. Curry-Ledbetter is putting the numbers back on them.  We'll

21   make copies of them.  We're going to scan them in so Ms. Brown

22   can show them from her computer onto their screens.  I'll print

23   the verdict form out.  I'll give you a copy of that.  I'll come

24   back in ten minutes or so to make sure that -- if there is

25   anything else we need to address with respect to instructions

Jenkins - Redirect

1  and so forth.

2         Otherwise, Ms. Choy, anything else we need to

3  address?

4         MS. CHOY:  No, Your Honor.

5         THE COURT:  Mr. Andonian?

6         MR. ANDONIAN:  Your Honor, we would just renew our

7  motion for judgment of acquittal and submit it on the record.

8         THE COURT:  So it is -- it's the defendant's burden

9  at this point to show where there is a lack of evidence.  I

10  know you rely upon the record.  That's the reason I asked if

11  there's anything else you wanted to go through, or anything

12  else you wanted to offer.

13         MR. ANDONIAN:  No, Your Honor.

14         THE COURT:  Nothing else?

15         Ms. Choy, anything you want to offer?

16         MS. CHOY:  No, Your Honor.

17         THE COURT:  Okay.  So let me just address it.  So I'm

18  going to -- as to Count One, the conspiracy count, there is

19  evidence of an agreement between Mr. Rychlik and Mr. Rahim and

20  Mr. Jenkins -- specifically between Mr. Rychlik and

21  Mr. Jenkins.  And there is abundant evidence of bringing people

22  in to make contributions, to pay money, call them what you

23  like, and in return, the motivating factor of these folks who

24  were not otherwise involved with or related to the Culpeper

25  County sheriff's department, they expected to be deputized.

Jenkins - Redirect

1    And the list of those individuals is significant.

2         With respect to the mail -- and so -- and there are

3    acts taken along with way in furtherance of the conspiracy, and

4    we -- the videotapes and the audio was abundant of

5    Mr. Jenkins's knowing participation in that.  So as to Count

6    One, there is enough evidence to go to the jury as to that.

7         As to Count Two, honest services mail fraud, this

8    relates specifically to Mr. Rahim's restoration of his gun

9    rights.  Ms. Weakley testified that Mr. Rahim's firearm

10   restoration had to be mailed back, notwithstanding the fact

11   that they tried to pick it up.  She said the statute says you

12   mail it, and so she mailed it, and so she did.  And that's use

13   of the mail.  And there's evidence of Mr. Jenkins's involvement

14   with Judge Durrer getting the hearing moved forward.  There is

15   evidence regarding his agreement with Mr. Rahim to be able to

16   show that he was a Culpeper resident on a lease that the jury

17   could conclude was not a real lease, and that the *quid pro quo*

18   for Mr. Rahim paying the monies early, because there was part

19   of the testimony was -- or part of the audio was that from the

20   jump, I think was the term used in the audio, if I remember

21   correctly, Mr. Rahim knew what he wanted and Mr. Jenkins knew

22   what he wanted.  So as to Count Two, mail fraud, the motion is

23   overruled.

24        As to Counts Three, Four, and Five, which is the wire

25   fraud, the text messages, Three relates to -- there is evidence

Jenkins - Redirect

1    that Mr. Rychlik and Mr. Rahim testified of the existence of

2    the scheme to accept bribes.  Mr. Rahim sent a text message on

3    June the 7th about getting his firearm rights restored, and

4    from Dawn Meisle at Apple about the interstate commerce, that

5    part.  And there's a stipulation that -- of course, that was --

6    interstate commerce as it relates to the campaign finance.

7    That was the banking -- the servers -- there are no servers in

8    Virginia.

9            As it relates to the wire fraud on Count Three as

10   well, the interaction with Mr. Jenkins and Judge Durrer and the

11   Commonwealth's Attorney about getting the restoration of the

12   firearms rights restored, there is sufficient there.

13           As to the honest services fraud in Count Four, that

14   relates to the text messages sent on January 3rd.  And that is

15   to get Mr. Cooper sworn in as an auxiliary deputy as well.  And

16   there is sufficient evidence that Mr. Cooper -- January 3rd of

17   2023, Mr. Cooper was sworn in as a deputy -- sworn in as a

18   deputy on the same day that he came down and gave a check for

19   $5,000 as well.  So I overrule it as to Count Four.

20           As to Count Five relates to the wire communication,

21   and that is a representative of the Blue Ridge Bank account and

22   the deposit of the Metcalf check.  Again, I'll overrule that.

23           Six through Twelve all relate to the individuals

24   we've heard from.  And there's abundant evidence that there is

25   a scheme that Mr. Rychlik -- the jury could conclude that he's

Jenkins - Redirect

1    an agent of the government -- of Mr. Jenkins to bring people

2    in.  And then Mr. Rahim was acting in that way as well, the

3    jury could conclude that he's an agent as well.  And as it

4    relates to each of the individuals in Six through Twelve, they

5    were sworn in either close in time or on the same day.  And so

6    there is sufficient evidence for that to go forward.

7              So I'll overrule the motion in all regards.

8              All right.  Otherwise, once we get those -- so we'll

9    just stand in recess until we get the jury instructions, and

10   we'll get them back to you all, and come back and instruct the

11   jury.

12             Stand in recess.

13             (Recess.)

14             THE COURT:  We're back on the record in the matter of

15   *United States v. Jenkins*.  The government is present by its

16   counsel.  The defendant likewise is present along with the

17   benefit of counsel.

18             So I have given to you all instructions 1 through 57,

19   along with the verdict form, and I've put them in a three-ring

20   binder that will go back to the jury room in the hopes it will

21   be not a complete mess.

22             Ms. Choy, on behalf of the government, instructions 1

23   through 57, are there any -- first of all, any objections to

24   the Court instructing the jury as to numbers 1 through 57?

25             MS. CHOY:  No, Your Honor.

Jenkins - Redirect

1          THE COURT:  Any additional -- any additional

2    instructions to be given from the government's perspective?

3          MS. CHOY:  No, Your Honor.

4          THE COURT:  All right.  Mr. Caleb, any objection to

5    instructions 1 through 37 -- 1 through 57, excuse me.

6          MR. CALEB:  1 through 57 -- no, Your Honor, assuming

7    they're the same as the ones we reviewed earlier.

8          THE COURT:  They are.

9          MR. CALEB:  And I believe that they are.

10         THE COURT:  Yeah.  Any additional instructions to be

11   offered on behalf of the defendant?

12         MR. CALEB:  No, Your Honor.

13         THE COURT:  All right.  Are we ready for the jury?

14         Well, actually, before we do that, so it's 11:40.

15   How long do you anticipate being on your closing, Ms. Choy?

16         MS. CHOY:  About an hour.

17         THE COURT:  About an hour?

18         Okay.  Mr. Andonian, Mr. Caleb, how long do you

19   anticipate?

20         MR. ANDONIAN:  Maybe 40 minutes.

21         THE COURT:  Okay.  My thought had been to tell the

22   jury that we were going to kind of get through closings and we

23   would have pizza waiting for them, but that's an hour and 40

24   minutes.  And if we instruct the jury until about 12:30, then

25   it's going to be 2:00.  So I'll instruct the jury, and then

Jenkins - Redirect

1  we'll go to lunch, I think, and we'll come back and we'll do

2  closings, and then go from there.

3         Okay.  Let's bring the jury in.

4  (*Jury in, 11:45 a.m.*)

5         THE COURT:  Ladies and gentlemen, please have a seat.

6         All right.  So let me tell you where we are and what

7  our proposed plan is.  So ladies and gentlemen, all the

8  evidence is in.  The time has come now for me to give you the

9  instructions that will guide your deliberations.  I'm going to

10  read those to you now.  For your ease, what we're going to do

11  is we're going to show them up on your screen.  You're going to

12  have a copy of the instructions that are going to go back with

13  you.  They're here in this notebook.  You'll have them back

14  there.  So what I want you to do is listen carefully.  I'm

15  going to read the instructions to you.

16         Given what I anticipate will be probably longer

17  closing arguments than the opening statements were, we'll then

18  break for lunch.  We'll come back.  We'll have our closing

19  arguments at that point in time.  And then we'll begin our

20  deliberations.  And then the case will be yours and then you

21  all will be the captain of the ship, and will kind of guide how

22  we go from there.

23         All right.  So ladies and gentlemen, if I could ask

24  you to -- you can put your pads down and pay attention to me

25  and to your screen.  These are the final instructions of the

Charge to the Jury

1    Court.

2                    CHARGE TO THE JURY

3          THE COURT:  Members of the jury, the instructions

4    that I gave you at the beginning of the trial and during the

5    trial remain in effect.  I now give you some additional

6    instructions.  You must, of course, continue to follow the

7    instructions that I gave you earlier, as well as those that I

8    give you now.  You must not single out some instructions and

9    ignore others, because all are important.

10         Instruction number 1:  Members of the jury, now that

11   you have heard all the evidence in the case, it becomes my duty

12   to instruct you on the rules of law that you must follow and

13   apply in arriving at your decision.  You will follow and apply

14   these rules of law after you have heard the final arguments of

15   the lawyers for the parties.  It is your duty as jurors to

16   follow the law as instructed -- as stated in my instructions

17   and to apply the rules of law, so given, to the facts as you

18   find them from the evidence in the case, and solely the

19   evidence presented to you.

20         Counsel may quite properly refer to some of the

21   governing rules of law in their arguments.  If, however, any

22   difference appears to you between the law as stated by me in

23   these instructions, you are governed by the instructions I am

24   about to give you.  You must follow all of the rules as I

25   explain them to you.  You may not follow some and ignore

Charge to the Jury

1   others.

2           You are not to single out one instruction alone as

3   stating the law, but must consider the instructions as a whole.

4           Neither are you to be concerned with the wisdom of

5   any rule of law stated by the Court.  Regardless of any opinion

6   that you may have as to what the law ought to be, it would be a

7   violation of your sworn duty to base a verdict upon any other

8   view of the law than that given in the instructions, just as it

9   would be a violation of your sworn duty as judges of the facts

10  to base a verdict upon anything but the evidence in the case.

11  You must not base your verdict on prejudice, sympathy, guess

12  work or speculation, but on the evidence and on the rules of

13  law I have given to you.

14          Justice through the trial by jury must always depend

15  on the willingness of each individual juror to seek the truth

16  as to the facts from the same evidence presented to all the

17  jurors, and to arrive at a verdict by applying the same rules

18  of law as given in the instructions of the Court.

19          Instruction number 2:  There are three important

20  rules that you must always keep in mind in a criminal case.

21  These are:  One, a defendant is presumed innocent.  The

22  government has the burden of proof to establish the defendant's

23  guilt, and the government has the burden to establish guilt

24  beyond a reasonable doubt.  An indictment is merely the

25  burden to establish guilt beyond a reasonable -- an

Charge to the Jury

indictment -- excuse me -- is merely the formal way of accusing
a person of a crime to bring that person to trial.  You must
not consider the superseding indictment as evidence of any
kind.  You may not consider it as any evidence of the
defendant's guilt or draw any inference of guilt from it.  The
defendant in this criminal case is presumed to be innocent.
The defendant begins the trial with a clean slate with no
evidence against him.  The presumption of innocence remains
with the defendant throughout the trial unless and until he is
proven guilty beyond a reasonable doubt.  The presumption of
innocence alone is sufficient to find the defendant not guilty
unless all of you are satisfied beyond a reasonable doubt of
the defendant's guilt from all the evidence admitted in the
case.

        The presumption of innocence also means that the
defendant has no burden or obligation to present any evidence
at all or to prove that he is not guilty.  As I have said many
times, the government has the burden of proving the defendant's
guilt beyond a reasonable doubt.  Some of you may have served
as jurors in civil cases where you were told that it was only
necessary to prove that a fact is more likely true than not.
In criminal cases, the government's proof must be more powerful
than that; it must be beyond a reasonable doubt.

        The burden is on the government -- instruction number
3:  The burden is on the government to prove the defendant

Charge to the Jury

1   guilty beyond a reasonable doubt.  This burden of proof

2   shifts -- never shifts throughout the trial.  The law does not

3   require a defendant to prove his innocence, to call any

4   witnesses, or produce any evidence.  While the government's

5   burden of proof is a strict and heavy burden, it is not

6   necessary that it be proved beyond all possible doubt, only a

7   reasonable doubt.

8          If you find that the government has proven beyond a

9   reasonable doubt every element of the offense or offenses for

10  which the defendant is charged, it is your duty to find him

11  guilty of that offense; however, if you find that the

12  government has failed to prove any single element of an offense

13  beyond a reasonable doubt, then you must find the defendant not

14  guilty of that offense.

15         So, if the jury, after careful and impartial

16  consideration of all the evidence in the case, if you have a

17  reasonable doubt that the defendant is guilty of a charge, you

18  must acquit on that charge.

19         Instruction number 4:  The government is required to

20  prove a defendant guilty beyond a reasonable doubt, but it is

21  not required to present all possible evidence related to the

22  case or to produce all possible witnesses who might have some

23  knowledge of the facts of the case.  In addition, as I have

24  explained, a defendant is not required to present any evidence

25  or produce any witnesses.

Charge to the Jury

1        Instruction number 5:  You are to decide whether the

2   government has proved beyond a reasonable doubt that the

3   defendant is guilty of the crimes charged.  The defendant is

4   not on trial for any act, conduct, or offense not alleged in

5   the superseding indictment; neither are you concerned with the

6   guilt of any other person or persons not on trial in this case.

7        Instruction number 6:  If a defendant elects to take

8   the witness stand and testify in his own defense, as the

9   defendant has done in this case, then he becomes as any other

10  witness, and you must determine his credibility and give his

11  testimony such credence and belief as you think it deserves.

12  You should judge and determine the defendant's believability as

13  you would any other witness in this case.

14        Instruction number 7:  I instruct you that if you

15  find the defendant guilty of the crimes charged, the sentence

16  to be imposed is my responsibility.  You may not consider

17  punishment in any way in deciding whether the government has

18  proved its case beyond a reasonable doubt.

19        Instruction number 8:  The evidence in this case

20  consists of, A, the sworn testimony of the witnesses; B, the

21  exhibits as I -- the exhibits I received into evidence; and C,

22  all facts to which the parties may have agreed or stipulated.

23        Stipulations are an agreement between the parties

24  that particular facts are true.  There were two stipulations in

25  this case.  Wherever the attorneys on both sides of the case

Charge to the Jury

1   have stipulated, or agreed, as to the existence of a fact, you

2   must accept the stipulation as evidence and regard the fact as

3   proved.

4          Certain things are not evidence.  Anything you may

5   have heard about the case from outside the courtroom is not

6   evidence in this case.  Do not let rumors, speculations -- do

7   not let rumors, suspicions, or anything else you may have seen

8   or heard outside the court influence your verdict.

9          Questions, statements, arguments of attorneys in this

10  case are not evidence unless they are made as an admission or

11  as a stipulation of fact.

12         You must not consider any matter that was rejected or

13  stricken by the Court.  It is not evidence and should be

14  disregarded.

15         Instruction number 9:  There are two types of

16  evidence that you may consider in properly finding the truth as

17  to the facts in this case.  One is direct evidence, such as

18  testimony of an eyewitness.  The other is indirect or

19  circumstantial evidence, the proof of a chain of circumstances

20  that indicates the existence or nonexistence of certain other

21  facts.  Circumstantial evidence is evidence of facts and

22  circumstances from which one may infer connected facts which

23  reasonably follow in the common experience of mankind.

24  Circumstantial evidence is evidence which tends to prove a

25  disputed fact by proof of another fact or other facts which

Charge to the Jury

1  have a logical tendency to lead the mind to the conclusion that

2  the disputed fact has been established.

3        The law makes no distinction between direct and

4  circumstantial evidence, but simply requires that the

5  government present evidence -- either direct or

6  circumstantial -- that proves its case against a defendant

7  beyond a reasonable doubt.  Therefore, circumstantial evidence

8  is to be treated no differently than direct evidence, and may

9  or may not be sufficient to support a verdict of guilty.

10        Instruction number 10:  While you should consider

11  only the evidence in this case, you are permitted to draw such

12  reasonable inferences from the testimony and exhibits as you

13  feel are justified in light of common experience.  You may make

14  deductions and reach conclusions that reason and common sense

15  lead you to draw from the facts that have been established by

16  the testimony and evidence in the case.

17        Instruction number 11:  The evidence in this case

18  before you has consisted in part of testimony from witnesses.

19  You may believe all of what any witness said, or only part of

20  it, or none of it.  You are the sole judges of the credibility

21  of the witnesses and the weight of the evidence.

22        You are not bound to decide any issue of fact in

23  accordance with the testimony of witnesses which does not

24  produce in your minds belief in the likelihood of truth.

25        The test is not which side brings the greater number

Charge to the Jury

1  of witnesses or presents the greater quantity of evidence; but

2  which witnesses, and which evidence, you believe are the most

3  accurate, and otherwise trustworthy.  The testimony of a single

4  witness may be sufficient to prove any fact, even if a greater

5  number of witnesses may have testified to the contrary, if,

6  after considering all the other evidence, you believe that

7  single witness.

8         In considering the evidence, you are not limited to

9  the bold statements of the witnesses; in other words, you are

10  not limited solely to what you see and hear as the witnesses

11  testify.  On the contrary, you are permitted to draw from the

12  facts which you find to have been proven such reasonable

13  inferences as may seem justified in light of your own

14  experience.

15         In determining the credibility of any given witness,

16  you should carefully scrutinize all the testimony given, the

17  circumstances under which each witness testified, and every

18  matter in evidence which tends to show either a witness is

19  worthy of belief.  You may consider the intelligence, motive,

20  state of mind, demeanor, and manner while on the stand of each

21  witness.  You may consider the witness's ability to observe the

22  matters as to which he or she has testified, and whether the

23  witness impresses you as having an accurate recollection of

24  these matters.  You may also consider his or her interest in

25  the outcome of the case, and any bias or prejudice, and the

Charge to the Jury

1  extent to which, if any at all, each witness is either

2  supported or contradicted by other evidence in the case.  In

3  evaluating credibility, you may call upon your own experience

4  and background in your everyday affairs in determining the

5  reliability or unreliability of statements made by others.

6        In considering the testimony of witnesses, you should

7  ask yourself whether there was evidence tending to prove that

8  the witness testified falsely concerning some important fact,

9  or whether there was evidence at all -- evidence that at some

10 other time the witness said or did something, or failed to say

11 or do something, which was different from the testimony the

12 witness gave during trial.

13       You should keep in mind, of course, that a simple

14 mistake by a witness does not necessarily mean that the witness

15 was not telling the truth as the witness remembers it, because

16 people naturally tend to forget some things or remember other

17 things inaccurately.  So if a witness has made a misstatement,

18 you need to consider whether that misstatement was simply an

19 innocent lapse of memory or an intentional falsehood; and the

20 significance of that may depend upon whether it was -- whether

21 it has to do with an important factor or with only an

22 unimportant detail.

23       Instruction number 12:  You have heard evidence that

24 several witnesses were previously convicted of one or more

25 crimes.  You may use that evidence only to help you decide

Charge to the Jury

1  whether to believe the witnesses and how much weight to give

2  their testimony.

3          Instruction number 13:  You have heard testimony from

4  witnesses who have pled guilty to one or more crimes which

5  arose out of the same events for which the defendant is on

6  trial today.  You must not consider their guilty pleas as

7  evidence of the defendant's guilt.  You may consider these

8  witnesses' guilty pleas only for the purpose of determining how

9  much, if at all, to rely upon these witnesses' testimony.

10          Instruction number 14:  The government has presented

11  testimony from one or more witnesses who have entered into a

12  plea agreement with the government, received immunity, or

13  testified in the hopes of receiving leniency in their own

14  cases, or for some other benefit from the government.  The

15  testimony of such witnesses -- or such a witness must be

16  considered by you and weighed with greater care and caution,

17  more so than the testimony of an ordinary witness.

18          You should not concern yourself with why the

19  government made such an agreement with the witness.  Your

20  concern is whether the witness has given truthful testimony.

21          In evaluating the testimony of these witnesses, you

22  should consider whether, or the extent to which, their

23  testimony may have been influenced by the plea agreement,

24  immunity, desire for leniency, or other benefits received from

25  the government in connection with this case.

Charge to the Jury

1           Under the law, the government may request leniency in

2    a case based on a criminal defendant's substantial assistance

3    in the prosecution of another person.  The ultimate sentence

4    imposed, however, is up to the judge, and not to the

5    government.

6           Instruction number 15:  The government has presented

7    exhibits in the form of charts and summaries.  I decided to

8    admit these charts and summaries in place of the underlying

9    documents that they represent in order to save time and avoid

10   unnecessary inconvenience.  You should consider these charts

11   and summaries as you would any other evidence.

12          Instruction number 16:  The parties have presented

13   exhibits in the form of demonstrative aids.  These

14   demonstrative aids are shown to you -- were shown to you in

15   order to make the other evidence more meaningful and to aid you

16   in considering the evidence.  They are no better than the

17   testimony or the documents upon which they are based, and are

18   not themselves independent evidence.  Therefore, you are not --

19   you are to give no greater consideration to these demonstrative

20   aids than you would give to the evidence upon which they are

21   based.

22          It is for you to decide whether the demonstrative

23   aids correctly present the information contained in the

24   testimony and in the exhibits on which they are based.  You are

25   entitled to consider the demonstrative aids if you find that

Charge to the Jury

1  they are of assistance to you in analyzing and understanding

2  the evidence.

3      Instruction number 17:  You may consider as evidence

4  of consciousness of guilt a specific statement made by the

5  defendant denying guilt or involvement if you find that the

6  statement was not true.  When a defendant voluntarily and

7  intentionally offers an explanation and makes some statement or

8  engages in a course of conduct tending to show he is guilty,

9  and the statement is later shown to be false or the course of

10  conduct fraudulent, the jury may consider whether this

11  circumstantial evidence points to a consciousness of guilt.

12  Whether or not evidence as to a defendant's voluntary

13  explanation or statement or course of conduct points to a

14  consciousness of guilt, and the significance to be attached to

15  any such evidence, are matters exclusively within the province

16  of the jury.

17      Instruction number 18:  You have also heard the

18  testimony of law enforcement officers.  The fact that a witness

19  is employed as a law enforcement officer does not mean that his

20  or her testimony necessarily deserves more or less

21  consideration or greater or lesser weight than that of any

22  other witness.

23      At the same time, it is quite legitimate for defense

24  counsel to try to attack the believability of a law enforcement

25  witness on the ground that his testimony may be colored by a

Charge to the Jury

1    personal or professional interest in the outcome of the case.

2           Just as with any witness, you must decide, after

3    reviewing all the evidence, whether you believe the testimony

4    of a law enforcement witness and how much weight, if any, it

5    deserves.

6           Instruction 19:  You have heard testimony from

7    undercover agents and informants who were involved in the

8    government's investigation of the case.  Law enforcement

9    officials may lawfully engage in stealth and deception, such as

10   the use of informants and undercover agents, to investigate

11   criminal activities.  Undercover agents and informants may use

12   false names and appearances and assume the roles of members in

13   criminal organizations.

14          Whether or not you approve of the use of an

15   undercover agent or informant to detect unlawful activities is

16   not to enter into your deliberations in any way.

17          Instruction number 20:  The government has offered

18   evidence in the form of tape recordings of conversations of the

19   defendant.  These recordings were made without the knowledge of

20   the defendant, but with the consent and agreement of one of the

21   other parties in the conversations.

22          The use of this procedure to gather evidence is

23   perfectly lawful, and the government is entitled to use the

24   tape recordings in this case.

25          Instruction number 21:  The transcripts of audio and

84

Charge to the Jury

1  video recordings were displayed for the limited purpose of

2  aiding you in following the content of the conversation as you

3  listened to the recording, and also to aid you in identifying

4  the speakers.

5       You are instructed that whether the transcripts

6  correctly or incorrectly reflected the content of the

7  conversation or the identity of the speakers is entirely for

8  you to determine.

9       Instruction number 22:  The intent of a person or the

10  knowledge that a person possesses at any given time may not

11  ordinarily be proved directly because there is no way of

12  directly scrutinizing the workings of the human mind.  In

13  determining the issue of what a person knew or what a person

14  intended at a particular time, you may consider any statement

15  made or acts done by that person and all other facts and

16  circumstances received in evidence which may aid in your

17  determination of that person's knowledge and intent.

18       You may infer, but are certainly not required to

19  infer, that a person intends the natural and probable

20  consequences of acts knowingly done or knowingly omitted.  It

21  is entirely up to you, however, to decide what facts to find

22  from the evidence received during the trial.

23       Instruction number 23:  To sustain its burden of

24  proof, it is not necessary for the government to prove that the

25  defendant personally did every act constituting the offense

Charge to the Jury

1  charged.

2          As a general rule, whatever any person is legally

3  capable of doing himself he can do through another acting as

4  his agent.  So if you find that the facts or conduct of another

5  were deliberately ordered or directed by the defendant or

6  deliberately authorized or consented to by the defendant, then

7  the law holds that defendant responsible for such acts or

8  conduct just the same as if personally done by him.

9          Instruction number 24:  At times during the trial,

10  the lawyers objected to questions or to answers by witnesses.

11  This simply means that the lawyers were requesting that I make

12  a decision on a particular rule of law.  Do not draw any

13  conclusion from such objections, or from my rulings on the

14  objections.  These are only related to the legal questions that

15  I had to determine, and should not influence your thinking.

16          When I sustained an objection to a question, the

17  witness was not allowed to answer it.  Do not attempt to guess

18  what answer might have been given had I allowed the question to

19  be answered.

20          Similarly, when I told you not to consider a

21  particular statement, you were told to put that statement out

22  of your mind, and you may not refer to that statement in your

23  deliberations.

24          Instruction number 25:  There is nothing different in

25  the way that a juror should consider the evidence in a trial

Charge to the Jury

1   from that in which any reasonable and careful person would deal

2   with any very important question that must be resolved by

3   examining facts, opinions, and evidence.  You are expected to

4   use your good sense in considering and evaluating the evidence

5   in this case.  Use the evidence only for those purposes for

6   which it has been received and give the evidence a reasonable

7   and fair construction in light of your common knowledge and the

8   natural tendencies and inclinations of human beings.

9          Instruction number 26:  The decision that you reach

10  in the jury room, whether guilty or not guilty, must be

11  unanimous.  You must all agree.  Your deliberations will be

12  secret.  You will never have to explain your verdict to anyone.

13         Instruction number 27 -- you all doing okay?

14         Instruction number 27:  The superseding indictment

15  charges that the offenses were committed on or about certain

16  dates and in or about certain months.  The government does not

17  have to prove that a crime was committed on an exact date, so

18  long as the government proves beyond a reasonable doubt that

19  the defendant committed the crimes on dates reasonably near the

20  dates stated in the superseding indictment.

21         Instruction number 28:  A separate crime is charged

22  in each count of the superseding indictment.  Each charge, and

23  the evidence pertaining to it, should be considered separately

24  by the jury.  The fact that you may find the defendant guilty

25  or not guilty as to one of the counts should not control your

Charge to the Jury

1    verdict as to any other count.

2           Instruction number 29:  The defendant, Scott Howard

3    Jenkins, is charged with crimes about which I will instruct you

4    shortly.  Each charge is called a count.  I will refer to each

5    count by the number assigned to it in the superseding

6    indictment.

7           You will not be furnished with the superseding

8    indictment itself, because an indictment is merely a statement

9    of charges and not, in and of itself, evidence.

10          The superseding indictment charges Scott Howard

11   Jenkins with 12 counts.  Count One charges the defendant with

12   conspiracy in violation of 18 United States Code, Section 371.

13          Counts Two through Five charge the defendant with

14   honest services mail and wire fraud in violation of 18 United

15   States Code, Sections 1341, 1343, and 1346.

16          Counts Six through Twelve charge the defendant with

17   bribery concerning programs receiving federal funds in

18   violation of 18 United States Code, Section 666(a)(1)(B).

19          Defendant Scott Howard Jenkins has pled not guilty to

20   each of these charges, and therefore, denies that he is guilty

21   of the charges in the superseding indictment.

22          Instruction number 30:  Count One charges that

23   beginning no later than in or around April 2019 and continuing

24   until in or around January 2023, in the Western District of

25   Virginia and elsewhere, the defendant, Scott Howard Jenkins,

Charge to the Jury

1   along with Rick Rahim, Fredric Gumbinner, James Metcalf, Kevin

2   Rychlik, Thomas Cooper, Philip Howell, and others known and

3   unknown, did knowingly and unlawfully combine and conspire,

4   confederate, and agree together and with each other, to commit

5   the following offenses against the United States.  A:  For

6   Jenkins, being an agent of the Culpeper County and the Culpeper

7   County sheriff's office, to corruptly solicit, demand, accept,

8   or agree to accept for his own benefit things of value from

9   Rick Rahim, Fredric Gumbinner, James Metcalf, Kevin Rychlik,

10  Thomas Cooper, and Philip Howell, intending to be influenced or

11  rewarded in connection with any business, transaction, or

12  series of transactions of Culpeper County or the Culpeper

13  County sheriff's office involving anything of value of $5,000

14  or more; that is, as to Rick Rahim, Fredric Gumbinner, James

15  Metcalf, Kevin Rychlik, Thomas Cooper, and Philip Howell,

16  appointments as auxiliary deputy sheriffs, and additionally as

17  to Rick Rahim, a petition to restore Rick Rahim's firearms

18  rights in violation of 18 United States Code, Section

19  666(a)(1)(B).

20        B:  For Scott Jenkins, Rick Rahim, Fredric Gumbinner,

21  James Metcalf, Kevin Rychlik, Thomas Cooper, and Philip Howell,

22  to devise and intend to devise a scheme or artifice to defraud

23  or deprive Culpeper County, the Culpeper County sheriff's

24  office, and the citizens of Culpeper County of their intangible

25  right to the honest services of Jenkins, through bribery, and

Charge to the Jury

1  for the purpose of executing such scheme, to knowingly use the

2  mail, or to cause wire communications to be transmitted in

3  interstate commerce in violation of 18 United States Code,

4  Section 1341, 1343, and 1346.

5      Instruction number 31:  To sustain his burden of

6  proof for the crime of conspiracy to commit bribery concerning

7  programs receiving federal funds and honest services mail and

8  wire fraud as charged in Count One, the government must prove

9  the following four elements beyond a reasonable doubt.

10      First, that the conspiracy, agreement, and

11  understanding to commit bribery concerning programs receiving

12  federal funds or honest services mail or wire fraud as

13  described in the superseding indictment, was formed, reached,

14  or entered into by two or more persons.

15      Second, that at some time during the existence of

16  life of the conspiracy -- the existence or life of the

17  conspiracy, agreement, or understanding, the defendant knew the

18  purposes of the agreement.

19      Third, that the knowledge of the purposes of the

20  conspiracy, agreement, or understanding, the defendant

21  deliberately joined the conspiracy, agreement, or

22  understanding.

23      And fourth, that at some time during the existence or

24  life of the conspiracy, agreement, or understanding, one of its

25  alleged members knowingly performed an overt act and did so in

Charge to the Jury

1  order to further or advance the purposes of the conspiracy.

2          I will instruct you on the elements of bribery

3  concerning programs receiving federal funds and honest services

4  mail and wire fraud shortly.  You should consider these

5  elements in determining whether the defendant knowingly and

6  intentionally conspired to participate in one or more of these

7  offenses.  Participating in a conspiracy -- participating in a

8  conspiracy to commit a crime is a separate and distinct charge

9  from the underlying substantive offense.  The crime of

10  conspiracy is the agreement to do something unlawful.  It

11  doesn't matter whether the crime agreed upon was committed.

12          Instruction number 32:  The first element of the

13  crime of conspiracy is the existence of a conspiracy, which is

14  an agreement between two or more persons to join together to

15  accomplish an unlawful purpose.  It is a kind of partnership in

16  crime in which each member becomes the agent of every other

17  member.

18          The government must prove that the conspiracy came

19  into existence during or reasonably near the period of time

20  charged in the superseding indictment, and the defendant

21  knowingly joined in the conspiracy within -- knowingly joined

22  in the conspiracy within or reasonably near the same time

23  period.

24          A conspiracy may exist even if a conspirator does not

25  agree to commit or facilitate each and every part of the

Charge to the Jury

1   substantive offense.

2           The partners in a criminal plan must agree to pursue

3   the same criminal objective, and may divide up the work, yet

4   each is responsible for the acts of the other.

5           The essence of the crime of conspiracy is an

6   agreement to commit a criminal act.  But there does not have to

7   be evidence that the agreement was specific or explicit.  By

8   its very nature, a conspiracy is clandestine and covert;

9   thereby frequently resulting in little direct evidence of such

10  an agreement.  Therefore, the government may prove a conspiracy

11  by circumstantial evidence.  Circumstantial evidence tending to

12  prove a conspiracy may consist of the defendant's relationship

13  with other members of the conspiracy, the length of the

14  conspiracy, the defendant's attitude and conduct, and the

15  nature of the conspiracy.

16          Instruction number 33:  The second and third elements

17  of the crime of conspiracy are that the defendant knew the

18  purposes of the conspiracy and with knowledge of those purposes

19  deliberately joined the conspiracy.

20          One may be a member of a conspiracy without knowing

21  the full scope of the conspiracy or all of its members, and

22  without taking part in the full range of its activities or over

23  the whole period of its existence.  The conspiracy does not

24  need a discrete and identifiable organizational structure.  The

25  fact that a conspiracy is loosely-knit, haphazard, and

Charge to the Jury

1   ill-conceived does not render it any less a conspiracy.  The

2   government need not prove that the defendant knew the

3   particulars of the conspiracy or all of his co-conspirators.

4   It is sufficient if the defendant played only a minor part in

5   the conspiracy.  Thus, a variety of conduct can constitute

6   participation in a conspiracy.  Moreover, a defendant may

7   change his role in the conspiracy.

8        Once it has been shown that a conspiracy exists, the

9   need only -- the evidence need only establish a slight

10  connection between the defendant and the conspiracy.  The

11  government must produce evidence to prove the defendant's

12  connection beyond a reasonable doubt, but the connection itself

13  may be slight, because the defendant does not need to know all

14  of his co-conspirators, understand the reach of the conspiracy,

15  participate in all the enterprises of the conspiracy, or have

16  joined the conspiracy from its inception.

17       Presence at the scene of criminal activity is

18  material and probative in the totality of the circumstances in

19  determining the defendant's participation in the conspiracy.

20  Mere presence alone is not sufficient to prove participation in

21  the conspiracy, but proof beyond a reasonable doubt of

22  presence, coupled with an act that advances the conspiracy is

23  sufficient to establish participation in the conspiracy.

24       The statements and actions of an alleged

25  co-conspirator may be considered in determining the existence

Charge to the Jury

1    of the conspiracy.  The jury may find knowledge and voluntary

2    participation from evidence of presence when the presence is

3    such that it would be unreasonable for anyone other than a

4    knowledgeable participant in the conspiracy to be present.

5              Instruction number 34:  The fourth element of the

6    crime of conspiracy is that at some time during the existence

7    or life of the conspiracy, agreement, or understanding, one of

8    its alleged members knowingly performed an overt act and did so

9    in order to further or advance the purpose of the agreement.

10   An overt act is an act, even one which may be entirely innocent

11   when considered alone, but which is knowingly committed by a

12   conspirator in an effort to accomplish some object of the

13   conspiracy.  Each conspirator is liable for overt acts of every

14   other conspirator done in furtherance of the conspiracy,

15   whether the acts occurred before or after he joined the

16   conspiracy.

17             Instruction number 35:  The crimes that the defendant

18   allegedly agreed to commit, bribery concerning programs

19   receiving federal funds, and honest services mail and wire

20   fraud, are known as the objects of the conspiracy.  You must

21   unanimously agree that the conspiracy had at least one of these

22   objects, and you must unanimously agree -- you must unanimously

23   agree as to which object the government has proved beyond a

24   reasonable doubt.  The government is not required to prove more

25   than one of the objects charged.

94

Charge to the Jury

1          Instruction number 36:  Count Two charges that the

2    defendant committed honest services mail fraud through bribery.

3    Specifically, Count Two charges that on or about August 17,

4    2020, in advancing, or furthering, or carrying out the scheme

5    to defraud, a copy of the order granting request for

6    restoration of firearms in the matter of In Re Rick Tariq

7    Rahim, Case Number 19-L-1242, was mailed by the Culpeper County

8    Circuit Court Clerk's office to the Virginia State Police.

9          To sustain its burden as to Count Two, the government

10   must prove the following four elements beyond a reasonable

11   doubt.

12         First, that the defendant knowingly devised or

13   participated in a scheme to defraud the public of its right to

14   the honest services of a public official through bribery as

15   charged in Count Two.

16         Second, that the scheme or artifice to defraud

17   involved a material misrepresentation, false statement, false

18   pretense, or concealment of material fact.

19         Third, that the defendant did so knowingly and with

20   the intent to defraud.

21         And fourth, that in advancing or furthering or

22   carrying out the scheme to defraud, the defendant used the

23   mails or interstate -- used the mails or an interstate carrier,

24   or caused the mails or an interstate carrier to be used.

25         Instruction number 37:  Counts Three through Five

Charge to the Jury

1  charge that the defendant committed honest services wire fraud

2  through bribery.  To prove Counts Three through Five, the

3  government must prove the following four elements beyond a

4  reasonable doubt.

5        First, that the defendant knowingly devised or

6  participated in any scheme to defraud the public of its right

7  to the honest services of a public official through bribery, as

8  charged in Counts three through Five.

9        Second, that the scheme or artifice to defraud

10  involved a material misrepresentation, false statement, false

11  pretense, or concealment of material fact.

12        Third, that the defendant did so knowingly and with

13  the intent to defraud.

14        Fourth, that in advancing or furthering or carrying

15  out this scheme to defraud, the defendant transmitted, or

16  caused to be transmitted, any wiring, signal, or sound by means

17  of a wire communication in interstate commerce, or caused the

18  transmission of any writing, signal, or sound of any kind by

19  means of a wire communication or interstate commerce.

20        Instruction number 38:  As to the fourth element of

21  the honest services wire fraud, Counts Three through Five

22  charge that in advancing, or furthering, or carrying out this

23  scheme to defraud, the following writings, signals, or sounds

24  by means of a wire communication were transmitted or caused to

25  be transmitted in interstate commerce:  Count Three, July 7,

Charge to the Jury

1  2020, text message from Jenkins to Rahim stating, new judge

2  hasn't done any that just sign off and weren't on court docket.

3  Wants to talk to Paul about it for now and for future

4  procedures.  Good thing is that he didn't seem too concerned

5  about sliding one in during the judicial emergency period.  I'm

6  heading over to catch Paul.

7         Count Four, January 4, 2023, text message from

8  Jenkins to Rychlik stating, see you little later this morning.

9         And Count Five, October 7, 2022, deposit of check

10  number 45898 in the account of -- in the amount of $5,000,

11  drawn on Virginia National Bank, account number ending 701,

12  held in the name of Yona Systems Group into Blue Ridge Bank

13  account number ending in 133, held in the name of Scott Jenkins

14  For Sheriff.

15         Instruction number 39:  Each use of the mails and

16  each transmission by wire communication in interstate commerce

17  to advance, or to further, or to carry out the scheme or plan

18  to defraud is a separate violation of the mail or wire fraud

19  statutes.

20         Instruction number 40:  The first element of both

21  honest services mail fraud charged in Count Two, and honest

22  services wire fraud, charged in Counts Three through Five, is

23  that the defendant knowingly devised and participated in a

24  scheme to defraud the public of its right to a public

25  official's honest services through bribery.

Charge to the Jury

1          A scheme is any plan or course of action formed with

2    the intent to accomplish some purpose.  Thus, the government

3    must prove beyond a reasonable doubt that the defendant devised

4    or participated in a plan or course of action involving bribes

5    given or offered to a public official or solicited or accepted

6    by a public official.

7          It is not necessary for the government to prove that

8    the defendant was actually successful in defrauding anyone.  An

9    unsuccessful scheme or plan to defraud is as illegal as a

10   scheme or plan that is ultimately successful.

11         Instruction number 41:  Public officials, such as

12   sheriffs, owe a duty of honesty and loyalty to act in the

13   public's interest, not for that official's own enrichment.

14   When a public official devises or participates in a bribery

15   scheme, that official defrauds the public of its right to the

16   official's honest, faithful, and disinterested services.

17         Instruction number 42:  The term bribery for purposes

18   of Counts Two through Five involves the exchange of a thing of

19   value for official action by a public official.  Bribery

20   involves a *quid pro quo*, meaning this for that, or these for

21   those.  Bribery also includes offers and solicitations of

22   things of value in exchange for official action; that is, for a

23   public official, bribery includes the public official's

24   solicitation or agreement to accept the thing of value in

25   exchange for official action, whether or not the payor actually

Charge to the Jury

1    provides the thing of value and whether or not the public

2    official ultimately performs the requested official action or

3    intends to do so.

4            Where the thing or things of value solicited or

5    received by a public official are something other than a

6    campaign contribution, the government must prove a *quid pro quo*

7    or a solicitation or agreement to engage in a *quid pro quo.*

8            Where the thing or things of value solicited or

9    received by a public official are the payment of campaign

10   contributions, the government must prove a meeting of the minds

11   on the explicit *quid pro quo*.  This means that the government

12   must prove that the payments are made in return for an explicit

13   promise or understanding by the public official to perform or

14   not to perform one or more specific official acts.

15           While the *quid pro quo* for a campaign contribution

16   must be explicit, it does not have to be express.  Political

17   contributions may be the subject of an illegal bribe even if

18   the terms are not formalized in writing or spoken out loud.

19   Explicit refers not to the form of the agreement between the

20   payor and the public official, but the degree to which the

21   payor and the public official were aware of its terms.  The

22   public official and the payor need not state the *quid pro quo*

23   in express terms, for otherwise the law's effect would be

24   frustrated by knowing winks and nods.

25           Rather, the intent to exchange may be established by

Charge to the Jury

1  circumstantial evidence, based on the defendant's words,

2  conduct, acts, and all surrounding circumstances disclosed by

3  the evidence and the rational or logical inferences that may be

4  drawn from them.

5      Instruction number 43:  Bribery involves the exchange

6  of a thing of value for official action by a public official.

7  The term official act means any decision or action on any

8  question or matter, which may at any time be pending, or which

9  may by law be brought before the public official, in such

10  public official's official capacity, or in such official's

11  place of trust or profit.  This has two parts to it.

12      First, the question or matter must be specific and

13  focused and involve a formal exercise of governmental power.

14      Second, the public official must make or agree to

15  make a decision, or take or agree to take an action on that

16  question or matter.  A decision or action on a qualifying step

17  for a question or matter is an official act.  An official act

18  also includes a public official exerting pressure on another

19  public official to perform an official act or providing advice

20  to another official knowing or intending such advice will form

21  the basis of an official act by another official.

22      Setting up a meeting, hosting an event, or talking to

23  another official, without more, does not qualify as a decision

24  or action on a question or matter.  Simply expressing support

25  at a meeting, event, or call, or sending a subordinate to such

Charge to the Jury

1  a meeting, event, or call, similarly does not qualify as --

2  similarly does not qualify as a decision or action on a

3  question or matter, as long as the official does not intend to

4  exert pressure -- exert pressure on another official to provide

5  advice, knowing or intending such advice to form the basis of

6  an official act.

7        You may, however, consider evidence that a public

8  official set up a meeting -- that a public official set up a

9  meeting, hosted an event, talked to another official, expressed

10 support, or sent a subordinate as evidence of an agreement to

11 take an official act.  You may consider all the evidence in

12 this case, including the nature of the transaction, in

13 determining whether the conduct involved an official act.

14       Instruction number 44:  Because people rarely act for

15 a single purpose, a public official need not have solicited or

16 accepted the thing of value only in exchange for the

17 performance of an official action.  If you find beyond a

18 reasonable doubt that a public official solicited or received a

19 thing of value at least in part in exchange for the performance

20 of an official action, then it makes no difference that the

21 public official may have also had another lawful motive for

22 soliciting or accepting the thing of value.

23       Instruction number 45:  The government also need not

24 prove that the thing of value caused the public official to

25 change his position.  It is not a defense to claim that a

Charge to the Jury

1    public official would have lawfully performed the official

2    action in question anyway, regardless of the bribe.  It is also

3    not a defense that the official action was actually lawful,

4    desirable, or even beneficial to the public.  The offense of

5    honest services fraud is not concerned with the wisdom or

6    results of the public official's decisions or actions, but

7    rather, with the manner in which the public official makes his

8    decisions or takes his actions.

9          The second element of both honest services mail fraud

10   charged in Count Two and honest services wire fraud charged in

11   Counts Three through Five, is that the scheme or artifice to

12   defraud involved a false or fraudulent statement,

13   representation, promise, or pretense that is material, or the

14   concealment of a material fact.

15         A statement, representation, promise, pretense, or a

16   concealed fact is material if it has a natural tendency to

17   influence or is capable of influencing the decision of the

18   public entity to which it is addressed.  The government can

19   prove materiality in either of two ways.

20         First, a statement, representation, promise,

21   pretense, or concealed fact is material if a reasonable person

22   would attach importance to its existence or nonexistence in

23   deciding how or whether to act in the transaction in question.

24         Second, a statement, representation, promise,

25   pretense, or a concealed fact could be material, even though an

Charge to the Jury

1    unreasonable person would rely on it, if the person who made

2    the statement or concealed fact knew or had reason to know his

3    or her victim was likely to rely upon it.

4            In determining materiality, you should consider the

5    naivety, carelessness, negligence, or stupidity of a victim

6    does not excuse criminal conduct, if any -- does not excuse

7    criminal conduct, if any, on the part of the defendant.

8            Instruction number 47:  The third element of both

9    honest services fraud charged in Count Two and honest services

10   wire fraud -- honest services mail fraud charged in Count Two

11   and honest services wire fraud charged in Counts Three through

12   Five is that the defendant participated in the scheme knowingly

13   and with the intent to defraud.

14           The defendant acts with the intent to defraud if he

15   acts knowingly and with the specific intent to deceive for the

16   purpose of depriving the public and the government of their

17   right to a public official's honest services.  The deceit may

18   consist of the concealment of things of value that the public

19   official has solicited or received, or the public official's

20   implicit false pretense to his government employer that the

21   official has not accepted things of value in return for the

22   official action.

23           Instruction number 48:  The fourth element of honest

24   services mail fraud, charged in Count Two, is the use of the

25   United States mails of an interstate carrier.

Charge to the Jury

1        The government must prove beyond a reasonable doubt,

2   however, that the mails of an interstate carrier were, in fact,

3   used in some manner to further, or to advance, or to carry out

4   the scheme to defraud.  The government must also prove that the

5   use of the mails or the interstate carrier would follow in the

6   ordinary course of business or events and that the use of the

7   mails or the interstate carrier by someone was reasonably

8   foreseeable.

9        The government is not required to prove that the

10  defendant actually mailed anything or the defendant even

11  intended that the mails would be used to further, or to

12  advance, or to carry out the scheme or plan to defraud.  Nor is

13  it necessary for the government to prove that the item itself

14  mailed was false or fraudulent or contained any false or

15  fraudulent statement, representation, or promise, or contained

16  any request for money or a thing of value.  The government must

17  prove beyond a reasonable doubt, however, that the use of the

18  mails or the use of the interstate carrier furthered, or

19  advanced, or carried out, in some way the scheme or plan to

20  defraud.

21       Instruction number 49:  The fourth element of honest

22  services wire fraud, charged in Counts Three through Five, is

23  use of a wire communication facility in interstate commerce.

24       The government must prove beyond a reasonable doubt,

25  however, that a transmission by a wire communication facility

Charge to the Jury

1  in interstate commerce was, in fact, used in some manner to

2  further, or to advance, or to carry out the scheme to defraud.

3  The government must also prove that the use of the wire

4  communication in interstate commerce would follow in the

5  ordinary course of business, or events, or that the use of the

6  wire communication facility in interstate commerce by someone

7  was reasonably foreseeable.

8       The government need not prove that the defendant

9  actually used a wire communication in interstate commerce or

10  that the defendant even intended that anything be transmitted

11  in interstate commerce by means of a wire communication --

12  excuse me -- or that the defendant even intended that anything

13  be transmitted in interstate commerce by means of a wire

14  communication to further, or to advance, or to carry out the

15  scheme or plan to defraud.  Nor is it necessary for the

16  government to prove that the information transmitted by means

17  of wire communication in interstate commerce itself was false

18  or fraudulent or contained any false or fraudulent pretense,

19  representation, or promise.

20       The government must prove beyond a reasonable doubt

21  that the use of the wire communication in interstate commerce

22  furthered, or advanced, or carried out, in some way, the scheme

23  or plan to defraud.

24       Instruction number 50:  Counts Six through Twelve

25  charge that in the Western District of Virginia or elsewhere,

Charge to the Jury

1   the defendant, Scott Howard Jenkins, being an agent of Culpeper

2   County or the Culpeper County sheriff's office, a local

3   government or an agency thereof, both of which received

4   benefits exceeding $10,000 under federal programs involving any

5   form of federal assistance in the relevant fiscal years ending

6   on June 30, 2019, June 30, 2020, June 30, 2021, June 30, 2022,

7   and June 30, 2023, did corruptly solicit or demand for his own

8   benefit or did solicit or did agree to accept things of value

9   from the persons specified below, intending to be influenced or

10  rewarded in connection with a specific business, transaction,

11  or series of transactions, of Culpeper County or the Culpeper

12  County sheriff's office, involving something of value of $5,000

13  and more described below, in violation of 18 United States

14  Code, Section 666.

15          Count Six charges that in -- that from in or around

16  July 2019 through in or around May 2021, Scott Howard Jenkins

17  did corruptly solicit or demand for his own benefit or did

18  accept or agree or accept -- did accept or agree to accept

19  approximately $25,000 from Rick Rahim for the appointment of

20  Rick Rahim as an auxiliary deputy sheriff or Rick Rahim's

21  petition to restore his firearm rights.

22          Count Seven charges that from in or around April of

23  2019 through in or around March 2020, Scott Howard Jenkins did

24  corruptly solicit or demand for his own benefit or did accept

25  or agree to accept approximately $20,000 from Fredric Gumbinner

Charge to the Jury

1  for the appointment of Fredric Gumbinner as an auxiliary deputy

2  sheriff.

3          Count Eight charges that from in or around August

4  2022 through in or around September 2022, Scott Howard Jenkins

5  did corruptly solicit or demand for his own benefit or did

6  accept or agree to accept approximately $5,000 from James

7  Metcalf for the appointment of James Metcalf as an auxiliary

8  deputy sheriff.

9          Count Nine charges that in or around September 2022

10 through in or around October 2022, Scott Howard Jenkins did

11 corruptly solicit or demand for his own benefit or did accept

12 or agree to accept $5,000 from Thomas Cooper for the

13 appointment of Thomas Cooper as an auxiliary deputy sheriff.

14         Count Ten charges that from in or around October 2022

15 through in or around November of 2022, Scott Howard Jenkins did

16 corruptly solicit or demand for his own benefit or did accept

17 or agree to accept $5,000 from Undercover Agent 1, Jerry McKee,

18 for the appointment of Undercover Agent 1 as an auxiliary

19 deputy sheriff.

20         Count 11 charges that from in or around November 2022

21 through in or around December 2022, Scott Howard Jenkins did

22 corruptly solicit or demand for his own benefit or did accept

23 or agree to accept $10,000 from Undercover Agent 2, Mike, for

24 the appointment of Undercover Agent 2 as a deputy -- auxiliary

25 deputy sheriff.

Charge to the Jury

1          Count 12 charges that from in or around September

2   2022 through in or around December of 2022, Scott Howard

3   Jenkins did corruptly solicit or demand for his own benefit or

4   did solicit -- or agree to accept -- did accept or agree to

5   accept approximately $5,000 from Philip Howell for the

6   appointment of Philip Howell as an auxiliary deputy sheriff.

7          Instruction number 51:  To prove the crime of bribery

8   concerning programs receiving federal funds as charged in

9   Counts Six through Twelve, the government must prove the

10  following five essential elements beyond a reasonable doubt.

11         We have four elements listed, counsel.

12         Must prove the following four essential elements

13  beyond a reasonable doubt.

14         First, that the defendant was, at the time alleged,

15  an agent of a local government or agency that received, in any

16  one-year period that includes commission of the offense,

17  benefits in excess of $10,000 under a federal program involving

18  any form of assistance.  The parties have stipulated that both

19  Culpeper County, a local government, and the Culpeper County

20  sheriff's office, an agency thereof, received benefits in

21  excess of $10,000 under one or more federal programs in the

22  fiscal years ending June 30, 2019, June 30, 2020, June 30,

23  2021, June 30, 2022, and June 30, 2023.

24         Second, that the defendant solicited or demanded for

25  the benefit of any person, or accepted or agreed to accept,

Charge to the Jury

1   anything of value from any person.

2          Third, that the defendant intended to be influenced

3   or rewarded in connection with any business, transaction, or

4   series of transactions of a local government or agency

5   involving anything of value of $5,000 or more.

6          And four, that the defendant did so corruptly.

7          Instruction number 52:  Agent means a person

8   authorized to act on behalf of any other person or a

9   government, and in the case of an organization or government,

10  includes a servant or employee, partner, director, officer,

11  manager, or representative.

12         Instruction number 53:  The phrase business or

13  transaction or series of transactions refers to the business of

14  the covered entity; here, Culpeper County or the Culpeper

15  County sheriff's office.  The business, transaction, or series

16  of transactions must be a discrete and actionable -- must be a

17  discrete actionable item under the purview of the covered

18  entity.  It cannot be something as general as broad policy,

19  policy matters relevant to the covered entity.  The terms

20  business or transaction do not include a typical meeting, call,

21  or event without more.

22         The following actions performed or agreed to be

23  performed by the public official, without more, are not

24  sufficient to establish a violation of 18 United States Code,

25  Section 666:  Setting up a meeting, hosting an event, talking

Charge to the Jury

1  to another official, sending a subordinate to a meeting, or

2  simply expressing support for a constituent.  You may, however,

3  consider evidence that a public official took these -- took

4  those actions as evidence of a corrupt agreement and the

5  government may satisfy its burden by proving that the public

6  official took those actions in order to exert pressure on

7  another official, or to provide advice to another official,

8  knowing or intending such advice to form the basis for action

9  by that official.

10        You may consider all the evidence in the case,

11  including the nature of the transaction, in determining whether

12  the conduct constituted a violation of the statute.

13        Instruction number 54:  The government must prove

14  that the value of the business, transaction, or series of

15  transactions at issue was $5,000 or more.  You may consider the

16  value of the alleged bribe as evidence of the value of the

17  business, transaction, or series of transactions; however, you

18  must still find that the value of the business, transaction, or

19  series of transactions itself was $5,000 or more, and you may

20  use any evidence in the case in determining value.

21        Instruction number 55:  The government does not have

22  to prove that federal funds were involved in the bribery

23  transaction or that the bribe had any particular influence on

24  federal funds.

25        Instruction number 56:  An act is done corruptly if

Charge to the Jury

1  it is done with the intent to engage in some more or -- in some

2  more or less specific *quid pro quo*; that is, to give a specific

3  benefit in return for a payment, or to be induced to commit a

4  specific act.  A payment is solicited, demanded, accepted, or

5  agreed to be accepted with corrupt intent only if it was done

6  with the intent to be corrupted.  Not every payment made to

7  influence or reward an official is made with intent to be

8  corrupted.  One has the intent to be corrupted only if he

9  solicits, demands, accepts, or agrees to accept a payment with

10 the intent to engage in a fairly specific *quid pro quo* with the

11 payor.  The defendant must have intended to engage in some

12 specific act or omission or course of action or inaction in

13 return for the payment charged in the superseding indictment.

14 Where the things of value -- where the thing or things of value

15 solicited or received by a public official are the payment of

16 campaign contributions, the government must further prove a

17 meeting of the minds on the explicit *quid pro quo*.

18          Instruction number 57:  To influence means that a

19 payment was made before the official action.  To reward means

20 that a payment was made afterwards.  Payments made to influence

21 official action and to reward official action are both

22 prohibited, but payments made without corrupt intent are not

23 criminal acts.

24          Payments made with no more than some generalized hope

25 or expectation of ultimate benefit on the part of the donor,

Charge to the Jury

1    sometimes referred to as goodwill gifts, are not bribes, since

2    they are not made with the intent to engage in a specific *quid*

3    *pro quo* with an official.

4         Ladies and gentlemen, those are the 57 instructions

5    of the Court.  Thank you very much for your attention.  It is

6    now ten till 1.  Can you all be back by a quarter till 2?

7    That's a little bit short of an hour -- or do you want to go

8    until 2:00?  And then we're going to have our closing arguments

9    and then we'll go -- then you all will begin to deliberate.

10        MALE JUROR:  Quarter of 2 is fine.

11        THE COURT:  Quarter of 2 is spoken.  So we'll all be

12   back and be ready to go at quarter till 2.

13        So recess the jury until a quarter to 2.

14   **(**Jury out, 12:54 p.m.**)**

15        THE COURT:  You all have a seat.  I want to talk

16   about instruction 51.  But otherwise, any other -- any

17   objections to the instructions given?

18        MS. CHOY:  No, Your Honor.

19        THE COURT:  From the defendant?

20        Okay.  Instruction 51, no matter how many times we

21   read these things -- it said the following five essential

22   elements, and then we listed four.

23        MS. CHOY:  I apologize for the oversight, Your Honor.

24        THE COURT:  Well, no, no, no.  Here's what I'd like

25   you all to do.  I simply interlined it on the set of

Charge to the Jury

1  instructions that I gave to the jury.  I'll interline it on

2  this set of instructions.  But what I'd like you to do -- so it

3  actually works out -- can you all just double-check the

4  instructions and make sure that we have not somehow left off an

5  element?  If we have, then we can give it to them.

6         Ms. Choy?

7         MS. CHOY:  Your Honor, I actually know why that

8  happened, because as I was editing, I was thinking about

9  breaking out the agency element into a separate element from

10  the federal funds, and then I decided not to make that change,

11  but I must not have corrected the five versus four.

12         THE COURT:  Okay.  So we're satisfied it's four

13  elements?

14         MS. CHOY:  Yes, Your Honor.

15         THE COURT:  So I'll interline it on this that will go

16  back with them, so it will be corrected there.

17         With that, why don't we come back -- we'll be ready

18  to go at 1:45.  And if for some reason we think we need to come

19  back in any earlier, then we will.  Otherwise, we'll stand in

20  recess until 1:45.

21         (Recess.)

22         THE COURT:  Back on the record in the matter of

23  *United States v. Jenkins*.  Let the record reflect the

24  government is present by its counsel.  The defendant likewise

25  is present by counsel.

Charge to the Jury

1           Just to make sure that I'm clear, I got the verdict

2    form that was sent over with the joint edits.  We printed it

3    out and gave it to you all.  I want to make sure there's no

4    objection, if you've had a chance to review it and make sure

5    it's the verdict form you wanted.

6           No objection from the government, Ms. Choy?

7           MS. CHOY:  None, Your Honor.

8           THE COURT:  Mr. Caleb?

9           MR. CALEB:  No objection.

10          THE COURT:  Okay.  All right.  So we'll go over that.

11          Also, we forwarded around to you all the forfeiture

12   instructions.  And during closing, Ms. Curry-Ledbetter will

13   finalize the verdict form.  It's going to depend upon how many

14   counts there are.  It's easier to take things away than to add

15   them -- it's quicker to take them away.  So she's going to do a

16   verdict form with everything.

17          What I'd like to do is -- I know everyone is going to

18   exhale once the jury goes out -- is just to take the time that

19   we need to make sure those instructions are what we want them

20   to be so that when the jury comes back, if there is a guilty

21   verdict, we can make any changes that are necessary promptly,

22   because we're going to have to tell them they can't go

23   anywhere, and send them back out.

24          Otherwise, are we ready for the jury?

25          MS. CHOY:  Yes, Your Honor.

Closing Argument by Ms. Choy

1           MR. ANDONIAN:  Yes, Your Honor.

2           THE COURT:  Let's bring the jury in.

3  (*Jury in, 1:55 p.m.*)

4           THE COURT:  Ladies and gentlemen, please have a seat.

5           Ladies and gentlemen, we have come to that point in

6  the trial where it is time for counsel to make their closing

7  arguments.

8           Ms. Choy, I'll give the government the first

9  argument.

10          MS. CHOY:  Thank you, Your Honor.

11          Is the presentation being published to the jury?

12  Thank you.

13                CLOSING ARGUMENT BY MS. CHOY

14          Ladies and gentlemen, good afternoon.  When Ms. Smith

15  stood before you last week, she told you that this is a case

16  about a corrupt sheriff, a sheriff who took an oath to uphold

17  the law, but instead chose to break it; a sheriff who was

18  duty-bound to serve and protect the people of Culpeper County,

19  the people who elected him, but instead chose to serve himself;

20  a sheriff who exploited the powers of his office to enrich

21  himself and to raise funds for his campaign so that he could

22  stay in power.

23          Well, now, ladies and gentlemen, you have seen the

24  evidence.  And what you've seen over the course of this trial

25  shows that for years Scott Jenkins took bribes, envelope after

Closing Argument by Ms. Choy

1  envelope stuffed with cash, checks to his re-election campaign.

2  And those envelopes full of cash, those checks, they came from

3  wealthy businessmen, people who had no real law enforcement

4  training, no real experience, no connection to Culpeper County,

5  no commitment to public service.  All they wanted was a badge.

6  And for a starting price of $5,000, Scott Jenkins was happy to

7  oblige.  That, ladies and gentlemen, is bribery, plain and

8  simple.

9       Now, Judge Ballou just instructed you on the law of

10 bribery, and there were a lot of details.  I will go over those

11 details with you in a little bit.  But the thing to remember is

12 that at bottom, the crime of bribery is a *quid pro quo*, that

13 Latin phrase you've now heard so many times.  It means "this

14 for that," a thing of value in exchange for an official act.

15 And let me make one point about the law clear right now,

16 because that *quid*, that thing of value, it can be anything of

17 value.  It can be money.  It can be a campaign contribution.

18 Just because something is a campaign contribution does not mean

19 it's not a bribe.  The question then becomes, was it given as

20 part of an explicit *quid pro quo*.  That question is at the

21 heart of what you must decide in this case.  It's at the bottom

22 of every charge in this case.

23      So what I'm going to do now is walk you through the

24 evidence and show you why it proves beyond a reasonable doubt

25 that Scott Jenkins engaged in a *quid pro quo*.  And after that,

Closing Argument by Ms. Choy

1    I'm going to circle back to the charges in this case and go

2    through each and every element with you and explain how the

3    government has proven those elements beyond a reasonable doubt.

4              So let's start with the facts.  Let's go back in time

5    to the summer of 2019.  Scott Jenkins is running for

6    re-election and it's a contested race.  He has an opponent.  He

7    needs money.  So he reaches out to his old pal, his right-hand

8    man, Kevin Rychlik.  He says he wants to build his war chest.

9    And remember, by this time, Scott Jenkins and Kevin Rychlik

10   have had a corrupt relationship for years.  Kevin Rychlik would

11   go out and recruit bribe payers, he would bring them to Scott

12   Jenkins, and they would give him money in exchange for a badge.

13   So when Scott Jenkins reached out to Kevin Rychlik about his

14   war chest, Kevin Rychlik knew exactly what he wanted him to do,

15   and that's what he did.  He brought in Rick Rahim, the big

16   fish.  And he sets up a meeting, a meeting between Scott

17   Jenkins and Rick Rahim.  That meeting took place on July 31st,

18   2019.  And during that meeting, Scott Jenkins and Rick Rahim

19   reached a corrupt agreement.  Rick Rahim told you exactly what

20   that corrupt agreement consisted of.  Scott Jenkins agreed to

21   help him with the restoration of his firearms rights, to help

22   him with his concealed carry permit, and to swear him in as a

23   deputy.  And in exchange, Rick Rahim agreed to give him money

24   and in-kind contributions to his campaign.

25              You heard from the other participant in that meeting,

Closing Argument by Ms. Choy

1  Kevin Rychlik.  He said the exact same thing.  In that meeting,

2  Scott Jenkins agreed to help Rick Rahim with his firearms

3  rights and to issue him a badge, and in exchange, Rick Rahim

4  agreed to provide monetary support and in-kind contributions.

5  So there's your first *quid*, your first thing of value, $15,000

6  in cash that was given after that meeting from Rick Rahim to

7  Scott Jenkins in a manila envelope.

8        A few weeks later, September 19th, 2019, Scott

9  Jenkins and Rick Rahim meet again.  They go out to dinner,

10 Ruth's Chris Steakhouse.  And at that dinner, Rick Rahim hands

11 Scott Jenkins another envelope full of cash; this time $10,000.

12 At that same meeting, Rick Rahim gives Scott Jenkins two checks

13 totaling $35,000, this purported loan.  Let's put that to the

14 side for a moment and focus on the cash.  Because a couple of

15 weeks later, Rick Rahim recruits Fred Gumbinner into the

16 corrupt scheme.  He gets $20,000 from Fred Gumbinner.  And Fred

17 Gumbinner told you that he intended Rick Rahim to give that

18 money to Scott Jenkins in exchange for a badge.  So Rick Rahim

19 reaches out to Scott Jenkins.  He says, I have been busy

20 getting you more donors.  Have 20K cash in hand from friends

21 from the campaign.  The two of them meet again for dinner, and

22 Rick Rahim gives that cash to Scott Jenkins, $45,000.

23       Now, Scott Jenkins does not dispute that he received

24 all that cash from Rick Rahim, and he doesn't dispute that he

25 never reported any of it as a campaign contribution.

Closing Argument by Ms. Choy

1         So move ahead to late 2021.  Scott Jenkins is

2  thinking ahead again to his re-election campaign.  He reaches

3  out to Kevin Rychlik.  He wants to build the war chest.  What

4  he doesn't know is by this time Kevin Rychlik is talking to the

5  government.  And in the summer of 2022, Kevin Rychlik begins

6  his active cooperation with the government.  He keeps doing

7  what he's been doing for years, recruiting bribe payers and

8  bringing them to Scott Jenkins to buy badges.  But this time,

9  he's wearing a wire, and he's reporting all of his activities

10 back to the FBI.  And what those tapes, those recordings that

11 Kevin Rychlik made show is that Scott Jenkins is running a

12 well-oiled bribery machine.  Each time is pretty much the same.

13 Kevin Rychlik finds a bribe payer.  They send the driver's

14 license to Pete Siebel to run a brief background check.  Scott

15 Jenkins signs off on the oath order.  The bribe payer travels

16 down to Culpeper.  They meet with the sheriff, get a tour of

17 the sheriff's office, maybe they go to lunch.  And that bribe

18 payer has brought with them their cash bribe or their check

19 because they know that that's the deal.  At some point during

20 the day, the bribe payer hands that money to Scott Jenkins.

21 Now remember, each of the bribe payers you heard from told you

22 they understood full well that this was an exchange, and they

23 told you that when they handed that money to Scott Jenkins, he

24 didn't bat an eye.  He was expecting it.  That's because he

25 knew it was an exchange too.  And then, like clockwork, the

Closing Argument by Ms. Choy

1   sheriff gives them a badge.

2           So let's talk about these bribe payments.  September

3   7, 2022, Jim Metcalf gives a check for $5,000 to Scott

4   Jenkins's campaign.  October 26, 2022, Tom Cooper, another

5   check, also $5,000, made out to Scott Jenkins's campaign.

6   November 14th, 2022, the first undercover agent, Jerry McKee,

7   he gives Scott Jenkins an envelope which Scott Jenkins puts in

8   his breast pocket.  And what's inside that envelope?  $5,000 in

9   cash.  December 26, 2022, the second undercover agent, that's

10  the one who goes by the name Mike.  Now, Mike was a little

11  different because his backstory is that he's a convicted felon

12  who wants to carry a gun, and he's willing to pay extra to make

13  that happen.  Kevin Rychlik tells that to Scott Jenkins.  Scott

14  Jenkins says, I'll just personally walk it through.  Then he

15  tells Pete Siebel not to run the usual criminal history check.

16  Scott Jenkins approves Mike to be sworn in anyway, and when

17  Mike comes to Culpeper, he gives him $10,000 in cash.  The next

18  day, Phil Howell hands Scott Jenkins an envelope with $5,000 in

19  cash.  Remember, he said that was in $100 bills that he had

20  recently taken out of the bank.  The last one, Rubar Sandi, on

21  January 4th, 2023, hands Scott Jenkins a gift bag containing

22  $5,000 in cash.

23          So there, ladies and gentlemen, you have your *quid*,

24  your things of value, $80,000, the vast majority of which was

25  in cash that never went into the campaign account and was never

Closing Argument by Ms. Choy

1    reported on Scott Jenkins For Sheriff's campaign finance

2    disclosures.  Scott Jenkins doesn't deny any of that.

3            So now let's talk about the *quo*.  Let's start with

4    Rick Rahim.  The first thing Rahim wanted was help with his

5    firearms restoration permit.  Scott Jenkins delivered on his

6    end of the bargain.  He created a fake lease agreement so that

7    Rick Rahim could make it look like he lived in Culpeper.  It

8    was for an old farmhouse belonging to Scott Jenkins's brother.

9    And Scott Jenkins knew full well that he didn't live there.

10   You heard him on a recorded conversation saying just this.  But

11   he aligned his story with Rick Rahim so that the two of them

12   could make it look as though Rick was living in that farmhouse.

13   Here's Scott Jenkins describing the property.  And you heard

14   Scott Jenkins today say, well, it was just some details.  But

15   it's not just the property.  It's the house itself.  Old white

16   farmhouse and barn; if he was living there, wouldn't he know

17   that?  And Rick Rahim also wanted to align the story just in

18   case it came up.  But even though he knew that Rick Rahim

19   didn't live in Culpeper, didn't meet that statutory

20   requirement, Scott Jenkins personally walked that permit into

21   the Culpeper County Clerk's office.  Sorry, I should have said

22   petition.  And Scott Jenkins assures the Assistant

23   Commonwealth's Attorney that Rick Rahim is, indeed, living in

24   his brother's farmhouse.  And then he goes to work pressuring

25   other local officials to push that petition through.  And it

Closing Argument by Ms. Choy

1  works.  Rick Rahim gets his firearms rights restored.

2          The second thing Rick Rahim wants is a badge.  He

3  told you why he wanted that.  He wanted to get professional

4  courtesy to get out of speeding tickets, and he wanted to be

5  able to carry a firearm in all 50 states without having to

6  apply for a permit.  Scott Jenkins made that happen, too.  He

7  swore in Rick Rahim and he issued him a badge and official

8  credentials.  He even issued him a county firearm.

9          The next bribe payer is Fred Gumbinner.  Fred

10 Gumbinner wanted a badge.  Scott Jenkins made that happen.

11         And now let's go to the fall of 2022.  Each of these

12 bribe payers wanted the same thing, a badge.  And remember,

13 there's that longstanding corrupt relationship between Kevin

14 Rychlik and Scott Jenkins, where Scott Jenkins will swear in

15 anyone that Kevin Rychlik brings in for money.  And that's

16 exactly what happened with these six men.

17         Jim Metcalf:  The same day he gives the check, he

18 gets his badge.  Tom Cooper:  Same day he gets the check, he

19 gets his badge.  Undercover Agent 1, Jerry McKee meets the

20 sheriff for the first time, same day gets his badge.

21 Undercover Agent 2, same deal, meets the sheriff, pays his

22 bribe, gets his badge.  Phil Howell, same story.  Rubar Sandi,

23 meets the sheriff, pays his bribe, gets his badge.

24         Ladies and gentlemen, everyone involved in this

25 scheme, they knew the deal:  A bribe for a badge.  This was a

Closing Argument by Ms. Choy

1   *quid pro quo*, plain and simple.

2        Yesterday, Scott Jenkins took the stand, and he told

3   you a different story.  And that story was full of lies.  Now,

4   let's talk about why those were lies.  But first, let's start

5   with who Scott Jenkins is, because he's told you a lot about

6   who he is.  Scott Jenkins is someone who knows how to spin.  He

7   knows how to tell a story to justify his actions after the

8   fact.  Here he is talking about Rick Rahim and how he'd spin

9   that story if it ever came back to bite him.

10       (Audio playing.)

11       MS. CHOY:  Ladies and gentlemen, Scott Jenkins told

12  you himself he's good at spinning a story.  You also heard from

13  Pete Siebel, former deputy, that Scott Jenkins likes to use a

14  term called feasible deniability, also known as plausible

15  deniability.  Scott Jenkins liked to be able to separate

16  himself from a situation so that he could deny it later.  Pete

17  Siebel told you that Scott Jenkins likes to keep himself

18  layered away from bad acts.  He likes to be able to blame

19  others.  And you heard that over and over again yesterday when

20  Scott Jenkins took the stand.  If it's about the general

21  orders, well, that's Chad McKnight's responsibility.  If it's

22  background checks, that's on Pete Siebel.  If it's the campaign

23  finance reports, go ask David Jones or David Myers.  If it's

24  the selection of auxiliaries, point the finger at Kevin

25  Rychlik.  It's never Scott Jenkins's responsibility.  There's

Closing Argument by Ms. Choy

1  always someone else to blame.

2         Scott Jenkins also told you on a recorded

3  conversation that he likes to leave himself two or three

4  avenues out.  He's always thinking ahead.  He's always got an

5  escape plan.  Here he is again talking about what he'd do if

6  Rick Rahim ever tried to make trouble for him.

7         (Audio playing.)

8         MS. CHOY:  When you listen to this recording, ask

9  yourself:  Do these sound like the words of an honest cop?  Of

10 course not.  Scott Jenkins told you who he is.  Believe him.

11        So that's -- so the first lie that Scott Jenkins told

12 you is that the cash he took from Rahim was some kind of

13 business venture.  That's just absurd on its face.  Scott

14 Jenkins wants you to believe that Rick Rahim gave him $45,000

15 in cash, having barely met him, as an investment in some kind

16 of T-shirt business.  That's just not believable.  But let's

17 look at the evidence.

18        From the beginning, it was clear that Rick Rahim was

19 being brought in for one thing and one thing only:  Money.

20 Here's Scott Jenkins reaching out to Kevin Rychlik over and

21 over again in the summer of 2019 asking him to find donors.

22 And that's when Kevin Rychlik brings in Rick Rahim.  And it was

23 equally clear what Rahim wanted in exchange:  Help with his

24 firearms rights, and auxiliary credentials.

25        (Audio playing.)

Closing Argument by Ms. Choy

1           MS. CHOY:  Sorry, ladies and gentlemen.

2           But you don't have to take it just from Kevin

3   Rychlik, because Scott Jenkins told you about this himself in a

4   recorded conversation.  Scott Jenkins told you that he had

5   formed a corrupt agreement with Rahim.  Let's listen to his

6   words.

7           (Audio playing.)

8           MS. CHOY:  Doing more than I told him originally.

9   He's referring back to that corrupt agreement, and it's exactly

10  what Rick Rahim and Kevin Rychlik told you it was.  That wasn't

11  the only time that Scott Jenkins talked about his corrupt

12  agreement with Rahim.  Let's listen again.

13          (Audio playing.)

14          MS. CHOY:  Ladies and gentlemen, this was a *quid pro*

15  *quo*.  Scott Jenkins told you so himself.

16          But let's talk about some more lies that Scott

17  Jenkins told.  Remember that $35,000 loan?  Scott Jenkins told

18  Rick Rahim that that was for the construction of his home.

19  That's right there in the documents.  But he didn't use that

20  money for home construction.  He deposited the checks into his

21  brother's bank account and then he laundered them through into

22  his own account in a series of cash and check transactions.

23  Then he used it to pay off his personal credit cards.  Scott

24  Jenkins lied even to Rick Rahim.  He never paid that money

25  back.  And then he lied on his ethics disclosures where he said

Closing Argument by Ms. Choy

1    he didn't owe anyone more than $5,000, and he lied to his bank

2    when he omitted that as a liability on his application.  And by

3    the way, in that application, he acknowledged that he

4    understood that lying on that form is a crime.

5            Remember Special Agent Medearis's analysis.  In that

6    time period, the fall of 2019, Scott Jenkins was in debt.  He

7    was living beyond his means.  He needed money to pay off his

8    credit cards.  So he was highly motivated to take these bribes.

9            Let's talk about some more lies that Scott Jenkins

10   told you.  Now, the testimony about Fred Gumbinner was a bit

11   confusing.

12           Here's what Scott Jenkins said:  You never took

13   $20,000 from Fred Gumbinner; that's your testimony?

14           No -- yes, uh-huh.

15           But ultimately, he claimed that that full $45,000

16   from the fall of 2019 from Rick Rahim was some kind of

17   investment in a business venture, and he repeated that this

18   morning on the stand.  That wasn't true.  Let's see what the

19   evidence shows.

20           Here is a text message where Rick Rahim tells Scott

21   Jenkins he has the 20K in hand.  He says, I have been busy

22   getting you more donors.  Have 20K in hand from friends from

23   the campaign.

24           And here's Scott Jenkins's response.  Not a word

25   about the money being for a business venture.

Closing Argument by Ms. Choy

1         Here are Scott Jenkins's texts with Kevin Rychlik the

2    day after he got Gumbinner's $20,000.  Again, nothing about a

3    business venture.  But what happened next is even more

4    important, because Rick Rahim started to get frustrated that

5    Fred Gumbinner hadn't gotten sworn in yet after spending all

6    that money.  So he reaches out to Scott Jenkins.

7         Here's his text:  Rick giving me crap about Fred not

8    getting sworn in yet after putting up all that money.

9         And then he forwards text messages from Rick Rahim to

10   Scott Jenkins.  I have to give him back 20K now and apologize

11   for being a liar.  I told him it was a done deal.  I look

12   ridiculous now.

13        And another one:  We've had his 20K for six plus

14   months, Kevin.  He's gotten nothing.  He makes me millions of

15   dollars.  I have to maintain credibility.  That's my world.  I

16   have to give the money back or I have to set a date for him.  I

17   was sure you would at least put everything through by now and

18   all we needed was to get him sworn.

19        And after those text messages, Scott Jenkins calls

20   Kevin Rychlik.  It's right there in the phone records.  And

21   what does he say?  Does he say, what are you talking about,

22   Kevin?  I never got any money from Fred Gumbinner?  Does he

23   say, there has been some kind of misunderstanding, we have to

24   give this gentleman his money back to clear this up?

25        No.  He keeps the money and he gets Fred Gumbinner

Closing Argument by Ms. Choy

1    sworn in.

2            So after that phone call, Kevin Rychlik calls Rick

3    Rahim to give him the good news, and then Rick Rahim confirms

4    with Scott Jenkins.  And sure enough, the next week, Fred

5    Gumbinner becomes an auxiliary deputy.

6            Ladies and gentlemen, this is devastating evidence of

7    bribery.  Some things you can't spin.  The *quid pro quo* is

8    right there, black and white.  And Scott Jenkins lied to you

9    about it on the stand under oath.

10           So let's turn now to those more recent bribes in the

11   fall and winter of 2022.  Scott Jenkins has admitted to you

12   that he took things of value from six men during that period,

13   and he's admitted that he performed an official act for each of

14   them, making them an auxiliary deputy.  But he denies that

15   there's any connection between the two.  He says it's just some

16   kind of big coincidence.  Ladies and gentlemen, that is not

17   believable on its face.  But let's talk about some reasons why

18   it's not believable.

19           Before I do, a note about the law.  You've heard some

20   suggestions during this trial that Scott Jenkins never

21   expressly said to these bribe payers, I will swear you in if

22   you pay me a bribe.  Under the law, he doesn't have to.  The

23   public official and the bribe payer don't have to state the

24   *quid pro quo* in express terms.  And that's because otherwise,

25   the law's effect could be frustrated by knowing winks and nods.

Closing Argument by Ms. Choy

1    So instead, what this instruction says is look at the

2    circumstantial evidence:  The defendant's words, conduct, acts,

3    and all the surrounding circumstances.  This instruction is

4    telling you to use your common sense, look at what happened,

5    and draw the obvious conclusions.

6            So let's make a few points about why this is not a

7    believable story.  And by the way, ladies and gentlemen, don't

8    get me wrong here, the defendant has no burden of proof.  The

9    entire burden of proof is on the government.  We accept that

10   burden and we believe we've met it.  But I'd like to talk to

11   you about why the evidence shows that this was a *quid pro quo*.

12           So first of all, Scott Jenkins and Kevin Rychlik have

13   a long-standing corrupt relationship.  They talk about it in

14   the text messages.  Here is one from January 1st, 2020.  This

15   was the first day of Scott Jenkins's new term in office, the

16   first day he could swear in auxiliaries for that term.  And

17   here's what he says -- here's what Rychlik says.  He reaches

18   out.  He's got five or six VASARS supporters ready to go, 5K

19   each.  Scott Jenkins's response?  Sounds good, man, ready

20   whenever.  Here's another one.  Kevin Rychlik reaches out and

21   says he has two new guys.  They're big money, help starting

22   right away.  Scott Jenkins knows exactly what he's talking

23   about.  He says, I'll get Bernie the info from you to process

24   through.

25           Now, remember, Bernie is Bernie Feaganes.  At that

Closing Argument by Ms. Choy

1  time, he was the one processing the paperwork for auxiliaries.

2  Scott Jenkins knows exactly what Kevin Rychlik is talking

3  about.

4         Kevin Rychlik goes further.  I told them 5K each a

5  year support with 5K each coming in, and lots more on

6  re-election years.

7         One more.  Here's Kevin Rychlik again.  Mike Duggin,

8  he was good for a couple of good money hits.  Willing to do

9  same if you want to get him re-sworn.

10        Scott Jenkins's response?  Sure.

11        He agreed to the *quid pro quo*.

12        So by 2022, there is no need for these individuals to

13  state the *quid pro quo* in express terms, because Kevin Rychlik

14  and Scott Jenkins, they already know the deal.

15        Now, a word about Kevin Rychlik, because you've heard

16  suggestions throughout this trial that this was all Kevin

17  Rychlik, that Scott Jenkins didn't know what was going on.

18  Well, Kevin Rychlik told you that he was acting with Scott

19  Jenkins's full knowledge and approval.  And that's backed up by

20  those tapes.  You heard them over and over and over again.

21  Kevin Rychlik updating Scott Jenkins on his progress, telling

22  him how many guys we've got lined up, telling him how much

23  that's worth.  Scott Jenkins knew exactly what Kevin Rychlik

24  was doing.  And under the law, if you order or direct someone

25  to do something, or you authorize or consent to it, then you're

Closing Argument by Ms. Choy

1  responsible for that conduct.

2          So now let's turn to Scott Jenkins's own words during

3  that fall of 2022 period, because he acknowledged the existence

4  of a *quid pro quo* relationship.

5          (Audio playing.)

6          MS. CHOY:  Jim Metcalf ready to plop down 5K, and in

7  exchange, put your boot behind Pete.  Pete was the one

8  processing the auxiliary paperwork.  Scott Jenkins knows

9  exactly what's going on here.

10          Here's another one.

11          (Audio playing.)

12          MS. CHOY:  $10,000 guys and you'll never hear from

13  them.

14          Here's another one.

15          (Audio playing.)

16          MS. CHOY:  Scott Jenkins knows what his part is.  He

17  knows it's a *quid pro quo*.  You heard it in his own words.

18  Let's talk about another reason you know this story isn't true.

19  The auxiliary program, it was a sham.  Now, the sheriff's

20  office had a general order governing the auxiliary program, and

21  Scott Jenkins -- he tried to tell you he's never seen that

22  order.  But ask yourself -- he also told you that he was trying

23  to stand up this big auxiliary program.  He was trying to

24  expand it.  It was going to involve search and rescue.  It was

25  going to involve lots more auxiliaries.  Ask yourself:  If

Closing Argument by Ms. Choy

1  you're the head of the office and you're standing up a new

2  program, wouldn't you want to know if your office has policies

3  in place governing that program?  But in any event, it doesn't

4  matter, because this general order, it shows you what an

5  auxiliary program is supposed to look like, a real auxiliary

6  program.  It involves a proper hiring process.  It involves

7  proper training.  It involves real service requirements.  But

8  this program that Scott Jenkins was running had none of that.

9        Here is Pete Siebel's testimony.  Other than that

10  criminal history check, there was no vetting.  Here he is

11  again.  None of these guys ever came back to receive any

12  training or to do any volunteer work.  And that's what those

13  bribe payers themselves told you.  They told you there was no

14  expectation of training, no real vetting, and no expectation of

15  any actual service.

16        Now, you heard a few times from Scott Jenkins that he

17  had authority to appoint whoever he wants.  And that may be

18  true, but if you were trying to set up a real auxiliary

19  program, is this how you would do it?  Of course not.  There

20  was no auxiliary program.  This is just spin.

21        Now I'd like to talk to you about these bribe

22  payments, because you heard some suggestions that these were

23  just genuine legitimate campaign contributions.  Let's take a

24  look at that.  With the exception of the two checks, none of

25  this money went into the campaign account, and none of it was

Closing Argument by Ms. Choy

1  reported as a campaign contribution.  Now, as I mentioned,

2  under the law, campaign contributions can be bribes.  You just

3  have to find an explicit *quid pro quo*.  So that's not the

4  question here.  The question is:  Are these legitimate campaign

5  contributions?  If they're not, then there's no legitimate

6  explanation for why Scott Jenkins is getting these payments.

7          So all that cash that wasn't deposited, we can't

8  trace all of it.  Remember David Jones's testimony, cash is

9  hard to trace.  Checks leave a paper trail.  Cash doesn't.  But

10 we've been able to trace a little bit of it.  So remember Scott

11 Medearis's testimony.  After that July 31st meeting where Rick

12 Rahim gives that first $15,000 cash bribe, that's when we start

13 seeing the large cash deposits into Scott Jenkins's account.

14 And how about those more recent transactions?  December 29th,

15 2022, Phil Howell hands Scott Jenkins a white envelope with

16 $5,000 in cash in $100 bills.  Two days later, Scott Jenkins

17 goes to the Dulles Gun Expo.  He purchases a firearm with cash

18 that he takes out of a white envelope.  And we've seen that

19 cash, $100 bills, crisp, $3,000.  So from that $5,000, he spent

20 $3,000, and there's $2,000 cash remaining.

21         Now, there are some suggestions that perhaps that

22 money came from Scott Jenkins's personal safe, that he went in,

23 and he grabbed some money, and he wasn't sure which it was.

24 But why would he have many envelopes full of cash sitting in

25 his personal safe?

Closing Argument by Ms. Choy

1          A few days later, January 4th, 2023, Rubar Sandi

2   gives Scott Jenkins another $5,000 in cash.  Where does that

3   go?  About an hour after Rubar Sandi leaves, there is a $7,000

4   deposit into Scott Jenkins's personal bank account, $5,000 from

5   Rubar Sandi, plus the $2,000 left over from Phil Howell.

6          The last way you know this is a *quid pro quo* is that

7   Scott Jenkins tried to cover it up.  He knew he was doing

8   something wrong.  Now, remember, he's a trained law enforcement

9   officer.  He knows how crime is detected.  He knows the tools

10  that law enforcement officers have to track down criminal

11  activity.  And he's careful.  He tried to cover his tracks, but

12  he didn't cover them all.

13         So we know that Scott Jenkins didn't want his

14  lieutenant communicating about this scheme via text.

15         (Audio playing.)

16         MS. CHOY:  Why not?  Because texts leave a record.

17  And we know that he didn't want information about this scheme

18  getting out even within his own office.

19         (Audio playing.)

20         MS. CHOY:  If this was all legitimate, if this was

21  all above board, why the secrecy?

22         He tried to cover it up in other ways, too.  He

23  encouraged the bribe payers to pay in cash, and said that he

24  could funnel that money through other people and report it

25  under other names.  Here's what he said.

Closing Argument by Ms. Choy

1          (Audio playing.)

2          MS. CHOY:  And this wasn't a one-time thing.  He said

3    this over and over again.  Here's another one.

4          (Audio playing.)

5          MS. CHOY:  Scott Jenkins tried to explain this when

6    he took the stand.  And you observed him.  You saw his

7    demeanor.  You heard his answers.  The man cannot give a

8    straight answer to a simple question.  The truth is, these

9    rules are simple.  Contributions over $100 have to be reported

10   and they have to be reported under the name of the real source

11   of the funds.  And Scott Jenkins admitted that he knows the

12   reason behind those rules.  It's because of transparency and so

13   that the people can trust in the election system.  It's to

14   prevent corruption.  Scott Jenkins knows that, but he tried to

15   circumvent those rules.

16         And he tried to conceal these bribes in another way

17   too.  He suggested breaking up the bribe amounts.  Here's what

18   he said.

19         (Audio playing.)

20         MS. CHOY:  Now, when Scott Jenkins took the stand, he

21   tried to explain this by saying it's better politically if

22   there's a larger number of contributions spread out over a time

23   period.  That's not what he's talking about here.  He's saying

24   it's better if it doesn't all look the same, because he knows

25   that if it's the same number over and over again, it looks

Closing Argument by Ms. Choy

1  like -- it doesn't look like real campaign contributions.  It

2  looks like bribes, because that's what it was.

3         You also heard Scott Jenkins talking about

4  recharacterizing payments as transactions, falsifying

5  transactions.  The first one was about a tractor.  Let's hear

6  what he said.

7         (Audio playing.)

8         MS. CHOY:  So he's trying to pretend the money he got

9  from Rick Rahim was for the purchase of a tractor.  And by the

10 way, that's a different story than you heard yesterday about

11 what the money was for.  But he's telling you why he wants to

12 falsify that transaction, so it comes to him clean, so he can't

13 get tagged or touched.

14        And he did that again, ladies and gentlemen.  After

15 he got those cash bribes in the fall of 2022, he tried to go

16 back and pretend that those were purchases of guns.  Here's

17 what he said.

18        (Audio playing.)

19        MS. CHOY:  Scott Jenkins admitted that none of these

20 bribe payers had ever discussed purchasing a gun from him.  And

21 what he testified was that he was just converting that money

22 from a donation into a purchase.  It doesn't work that way.

23 You can't go back and rewrite history and make a bribe into a

24 transaction.

25        These are the four guns that Scott Jenkins tried to

Closing Argument by Ms. Choy

1  pass off as legitimate transactions.  Ladies and gentlemen,

2  Scott Jenkins told you he knows what this looks like.  Well,

3  it's not that complicated.  It is what it looks like.  It's a

4  bribery scheme.

5       So now I'd like to talk to you about the charges in

6  this case.  And I'm going to skip conspiracy and circle back to

7  that.  Start with honest services fraud.  What is honest

8  services fraud?  Well, it's the idea that public officials by

9  virtue of their office have a duty of honesty, integrity, and

10  loyalty to the public.  They're supposed to act in the public

11  interest, not for their own enrichment.  And when they engage

12  in a bribery scheme, that defrauds the public.  It cheats the

13  public of what the public is entitled to, their honest

14  services.

15       So the first element of honest services fraud is a

16  scheme to defraud through bribery.  And we know that Scott

17  Jenkins owes the public a duty of honest services.  He took an

18  oath.  And bribery, as I've told you before, is defined as a

19  *quid pro quo*, a thing of value in exchange for an official act.

20  The *quid* is clear:  Money and campaign contributions.  And

21  Judge Ballou defined official act for you.  The official act

22  here is clear too:  Deputizing someone as an auxiliary.  That's

23  a specific, clear, concrete exercise of official power.

24       Official act also includes a public official exerting

25  pressure on another official to perform an official act, or

Closing Argument by Ms. Choy

1  giving advice to another official, intending that that official

2  then take an official act.  So when Scott Jenkins called Travis

3  Owens and advised him that Rick Rahim was living at his

4  brother's farmhouse in order to get him to sign off on the

5  petition, that was an official act.  So you can check that box.

6         The second element of honest services fraud is

7  misrepresentation or concealment of material facts.  And we

8  just talked about this a lot.  There was a lot of

9  misrepresentation and concealment in this scheme.  You can

10 check that box.

11        The third element is intent to defraud.  And that

12 means acting with specific intent to deceive for the purpose of

13 depriving the public and the government of the right to honest

14 services.  And you can deceive by concealing the things of

15 value that you're receiving, or by pretending to act like an

16 honest, upright official while secretly taking bribes.  And

17 both of those are exactly what Scott Jenkins did here.  You can

18 check that box.

19        So the first three elements are the same for Counts

20 Two, Three, Four, and Five.  But the fourth element is a little

21 bit different for each of those counts, because honest services

22 fraud involves use of either the mail or interstate wires to

23 further that scheme to defraud.

24        Count Two charges mail fraud.  So we have to prove

25 that the defendant used the mails or caused the mails to be

Closing Argument by Ms. Choy

1   used.  And remember the instructions on the law that we don't

2   have to prove that the defendant himself mailed anything or

3   even that he intended the mails to be used.  It just has to be

4   foreseeable that that would be a result of the scheme.  So the

5   mailing here is Rick Rahim's petition -- the granting of Rick

6   Rahim's petition, which was mailed from the Culpeper County

7   Circuit Court to the Virginia State Police.  And this was

8   certainly foreseeable.  Remember, Jennifer Weakley testified

9   that mailing of these documents is done in the ordinary course

10  of business.  So you can check that box for Count Two.

11          Counts Three, Four, and Five require use of an

12  interstate wire.  So this is the interstate wire that's charged

13  in Count Three:  A text message on July 7th, 2020.  So remember

14  the testimony of Dawn Miesle, the Apple employee.  He explained

15  that when someone sends a text message from their iPhone it

16  first has to query a data center that's located outside of

17  Virginia to find out whether the recipient can also receive

18  iMessages.  And he said that that has to happen so long as the

19  sender and the recipient, their phones haven't communicated in

20  the past eight hours.  So then remember Scott Medearis's

21  testimony.  He told you that he can tell that this message was

22  sent from Virginia because of the context.  I'm headed over to

23  catch Paul.  It was sent from Culpeper.  And he told you that

24  Scott Jenkins has an iPhone.  And he told you that he reviewed

25  the text messages and there was no communication between Scott

Closing Argument by Ms. Choy

1   Jenkins's phone and Rick Rahim's phone in the past eight hours.

2   That means that this message necessarily required Scott

3   Jenkins's phone to talk to that data center outside of

4   Virginia.  That's an interstate wire.

5       Same thing for Count Four.  This text message was

6   sent on January 4th, 2023.  Scott Jenkins sends a message to

7   Kevin Rychlik to confirm the meeting with Rubar Sandi.  And we

8   went through the same analysis with this.  There was no

9   communication within the past eight hours between those two

10  phones.

11      Count Five charges the deposit of Jim Metcalf's bribe

12  check into Scott Jenkins For Sheriff's Blue Ridge Bank account.

13  Remember the testimony of Jaime Travis, the Blue Ridge Bank

14  employee.  She told you that she can tell from this document

15  that the check was deposited in Culpeper.  And she told you

16  that in order to complete that transaction, the check image

17  would be -- the check would be scanned, and the image would be

18  uploaded to the Jack Henry server.  We have a stipulation that

19  Jack Henry does not have any servers in the Commonwealth of

20  Virginia.  So you know that that check deposit required use of

21  an interstate wire.  You can check that box for all of those

22  counts.  So that's honest services fraud.

23      The next seven counts charge federal programs

24  bribery, or bribery concerning programs receiving federal

25  funds.  The first element is that the defendant was an agent of

Closing Argument by Ms. Choy

1    an organization that received benefits exceeding $10,000 under

2    a federal program.  There is a stipulation that says that

3    Culpeper County and Culpeper County sheriff's office both meet

4    that requirement.  And we know that Scott Jenkins was an agent

5    certainly of the Culpeper County sheriff's office.  He was

6    authorized to act on the sheriff's office's behalf.  You heard

7    that over and over again.  There is no question about that.  So

8    you can check that box.

9        Second element, the defendant accepted anything of

10   value.  This is your *quid*, ladies and gentlemen, the things of

11   value.  There is no dispute about that.  Scott Jenkins accepted

12   those things of value.  You can check that box.

13       The third element is that the defendant intended to

14   be influenced or rewarded in connection with some business or

15   transaction of that organization of which he is an agent, and

16   that the business or transaction had a value of $5,000 or more.

17   So this is your *quo*.  This is the badges.  And that's a

18   business or transaction of the Culpeper County sheriff's

19   office.  It's a matter within that office's jurisdiction.  And

20   how do you tell that those badges had a value of $5,000 or

21   more?  Well, you can look to the value of the bribes.  So think

22   about it this way:  When you sell your house, how do you tell

23   how much it's worth?  You look at what other people in the

24   market are paying for similar houses.  You can apply the same

25   reasoning here.  If people are willing to pay $5,000, $10,000,

Closing Argument by Ms. Choy

1  $20,000 for a badge, you can infer that that badge is worth at

2  least $5,000.  You can check that box.

3       And the last element is the defendant acted

4  corruptly.  Corruptly in this context just means *quid pro quo*.

5  We talked about this.  There was a *quid pro quo*.  You can check

6  that box.

7       And the last count is conspiracy.  Conspiracy is an

8  agreement to commit a crime.  And the crimes charged here are

9  the ones we've just been talking about:  Honest services mail

10 and wire fraud, and federal programs bribery.  So the first

11 element is that that conspiracy existed, an agreement between

12 at least one other person to commit those offenses.  There was

13 an agreement here, folks.  The conspirators in this case

14 included three men who pled guilty:  Fred Gumbinner, Rick

15 Rahim, and Jim Metcalf.  And they also include the other men

16 who told you that they paid bribes to Scott Jenkins:  Tom

17 Cooper, Phil Howell.  You can check that box.  There was an

18 unlawful agreement.

19      The second element is the defendant knew the purposes

20 of the agreement.  We've talked about this too.  Scott Jenkins

21 knew exactly what was going on.

22      The third element is that the defendant deliberately

23 joined the conspiracy.  Scott Jenkins joined this conspiracy

24 knowing exactly what it was.  You can check that box.

25      And the final element is an overt act.  That's any

Closing Argument by Mr. Andonian

1  act performed in furtherance of the conspiracy.  So that's

2  every single act we've been talking about:  The meetings, the

3  calls, the bribes, the badges.  Each of those is an overt act

4  in furtherance of the conspiracy.  You can check that box.

5          To sum up, ladies and gentlemen, this case represents

6  a shocking breach of public trust.  Scott Jenkins swore an

7  oath, a promise to support the Constitution of the United

8  States and of Virginia, and to faithfully and impartially

9  discharge the duties incumbent upon him.  Holding elected

10 office, especially as a law enforcement officer, is a solemn

11 responsibility.  Scott Jenkins didn't see responsibility.  He

12 saw an opportunity, an opportunity to put the powers of his

13 office up for sale, to sell that law enforcement authority to

14 people who had no business carrying a badge.

15          Ladies and gentlemen, in this country, no one is

16 above the law.  Scott Jenkins enforced the law against other

17 people, but he thought it didn't apply to him.  He was wrong.

18 Hold him accountable.  Find him guilty on all counts.

19          Thank you.

20          THE COURT:  Thank you, Ms. Choy.

21          Mr. Andonian?

22          MR. ANDONIAN:  Is it okay if I move the podium here

23 and use that?

24          THE COURT:  Sure.

25                  CLOSING ARGUMENT BY MR. ANDONIAN

Closing Argument by Mr. Andonian

1        I couldn't take a bribe.  Never did, never will.  I
2   have to be able to sleep at night.  How it gets to where it
3   needs to be has to be legal and proper and that's what we'll
4   do.  These are just some of the words that Scott Jenkins said
5   at a time when he did not know he was being recorded, when he
6   was supposedly talking to people, who according to the
7   government, knew full well about this intentional bribery
8   scheme that was going on.  These are just some of the words
9   that Scott Jenkins said that are inconsistent with the
10  government's theory of a person who is trying to do wrong with
11  a bunch of confederates who all know what's going on.  And
12  that's because Scott Jenkins never took bribes.  Scott Jenkins
13  wanted to sleep at night.  Scott Jenkins wanted things to be
14  lawful and proper.  Scott Jenkins never engaged in a pay to
15  play bribery scheme, as the government has alleged.  He
16  welcomed people that Kevin Rychlik, who he trusted, brought to
17  him as candidates to be auxiliary deputies.  He certainly
18  welcomed people who were willing to contribute to his campaign,
19  as any politician would, but he did not do that corruptly.
20  Scott Jenkins is innocent of each and every one of the charges
21  against him.
22        Ladies and gentlemen, there's a lot to talk about,
23  and I want to talk about it with you, but before I do that, I
24  want to talk to you about two legal principles that the judge
25  instructed you on a moment ago, two important principles that

Closing Argument by Mr. Andonian

1  will guide your deliberations in this case.  The first is the

2  presumption of innocence, and the second is the government's

3  incredibly high standard of proof:  Proof beyond a reasonable

4  doubt.

5       The presumption of innocence is exactly what it

6  sounds like.  Scott Jenkins was innocent when he walked into

7  this courtroom last week.  He was innocent as he sat in that

8  chair throughout this trial.  And he is innocent as he sits

9  behind me right now as I'm talking to you.  And what that

10 means, ladies and gentlemen, is that when you look at the

11 evidence, when you listen to the recordings, when you look at

12 the videos, when you look at the text messages, when you

13 understand that things can be interpreted one way, they can be

14 taken another way, you resolve those questions, you resolve

15 those doubts in favor of Mr. Jenkins, not the government,

16 because Mr. Jenkins is presumed to be innocent.

17      The next legal principle is proof beyond a reasonable

18 doubt, the legal standard the government has to meet as to each

19 element of each offense with which they have charged

20 Mr. Jenkins.  Ladies and gentlemen, it's no over-statement to

21 say that proof beyond a reasonable doubt is the highest level

22 of proof in our legal system.  It is the highest level of proof

23 in our legal system.  It means that if any one of you has a

24 reason to doubt that the government has not met its burden, you

25 must find Scott Jenkins not guilty.  But to put this in

Closing Argument by Mr. Andonian

1    practical terms, people, businesses can go to court fighting

2    over millions, billions, trillions of dollars, and those

3    disputes would be resolved on legal standards less than proof

4    beyond a reasonable doubt.  Family members could fight over end

5    of life care for family members and loved ones, and those

6    disputes, if they went to court, would be decided on standards

7    less than proof beyond a reasonable doubt.  If the government

8    wanted to take someone's property or take someone's children

9    from them, those legal disputes, too, would be decided on

10   standards less than proof beyond a reasonable doubt.

11          So ladies and gentlemen, as you sit here, if you

12   think, I think Scott Jenkins probably did what the government

13   said he did, you must find him not guilty.  If as you're

14   sitting here you think, I think it's highly likely that Scott

15   Jenkins did what the government said he did, you must find him

16   not guilty.  If you are sitting here thinking, I think there's

17   clear and convincing evidence of Scott Jenkins's guilt based on

18   what the government showed us, ladies and gentlemen, you must

19   find him not guilty.  Because all of those standards are lower

20   than proof beyond a reasonable doubt.  And ladies and

21   gentlemen, we submit there are plenty of reasons to doubt that

22   the government has met every burden -- its burden as to every

23   element as to every offense with which they have charged

24   Mr. Jenkins.

25          Now, ladies and gentlemen, look, I'm not standing up

Closing Argument by Mr. Andonian

1   here telling you that there aren't things that might have made

2   you raise an eyebrow, might have made you scratch your head,

3   that might have made you question something that you saw or

4   something that you heard.  You saw a little bit of the inner

5   workings of a small town sheriff's office in all of its

6   unpolished raw glory.  You saw a little bit about of the

7   workings of a small town where elected officials know each

8   other.  So you heard about noncompliance with ethics reports.

9   You heard about loans that might not have been reported on

10  documents.  You heard about conversations between Mr. Jenkins

11  and the Commonwealth's Attorney or the Deputy Commonwealth's

12  Attorney and the Judge of the Circuit Court of Culpeper.  But

13  ladies and gentlemen, we're not here to pass judgment on

14  Mr. Jenkins and whether or not he acted completely ethically or

15  completely properly when it comes to campaign finance reports.

16  We're not here to cast judgment on Mr. Jenkins about his

17  decision to make outreaches to people that he knows in other

18  public offices.  We're here to decide whether or not the

19  government has met its burden of proof as to each and every

20  element of each and every offense that they have charged him

21  with in this case.  And when you look at this case, and you

22  look at the facts through the lens of innocence, the

23  presumption of innocence, you will see that there are plenty of

24  reasons to doubt.

25          So where do we start this discussion?  Well, we start

Closing Argument by Mr. Andonian

1  where everyone else did, with Kevin Rychlik, because the best

2  sources are criminals.  That's what Special Agent Medearis told

3  us yesterday.  And Kevin Rychlik is a criminal.  He's a

4  criminal based on what he said he's done, and he's a criminal

5  because he pled guilty to a crime in another part of Virginia

6  for failing to pay taxes.  And not just a little bit of taxes,

7  but a course of conduct over many years, 60-plus quarters for

8  just two of his businesses that we talked about, millions of

9  dollars of money that he didn't pay.  And we'll talk more about

10 why that's important in a moment.  But it starts with Kevin

11 Rychlik because Kevin Rychlik was the focus point.  He was the

12 one that went out and found people to bring back to Scott

13 Jenkins for the auxiliary deputy program.  And he was the one

14 that Scott Jenkins trusted because of Mr. Rychlik's business

15 connections, while he still had them, to bring back people who

16 wanted to donate to the campaign, two completely legitimate

17 objectives.

18         So on the one hand, you have Kevin Rychlik, who is

19 Scott Jenkins's lieutenant in charge of the auxiliary program,

20 a trusted confidant and adviser, who Scott Jenkins has tasked

21 with helping him build an auxiliary program, who he has tasked

22 with helping him build a campaign war chest.

23         And on the other hand, you have Kevin Rychlik, who

24 since 2021, has been working with the government.  You have

25 Kevin Rychlik, who since well before 2019 was engaging in

Closing Argument by Mr. Andonian

1  criminal conduct that he knew he was engaging in.  And what's

2  important is that Kevin Rychlik, the adviser, Kevin Rychlik,

3  the person working with the government, the person committing

4  crimes, all came together as a cooperating witness when he came

5  into this courtroom and sat here and talked to you.  And he

6  told you he's looking at time, as much as five years in prison

7  for the tax fraud that he pled guilty to, and he doesn't want

8  to do that time.  He doesn't want to do close to that time.

9  He's got a family.  He's got a house.  He doesn't want to go to

10  prison.  And it wasn't just the fact that he's hoping that by

11  being here and talking to you all and testifying that he will

12  please the government enough that they will help him and go to

13  bat for him at sentencing, but it's also what he didn't have to

14  deal with because of his cooperation.  He wasn't looking at

15  multiple counts of tax fraud.  He was looking at one.  He

16  wasn't looking at multiple counts that could put him in prison.

17  He wasn't looking at multiple counts that could add up more

18  fines.  He was looking at one.  And all of that was because he

19  entered into an agreement with the government to cooperate.

20  And that cooperation, the determination as to whether or not

21  Kevin Rychlik gets the benefit of that deal, that ultimately

22  rests with the government.  Whether they go to bat for him or

23  not is the government's sole discretion.  And Kevin Rychlik

24  knows that.  So when he sat here in this chair, he was doing

25  everything he could to make the government happy.  That's what

Closing Argument by Mr. Andonian

1  his motive was when he was testifying before you all.

2          So when Kevin Rychlik tells you the money guys are

3  different than the VASARS guys, when he tells you that he was

4  in the pickup truck with Mr. Jenkins and Rahim when they were

5  initially talking, even though Mr. Jenkins and Mr. Rahim both

6  said he wasn't, ask yourself why that might be.  When he's the

7  one in the car with Jim Metcalf on that video clip using the

8  phrase pay to play while he's recording the entire

9  conversation, ask yourself what he might be trying to get out

10  of that.  When he's the one who says, we have a VIP program

11  that he's the principle driver of, to quote Fred Gumbinner, ask

12  yourself what Kevin Rychlik might be up to when he's trying to

13  push these terms and phrases and this agenda.  As Rick Rahim

14  said, Kevin Rychlik came to him with a mission, and a mission

15  he had to do whatever he could to make the government happy to

16  save his own neck.

17          Now, ladies and gentlemen, I want to be very clear

18  about what it is that happened and what you saw evidence of.

19  Scott Jenkins is a politician.  He's an elected official -- or

20  was an elected official at the time.  Elected officials run for

21  office and they need money to do that.  That's not a surprise.

22  That's no secret.  They have campaigns.  They have obligations.

23  They have publicity they need to get.  And Scott Jenkins was no

24  exception.  Scott Jenkins was also the sheriff with an office

25  and people under him, and an agenda that he wanted to fulfill

Closing Argument by Mr. Andonian

1   in the terms that he held.  And you heard some of those agendas

2   that he had discussed.  Kevin Rychlik was somebody that Scott

3   Jenkins had no reason to believe at the time was going to turn

4   around and stab him in the back.  Kevin Rychlik was somebody he

5   had known for a while.  Kevin Rychlik was a friend.  He was a

6   trusted adviser and confidant, and he was somebody Scott

7   Jenkins looked to for help, help on both fronts:  Recruiting

8   auxiliary deputies, recruiting people who could help

9   financially with the campaign.  And as Mr. Jenkins told you,

10  over the time what happened was Mr. Rychlik essentially got

11  efficient in what he was doing, finding people who would be

12  good auxiliary deputies who also wanted to support Scott

13  Jenkins.  And all of those things happened at one meeting at

14  one time while everybody was in the same place.  That doesn't

15  make it a *quid pro quo*, because Scott Jenkins never had any

16  intent of giving a badge only on the condition that he get

17  money in return.  He certainly never authorized Kevin Rychlik

18  to make that point clear to anyone.  And Scott Jenkins never

19  had any intent of any of that being a bribe.  Scott Jenkins was

20  looking to build an auxiliary deputy force, and he was looking

21  for people to help his campaign.

22          Despite the fact that much was made over the lack of

23  training, the lack of connection to Culpeper, the lack of

24  knowledge or lack of meeting Mr. Jenkins ahead of time, there

25  was rhyme and reason to the people that Mr. Rychlik was

Closing Argument by Mr. Andonian

1  bringing to Scott Jenkins, putting aside the fact that

2  Mr. Rychlik was telling them something completely different

3  than what he was telling Mr. Jenkins.  Rick Rahim was active

4  with the Culpeper County sheriff's office.  You saw a picture

5  of him in a uniform at an event.  You heard about him going on

6  ride-alongs.

7        Jim Metcalf talked about how he longed to get back on

8  a police motorcycle, and that there were a couple in Culpeper

9  that weren't being used, and wanted to create or resurrect a

10 police motorcycle program.

11       Each and every one of the other individuals told you

12 that although they hadn't been asked to do anything, if they

13 had been asked to do something, they would have come and served

14 -- in a moment, I believe Mr. Howell said.  And ladies and

15 gentlemen, we're talking about people who live in another part

16 of Virginia, not the moon; an hour away, sometimes less than an

17 hour away, people who would be able to take part in activities

18 that varied, depending on what Scott Jenkins wanted or needed

19 at any given time.

20       Fred Gumbinner called Mr. Jenkins a luminary.  Tom

21 Cooper liked his platform.  Jim Metcalf liked what he stood

22 for.  You saw text messages of Mr. Rychlik referring to the

23 Kuhns, father and son, both of whom were helicopter pilots and

24 VASARS supporters.  VASARS was Mr. Rychlik's nonprofit search

25 and rescue organization.  We're talking about people who have

Closing Argument by Mr. Andonian

1    some interest.  They have a connection, whether it's directly

2    to the office, whether it's because of an affinity for

3    Mr. Jenkins or his platform, or whether it's because they have

4    services that they can offer, which could include financial

5    support.  We're not talking about a completely illogical set of

6    people, contrary to what the government has said.  And as far

7    as the lack of training, ladies and gentlemen, look, you don't

8    have to like the fact that a sheriff as a Constitutional

9    officer in Virginia has discretion to do what he wants to do

10   with his office, you don't have to like the fact that a

11   sheriff -- the sheriff's office is held to a different standard

12   than the city police, which is what Chad McKnight, one of the

13   government's witnesses, told you.  You don't have to like the

14   fact that an auxiliary officer that doesn't meet a certain

15   hours threshold on any given month doesn't have to have any

16   training at all.  Again, that came from Captain McKnight, one

17   of the government's witnesses.  But you have to understand that

18   that was the reality for Scott Jenkins.  That was his sheriff's

19   office under his regime.  And to the extent he saw value in

20   people that Mr. Rychlik, somebody he trusted -- that's how it

21   was.  But at the end of the day, the point was:  Scott Jenkins

22   was not conditioning the appointment of auxiliary deputies on

23   the provision of money to him.  He was looking for good people

24   to be auxiliary deputies, and he was looking for people to help

25   with his campaign, his politician hat, his sheriff's hat coming

Closing Argument by Mr. Andonian

1   together, and he was relying on Kevin Rychlik to help him

2   accomplish both of those goals, which is what Kevin Rychlik was

3   telling Mr. Jenkins he was doing.

4           Ladies and gentlemen, I'm not going to stand up here

5   and insult you and act like there aren't things that have to be

6   explained and act like there aren't things that if you don't

7   talk about them can look bad, because we certainly saw plenty

8   of that in this trial.  But again, if you're looking at these

9   things through the lens of guilt, which is what the government

10  is trying to get you to wear, they're going to look bad.  You

11  can make anything you want out of them that casts Scott Jenkins

12  as a villain.  But when you take off those glasses and you put

13  on the glasses of innocence, the presumption of innocence that

14  protects this man at this moment, there are other explanations.

15  There are other reasons things happen.  And you have to look at

16  those things through the lens of innocence.  And to the extent

17  there's a question, to the extent there is doubt, those are

18  reasons to find Mr. Jenkins not guilty.

19          The gun sale, let's just talk about that right now.

20  Mr. Jenkins on a recorded conversation with Kevin Rychlik in

21  the Target parking lot.  Ladies and gentlemen, that might not

22  make sense.  That might sound wild and concocted.  But Sheriff

23  Jenkins explained to you what was going on in his mind at that

24  time.  There was a report that had been due that he was unaware

25  of, that had been filed without those cash donations being part

Closing Argument by Mr. Andonian

1  of it.  And Scott Jenkins had a moment of panic.  He didn't

2  want to amend the report, because that's political weakness,

3  blood in the water I think is the term he used, because then

4  your opponents say, well, look at this guy.  He can't even keep

5  his money straight, he's got to amend his campaign report.

6  This guy is a bumbling idiot, vote for me instead.

7         Did Scott Jenkins make a decision or a choice that

8  was the best that he could have made?  Did he make a choice or

9  a decision that opened him up to a tremendous amount of

10  scrutiny?  Perhaps.  But he explained to you what he was trying

11  to do.  He was trying to find a way to make the cash that

12  didn't make it onto that report legal, and not be something

13  that he kept improperly.

14         First off, before I talk about the details, if what

15  Mr. Jenkins is doing this entire time is running this illegal

16  scheme trying to get money and sell badges, what does he even

17  need to have the conversation with Kevin Rychlik in the first

18  place for?  He's got a bunch of cash.  Why doesn't he just go

19  home, tuck it under his mattress, and not tell anyone about it?

20  Who would find out?  Who would even know?  Instead, he comes to

21  Kevin Rychlik and says, I need to be able to sleep at night.  I

22  need to have my conscience clear.  I need to figure out a way

23  to make this right.  And what he came up with -- again, you can

24  cast any kind of judgment you want on his judgment at that

25  time, but the idea that he came up with was:  I'll make it a

Closing Argument by Mr. Andonian

1    gun sale.  And it's not like we're talking about some fantasy

2    that existed only in Mr. Jenkins's head.  He showed up at that

3    meeting with guns.  You saw them.  They were here in the

4    courtroom.  Real guns that Mr. Jenkins told you had real value.

5    And when he left that meeting with Mr. Rychlik, he left the

6    guns with Mr. Rychlik, along with the receipt signed by him,

7    signed by Mr. Rychlik, who was a licensed firearms dealer at

8    that time, and he went home.

9          Again, ladies and gentlemen, maybe not the decision

10   you would make, maybe not the decision somebody else would

11   make, but it was a decision he made at that time.  And again,

12   if he wanted to get away with something, why on earth would he

13   go through the trouble of doing what he did instead of just

14   taking the money and running with it?  And the reason is

15   because he wasn't trying to do anything wrong.  He was trying

16   to do what he thought was right.

17         Helping Rick Rahim -- by the way, Rick Rahim was also

18   somebody who came in here and sat down in this chair and sung

19   the song that the government wanted, because Rick Rahim is not

20   only pleading guilty with allegations in connection with this

21   investigation, he pled guilty in two other matters in other

22   parts of Virginia for more criminal conduct.  He told you he

23   doesn't want to go to prison either.  He's got a family.  He's

24   got nice cars.  He's got nice houses.  So when Rick Rahim tells

25   you, I'm not going to let you put words in my mouth, I was not

Closing Argument by Mr. Andonian

1  a resident of Culpeper, even though he had a lease for a

2  residence in Culpeper that exists.  You saw the house.  You saw

3  pictures the government presented.  Even though he registered

4  his cars there, even though he registered to vote there, and he

5  told Scott Jenkins all of this.  Rick Rahim, trying to do what

6  is in Rick Rahim's best interests.

7        But getting back to Mr. Jenkins helping Mr. Rahim,

8  Mr. Jenkins told you they became fast friends.  That happens

9  sometimes.  You become fast friends with someone.  And

10 Mr. Rahim was somebody with means.  Mr. Jenkins with somebody

11 with ideas.  And he told you about some of them:  Shooting

12 ranges, the Make Virginia Great Again apparel that he had made.

13 Mr. Rahim was a businessman, an investor in particular.  And

14 Mr. Jenkins told you that they got to talking and they had

15 ideas and they built a friendship around them.

16        What did Mr. Jenkins really do for Mr. Rahim?  He

17 talked to a few people that he knew in county government in the

18 small town of Culpeper.  And you heard from those people.  You

19 heard from the Deputy Commonwealth's Attorney, Travis Owens.

20 You heard from the Circuit Court Judge, Dale Durrer.  Did any

21 one of them say, oh, my God, I cannot believe Scott Jenkins

22 reached out to me.  When he did that, I went running out of the

23 room covering my ears because it was so improper.  Did Judge

24 Durrer say when Scott Jenkins called me or texted me I

25 practically threw my phone in the garbage because I couldn't

Closing Argument by Mr. Andonian

1    believe such a thing was happening?  No.  They talked about it

2    like it was commonplace occurrence, which it probably is

3    between people who know each other well in a small town.  Be

4    that as it may, what did it get Rick Rahim?  He had to wait

5    like 100 years before his firearms rights were finally

6    restored.  He had to wait the full 45 days to get his concealed

7    carry permit, no matter how much checking in the sheriff's

8    deputies were doing.  And as far as being sworn in, well, we've

9    talked about that.  Rick Rahim was somebody who had acted in a

10   law enforcement capacity for the Culpeper County sheriff's

11   office.  He had materials and equipment that would be valuable

12   to the office, like getting a drone package.  We heard about a

13   SHERP, an amphibious vehicle.  Scott Jenkins at most was making

14   inroads for a friend that really didn't have that much of an

15   impact at the end of the day.

16          Now, Rick Rahim talked about other support that he

17   provided to the office.  He helped put up two big billboards

18   that we saw.  He made up some fliers, some postcards, and some

19   other trinkets.  And to the extent the billboards should have

20   been reported on campaign finance reporting documents,

21   Mr. Jenkins told you yesterday that should have been done, and

22   it wasn't.  And maybe that's because David Myers didn't convey

23   to David Jones that those billboards had been paid for by Rick

24   Rahim, or maybe it was something else.  Again, the point is, it

25   doesn't matter.  Mr. Jenkins isn't on trial for not reporting

Closing Argument by Mr. Andonian

1   something that he should have in a campaign finance disclosure

2   document.

3           The same thing goes for Fred Gumbinner.  Fred

4   Gumbinner took forever for him to actually become an auxiliary

5   deputy, despite the fact that according to the government and

6   according to Rick Rahim, who is sitting here telling you

7   anything the government wants to hear, that Mr. Gumbinner paid

8   Mr. Jenkins money, Mr. Jenkins can just snap his fingers and

9   make things happen.  It took a while.  And while we're on the

10  topic of Mr. Gumbinner, remember the paper trail with that.

11  Nobody said that Mr. Gumbinner walked up to Mr. Jenkins and

12  handed him $20,000.  You saw the check for Mr. Gumbinner's

13  account that he wrote to Mr. Rahim as an LLC investment.  Now,

14  Mr. Rahim and Mr. Gumbinner -- Mr. Gumbinner also being

15  somebody who has an agreement to cooperate with the

16  government -- they told you, oh, no, that was really just a

17  pass-through so it could go to Sheriff Jenkins.  But again, you

18  have to take the source with a grain of salt when you're

19  talking about people with self-interest, talking about people

20  who want to get the government's help when it's all said and

21  done.

22          Mr. Jenkins did some outreach.  He did some

23  connecting.  He prodded some people.  But in the end, it didn't

24  really make much of a difference.

25          Another thing I want to address is the cash that Rick

Closing Argument by Mr. Andonian

1  Rahim gave to Sheriff Jenkins.  Again, ladies and gentlemen, if

2  Sheriff Jenkins is doing something wrong and he's trying to get

3  away with it, why would he not just come up and say, I don't

4  know what you're talking about, I've never seen any cash from

5  Rick Rahim.  Rick Rahim never gave me a dime.  Cash is not

6  traceable, as we heard from Mr. Jones.  Why wouldn't he just

7  say anything other than what he did say, which is yeah, I got

8  cash from Rick Rahim.  Why would he put himself in that

9  position if it wasn't true?  And he told you why he got the

10 cash from Rick Rahim, because Rick Rahim is a businessman, an

11 investor.  Mr. Jenkins had ideas, and they partnered up

12 together to try to implement them.  There's nothing wrong with

13 that, because that wasn't contingent on anything.  That was

14 Mr. Rahim voluntarily helping somebody he had become fast

15 friends with.

16        I want to talk a little bit about the general order

17 that we've heard a lot about at this point in time, and really

18 the sheriff's office and authority more broadly.  Sheriff

19 Jenkins testified and told you that as the sheriff, he was at

20 the top of the food chain.  He was the one running the office,

21 and that's true.  We're not running from that.  And in that

22 capacity, he had the discretion to appoint people to be

23 auxiliary deputies as he saw fit.  But one thing that he did as

24 sheriff, as most managers do, was delegate.  Now, the

25 government is trying to spin that into feasible deniability or

Closing Argument by Mr. Andonian

1   plausible deniability. But in the management world, it's got

2   its own term and it's called delegation. And he had people

3   under him that would do different things. One of those duties

4   was writing general orders as part of the accreditation program

5   -- or the programs that the Culpeper County sheriff's office

6   was part of. One of those things was to be in charge of

7   policies relating to accreditation. And one of those policies

8   happened to be that general order, which, by the way, isn't

9   signed by Mr. Jenkins. It says issued on the authority of, and

10   then it's typed out. So that doesn't really tell you anything

11   about who saw what. But more to the point, it didn't matter.

12   Sheriff Jenkins sat up here and told you, if he had seen that

13   and if he had read it, he would have required it to be

14   rewritten, because he would not have had some policy in his

15   office limiting his ability to appoint auxiliary deputies as he

16   chose.

17         Another thing that we heard about that I want to

18   tackle head on is this idea of money in the form that it takes

19   and the way that it got to him. We saw the clips. We heard

20   the clips. We read text messages. Mr. Jenkins is making

21   suggestions that money can go through his brothers or other

22   people. He's talking about splitting money up into different

23   amounts. Again, if you put on the government's guilty glasses,

24   and you look at that information through that perspective, you

25   could certainly tell a bad tale of wrongdoing. But if you go

Closing Argument by Mr. Andonian

 1  back and you put on the lens or the glasses of innocence,

 2  there's an explanation, and you got it from Mr. Jenkins.

 3  Again, he's wearing a sheriff's hat, but he's also wearing a

 4  politician's hat.  And there's political reasons, right or

 5  wrong, good or bad, ill-advised or not, there are political

 6  reasons that Mr. Jenkins was saying the things he was saying.

 7  Yes, there are reporting requirements that need to be followed

 8  in a perfect world.  Yes, payments should be exactly what they

 9  are however anybody wants them to come in.  But in the

10  political reality that Mr. Jenkins was living in, sometimes

11  people don't want their names associated with a donation to a

12  particular campaign; in particular, somebody like Mr. Jenkins

13  who happened to be a lightening rod on a number of big issues.

14  And in the political world, somebody putting a large amount of

15  donation down at one time, a couple of things happen:  One,

16  they spent all their money at once, and you get one reporting

17  period to kind of flex and show that you've got the support of

18  that donor; and two, they put a big old target on their back

19  because now everybody knows that they might have deep pockets

20  and other politicians come along and try to poach them.  So

21  Mr. Jenkins suggested at various times to address these

22  problems that people who didn't want to be associated with him

23  or his campaign could potentially give money to his brothers,

24  who could then donate.  Again, we're not here to talk about

25  whether or not that's a violation of some campaign finance

Closing Argument by Mr. Andonian

1   reporting rule or not, but that was the explanation that he

2   gave, not because he's trying to hide a bribe.  And with

3   respect to splitting up payments, including in different

4   amounts, not just splitting them up in different periods,

5   you're talking about protecting somebody from poaching, and

6   you're talking about stretching out the value of their donation

7   over multiple reporting periods so you can appear to have more

8   donors and more financial support over a longer period of time.

9   Again, might not be the best way to do things if you're looking

10  at this as a campaign finance reform or finance disclosure

11  hypothetical, but that isn't why we're here.

12          Scott Jenkins told you why he was making those

13  suggestions.  And again, he's doing this at a time where he

14  doesn't know he's being recorded.  He doesn't know Kevin

15  Rychlik has already thrown his hat in with the government and

16  is trying to save his own neck.  Might he have chosen better

17  words?  Might he have explained things a little bit more if he

18  had?  Probably.  But he didn't.  But that's the explanation

19  that he gave you, and it's a credible explanation.  And it's a

20  reason to doubt.

21          By the same token, we've heard a lot of testimony

22  about Mr. Jenkins's habits when it came to communicating.  He

23  didn't like to have his cell phone around him.  He didn't like

24  to be on text all that much, although he was.  Mr. Jenkins

25  explained to you the reason for that.  First, he had been the

Closing Argument by Mr. Andonian

1   victim of a political attack by disgruntled deputies who took a

2   recording of him and used it against him on a public platform.

3   He talked about how he just doesn't trust listening devices,

4   because in his experience as a cop, he knows that you can turn

5   them into recording devices.  Ladies and gentlemen, is it a

6   little bit much?  Is that kind of paranoia warranted?  It

7   doesn't matter.  That's what was going through Scott Jenkins's

8   mind and that's why he was acting, but it wasn't because he was

9   trying to conceal anything or hide anything.  It wasn't because

10  he was trying to stay off the radar for illegal activity.  It's

11  because he was trying to protect himself politically.  And that

12  is the same reason that Scott Jenkins talked about on multiple

13  occasions, a small circle of trusted people.  Is it that hard

14  to imagine a small-town sheriff and an elected politician

15  having a small group of people that he trusts with various

16  things?  That's what he's saying.  Again, put on the guilty

17  glasses, and you can spin that a number of different ways that

18  look really bad for Scott Jenkins.  But if you look at it

19  through the presumption of innocence, there is an explanation

20  that makes sense, and it's yet another reason to doubt the

21  government's case.

22          And finally the gun purchase using cash.  Mr. Jenkins

23  told you that he had lots of cash on hand.  And he had lots of

24  guns.  Again, you don't have to like guns.  You don't have to

25  be somebody that has lots of cash on hand.  But you have to

Closing Argument by Mr. Andonian

1  understand that's where he was coming from.  And the government

2  makes a huge deal about the fact that he went and he purchased

3  the gun using cash that looked like cash that he might have

4  gotten from one person or another.  Again, ladies and

5  gentlemen, this is Scott Jenkins acting openly.  This is Scott

6  Jenkins acting without shame, without trying to cover anything

7  up.  If he was trying to do something wrong, wouldn't he not go

8  out and put cash that shouldn't be out there, out there?

9  Wouldn't he just go and shove everything, again, under his

10  mattress and just keep his mouth shut?  There isn't a there,

11  there.  It's more of the government trying to get you to look

12  at every last little thing Mr. Jenkins said or did through the

13  perspective of guilt and not the perspective of innocence.

14          Mr. Jenkins's own words -- his own words are what I

15  want to leave you with.  I have never taken a bribe, never

16  have, never will; is what he said to undercover Mike.  I need

17  to be able to sleep at night, is what he said to Kevin Rychlik.

18  All the things that we need to do have to be lawful and proper,

19  and that's what we'll do, is what he said to undercover Jerry

20  McKee.  These are the words of somebody who had absolutely no

21  reason to be saying those things, because he had absolutely no

22  idea he was being surveilled and recorded and checked up on.

23  These were the words of somebody who was telling you in real

24  time what his actual subjective intent was in those moments and

25  others.

Closing Argument by Mr. Andonian

1           Ladies and gentlemen, I'm about done and I'm going to

2    sit down in a moment.  And that's the last you're going to hear

3    from me.  The government has an opportunity to get back up and

4    talk to you one more time.  But I want you to know that the

5    government doesn't get the last word in this courtroom.  You

6    do.  Because you are ultimately the ones that decide whether or

7    not the government met its burden of proof beyond a reasonable

8    doubt, that high, high, highest burden that we have in this

9    country.  And so after the government talks to you again, as

10   you go back and deliberate, ask yourself whether or not,

11   looking at things through the presumption of innocence, the

12   government has met its burden as to each and every element of

13   each and every offense with which they've charged Mr. Jenkins.

14          And I would submit, ladies and gentlemen, if you do

15   that, and you faithfully apply the burden of proof to the

16   government, you will see that there are plenty of reasons to

17   doubt, plenty of reasons to find Mr. Jenkins not guilty on each

18   and every charge.

19          Thank you.

20          THE COURT:  Thank you, Mr. Andonian.

21          Ladies and gentlemen, as Mr. Andonian indicated, the

22   government is going to have an opportunity for rebuttal, and

23   then I've got some final instructions.  We've been going about

24   two hours.  I want you to be comfortable for this last piece.

25   And so I'm going to take a quick ten-minute break, let everyone

Closing Argument by Mr. Andonian

1   have a little comfort break.  Then we'll come back and get this

2   last bit done.

3           We'll stand in recess for ten minutes.

4   **(*Jury out, 3:44 p.m.*)**

5           THE COURT:  All right.  Let's try to come back

6   around -- between ten and five till 4.  We'll stand in recess

7   until then.

8           (Recess.)

9           THE COURT:  We're back on the record in the case of

10  *United States v. Jenkins*.  The government is present by its

11  counsel.  The defendant likewise is present along with the

12  benefit of counsel.

13          Ladies and gentlemen, just so that you will know, in

14  my final instructions, the last little piece gets me to

15  alternates.  And so I will not let the alternates go back in

16  the back.  We'll probably have to end up getting their stuff

17  out of the jury room.  But the two people that I have on my

18  list as alternates, alternate 2, who is now the first

19  alternate, is Ms. Patrizia, and the second alternate, who was

20  alternate 3, is Ms. Dowdy, if you all were keeping score.

21          So as I dismiss the jury, I'll ask them to stay back.

22  And I do ask them to abide by all the same rules that the jury

23  has to abide by, and that is not talk to anybody until they

24  know there's a verdict.  Once there's a verdict, if they're not

25  needed, we reach out to them and let them know that there has

Closing Argument by Mr. Andonian

1    been a verdict.  But we don't make them stay here.  They can go

2    home.  And it looks like both of them are local, in any event.

3              All right.  Otherwise, are we ready for the jury?

4              Who's got the rebuttal?  How long are you going to

5    be, Ms. Peng?

6              MS. PENG:  20, 30 minutes.

7              THE COURT:  They're ready to go.  So brevity is --

8              MS. PENG:  Yes, Your Honor.

9              THE COURT:  All right.  Are we ready for the jury,

10   counsel?

11             MS. CHOY:  Yes, Your Honor.

12             THE COURT:  Let's bring the jury in.

13   (*Jury in, 4:02 p.m.*)

14             THE COURT:  Ladies and gentlemen, you all please have

15   a seat.  What a difference a week makes.  We've gone from

16   puffer jackets to short sleeves.  I don't think we're going to

17   be that much longer, but we're trying to bring the temperature

18   down just a little bit.

19             What we have left is the government has an

20   opportunity for rebuttal.  Then I have some instructions for

21   you, and then the case will be yours to begin your

22   deliberations.  So if I can kindly ask you to turn your

23   attention to Ms. Peng, I believe, who is going to give the

24   government's rebuttal.

25             Ms. Peng?

Rebuttal Argument by Ms. Peng

1              REBUTTAL ARGUMENT BY MS. PENG.

2              Hello, everyone.  So the good news is I'm going to be

3    the last attorney you hear from today.  And so I'm going to try

4    to keep my remarks short, because my job is basically to

5    respond to just a couple of arguments that you heard from the

6    defense just now.  I know you've all been listening very

7    carefully throughout the trial.  So I'm not going to walk

8    through all of the evidence like my colleague, Ms. Choy did,

9    because I know you've been paying attention, so I'm not going

10   to try to repeat anything that you already know.

11             But you know, where I want to start is where I

12   started when I talked to you at the very beginning of this

13   trial, which is you were selected as jurors for your common

14   sense and reason.  And the system depends on you, average

15   citizens, to determine what the truth is.  That's the point of

16   trial.  And so you heard defense counsel just now tell you that

17   you ought to put on glasses of innocence.  You just heard the

18   judge give you detailed instructions that the arguments of the

19   attorney is not the law.  The law you follow are the jury

20   instructions that the judge read to you.  I do want to share

21   with you some jury instructions and show them to you and

22   explain to you some of the law that we're going to be looking

23   at.

24             So first of all, the law tells you what I just told

25   you, which is you are to use your common sense when evaluating

169

Rebuttal Argument by Ms. Peng

1  the disputes and the facts in this case.  That is the whole

2  point of you as jurors.  You're expected to use your good

3  sense.  So I submit to you under the jury instructions you're

4  not putting on glasses of innocence.  That's not a thing.  But

5  you can put on glasses of common sense, if you will, to look at

6  the facts that have been presented to you.  Now -- and I submit

7  to you, if you use your common sense, focus on the evidence,

8  not on the spin, it's a pretty simple case.  We've told you

9  from the very beginning, the facts are simple.  Scott Jenkins

10 sold badges for money.  If you find that fact to be true, then

11 I submit to you your job back there is going to be pretty

12 straightforward.

13         Okay.  So let's get to some of the arguments that you

14 just heard from the defense.  You've heard throughout the case

15 that the government's witnesses are liars because they're

16 expecting a benefit.  Specifically, Kevin Rychlik, he's the one

17 that did all of this and you shouldn't believe him.  I talked

18 to you about this at the beginning of the trial too.  And you

19 have instructions on this.  Yes, the instructions tell you that

20 you ought to examine the credibility of a witness such as Kevin

21 Rychlik more carefully than other witnesses because he has an

22 interest in the case.  He can receive a benefit if he

23 cooperates with the government.  We don't run away from that.

24 That's all true.  But what else does the jury instruction tell

25 you about evaluating the credibility of witnesses?  It asks you

Rebuttal Argument by Ms. Peng

1  to look at all of the evidence presented.  It asks you to look

2  at the corroboration, the text messages, the recordings, the

3  corroborating testimony of multiple witnesses that all align

4  with each other, except for one, and that's Mr. Jenkins.  And

5  all of you know, using your common sense, simply because a

6  witness is -- has taken responsibility and is cooperating with

7  the government doesn't make them a liar.  If their testimony

8  aligns with the facts that you've seen, you're allowed to

9  believe them.  And I submit to you with respect to Kevin

10 Rychlik and Rick Rahim, all of their evidence has been

11 corroborated by text messages, recordings, other witness

12 testimony, things that Mr. Jenkins cannot spin, things that are

13 written down in black and white.  And by the way, here's how

14 you know it's true:  Because the only fact they had to quibble

15 with with respect Mr. Rychlik is that somehow Rahim handed

16 him -- Scott Jenkins the money inside of a truck as opposed to

17 outside of a truck.  Okay.  Scott Jenkins already admitted that

18 Rick Rahim gave him $45,000 in cash.  Does it matter whether

19 Mr. Rychlik was inside the truck?  No, it doesn't.  And the

20 same thing with Mr. Rahim.  You heard his testimony and now

21 they've told you that, you know, he's also not telling you the

22 truth.  The same instructions apply to Mr. Rahim.  You saw

23 those text messages in black and white of Mr. Rahim agreed to

24 do with Mr. Jenkins.  You heard Mr. Jenkins in his own words in

25 that recording reiterating the original deal that he

Rebuttal Argument by Ms. Peng

1   understood, the money for the three things that he promised:

2   Firearms restoration, the concealed carry permit, and then

3   finally the badge, three things that he delivered on just like

4   he told Rahim he would do.  And then you also heard the

5   suggestion, well, if he had something to hide, why didn't he

6   just pocket the cash from Rahim and not tell anyone?  Why did

7   he say he accepted the cash from Rahim?  Here's why:  You know

8   why.  You know Scott Jenkins is an experienced law enforcement

9   officer.  He tells you he leaves himself two to three avenues

10  out.  And you saw the financial records, again, in black and

11  white, showing the money flowing into his account in large

12  amounts of unexplained cash.  He can't deny the bank records.

13  That's why he has to admit that he got some money from Rahim,

14  right?  But what did he tell you the money was for?  A business

15  deal.  You heard that.  He told you that.  He made up that lie

16  in contrary -- in contrast to the words that he recorded -- he

17  was recorded on -- and this part I agree with counsel -- when

18  he didn't know he was being recorded, that's when he told the

19  truth.  And you heard the truth out of Mr. Jenkins's mouth over

20  and over again.

21          And beyond that, it's not just Mr. Rychlik or

22  Mr. Rahim who you heard testify before you.  The government

23  presented with you multiple witnesses who told you the same

24  thing.  They told you they took bribes.  These are businessmen,

25  maybe not so sophisticated, but they told you they had an

Rebuttal Argument by Ms. Peng

1   expectation that they were paying the money and they expected a

2   bribe.

3         Use your common sense, ladies and gentlemen, about

4   what is happening here.  I want you to imagine -- let's say you

5   showed up to a job interview, and you came with $500 of cash,

6   right, and you handed it to the interviewer because the

7   interviewer's second in command had told you if you give over

8   that cash, you're going to get the job.  I assume none of you

9   have done that because that's not what you do in order to get a

10  job.  But if the interviewer then takes that cash, doesn't say

11  anything, doesn't open it, doesn't count it, and gives you the

12  job, your common sense tells you that interviewer -- in this

13  case, Mr. Jenkins -- knew exactly what the deal was.  Except in

14  this case, he didn't bother to conduct any interviews.  He just

15  handed out the badge after a lunch.

16        Now, you also heard some arguments that, well, he

17  wasn't really trying to conceal the bribes, that he was a

18  politician, that's what they do, and he was really doing it for

19  the benefit of the donors.  Think about that.  He's telling you

20  that donors didn't want their names to appear on the campaign

21  finance reports, and that's why he wanted, you know, them to

22  give money to his brother, to other people, to whomever.  He's

23  the elected official who is required to file these campaign

24  finance reports.  He's concerned about anonymous donors?  He

25  admitted to you on the stand he's done the election countless

Rebuttal Argument by Ms. Peng

1    times.  He knows exactly what needs to be reported.  He's not

2    doing it because he's trying to help the donors not be

3    solicited for donations.  He's doing it because he wants to

4    hide the bribe money.  And so I want you to use your common

5    sense.

6          And you've also heard that, you know, he's the

7    sheriff.  He can do whatever he wants.  If he wanted a program

8    where nobody was trained, nobody had, you know, any

9    qualifications, that's okay.  Okay.  That's fine.  He can do

10   that if he wants to.  I mean, I don't want to talk about the

11   general order again.  You've heard enough about that.  But I

12   encourage you to go look at that general order, to look at the

13   Culpeper ordinances, things that Mr. Jenkins thinks does not

14   apply to him.

15         But also, I want you to look at the law.  This

16   instruction number 45.  And it tells you it's not a defense

17   that the official action was actually lawful.  That's what

18   we've been saying all along.  The crime is the exchange.  He

19   could have appointed any auxiliary deputy he wants.  He could

20   appoint anyone he wants.  That's true, right?  But the reason

21   it's unlawful is that he can't appoint them because they gave

22   him money, and he agreed to appoint them because he gave them

23   money -- they gave him money.  That's what is the crime that's

24   being alleged here.

25         And so when we look at this, right, and he says, I

Rebuttal Argument by Ms. Peng

1  want you to keep that in mind, right, all this stuff about what

2  he can do, what he cannot do, it doesn't matter if he did it in

3  exchange for a bribe.  But the reason why you heard so much

4  about lack of training, no vetting whatsoever -- the reason why

5  you heard that evidence is because that's a strong evidence

6  that he took the money only as a bribe.  Because if he had a

7  real program, maybe he could have said -- come up with some way

8  why it was legitimate.  But because he had no real program, the

9  only program he had was the cash for bribes program, right?

10 And you heard defense say, he did see value in those people

11 that he deputized.  The value he saw was the cash and the

12 checks that they brought.

13         And this is what the jury instruction also tells you.

14 If you find beyond a reasonable doubt that a public official

15 solicited or received a thing of value at least in part in

16 exchange for the performance of an official action, it makes no

17 difference that the public official may have had another lawful

18 motive for soliciting or accepting the thing of value.  So all

19 the stuff you heard about a political agenda, about he could

20 have done anything, those are distractions because it doesn't

21 matter if he might have had other motives if he also had the

22 motive of doing it in exchange for a bribe.

23         Now, I want to -- the last thing I think I'll talk to

24 you about is Mr. Jenkins, right, and what he said and what he

25 didn't say.  And you heard Mr. Andonian say, well, he said he

Rebuttal Argument by Ms. Peng

1   never took a bribe.  And he said, you know, he wants to sleep

2   at night, right?  He said basically that he's not guilty.  I

3   submit to you that saying that you're not -- you did not commit

4   a crime does not actually mean you did not commit a crime.  You

5   heard him testify yesterday.  Now, he had the right to remain

6   silent.  The burden is always on the prosecution.  But if he

7   takes the stand, you're allowed to consider whether to believe

8   what he said, and you're the judge of his credibility.  And I

9   submit to you that you got a front row seat to Scott Jenkins

10  and his spin, just like he would -- you heard -- you saw him do

11  just like what he said he would do in those recordings that you

12  heard.  And let me show you a great example of that.

13          Mr. Andonian brought up the issue of the billboards,

14  right, remember this?  So I asked him, you did not report any

15  of the contributions you gave on your campaign finance reports?

16  And then -- I'm sorry, this is on direct, right?  He says --

17  sorry, on cross.  Then he says, he gave no in-kind

18  contributions -- referring to Rahim -- that weren't reported.

19  He gave items that were unrelated to a campaign.  So I tried to

20  lock him down on this and I asked him, so your testimony

21  is here -- here is that you do not have to report those items

22  because they were not related to your campaign?  None.  I know

23  of none.  That's what he said yesterday.  And then remember I

24  show him this exhibit, Exhibit 120.  What is Exhibit 120?  It

25  says, Reelect Sheriff Scott Jenkins.  That was the billboard

Rebuttal Argument by Ms. Peng

1   that Rahim gave him.  So then I asked him, your testimony is

2   that this billboard Rick Rahim paid for was not in fact related

3   to your campaign?  What does he say then?  No, that's not my

4   testimony.  That is related to the campaign, and it should have

5   been reported because that's campaign material.  I was talking

6   about the fliers and knives.  Right?  And then I ask him, well,

7   that wasn't reported, was it?  Then he does what he told you he

8   was going to do.  He shifts the blame -- he cashes in on his

9   feasible deniability to Bernie Feaganes or David or whoever is

10  responsible for that.  I mean, I had nothing to do with it.

11  Right?  What else does Exhibit 120 show you?  This is a text

12  message between him and Rahim.  How many more billboards to go?

13  And then Scott Jenkins replies, can't possibly thank you

14  enough.

15          He spins a tale until he's confronted with undeniable

16  facts.  He agreed with me that if it's on a recording, you

17  can't spin it.  But ladies and gentlemen, you saw him try to do

18  that right there from that witness stand.  He tried to even

19  spin the recordings of his own voice, the text messages he

20  sent, the undeniable admissions of guilt.  Remember when I

21  asked him about that recording, the one that you've heard

22  several times now, the one where he talks about the Rahim

23  transaction.  He says, one hand scratches the other.  Remember

24  that?  I think perhaps he meant either one hand washes the

25  other, or I'll scratch your back and you scratch mine, or

Rebuttal Argument by Ms. Peng

1  something of that nature.  And I asked him, hey, that means

2  pretty much *quid pro quo*, right?  He says no, because *quid pro*

3  *quo* means something illegal.  That's not what I meant.  He

4  thinks if he doesn't say the words out loud, there is no crime.

5  He thinks if he says, I didn't do that, or I didn't commit the

6  crime, or I didn't think it was illegal, there is no crime.

7  This is a man so confident in his abilities to create spin, he

8  sat there and repeatedly tried to defend those fake -- those

9  obviously fake gun transactions, and his counsel just tried to

10 do it again on his behalf.  He was asked multiple times during

11 his direct examination:  Why didn't you just amend that

12 campaign finance report?  And his answer, you heard him again

13 this morning, was, well, then I could be politically attacked

14 if I make the amendment.  Ask yourselves:  Does it make any

15 sense that he thinks that he could be attacked by his political

16 opponents for not amending a campaign finance report, but then

17 he thinks he won't be attacked for making up wholly fake gun

18 transactions?  It doesn't make any sense, because it's a lie.

19 I mean, he thinks -- he pointed to those guns and he talked

20 about those guns.  Hey, look, there were four real guns.  Okay.

21 Does that mean that the transactions were real?  No.  Nobody

22 bought any guns.  Nobody agreed to buy any guns.  Even Kevin

23 Rychlik, you heard on the recording when he suggested it was

24 laughing about it because it was so preposterous.  He couldn't

25 answer my question.  Nobody got guns, right?  I tried to ask

Rebuttal Argument by Ms. Peng

1  him several times.  And this was the explanation he gave, an

2  explanation he gave this morning.  Right?  He thinks that

3  because after the fact he tried to create some fake gun

4  transactions, somehow that it makes the bribes okay.  That's

5  not how it works, right?

6       Here's the real reason.  Here's the real reason why

7  he did not want to report those cash transactions.  You've seen

8  this chart already.  The four guns were tied to those four last

9  bribe payers.  Look at the dates of when they first met

10 Jenkins, when they took the oath, and what they paid.  He

11 didn't want to report that publicly, because you see for the

12 last four bribe payers the same day that they met him, they got

13 sworn in, that cash for badge, cash for badge, it's all right

14 there.  That's why he didn't want to report this.  That's why

15 he was desperate to concoct the gun transactions, because if

16 the public had seen this, they would know that he was engaged

17 in bribery.  They would know that they were defrauding him --

18 defrauding them of their -- of his honest services, which he

19 took an oath to do.

20       Members of the jury, you've seen the evidence.  He's

21 told you enough half-truths that might have thrown off a member

22 of the public, because as he told you, he's an experienced

23 politician.  He knows how to spin a good story.  But you're not

24 a regular member of the public anymore.  You've been a member

25 of this jury, and you've seen the evidence, the consistent

Continued Charge to the Jury

1  testimony and multiple witnesses, the texts and the recordings

2  in Mr. Jenkins's own words, the campaign finance reports, that

3  he try as he might cannot deny.  This man is the textbook

4  definition of a dirty cop, a corrupt politician.  He cheapened

5  and disrespected the badge he wore, a badge that's supposed to

6  stand for something.  His oath to uphold the law and tell the

7  truth, he didn't do that.  And he tried to get away with it.

8  He tried to get away with it in front of you.  But you have the

9  evidence.  So don't let him get away with it.  Hold him

10  accountable.  Thank you.

11         THE COURT:  Thank you, Ms. Peng.

12              CONTINUED CHARGE TO THE JURY

13         THE COURT:  Ladies and gentlemen, the case is almost

14  yours.  In just a few minutes, it'll be time for you to retire

15  to the jury room to begin your deliberations.  In conducting

16  your deliberations and returning your verdict, there are

17  certain rules that you must follow.  I shall list those for you

18  now.

19         First, when you go to the jury room, you must select

20  one of your members as your foreperson.  That person will

21  preside over your discussions and speak for you here in court.

22         Second, it is your duty, as jurors, to discuss this

23  case with one another in the jury room.  You should try to

24  reach agreement if you can do so without sacrificing your

25  individual judgment, because a verdict, whether guilty or not

Continued Charge to the Jury

1   guilty, must be unanimous.  Each of you must make your own

2   conscientious decision, but only after you've considered all

3   the evidence, discussed it fully with your fellow jurors, and

4   listened to the views of your fellow jurors.  Do not be afraid

5   to change your opinion if the discussion persuades you that you

6   should, but do not come to a decision simply because other

7   jurors think it is right, or simply to reach a verdict.

8           Third, during your deliberations, you must not

9   communicate with or provide any information to anyone else by

10  any means about this case.  You may not use any electronic

11  device, media, including cell phones.  You may not access

12  through any means the internet, any internet service, any text

13  or instant messaging service, any internet chat room, blog, or

14  website such as Facebook, LinkedIn, YouTube, X, and all those

15  different social media opportunities to communicate with

16  anyone -- to communicate to anyone any information about this

17  case, or to conduct any research about this case until I then

18  accept your verdict.

19          You can only discuss the case in the jury room with

20  your fellow jurors during deliberations.  I will also need

21  to -- I will also need you to inform me through a note to the

22  court security officer if you become aware of another juror's

23  violation of these instructions.

24          The reason why you may not use electronic means to

25  investigate or communicate about the case is because it is

Continued Charge to the Jury

1   important that you decide the case based solely on the evidence

2   presented in this courtroom.  Information on the internet or

3   available through social media might be wrong, incomplete, or

4   inaccurate.  You are only permitted to discuss the case with

5   your fellow jurors during deliberations because they have seen

6   and they have heard the same evidence of you -- as you.  In our

7   judicial system, it is important that you're not influenced by

8   anything or anyone outside of this courtroom; otherwise your

9   decision may be based upon information known only to you and

10  not by your fellow jurors or to the parties in this case.  This

11  would unfairly and adversely impact the judicial process.

12          Fourth, if you need to communicate with me during

13  your deliberations, you may send a note to me through the court

14  security officer, signed by one or more of your jurors.  I will

15  respond as soon as possible either in writing or orally in open

16  court.  Remember that you should not tell anyone, including me,

17  how your votes stand numerically.

18          Fifth, if the defendant is found guilty, the sentence

19  to be imposed is my responsibility.  You may not consider

20  punishment in any way in deciding whether the government has

21  proved its case beyond a reasonable doubt.

22          Six, your verdict must be based solely on the

23  evidence and on the law that I have given to you in my

24  instructions.  The verdict must be unanimous.  Nothing I have

25  said or done is intended to suggest what your verdict should

Continued Charge to the Jury

1  be.  That is entirely for you to decide.

2          Finally, a verdict form is simply written notice of a

3  decision that you reach in this case.  You will take the

4  verdict form with you.  And I'm going to go over it here in

5  just a second.  You will take the verdict form with you to the

6  jury room, and when each of you has agreed upon the verdict,

7  your foreperson will fill in the verdict form, they will sign

8  it and date it, and advise the court security officer that

9  you're ready to return to the courtroom.

10          If one of you needs to step out of the jury room for

11  any reason, your deliberations must cease.  Deliberations must

12  take place only while all members of the jury are present.  Do

13  not reveal your verdict until such time as you're discharged

14  unless otherwise directed by me.  After you've reached a

15  verdict, you're not required to talk to anybody about the case

16  unless the Court orders otherwise.

17          So let me explain to you the verdict form.  And we

18  have a notebook -- Ms. Brown will have it -- that has the jury

19  instructions in it.  And in the front pocket is going to be

20  this verdict form.  So it says this:  *In the United States of*

21  *America v. Scott Howard Jenkins* -- the verdict form -- we the

22  jury unanimously find as follows.  As to Count One -- and we're

23  going to go all through each of the 12 counts.  As to the

24  charge that Scott Howard Jenkins conspired with at least one

25  other person to commit bribery concerning programs receiving

Continued Charge to the Jury

1  federal funds or honest services or wire fraud in violation of

2  Title 18 United States Code, Section 371, we find the defendant

3  not guilty, or guilty.  Put a checkmark or X, whatever you

4  want, in whichever line you believe.

5       You have some further instructions after that.  If

6  you found the defendant guilty as to Count One, you must answer

7  the following additional question.  If you find the defendant

8  not guilty as to Count One, you skip this next question here

9  and go down to Count Two.  So the next question would be:  We

10  unanimously find the defendant conspired to commit the

11  following offenses against the United States and check all that

12  apply; in other words, as to conspiracy, you have to indicate

13  what unanimously agreed if you found him guilty of conspiracy,

14  as to whether it's federal programs bribery, honest services

15  mail fraud, honest services wire fraud, any one or all.

16       You then proceed to Count Two.  As to the charge that

17  the defendant, Scott Howard Jenkins, committed honest services

18  mail fraud in violation of 18 United States Code, Section 1341

19  and 1346, we find the defendant not guilty, or guilty.

20       You then proceed to Count Three.  Count Three

21  provides that as to the charge the defendant Scott Howard

22  Jenkins committed honest services wire fraud in violation of 18

23  United States Code, Section 1343 and 1346, related to the text

24  message sent from defendant Rick Rahim on or about July 7

25  charged in the superseding indictment, we find the defendant

Continued Charge to the Jury

1  not guilty, or guilty.

2         Then you proceed to Count Four.  Count Four provides

3  that as to the charge that the defendant Scott Howard Jenkins

4  committed honest services wire fraud in violation of Title 18

5  United States Code, Section 1343 and 1346 related to the text

6  message from the defendant to Kevin Rychlik on or about January

7  4, 2023 charged in the superseding indictment, we find the

8  defendant not guilty, or guilty.

9         Count Five is as to the charge that the defendant,

10 Scott Howard Jenkins, committed honest services wire fraud in

11 violation of 18 United States Code, Section 1343 and 1346

12 related to the check deposit on October 7, 2022, charged in the

13 superseding indictment, we find the defendant not guilty, or

14 guilty.

15        As it relates to Six through Twelve -- and I'm going

16 to read them to you -- but these are all the same charge

17 relating to different persons.  As to the charge that the

18 defendant, Scott Howard Jenkins, committed bribery concerning

19 programs receiving federal funds in violation of 18 United

20 States Code, Section 666(a)(1)(B) with respect to Rick Rahim,

21 we find the defendant guilty, or not guilty.

22        As to the charge -- Count Seven is as to the charge

23 that Scott Howard Jenkins committed bribery concerning programs

24 receiving federal funds in violation of 18 United States Code,

25 Section 666(a)(1)(B) with respect to Fred Gumbinner, we find

Continued Charge to the Jury

1    the defendant not guilty, or guilty.

2            Count Eight is as to the charge the defendant Scott

3    Howard Jenkins committed bribery concerning programs receiving

4    federal funds in violation of 18 United States Code, Section

5    666(a)(1)(B) with respect to Jim Metcalf, we find the defendant

6    guilty, or not guilty.

7            Count Nine provides that as to the charge that Scott

8    Howard Jenkins committed bribery concerning a program receiving

9    federal funds in violation of 18 United States Code, Section

10   666(a)(1)(B) with respect to Thomas Cooper we find the

11   defendant not guilty, or guilty.

12           Count Ten is as to the charge the defendant, Scott

13   Howard Jenkins, committed bribery concerning programs receiving

14   federal funds in violation of 18 United States Code, Section

15   666(a)(1)(B) with respect to Undercover Agent 1, Jerry McKee,

16   we find the defendant guilty -- not guilty, or guilty.

17           And as to Count Eleven as to the charge the

18   defendant, Scott Howard Jenkins, committed bribery concerning

19   programs receiving federal funds in violation of 18 United

20   States Code, Section 666(a)(1)(B) with respect to Undercover

21   Agent 2, that is Mike, we find the defendant not guilty, or

22   guilty.

23           And Count Twelve is as to the charge the defendant,

24   Scott Howard Jenkins, committed bribery concerning a program

25   receiving federal funds in violation of 18 United States Code,

186

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1  Section 666(a)(1)(B) with respect to Philip Howell we find the

2  defendant not guilty, or guilty.

3        After you've completed the entire form, your

4  foreperson will sign it, and then they'll date it, and then let

5  the court security officer know right outside that you've

6  completed your deliberations and you're ready to come back to

7  the courtroom.

8        You all are now the captain of the ship.  We will

9  send all this back to you.  I know Ms. Brown was in there a

10 little bit earlier making sure the technology works so that you

11 can pull the exhibits up and be able to see them.  She'll make

12 sure you know how to work all of that.  And one of your first

13 questions may be, how late do we stay?  We are here on you

14 all's schedule at this point in time.  It's 4:30.  I was going

15 to let you all deliberate, and we'll see where you are as we

16 need to as to whether we get dinner and we bring it in, as to

17 whether we come back tomorrow.  But let's go for a while and

18 then we'll see where we are.

19       All right.  So with that, we will release the jury to

20 begin -- and Ms. Brown will come in and tell you when you can

21 start your deliberations.

22       And if I could have Ms. Patrizia and Ms. Dowdy stay

23 with me for just one second, please.

24 (*Jury out, 4:36 p.m.*)

25       THE COURT:  You all can have a seat.  Ms. Patrizia

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1    and Ms. Dowdy, the law only permits 12 persons to deliberate.

2    You probably counted around the room.  We have 14.  We always

3    in a criminal case -- we always have alternates.  We had three

4    alternates in this particular case.  We lost one of our jurors

5    the first day, and we had to -- had to use one of the other

6    alternates.  Without alternates, we would frequently be unable

7    to try criminal cases, because once you lose a juror, you can't

8    go any further if you have less than 12 jurors.  And so it is

9    incredibly important for the role that you all have served as

10   being alternates here.  And I want to thank you.  I know that I

11   have taken you away from your family, your jobs, your daily

12   life.  You have been here on time.  You have been here with a

13   smile on your face.  I've paid attention to all of you all.

14   You have paid attention and you've been a part of a fantastic

15   jury.  But you're alternates.  But your service is not done

16   yet.  And you're saying what in the world do you mean?

17            So until we reach a verdict, you may still be needed.

18   If someone becomes ill or is unable to complete their service,

19   we'll need to call you back.  We're not going to ask you to

20   stay here.  We're going to get your cell phone numbers, and you

21   can go about your daily affairs.  Just keep your cell phone

22   with you.  As soon as we have a verdict, we will let you know.

23   But until we have a verdict, I'm going to ask you to continue

24   to abide by the rules that I've always asked you to abide by up

25   to this point, and that is, have no discussions with anyone

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1    about the case, no discussions with anyone -- you can tell your

2    family members that you're an alternate, but I can't talk about

3    it at this point.  And once we have a verdict, then you'll be

4    released from those discussions.  Don't do any research.  Don't

5    catch up on the news about this case until there's a verdict at

6    all as well.  But I want to thank you truly from the bottom of

7    my heart with respect to -- and as well as all the members of

8    the Western District of Virginia, and frankly all the citizens

9    of the Western District for the incredibly valuable service

10   that you've provided, because without having alternates, we

11   could not have tried this case.  And so it's a very, very

12   important and valuable role.  So with that -- I can't let you

13   go back to the jury room.  I know you have some things back

14   there.  If you can let the court security officers know where

15   your things are, and then Ms. Melvin is going to get you all's

16   cell phone numbers, and then we'll let you all be released.  So

17   I want to thank you, thank you, very much for everything you've

18   done.  Thank you.  We'll release you all at this point.

19   (*Alternate jurors released.*)

20          THE COURT:  You all please have a seat.  Let's see if

21   we can't -- are you all ready to talk about the forfeiture

22   instructions at this point?

23          MR. CALEB:  We can, yeah.

24          THE COURT:  Okay.  Let's go ahead and do that.  Can

25   we -- I'm going to let Ms. Brown go back to the back and get

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1  the jury organized.

2          So I've provided you all -- I don't have -- these

3  instructions are not numbered by way of page or anything else.

4  And I simply set them up because it's easier to take away than

5  to -- it's quicker to take away than it is to add.  Right now

6  it assumes a verdict on all 12 counts.  Obviously, if there's a

7  not guilty verdict on all counts, then the jury is dismissed

8  and there are no forfeiture instructions.  If there's a verdict

9  on any one count, the case will go forward as to forfeiture as

10 to that count -- and all those counts.

11         So you all take a minute and read -- are you all

12 reading the verdict form at this point?  Yeah, you all take

13 your time.

14         (Pause.)

15         THE COURT:  You all let me know when you're ready to

16 discuss.

17         (Pause.)

18         MS. SMITH:  Thank you, Your Honor.  We're ready

19 whenever the Court is ready.

20         THE COURT:  All right.  I had the first -- we'll just

21 go through them in order.  It begins with members of the jury,

22 you must now render special verdicts concerning property the

23 government has alleged is subject to forfeiture of the United

24 States.

25         Any objection from the government?

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1          MS. SMITH:  No, Your Honor.

2          THE COURT:  How about from the defendant?

3          MR. CALEB:  No, Your Honor.

4          THE COURT:  Second instruction defines forfeiture.

5          Any objection from the government?

6          MS. SMITH:  No, Your Honor.

7          THE COURT:  Defendant?

8          MR. CALEB:  No objection.

9          THE COURT:  Third instruction begins with Section

10    981(a)(1)(C) of the United States Code.

11          Any objection from the government?

12          MS. SMITH:  The one thing I would just like to bring

13    up -- and it's what we were looking at with the special verdict

14    form -- and I realize that the superseding indictment and the

15    forfeiture allegation lays out all of the counts should they

16    return a verdict on Counts One through Twelve.  When looking at

17    it, we think that the funds are most traceable to Counts One

18    through Five, and then Counts Eight and Nine, because these

19    have to do with the two checks from Mr. Metcalf and Mr. Cooper.

20    So we would be proceeding under Counts One through Five and

21    then Eight through Nine.  So the only edit I would make would

22    be alleged in Counts One through Five and then Eight and Nine.

23          THE COURT:  And the same would be true on the first

24    instruction as well.  The second paragraph, derived or

25    constituting the proceeds of offenses charged in Counts One

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1  through Five and Eight through Twelve.

2          MS. SMITH:  Just Eight and Nine, Your Honor.  Those

3  are --

4          THE COURT:  Eight and Nine.  Excuse me.

5          MS. SMITH:  Thank you.  And I'm sorry I didn't catch

6  that in instruction 1.

7          THE COURT:  Okay.  And I presume no objection from

8  the defendant's standpoint as it relates to that, Mr. Caleb?

9          MR. CALEB:  No objection.

10          THE COURT:  All right.  As to the instruction -- when

11  I use the term proceeds of mail or wire fraud or proceeds of

12  bribery, any objection from the government?

13          MS. SMITH:  No objection, Your Honor.

14          THE COURT:  From the defendant?

15          MR. CALEB:  No objection.

16          THE COURT:  The instruction, while deliberating, you

17  should consider all the evidence presented during the post

18  verdict proceeding and the trial.

19          Any objection from the government.

20          MS. SMITH:  No, Your Honor.

21          THE COURT:  From the defendant?

22          MR. CALEB:  No objection.

23          THE COURT:  Next instruction, I instruct you that

24  your previous findings the defendant is guilty of the

25  violations set forth -- and I'll just again change One through

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1  Five and Counts Eight and Nine -- are finally conclusive.  Any

2  objection from the government?

3            MS. SMITH:  No, Your Honor.

4            THE COURT:  From the defendant?

5            MR. CALEB:  No objection.

6            THE COURT:  And then the next instruction is, in

7  deliberating and deciding your verdict regarding forfeiture, I

8  instruct you the government need only prove by a preponderance

9  of the evidence.

10           Any objection from the government?

11           MS. SMITH:  No, Your Honor.

12           THE COURT:  From the defendant?

13           MR. CALEB:  No objection.

14           THE COURT:  Next instruction, you should not consider

15 what might happen to the funds in determining whether the funds

16 are subject to forfeiture.

17           Any objection from the government?

18           MS. SMITH:  No, Your Honor.

19           THE COURT:  From the defendant?

20           MR. CALEB:  No objection.

21           THE COURT:  And then the final instruction is a

22 special verdict form has been prepared for your use.

23           Any objection from the government?

24           MS. SMITH:  No, Your Honor.

25           THE COURT:  From the defendant?

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1          MR. CALEB:  No objection.

2          THE COURT:  All right.  And then on the verdict form,

3   I'll change in the first paragraph where it says Counts One

4   through Twelve, I'll do Counts One through Five and Counts

5   Eight and Nine, and make the change to remove Counts Six,

6   Seven, Ten, Eleven, and Twelve, and obviously anything else

7   that would need to be removed depending upon what the jury's

8   verdict is.

9          Any objection from the government?

10          MS. SMITH:  No objection, Your Honor.  The only other

11   edit we had -- and I think it goes to each count.  It says, for

12   Count One do you unanimously find by a preponderance of the

13   evidence that the following property.  I think we need to add

14   in preponderance of the evidence, but otherwise there's no

15   objection to the verdict form with the edits you've already

16   mentioned.

17          THE COURT:  And I think that that looks like that

18   will carry through on all of those counts that are going to

19   remain.  Looks like we just -- we need to add preponderance of

20   the evidence.

21          MS. SMITH:  Thank you, Your Honor.  That's correct.

22          THE COURT:  With those edits, Mr. Caleb, any

23   objection to the verdict form?

24          MR. CALEB:  Just one other.  To be consistent with

25   the original verdict form, I think we're requesting no before

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1    yes.

2              THE COURT:  Okay.  I think that's right.  We'll make

3    that change as well.  And just so that I am familiar -- so we

4    don't have this debate in front of the jury when they come

5    back, if there is a guilty verdict, do you all want to make any

6    closings to them?  I know the agreement -- not the agreement --

7    but the government is satisfied that there is sufficient

8    evidence already in the record that they can make it without

9    providing any more evidence.  Do you want to have an argument

10   with the government -- I mean with the jury?

11             MS. SMITH:  Your Honor, I would just like to speak to

12   them for a very few minutes just to kind of explain.  This is

13   kind of a foreign concept.

14             THE COURT:  Sure.

15             MS. SMITH:  But otherwise, I don't believe we're

16   going to put on any other evidence even though we're entitled

17   to.

18             THE COURT:  And I presume, Mr. Caleb, do it just like

19   any other closings, government, defendant, government gets a

20   rebuttal?

21             MR. CALEB:  I'm not sure that we will have one,

22   but --

23             THE COURT:  You may -- right.  But you'll have the

24   opportunity.

25             MR. CALEB:  The opportunity, yes.

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1        THE COURT:  Yes.  Absolutely.  Okay.  We'll do that.

2        If they decide to stay tonight and they come back

3   late, we may have a judgment call.  I presume if they've

4   decided to stay late tonight, they're going to want to go ahead

5   and go back and get it all done so they don't come back, but

6   we'll see.  I'll make these revisions.  I'll e-mail them out to

7   you all promptly so that you'll have them.  And if you all can

8   just look at them fairly quickly and get back to us if there's

9   any issues with respect to the instructions.  I'll go ahead and

10  number them so you'll know exactly what they're going to look

11  like.  And if there's any issue, e-mail me back right away so

12  that we can deal with it while the jury is out deliberating,

13  okay?

14        Anything else from the government's perspective?

15        MS. SMITH:  No, Your Honor.

16        THE COURT:  How about from the defendant's

17  perspective?

18        MR. ANDONIAN:  No, Your Honor.

19        THE COURT:  Before we break, let me just take a

20  moment of personal privilege.  I always do this while the jury

21  is out, because when a jury comes back, everyone is thinking

22  about anything but this.  But I want to speak primarily to the

23  parties through the record, and first of all, thank the counsel

24  for the way in which you've conducted this case.  All the

25  parties have been incredibly well acquitted by the quality of

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1    the legal representation that is here.  The hallmark of -- and

2    we started last Wednesday with this, and it's been touched upon

3    as well during the closings -- but the hallmark of our legal

4    system, the hallmark of the rule of law is that when there is a

5    dispute, it's resolved here in the courtroom, and it's resolved

6    in an orderly fashion, and it's resolved between the parties

7    and with the benefit of legal counsel.  And they've done

8    incredibly well in doing this.

9            It is -- I have no idea what the verdict is going to

10   be.  I have no idea what the jury is going to do, but it's --

11   I'm well satisfied that the evidence came in so the jury can

12   make a decision, and it's a decision that the jury will make

13   based upon the evidence, not about the personalities of lawyers

14   or about any disputes with the lawyers.  You all were fantastic

15   to work with.  You're fantastic to -- the way in which it was

16   apparent that you worked with each other so that the case could

17   come together.  And I want to thank you for that, because it

18   makes the job of being a judge enjoyable when you have really

19   good lawyers that try really nice cases.  You make the job

20   enjoyable.  You don't make it easy, I can tell you that.  But I

21   want to say that.  And you know, I'll speak to the special

22   agents, they're the clients in the room, if you will, but you

23   know, pass it back to your SACs, pass it back to the U.S.

24   Attorney, however much longer he may be here.

25           And Mr. Jenkins, I'll speak to you, that the quality

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1  of legal representation was fantastic, and I want to thank

2  everyone for the way in which you've conducted yourselves.

3         However the case comes out, I wish everyone all the

4  best.  I'll come down and greet the parties and counsel, and

5  then we'll wait for the verdict.  Thank you.

6         MR. ANDONIAN:  Your Honor, may we just ask,

7  logistically will we just -- will we get an e-mail, or --

8         THE COURT:  Yeah, so make sure that Ms. Brown has

9  your cell phones.  I think -- I know you all are across the

10  street.  You all will probably be camped out at the U.S.

11  Attorney's office.  And then we'll send you a text or phone

12  call as well and let you know.  You know, the only reason I

13  would encourage you not to go back to the hotel is we get

14  questions.  This is a jury that has not been afraid to ask

15  questions.  So -- and I won't answer them at all, even if it's

16  "I can't answer that," without bringing counsel together on the

17  record, letting you know what the question was.  So the further

18  away you are, the longer that takes.

19         MR. ANDONIAN:  Very well, Your Honor.

20         THE COURT:  Thank you very much.

21         (Recess.)

22         THE COURT:  All right.  Folks, we're back on the

23  record in *United States v. Jenkins*.  Let the record reflect the

24  government is present by its counsel.  The defendant likewise

25  is present by counsel.  We have a question from the jury.  The

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1    first thing that you all want to know is who signed it, and

2    that is none of them.  So we don't know who the foreperson or

3    at least the writer may be.  Dated today at 5:54.  And I'm

4    going to let you all see this.

5            The video files aren't labeled and it's taking a long

6    time to find what we need.  Is there a list of how they are

7    organized or some easier way to search them?  We'd like

8    subtitles, if available, too.  Can we see the court reporter's

9    notes of testimony?

10           So Kelly, can you hand this down to counsel to take a

11   look at it?

12           And I've got a couple of questions and a couple of

13   thoughts.

14           MR. CALEB:  Your Honor, may we have a copy of the

15   note?

16           THE COURT:  Yeah.  Kelly, go ahead and scan this in

17   and print out copies.

18           We're going to print another copy of it, but we've

19   run out of paper, but that's okay.  We'll get you -- any

20   thoughts from the government?

21           MS. CHOY:  Yes, Your Honor.  As to the request for

22   guidance on finding the video files, I think the descriptions

23   in the exhibit list are quite neutral.  They just say the dates

24   and maybe the names of the speakers.  And so --

25           THE COURT:  At least what we have is -- simply says

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1  audio/video file or audio file and then the date.

2          MS. CHOY:  So I think it would be appropriate to

3  provide that to the jurors.

4          Second, on the transcripts, the government would

5  propose that Your Honor read back the instruction about use of

6  transcripts.

7          And then third on the court reporter notes, I think

8  we could suggest the jury can ask for portions to be read back

9  to it, but we wouldn't provide those transcripts to the jury.

10          THE COURT:  All right.  Mr. Caleb, Mr. Andonian?

11          MR. ANDONIAN:  Your Honor, we have no problem with

12  the exhibit list, with the descriptions going back.  That seems

13  like it would be helpful for them.  I think just --

14          THE COURT:  Do you all have a clean copy?  So here's

15  a little bit of the issue.  Not all the exhibits were

16  admitted -- were offered.  So what we could -- what I was

17  contemplating -- I don't mind sending the exhibit list.  I

18  mean, I can either send the entire exhibit -- well, the problem

19  with sending the entire exhibit list is there's going to be

20  some descriptions on there of the exhibits that were not

21  admitted, right?

22          MS. CHOY:  We'd be happy to prepare a revised list

23  with only the admitted exhibits, Your Honor.  That would be

24  very quick.

25          MR. ANDONIAN:  And I guess we would just want to

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1    double-check.  We don't have any objection in principle to the

2    descriptions.  We just would like an opportunity to

3    double-check the list.  We would not want an unadmitted exhibit

4    description to go back and create questions.

5            THE COURT:  Exactly.  No, I don't mind that.  I think

6    in the interim what I might do is advise them that we will

7    attempt to prepare a list of exhibits that have been admitted

8    for now.  The audio and video files, to the extent admitted,

9    because they do have the exhibit numbers, are at G001 through

10   G00 -- I think it's 42 or 43.  So they at least have that, and

11   they can see those are the audio/video files.  Because it's

12   going to take you a while to prepare that and then for you all

13   to review it and confirm that that's what's on there.  I'd like

14   Ms. Brown to be able to double-check it against her list as

15   well so that we know -- so that's going to take a hot minute as

16   well.

17           MR. ANDONIAN:  Then Your Honor, with respect to the

18   other ones, I mean, we think, you know, either directing them

19   to the instruction or reading the instruction about subtitles

20   makes sense.

21           I guess with respect to reading the court reporter --

22   the transcript, I mean, I guess mechanically how would that

23   work?  I mean, is that -- every time they want that, do we have

24   to be back?  I mean, I just don't want to create a logistical

25   nightmare of, you know, 100 times they want to hear testimony

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1  back, and we have to come back up here for that to happen.  I

2  don't know, I mean --

3          THE COURT:  I mean, I think -- do you disagree that

4  they're entitled to ask to have certain testimony read back to

5  them?  I've never had to review that -- look at that issue.

6          MR. ANDONIAN:  I mean, it's always been my

7  understanding that their recollection controls as to what they

8  heard.  I don't know that there is theoretically a problem with

9  them getting the actual testimony read back to them.  Just --

10 this really is more of a question --

11         THE COURT:  Logistical issue, right.

12         MR. ANDONIAN:  Your Honor, if I could just add one

13 more --

14         THE COURT:  Yes, sir.

15         MR. ANDONIAN:  About the transcripts, I mean, I guess

16 the other issue -- I'm trying to figure out how to articulate

17 it.  I mean, to the extent that there were a difference between

18 the transcript and the jurors' recollection of what was said

19 during the trial, I think it's my view that the jurors'

20 recollection would control.  So I don't know if we're creating

21 an issue by allowing the transcripts to be brought into the mix

22 as opposed to just having them remember what was said.

23         THE COURT:  I don't know the answer to the question.

24         Have you had to look at that issue, Ms. Choy?

25         MS. CHOY:  I can't say I have a case cite for you,

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1   Your Honor.  That was just sort of my general understanding.

2          THE COURT:  Right.  I'm going to give you all an

3   opportunity to look at it.  We can always send another note

4   back to them.  I don't want to say, hey, you can get whatever

5   testimony you want.  I'm not worried about the logistics.

6   We'll figure that out.  If they're entitled to it, they're

7   entitled to it, and we'll figure out the logistics.  But I

8   don't want to say, hey, you can get it, and then we all go hit

9   Westlaw and come back and say, oops, just kidding, you don't

10  get to see that.  So I'd rather look at it and be certain about

11  it, and send them a note back in 30, 45 minutes, or tomorrow

12  morning, and say, in follow-up to your question, to the extent

13  you want further testimony, you can.

14         And then -- is it 42 or 43, Kelly, the exhibit?

15         THE CLERK:  42.

16         THE COURT:  42, okay.

17         So here's what I propose as it relates to the first

18  question, and that is the video files.  If possible, we will

19  provide a list of the admitted exhibits with the descriptions

20  as used by the parties.  For now, the audio and video

21  recordings are located at G001 through G0042.

22         For the second question -- and that is the

23  subtitles -- all the instructions given by the Court are

24  important.  Instruction number 21 provides guidance regarding

25  transcripts for audio and video recordings.

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1           And then the last one is, we're not able to provide

2   the court reporter -- because they asked for the court

3   reporter's notes of testimony.  The court reporter's notes or a

4   transcript of testimony -- you must rely upon your memory of

5   the testimony of the witnesses, period, and then not go any

6   further.

7           MS. PENG:  Your Honor, will the parties be able to

8   review a written copy of that note before it gets sent back?

9           THE COURT:  Yeah, so you all have the note.  And then

10  I'm going to write it out, and I'm going to read it to you, and

11  you all can -- because I'm going to write it out on here so it

12  will go back to them in one piece.

13          Does that -- it looks like you all are -- may have a

14  case, may not have a case?

15          MS. PENG:  Well, Your Honor, I mean, I've had that

16  done before, but you know, I'm referencing the Ninth Circuit,

17  and there is like a model instruction there with commentary on

18  how to do this procedure.  It's in your honest discretion after

19  discussion with the attorneys whether to allow read-back of

20  particular testimony.

21          THE COURT:  And I don't disagree that that may be

22  where we are, but since there's a question that's being raised,

23  and I haven't had to look at it before, I don't want to answer

24  first and figure out later.  I'd rather figure out first and

25  answer later, and for us to have a -- if you all want to send

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1    that over to us and send it to defense counsel as well, that

2    would be good.

3            Okay.  I'll let you all see this.  But I've numbered

4    these 1, 2, and 3.

5            One, if available, we will provide a list of the

6    admitted exhibits with the descriptions used by the parties.

7    For now, the audio and video recordings are located at G001

8    through G0042.

9            Two, all instructions of the Court are important;

10   however, instruction 21 provides guidance regarding transcripts

11   for audio and video recordings.

12           Three, we are not able to provide court reporter

13   notes or a transcript of testimony.  You must rely upon your

14   memory of the testimony of the witnesses.

15           If that's suitable, I'll sign that and send it on

16   back to them.

17           Any objection to what I propose to send back?

18           MS. CHOY:  On number three, Your Honor, if we are

19   going to have further discussion and potentially allow

20   read-back of transcripts, our preference would be that for now

21   we say we can't provide guidance at this time.  That way we're

22   not telling them something different later.

23           THE COURT:  What I'd like to do, if we -- I'd like to

24   be able to answer their question and say, at this time, we're

25   not able to provide the court reporter notes or a transcript of

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1  the testimony.  You must rely upon your memory of the testimony

2  of the witnesses.

3       And just the short things that we're seeing, I'm

4  reticent because it looks like, one, what Ms. Curry-Ledbetter

5  has found and shown to me -- and I certainly don't mind

6  instructing the jury -- bringing them back in, you have to rely

7  primarily upon your -- but there's some decent authority that

8  suggests you've got to provide the entire transcript of that

9  particular witness's testimony.  Certainly both sides would

10  have a chance to review it beforehand.  We'd need to make sure

11  if there were any bench conferences those come out.  And if you

12  provide only a portion, does each side get to offer something

13  so that it's made more complete, right, because if they want

14  something that the government likes, and the defendant wants to

15  make sure, well, don't forget such-and-such, or vice versa,

16  what do we do?  So I've got to think about it as to what we

17  would do in that regard.  So that's the reason I'd like to put,

18  at this time.

19       MS. CHOY:  That would be fine, Your Honor.  Thank

20  you.

21       THE COURT:  Mr. Andonian, Mr. Caleb?

22       MR. ANDONIAN:  That's fine, Your Honor.

23       THE COURT:  The other thing I'm going to do, because

24  you all probably struggled with my handwriting as it was, we're

25  going to -- can you type this out -- we'll print out their

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1   question and then staple them together and send them back, and

2   just type it as the Court's response to jury question.

3          While we have you all here, it is 6:30.  It seems to

4   me we have three different options that we can address with the

5   jury.  Do nothing.  Go in there and ask them if they want

6   dinner, not give them, you know, an option of going home.  Or

7   go in there and say, you know, do you all want to keep going?

8   Do you want us to order dinner?  You know, what do you all want

9   to do, and just leave it up to them.  My experience with

10  respect to when a jury gets dinner, you know you're going to be

11  here at least until the food arrives and they have a chance to

12  eat if they want to go home.  It matters not to me.  I think

13  Ms. Smith is the only one that is going to sleep in her own bed

14  tonight, as well as the agents.  So it doesn't matter to us.

15          Do you all have a preference?

16          MS. CHOY:  We'd say offer them dinner.

17          MR. ANDONIAN:  We have no problem offering them

18  dinner.  I mean, it would be helpful -- I keep harping on

19  this -- to know somewhat about what their plans are, if only so

20  we --

21          THE COURT:  Can get dinner if you need to?

22          MR. ANDONIAN:  -- can eat.

23          THE COURT:  Exactly.  Okay.  Well, so what we can do,

24  if you want, is once we have this written out, we can actually

25  bring them in, and I'll read them the answers back, and then at

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1  the same time I'll tell them that, you know, like I said,

2  you're the captain of the ship.  We'll stay here as late as you

3  want.  We'll order dinner.  You know, we'll do whatever you

4  want.  Just let us know.  So we'll just bring them back in for

5  that purpose, if you like.

6              (Discussion off the record.)

7              MS. SMITH:  Your Honor, so we right now have an

8  exhibit list together.  Ms. Fastenau is putting in the

9  speakers, but we can at least send the preliminary list so that

10  Ms. Brown can start checking it, and defense counsel can start

11  checking it as well.  I don't know if you then just want to

12  send your note back to the jury so that they can keep going

13  and --

14              THE COURT:  Yeah, that's going to take a little bit

15  of time.

16              You don't have to staple them together.  Just give

17  those back to them so they can look at my response.  And print

18  it out for both sides, please, Kelly.

19              Is the response okay?

20              MS. CHOY:  Yes, Your Honor.

21              MR. ANDONIAN:  Yes, Your Honor.

22              THE COURT:  All right.  So I'll go ahead and sign

23  that.  Let's bring the jury in, if we can.

24              (Discussion off the record.)

25              THE COURT:  Ms. Smith, are you providing the

208

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1  additional -- speakers?

2         MS. SMITH:  We're going to -- we're adding in the

3  speakers right now to help aid the jury, but I wanted to at

4  least be able to double-check the exhibits.

5         THE COURT:  This is currently the way it's in Box.

6         THE CLERK:  Because I just used your description in

7  my description.

8         MS. SMITH:  Oh, okay.  So the files are saved as they

9  are written on the exhibit list?

10        THE COURT:  Correct.  And the exhibits go in with the

11 names, with these descriptions as well.

12 (*Jury in, 6:45 p.m.*)

13        THE COURT:  All right.  Ladies and gentlemen, first

14 of all, you all please have a seat.

15        Let the record reflect the jury is present and

16 seated.

17        I got your question.  Thank you very much for sending

18 that over.  Let me read to you the response, and I'm going to

19 send it back to you as well, that if available, we will provide

20 a list of admitted exhibits with the descriptions used by the

21 parties.  For now the audio and video recordings are located

22 generally at G001 through G0042.  And I think what you have on

23 Box is, for the most part, the descriptions that you're going

24 to get back.  Whether we can add the names of the speakers in,

25 I'm not sure yet at this point in time.  So that's the answer

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1   to the first question.

2           The answer to the second question is, all

3   instructions of the Court that we provided earlier are

4   important.  However, instruction 21 provides guidance regarding

5   transcripts for audio and video recordings.

6           The answer to question number 3 is at this time we're

7   not able to provide the court reporter notes or any transcript

8   of testimony.  You must rely upon your memory of the testimony

9   of the witnesses.

10          And so that's my response to each of your questions.

11  I'll send it back -- this back with you.

12          With that, ladies and gentlemen, let me -- like I

13  said, you are the captain of the ship.  And so we're going to

14  be guided by what you all want to do.  It is about 6:45.  You

15  have various different options available.  Stay as long as you

16  like, that's always one option.  We can order dinner in, if you

17  like, and stay as long as you like.  You can keep going a

18  little bit longer and make a decision about dinner a little bit

19  later.  It's 6:45.  If you don't think you're going to be --

20  well, I don't want to put any caveats on how late you stay.  If

21  you want to come back tomorrow, I understand that as well.  I

22  don't need you all to have that discussion amongst yourselves

23  here in the courtroom in front of everybody, but I want you all

24  to be thinking about that, because -- and then we'll be guided

25  by whatever your decision is in that regard.

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1         All right.  So with that, we'll send the answers to

2    the question back to you, and we'll allow the jury to be

3    adjourned.

4    (*Jury out, 6:48 p.m.*)

5         THE COURT:  You all please have a seat.  Actually,

6    the easiest thing to do, maybe -- we can double-check it from

7    Ms. Fastenau.  So what we did in Box is as the government

8    uploaded their exhibits into Box, it has, I presume, these

9    exact same descriptions on it that were on the exhibit list.

10   When an exhibit gets admitted, Ms. Brown just takes it from the

11   government's box, drags it over into the admitted box, so it

12   carries with it the same description.  So the audio files and

13   video files are simply audio recording dated such-and-such,

14   video recording dated such-and-such.  And the -- of course,

15   then, the other exhibits have a little bit more description so

16   you can kind of tell what they are.  And then whether we can

17   add a description next to this that -- you know, for video

18   recording dated such-and-such date, hyphen, and then just list

19   the speakers on it.  I don't think any other description would

20   be appropriate at all, but just simply list the speakers, you

21   know, Scott Jenkins and Kevin Rychlik, or whatever it may be.

22   And so if that can be put together, and there is no objection

23   to that, you know, we can address that.  That's going to take a

24   hot minute to get together, would be my guess.

25         MS. SMITH:  We are almost done, Your Honor.  She

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1  works very fast.

2          THE COURT:  But to be fair, the defendants will

3  probably want to double-check it, including maybe even

4  listening to that to make sure those are the folks.

5  Completely -- it's not distrust, but just to make sure the math

6  checks.

7          MS. SMITH:  Absolutely.

8          THE COURT:  All right.  I think we're being told

9  we're going to get another note.  So we can wait.  We can go

10 off the record, and you all just --

11          (Discussion off the record.)

12          THE COURT:  We have reached a verdict.  So with that,

13 are we ready for the jury?

14          Actually, before we do that, the forfeiture

15 instructions, we mailed them to you all with the updates.

16          MS. SMITH:  Everything looked fine for the

17 government.

18          MR. CALEB:  Yes.

19          THE COURT:  Okay.  All right.  So let's print those

20 out.

21          Also, it is my practice to poll the jury regardless

22 of whether there's a request.  So you all don't need to ask for

23 the jury to be polled.  So I'll poll them.

24          All right.  Are we ready for the jury?  All right.

25 Let's bring the jury in.

Verdict

1   (*Jury in, 7:02 p.m.*)

2          THE COURT:  Ladies and gentlemen, you all please have

3   a seat.

4          All right.  I'm advised that you have reached a

5   verdict; is that right?  Pass your verdict form up to the CSO.

6          I'll ask the clerk to publish the verdict.

7          THE CLERK:  Ladies and gentlemen, is this your

8   verdict?

9          JURORS:  Yes.

10         THE CLERK:  In the United States District Court for

11  the Western District of Virginia, Charlottesville Division,

12  *United States of America v. Scott Howard Jenkins*, case number

13  3:23-cr-11, we the jury unanimously find as follows:  Count

14  One, as to the charge that the defendant, Scott Howard Jenkins,

15  conspired with at least one other person to commit bribery

16  concerning programs receiving federal funds or honest services

17  mail or wire fraud in violation of Title 18 United States Code,

18  Section 371, we find the defendant guilty.  We unanimously find

19  that defendant conspired to commit the following offenses

20  against the United States:  Federal programs bribery, honest

21  services mail fraud, honest services wire fraud.

22         Count Two:  As to the charge that defendant Scott

23  Howard Jenkins committed honest services mail fraud in

24  violation of Title 18 United States Code, Sections 1341 and

25  1346, we find the defendant guilty.

Verdict

1          Count Three:  As to the charge that defendant Scott

2     Howard Jenkins committed honest services wire fraud in

3     violation of Title 18 United States Code, Sections 1343 and

4     1346 related to the text message sent from defendant Rick Rahim

5     on or about July 7th, 2020 charged in the superseding

6     indictment, we find the defendant guilty.

7          Count Four:  As to the charge that defendant Scott

8     Howard Jenkins committed honest services wire fraud in

9     violation of Title 18 United States Code, Sections 1343 and

10    1346 related to the text message sent from defendant to Kevin

11    Rychlik on or about January 4th, 2023 charged in the

12    superseding indictment, we find the defendant guilty.

13         Count Five:  As to the charge that the defendant,

14    Scott Howard Jenkins, committed honest services wire fraud in

15    violation of Title 18 United States Code, Sections 1343 and

16    1346 related to the check deposit on or about October 7th, 2022

17    charged in the superseding indictment, we find the defendant

18    guilty.

19         Count Six:  As to the charge that defendant Scott

20    Howard Jenkins committed bribery concerning programs receiving

21    federal funds in violation of Title 18, United States Code,

22    Sections 666(a)(1)(B) with respect to Rick Rahim, we find the

23    defendant guilty.

24         Count Seven:  As to the charge that the defendant,

25    Scott Howard Jenkins, committed bribery concerning programs

Verdict

1  receiving federal funds in violation of Title 18 United States

2  Code, Section 666(a)(1)(B) with respect to Fredric Gumbinner,

3  we find the defendant guilty.

4          Count Eight:  As to the charge that the defendant,

5  Scott Howard Jenkins, committed bribery concerning programs

6  receiving federal funds in violation of Title 18 United States

7  Code, Section 666(a)(1)(B) with respect to James Metcalf, we

8  find the defendant guilty.

9          Count Nine:  As to the charge that defendant, Scott

10  Howard Jenkins, committed bribery concerning programs receiving

11  federal funds in violation of Title 18 United States Code,

12  Section 666(a)(1)(B) with respect to Thomas Cooper, we find the

13  defendant guilty.

14          Count Ten:  As to the charge that the defendant,

15  Scott Howard Jenkins, committed bribery concerning programs

16  receiving federal funds in violation of Title 18 United States

17  Code, Section 666(a)(1)(B) with respect to Undercover Agent

18  Jerry McKee, we find the defendant guilty.

19          Count Eleven:  As to the charge that the defendant,

20  Scott Howard Jenkins, committed bribery concerning programs

21  receiving federal funds in violation of Title 18 United States

22  Code, Section 666(a)(1)(B) with respect to Undercover Agent 2,

23  Mike, we find the defendant guilty.

24          Count Twelve:  As to the charge that the defendant,

25  Scott Howard Jenkins, committed bribery concerning programs

Verdict

1   receiving federal funds in violation of Title 18 United States

2   Code, Section 666(a)(1)(B) with respect to Philip Howell, we

3   find the defendant guilty.

4            Signed, Diana Walker, foreperson, on December 18th,

5   2024.

6            THE COURT:  I'll ask the clerk to poll the jury.

7            THE CLERK:  Ladies and gentlemen, as I call your

8   name, please answer yes or no if the verdict just read is your

9   true verdict.

10           Diana Veronica Walker?

11           FEMALE JUROR:  Yes.

12           THE CLERK:  Shawn Holden Mitchell?

13           MALE JUROR:  Yes.

14           THE CLERK:  Kelly Marie Rhoden?

15           FEMALE JUROR:  Yes.

16           THE CLERK:  Susan Thomas?

17           FEMALE JUROR:  Yes.

18           THE CLERK:  Bobbie Swaringen Relken?

19           FEMALE JUROR:  Yes.

20           THE CLERK:  Cody Daniel Bryant?

21           MALE JUROR:  Yes.

22           THE CLERK:  Christine Crute Estes?

23           FEMALE JUROR:  Yes.

24           THE CLERK:  Dora Shelton Smith?

25           FEMALE JUROR:  Yes.

Forfeiture Charge to the Jury

1      THE CLERK:  Emily Hobgood Walker?

2      FEMALE JUROR:  Yes.

3      THE CLERK:  Sherrie Lynn Frazier?

4      FEMALE JUROR:  Yes.

5      THE CLERK:  Lisa Michelle Choi?

6      FEMALE JUROR:  Yes.

7      THE CLERK:  Margaret Conway Short?

8      FEMALE JUROR:  Yes.

9            FORFEITURE CHARGE TO THE JURY

10      THE COURT:  All right.  Ladies and gentlemen, first

11 of all, thank you very much for your work.  There's one other

12 thing that I must ask of you, though.  The government has

13 alleged that certain property is subject to forfeiture,

14 specifically the $10,000 that was seized from Blue Ridge Bank.

15 You will be required now to render a special verdict relating

16 to that issue.  I have some instructions for you as well.

17      Members of the jury, you must now render special

18 verdicts concerning property that the government has alleged is

19 subject to forfeiture to the United States.  The United States

20 Code provides that all property derived from or constituting

21 the proceeds of the offenses charged in Counts One through Five

22 and Counts Eight and Nine is subject to forfeiture.  As to the

23 item of property for which the government seeks forfeiture, you

24 must find whether that property is connected to the underlying

25 crime.  I'll define those terms for you in a moment.

Forfeiture Charge to the Jury

1          The property the government is seeking to forfeit is

2     $10,000 in funds seized from a Blue Ridge Bank account ending

3     in 8133 on January 31, 2023, which I will refer to as "the

4     funds."

5          Instruction number 2:  Forfeiture means that as part

6     of the penalty for engaging in criminal activity, a defendant

7     loses any ownership or interest he has or claims to have in

8     certain property.

9          Instruction number 3:  Section 981(a)(1)(C) of the

10    United States Code provides in part that whoever is convicted

11    of mail or wire fraud and/or bribery shall forfeit to the

12    United States any property, real or personal, which constitutes

13    or is derived from proceeds traceable to the offense.  The

14    government alleges that the funds are forfeitable because they

15    are traceable to the offenses alleged in Counts One through

16    Five and Counts Eight and Nine.

17         Instruction number 4:  When I use the term proceeds

18    of mail or wire fraud, or proceeds of bribery, this term

19    includes any monies or other property that the defendant

20    obtained directly or indirectly as a result of his actions.  To

21    determine if the funds are forfeitable, you will be asked to

22    return a special verdict of forfeiture on whether there is a

23    nexus between the offenses and the funds.  In the instance of a

24    proceeds of forfeiture case such as this, there is a nexus if

25    the funds constitutes or derives from proceeds traceable to the

Forfeiture Charge to the Jury

1   offenses.  Proceeds satisfy the nexus test if a person would

2   not have the money but for the criminal offense.  This means

3   proceeds include the total amount of money obtained by the

4   defendant as a result of his actions.  There is no set-off for

5   any cost or expenses the defendant incurred, and the term

6   proceeds is not limited to the net gain or profit realized from

7   the offense.

8         Instruction number 5:  While deliberating, you should

9   consider all the evidence presented during the post-verdict

10  proceeding and the trial regardless of who offered it.  There

11  is going to be no additional evidence.  You have all the

12  evidence in the record.

13        All instructions previously given to you concerning

14  duties of the jury, your consideration of the evidence, and

15  what is and is not evidence, the credibility of the witnesses,

16  expert testimony, your duty to deliberate together and your

17  duty to base your verdict solely on the evidence without

18  prejudice, bias, or sympathy, and the necessity of a unanimous

19  verdict will continue to apply during these deliberations.

20        Instruction number 6:  I instruct you that your

21  previously findings that the defendant is guilty of the

22  violations set forth in Counts One through Five and Counts

23  Eight and Nine are final, conclusive, and binding.  Because you

24  are bound by your previous findings that the defendant is

25  guilty, I direct you not to discuss in your forfeiture

Forfeiture Charge to the Jury

1  deliberations whether the defendant is guilty or not guilty of

2  any violations.

3        Instruction number 7:  In deliberating and deciding

4  your verdict regarding forfeiture, I instruct you that the

5  government need only prove by a preponderance of the evidence

6  whether there is a connection or nexus between the offense and

7  the funds.  The government is not required to prove the nexus

8  beyond a reasonable doubt.  Preponderance of the evidence means

9  that a fact is more likely true than not true.  The government

10 must prove that it is more likely than not that the funds

11 constitute or derive from proceeds traceable to the offenses.

12 In other words, preponderance of the evidence means that the

13 government's evidence, when considered and compared with that

14 opposed to it, has more convincing force and produces in your

15 minds a belief that there is a nexus between the funds and the

16 defendant's crimes.

17        Instruction number 8:  You should not consider what

18 might happen to the funds in determining whether the funds are

19 subject to forfeiture.  You should also disregard any claims

20 that other persons may have to the funds.  The Court will

21 account for any interest that other persons may have in the

22 funds, or whether forfeiture of the funds would constitute

23 excessive punishment at a later time.  Your sole concern now is

24 to determine whether the funds constitute or derive from

25 proceeds traceable to violations.

Forfeiture Charge to the Jury

1      Instruction number 9:  A special verdict form has

2  been prepared for your use.  The special verdict form lists the

3  funds that the government asserts are subject to forfeiture.

4  You may answer by simply putting an X or checkmark in the space

5  provided next to the words yes or no.  Depending upon your

6  answer, there is a follow-up question you must answer.  You

7  must reach a unanimous verdict as to each question on the

8  special verdict form.  The foreperson must then sign and date

9  the special verdict form.  You will see that the special

10  verdict form asks you to consider separately whether the funds

11  are subject to forfeiture on more than one basis.  Even if you

12  find the funds are subject to forfeiture for more than one

13  reason, that does not mean that the government will receive

14  forfeited property twice.  It is important, however, that you

15  indicate on the special verdict form all bases on which you

16  find the funds are subject to forfeiture.

17      Ladies and gentlemen, here's the way that we're going

18  to proceed.  I know you may feel I pulled a fast one on you in

19  saying you have a little bit more work to do before you go

20  home.  But I'm going to allow the parties to address you in

21  closing argument style.  I'm going to explain to you the

22  verdict form.  And the same thing that I told you before you

23  reached your verdict is going to remain the same.  You are the

24  captain of the ship.  If you all want to discuss this tonight,

25  fine.  We're here for you.  If you want to discuss it for a

USA v. Jenkins, 3:23-cr-11, 12/18/2024

 1  while, and if you can't reach a decision, and come back

 2  tomorrow, fine, we're here for you.  If you want to decide to

 3  go home and come back in the morning to resolve it, fine, we're

 4  here for you.  But I wanted to make sure that this issue got in

 5  front of you tonight as well.

 6          So with that, Ms. Smith, does the government have

 7  anything to address the jury about?

 8          MS. SMITH:  Just briefly, Your Honor.

 9          THE COURT:  Yes, ma'am.  Come around.

10          MS. SMITH:  Good evening.  I know everyone is tired.

11  It's been a long day.  I just want to give you guys just a few

12  points to keep in mind.  What the government is seeking to

13  forfeit is that $10,000 related to the two checks that were

14  deposited into Scott Jenkins's Blue Ridge account.  As you

15  heard Special Agent Scott Medearis testify to, the Blue Ridge

16  Bank account ending in 8133 was the bank account for the Scott

17  Jenkins For Sheriff account.  Specifically, after receiving

18  each $5,000 check from James Metcalf and Tom Cooper, Scott

19  Jenkins deposited into that account those two checks.  As you

20  heard the special agent testify to, there were no significant

21  deposits after those two checks were deposited, and then

22  subsequently the FBI seized those $10,000.  So those are the

23  two sources of funds that we're asking you to look at and

24  decide whether or not it's traceable to the numerous counts

25  that you just found Scott Jenkins guilty of.

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1    Thank you.

2    THE COURT:  Thank you, Ms. Smith.

3    Mr. Andonian?

4    MR. ANDONIAN:  We don't have anything to add, Your

5  Honor.

6    THE COURT:  All right.  Very well.

7    Ladies and gentlemen, let me explain to you your

8  verdict form that you'll go back with.

9    Again, in the matter of *United States of America v.*

10 *Scott Howard Jenkins*, this is the verdict form -- jury verdict

11 form with regard to forfeiture, and it reads as follows.

12    We, the jury, on the above captioned case present the

13 following unanimous verdict:  The United States has in its

14 custody $10,000 from the Scott Jenkins For Sheriff bank account

15 with an account number ending in 8133 that was seized by

16 federal law enforcement agencies as a result of the

17 investigation into the allegations of Counts One through Five

18 and Counts Eight and Nine for which the jury returns a verdict

19 of guilty in the superseding indictment.

20    And these are the questions you'll need to answer.

21 One, for Count One, do you unanimously find by a preponderance

22 of the evidence that the following property constitutes

23 property traceable to the gross receipts obtained directly or

24 indirectly:  A, $10,000 in U.S. currency seized from the Blue

25 Ridge Bank account ending 8133 on or about January 31, 2023, no

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1  or yes.  And then if you find that it was lesser or greater

2  amount, please state that amount.

3          And if they don't put an amount in, it's the full

4  $10,000; do you all agree, counsel?

5          MS. SMITH:  Yes, Your Honor.

6          THE COURT:  Mr. Andonian?  Is that a yes?

7          MR. ANDONIAN:  Yes.

8          THE COURT:  All right.  Very well.

9          So if you don't put an amount in, it's the full

10  $10,000.  If you put an amount in, if you believe that it's a

11  different amount than $10,000.

12          For Count Two, you unanimously find by a

13  preponderance of the evidence that the following property

14  constitutes property traceable to the gross receipts obtained

15  directly or indirectly:  A, $10,000 in U.S. currency seized

16  from the Blue Ridge Bank account ending in 8133 on or about

17  January 31, 2023, no or yes.  And then if you find that a

18  lesser or greater amount, please state that amount and fill

19  that in.

20          Number 3 -- for Count Three, do you unanimously find

21  by a preponderance of the evidence that the following property

22  constitutes property traceable to the gross receipts obtained

23  directly or indirectly:  A, $10,000 in U.S. currency seized

24  from Blue Ridge Bank account ending in 8133 on or about January

25  31, 2023, no or yes.  And then if you find a lesser or greater

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1   amount, fill that number in.

2          As to Count Four, do you unanimously find by a

3   preponderance of the evidence that the following property

4   constitutes property traceable to the gross receipts obtained

5   directly or indirectly -- and again, it's the same $10,000 from

6   the same bank account, from the Blue Ridge Bank account ending

7   in 8133, no or yes.  If you find a different or greater amount.

8          As to Count Five, it's the same thing.  Do you

9   unanimously find by a preponderance of the evidence that the

10  following property constitutes property traceable to the gross

11  proceeds, same bank account, no or yes.  And then if you find a

12  different amount, fill that in.

13         And as to Count -- question 6 and question 7 are for

14  Counts Eight and Nine.  It's the same question, same bank

15  account, but you need to answer it for each one of these

16  counts.

17         After you get done, please sign and return this to

18  the courtroom, and we're going to make -- Campbell, can you

19  bring this up to where the date is on the same page?  We're

20  going to print this out to where we get the date and signature

21  on the same page, but then we'll send that -- send the verdict

22  form back with you.

23         With that, ladies and gentlemen, all the instructions

24  that I gave to you immediately before you began your

25  deliberations this evening remain.  You already have your

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1  foreperson.  But again, conduct your deliberations in a

2  businesslike manner, paying due respect for everyone's opinions

3  and so forth.

4          With that, I will let you all adjourn.  Again, you

5  all make the decision about when you want to tackle this

6  question, tonight into the evening, or tomorrow.  We are here

7  at your convenience.

8          So with that, we'll excuse the jury.  And we will

9  send the verdict form in, in a second.

10  **(***Jury out, 7:21 p.m.***)**

11          THE COURT:  So as it relates to the jury verdict, any

12  motions at this time?

13          MR. ANDONIAN:  No, Your Honor.

14          THE COURT:  Okay.  Very well.  So Mr. Jenkins will

15  remain on bond, the exact same conditions, Mr. Jenkins, that

16  were previously set when we were together before trial.

17          Ms. Smith?

18          MS. SMITH:  Your Honor, the government does have a

19  motion under 18 U.S.C. 3143.

20          THE COURT:  Okay.

21          MS. SMITH:  We would move for his remand at this

22  time.

23          THE COURT:  All right.  I'm going to -- given where

24  we presently are, I'm going to leave Mr. Jenkins on bond.  I'll

25  pull up 3143.  I do believe that -- so I give you the right

226

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1   standards --

2          MS. SMITH:  And Your Honor, if I could just be heard?

3          THE COURT:  Sure.

4          MS. SMITH:  The posture has changed in this case.

5   Mr. Jenkins is no longer accused of crimes.  He has been found

6   guilty, and he's been found guilty on all 12 counts, and he is

7   facing significant jail time.  If you look at 18 U.S.C. 3143,

8   it says the Court shall remand unless it is found by clear and

9   convincing evidence that he is not a flight risk and no danger

10  to others.  And I think it's important to note that we have

11  more information than we did back on June -- back in June of

12  2023 when he was allowed to be out on bond, and even after Your

13  Honor continued to have him on bond back in November of this

14  year.  First we have him not showing up to his original court

15  date.  He basically excused himself from his own federal jury

16  trial.

17         THE COURT:  But he let everybody know where he was.

18  He didn't follow the order of the Court to be here, but he let

19  everybody know where he was.  He was not fleeing.

20         MS. SMITH:  Your Honor, he was not fleeing, but he

21  was -- he's supposed to show up for court, and he did not show

22  up for court.  And we had no communication until after hours

23  even as to what was going on with his medical status.

24         Additionally, he continued to have these purported

25  medical issues.  And if you recall the testimony from that UVA

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1   Culpeper emergency room doctor, he said both in his reports and

2   on the stand that he thought that the defendant was

3   malingering.  And so I do think you have some concerns about

4   delay and whether or not he's being truthful with the Court,

5   and with even medical personnel.

6        And additionally, we have the defendant continuing to

7   obstruct in this case.  He took the stand, and he was supposed

8   to tell the truth, and I think the Court has plenty of

9   information that he has lied under oath.  And the jury has

10  found that he lied under oath, because they returned a swift

11  and decisive verdict in this case.  They did not believe a word

12  that he said, and I think that shows that he cannot follow the

13  Court's orders, and that he thinks he can continue to get away

14  with things.  He was supposed to testify truthfully under oath,

15  and instead, he took that stand and for hours told falsehoods.

16  So the government has serious concerns about his ability to

17  continue to follow the Court's orders.  And I think the statute

18  is quite clear that he shall be remanded, and that we ask that

19  you do that at this time.

20       THE COURT:  Mr. Andonian, Mr. Caleb, do you want to

21  address that?

22       MR. ANDONIAN:  Yes, Your Honor.

23       Your Honor, we do believe that there is clear and

24  convincing evidence that he is not a risk of flight and not a

25  danger to anyone in the community.  He has been following every

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1   condition of release since he has been put on release back in

2   the beginning or the middle of 2023.

3          The health episodes, I don't -- I'm happy to address

4   it.  I mean, Mr. Jenkins did what he could.  He clearly was

5   having a health episode.  He got treatment promptly after that.

6   He's been following all of the directions of his treating

7   physician.  He's been here every day of this trial.  He has not

8   been late.  He hasn't missed a date.  There's absolutely

9   nothing to suggest that he poses a danger.  He doesn't even

10  have a passport, I'll represent to the Court.  So there's just

11  simply no -- I mean, he's lived in Culpeper his entire life.

12  Based on the record that you have before you, we would submit

13  there's clear and convincing evidence that he is not a flight

14  risk, and he is not a danger to anyone in the community.

15         THE COURT:  All right.  Thank you.

16         I'll give you the final word, Ms. Smith.

17         MS. SMITH:  Your Honor, I just would point out that

18  it has changed now.  He is no longer just accused.  He's been

19  found guilty.  And I think under the statute and what we've

20  seen in this courtroom it's appropriate to remand him.

21         THE COURT:  So 3143, Ms. Smith does properly indicate

22  that a person who has been found guilty and is awaiting

23  sentencing shall be remanded unless several conditions may

24  exist.  One is that under any applicable guideline promulgated

25  under 994 doesn't recommend a term of imprisonment.  I don't

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1   think that's the issue here.  And two, is unless a judicial

2   officer finds by clear and convincing evidence that the person

3   is not likely to flee or pose a danger to the safety of any

4   other person or the community if released under 3142.

5           So again, the same standards that the Court

6   considers, though with different burdens at this point in time.

7           So with respect to a flight risk, since released on

8   bond in this case before it was assigned to me, my

9   understanding is that Mr. Jenkins complied in all respects with

10  respect to his conditions of bond.  There may have been some to

11  and fro-ing with respect to getting the case off the ground,

12  getting counsel and so forth, but none of that has been before

13  me in any great respect.  At the time of trial, Mr. Jenkins --

14  in November -- Mr. Jenkins certainly didn't come here, but he

15  called his probation officer before he went to the ER, as I

16  recall in my conversations with Ms. Salazar.  We knew where he

17  was.  There was -- it was frustrating to get the case to trial.

18  We set him on conditions of release at a hearing that we had in

19  early -- late November, I believe, and -- many of which -- I

20  think actually put Mr. Jenkins on a different health regimen

21  than perhaps he had experienced for quite some time.  I will

22  note that during the trial here over the last I guess six days

23  of trial, I haven't noticed any apparent anxiety, any

24  apparent -- any of the conditions that were what delayed us.

25  And so he appears to be -- and my conversations with

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1  Ms. Salazar have been he's complied in all respects with his

2  terms and conditions of release.

3          As it relates to whether he is a danger to the

4  community, the only evidence that's cited is that there is

5  obstruction based upon his testimony.  I've got to think about

6  that, whether that sentencing enhancement will otherwise apply,

7  whether the government seeks it, which apparently it will.  But

8  I can't make that conclusion at this point in time.  It's

9  something that I have to decide.  And there is no indication

10  that Mr. Jenkins is -- has shown any violent tendencies or has

11  threatened any witnesses at all.

12          I am going to revisit one thing, however.  And that

13  is, it's my understanding, Mr. Jenkins, that all of the guns

14  that you owned are out of your house; is that correct?

15          THE DEFENDANT:  Yes, sir.

16          THE COURT:  Okay.  And they're either with your

17  brother or others; is that right?

18          THE DEFENDANT:  Yes, sir.

19          THE COURT:  Okay.  All right.  Your brother is not

20  before the Court.  I think he's in the courtroom.  And that is

21  -- you are not to possess a firearm, period.  Any -- and if you

22  go to your brother's house -- and I'm going to impose this upon

23  you because you're the one in front of the Court -- that you

24  need to assure with your brother that any firearms that he has

25  in the house need to be in a safe, in a safe for which you

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1   don't have either the combination or access to the key.

2            Do you understand?

3            THE DEFENDANT:  Yes, sir.

4            THE COURT:  So I'm going to add that condition as

5   well.  I'm going to deny the government's motion for immediate

6   release, but I'm going to add that condition.  I'm going to

7   leave in place that you continue to receive the medical

8   treatment, that you continue to go to the counseling that I

9   directed in the past as well, and that the medical

10  authorizations that have been provided continue to remain in

11  place.

12           So with that, I'm going to set a sentencing date.

13           (Discussion off the record.)

14           THE COURT:  So I'm going to set sentencing for March

15  the 31st, if that is available on you all's calendars.

16           MS. CHOY:  Just a moment.

17           That works for the government, Your Honor.

18           MR. ANDONIAN:  Your Honor, that will work for us.  If

19  we could do it in the afternoon, that would be ideal

20  for scheduling purposes.

21           THE COURT:  Kelly, can you -- do you have access to

22  -- how about 1:00?

23           MR. ANDONIAN:  That's fine.

24           THE COURT:  Is that enough time for you all to get

25  down here?

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1          MS. CHOY:  Yes, Your Honor.

2          THE COURT:  Okay.  I'll set sentencing for

3  Mr. Jenkins for March the 31st at 1:00.  That will be the only

4  notice that you get.  We'll put notice on the docket, but

5  you're not going to be served with a separate notice as well.

6          All right.  Anything else we need to address at this

7  point in time, other than wait for the jury on the forfeiture

8  issue?

9          MS. CHOY:  Nothing from the government, Your Honor.

10          THE COURT:  Anything from the defendant?

11          MR. ANDONIAN:  Nothing from us, Your Honor.

12          THE COURT:  All right.  Very well.  We'll stand in

13  recess and await the jury.

14          (Recess.)

15          THE COURT:  You all please have a seat.

16          Back on the record in the matter of *United States v.*

17  *Jenkins*.  The government is present by its counsel.  The

18  defendant likewise is present by counsel.  I'm advised that we

19  have a verdict as it relates to the forfeiture.

20          Are you all ready for the jury?

21          MS. SMITH:  Yes, Your Honor.

22          THE COURT:  All right.  Let's bring the jury in.

23  (*Jury in, 7:37 p.m.*)

24          THE COURT:  Ladies and gentlemen, please have a seat.

25          All right.  I am advised that we have a verdict on

233

Forfeiture Verdict

 1   the forfeiture issue; is that correct, Madam Foreperson?

 2             FEMALE JUROR:  Yes.

 3             THE COURT:  If you could hand the verdict form up,

 4   I'd be much obliged.

 5             All right.  I'll ask the clerk to call the verdict.

 6             THE CLERK:  Ladies and gentlemen, is this your

 7   verdict?

 8             JURORS:  Yes.

 9             THE CLERK:  In the United States District Court for

10   the Western District of Virginia, Charlottesville Division,

11   *United States of America v. Scott Howard Jenkins*, case number

12   3:23-cr-11:  We the jury in the above captioned case present

13   the following unanimous verdict.  The United States has in its

14   custody $10,000 from Scott Jenkins For Sheriff bank account

15   with account number ending in 8133 that was seized by federal

16   law enforcement agencies as a result of the investigation into

17   the allegations of Counts One through Five, and Counts Eight

18   and Nine for which the jury returned a verdict of guilty of the

19   superseding indictment.

20             For Count One, do you unanimously find by the

21   preponderance of the evidence that the following property

22   constitutes property traceable to the gross receipts obtained

23   directly or indirectly:  A, $10,000 in U.S. currency seized

24   from a Blue Ridge Bank account ending in 8133 on or about

25   January 31st, 2023?  Yes.

Forfeiture Verdict

1          For Count Two, do you unanimously find by a

2    preponderance of the evidence that the following property

3    constitutes property traceable to the gross receipts obtained

4    directly or indirectly:  A, $10,000 in U.S. currency seized

5    from a Blue Ridge Bank account ending in 8133 on or about

6    January 31st, 2023?  Yes.

7          For Count Three, do you unanimously find by a

8    preponderance of the evidence that the following property

9    constitutes property traceable to the gross receipts obtained

10   directly or indirectly:  A, $10,000 in U.S. currency seized

11   from a Blue Ridge Bank account ending in 8133 on or about

12   January 31st, 2023?  Yes.

13         For Count Four, do you unanimously find by a

14   preponderance of the evidence that the following property

15   constitutes property traceable to the gross receipts obtained,

16   directly or indirectly:  A, $10,000 in U.S. currency seized

17   from Blue Ridge Bank account ending in 8133 on or about January

18   31st, 2023?  Yes.

19         For Count Five, do you unanimously find by a

20   preponderance of the evidence that the following property

21   constitutes property traceable to the gross receipts obtained

22   directly or indirectly:  A, $10,000 in U.S. currency seized

23   from the Blue Ridge Bank account ending in 8133 on or about

24   January 31st, 2023?  Yes.

25         For Count Eight, do you unanimously find by a

Forfeiture Verdict

1  preponderance of the evidence that the following property

2  constitutes property traceable to the gross receipts obtained

3  directly or indirectly:  A, $10,000 in U.S. currency seized

4  from a Blue Ridge Bank account ending in 8133 on or about

5  January 31st, 2023?  Yes.

6          For Count Nine, do you unanimously find by a

7  preponderance of the evidence that the following property

8  constitutes property traceable to the gross receipts obtained

9  directly or indirectly:  A, $10,000 in U.S. currency seized

10  from a Blue Ridge Bank account ending in 8133 on or about

11  January 31st, 2023?  Yes.

12          Signed by foreperson Diana Walker on December 18th,

13  2024.

14          THE COURT:  All right.  I'll ask you to poll the

15  jury, please.

16          THE CLERK:  Ladies and gentlemen, as I call your

17  name, please answer yes or no, if the verdict just read is your

18  true verdict.

19          Diana Veronica Walker?

20          FEMALE JUROR:  Yes.

21          THE CLERK:  Shawn Holden Mitchell?

22          MALE JUROR:  Yes.

23          THE CLERK:  Kelly Marie Rhoden?

24          FEMALE JUROR:  Yes.

25          THE CLERK:  Susan Thomas?

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1          FEMALE JUROR:  Yes.

2          THE CLERK:  Bobbie Swaringen Relken?

3          FEMALE JUROR:  Yes.

4          THE CLERK:  Cody Daniel Bryant?

5          MALE JUROR:  Yes.

6          THE CLERK:  Christine Crute Estes?

7          FEMALE JUROR:  Yes.

8          THE CLERK:  Dora Shelton Smith?

9          FEMALE JUROR:  Yes.

10         THE CLERK:  Emily Hobgood Walker?

11         FEMALE JUROR:  Yes.

12         THE CLERK:  Sherrie Lynn Frazier?

13         FEMALE JUROR:  Yes.

14         THE CLERK:  Lisa Michelle Choi?

15         FEMALE JUROR:  Yes.

16         THE CLERK:  Margaret Conway Short?

17         FEMALE JUROR:  Yes.

18         THE COURT:  All right.  Ladies and gentlemen, I don't

19  have anything else waiting for you this time.  So let me just

20  start, though, by thanking you very much for the work that

21  you've done.  As I indicated when we first met last Wednesday,

22  that one of the most important and highest civic duties that we

23  have as citizens is to sit as jurors, to be able to resolve

24  disputes, whether they relate to a criminal matter or a civil

25  matter as well.  You all join a long line of folks since the

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1   dawn of our country who have stepped in the breach and resolved

2   disputes and handled matters, which is exactly where they

3   should be, by the people, rather than by the government.  So I

4   want to thank you very much for the work that you've done.  I

5   want to thank you on behalf of all the staff here.  I want to

6   thank you on behalf of all the citizens of the Commonwealth,

7   and the Western District of Virginia as well, and also thank

8   you on behalf of the parties as well for your work.  I know

9   that I've taken you away from your daily affairs.  I've taken

10  you away from your job.  I've taken you away from your family,

11  your friends, and the other things that you wanted to do over

12  the course of the past week, especially here in this busy, busy

13  time of the year.  But I thank you for your dedicated work, for

14  being here on time, for being -- for paying very close

15  attention.  I paid attention to you all during the course of

16  the trial, and without exception, you have all been tuned into

17  the testimony and paying close attention.  So I very much

18  appreciate that.

19        I can't answer the question that was given to me

20  early on, and that is, does this mean you're done till March.

21  Ms. Melvin may be able to answer that, if you want to reach out

22  to her at a later point in time, but she'll let you know if

23  you're going to be still on the list or not.

24        Also note that the jury questionnaires -- I had a

25  question about this -- those were confidential when we sent

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1  them out.  They remain confidential.  Any information that's

2  contained in those can only be used for purposes of this case,

3  as well.  So you all should all know that.

4        And as I indicated to you in my instructions right

5  before you deliberated, you're under no obligation to talk to

6  anybody about this case as well, unless you choose to do so, or

7  unless otherwise ordered by the Court.  In all my time as a

8  judge, all my time as a lawyer, I've never seen -- I've never

9  been involved in a case where a judge has ordered jurors to

10  speak.  So that's where we are on that.

11        With that, I know that it's getting late.  Some of

12  you have quite a drive in front of you, so I'm not going to

13  belabor it any longer, but I do truly want to thank you, wish

14  you all safe travels, wish you happy holidays, and all the best

15  wishes that I can send with you.

16        So with that, I'll excuse the jury.

17  **(Jury out, 7:44 p.m.)**

18        THE COURT:  All right.  Ladies and gentlemen,

19  anything else we need to address from the government's

20  perspective?

21        MS. CHOY:  No, Your Honor.

22        THE COURT:  Anything else from the defendant's

23  perspective?

24        MR. ANDONIAN:  No, Your Honor.

25        THE COURT:  All right.  Very well.  I reiterate the

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1  comments that I made right after the closing and while the jury

2  went out.  Thank you all for a very, very well-tried case.

3  Thank you for letting me be a part of it.  Safe travels and

4  happy holidays to everyone.  Thank you.

5  (Proceedings adjourned, 7:45 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA v. Jenkins, 3:23-cr-11, 12/18/2024

1          C E R T I F I C A T E

2       I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3   the United States District Court for the Western District of

4   Virginia, appointed pursuant to the provisions of Title 28,

5   United States Code, Section 753, do hereby certify that the

6   foregoing is a correct transcript of the proceedings reported

7   by me using the stenotype reporting method in conjunction

8   with computer-aided transcription, and that same is a

9   true and correct transcript to the best of my ability and

10  understanding.

11      I further certify that the transcript fees and format

12  comply with those prescribed by the Court and the Judicial

13  Conference of the United States.

14      /s/ Lisa M. Blair              Date: December 19, 2024

15

16

17

18

19

20

21

22

23

24

25