UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 3:23-CR-00011 |
| | ) | |
| SCOTT HOWARD JENKINS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**UNITED STATES' SENTENCING MEMORANDUM**

For over a decade, defendant Scott Howard Jenkins exploited his position as the elected Sheriff of Culpeper County, Virginia, to corruptly and unlawfully enrich himself and fund his re-election campaigns through bribery. In exchange for bribes, he granted law-enforcement authority to untrained, unvetted businessmen who had no connection to Culpeper County and no real interest in public service. His actions violated his oath, tarnished his office, and betrayed the citizens he was duty-bound to serve and protect. Jenkins' extraordinary breach of public trust demands a substantial sentence. The Government respectfully requests that the Court sentence Jenkins to 188 months' imprisonment, which is the low end of the applicable Guidelines range.

## I. BACKGROUND

### A. Procedural History

On June 28, 2023, Jenkins was indicted alongside three co-defendants—Rick Rahim, Fred Gumbinner, and James Metcalf—on charges arising from a sprawling scheme in which Jenkins accepted bribes in exchange for appointing the bribe payors as auxiliary deputy sheriffs, a volunteer sworn law-enforcement position. *See* ECF No. 3. Each of Jenkins' co-defendants subsequently pleaded guilty pursuant to plea agreements. *See* ECF Nos. 78–80 (Gumbinner); ECF Nos. 89–90, 102 (Metcalf); ECF Nos. 117–119 (Rahim). On June 12, 2024, Jenkins was charged

1

by superseding indictment with one count of conspiracy in violation of 18 U.S.C. § 371, four counts of honest-services mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343 & 1346, and seven counts of bribery concerning programs receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(B)).

Jenkins elected to proceed to trial. Jenkins' trial was set to begin on November 12, 2024. However, Jenkins failed to appear for trial, claiming a medical emergency. After Jenkins claimed to suffer additional medical emergencies over the following two days, the Court granted a continuance. Jury selection for Jenkins' trial began on December 11, 2024. On December 18, 2024, after deliberating for approximately two hours, the jury found Jenkins guilty on all counts. *See* ECF No. 271. The jury further determined that $10,000 seized from a Blue Ridge Bank account held in the name of Scott Jenkins for Sheriff was traceable to the counts of conviction. *See* ECF No. 272.

**B.    Summary of Facts Established at Trial**

From 2012 through 2023, Jenkins served as the elected Sheriff of Culpeper County, Virginia. As Sheriff, Jenkins had authority to appoint auxiliary deputy sheriffs—volunteer, sworn law-enforcement officers who could be called into service to supplement the Sheriff's Office's law-enforcement capabilities. *See* 12/12/24 Tr. at 50:24–52:11 (Siebel). According to Culpeper County Sheriff's Office General Order 1-15, issued under Jenkins' authority, an auxiliary deputy "generally performs the same duties and has law-enforcement powers equivalent to those of a paid deputy." GX723, at 1. That General Order provided that auxiliary deputies would "go through the same hiring process as that for paid officers"; would receive extensive law-enforcement training similar to that of paid officers; and would be required to perform a minimum of 16 hours of service per month, amongst other requirements. *See id.* at 2–3.

Auxiliary deputies were issued official Culpeper County Sheriff's Office badges as well as credentials identifying them as a "duly sworn and qualified deputy sheriff vested with the powers and authorized to perform all duties of that office." *See, e.g.*, G515 (Metcalf badge), G516 (Metcalf credentials); 12/12/24 Tr. at 65:2–8 (Siebel). The card identified them as an auxiliary only on the back, in the section listing their "rank." *See, e.g.*, G516.

Jenkins had a longstanding relationship with Kevin Rychlik, a Northern Virginia businessman. During Jenkins' first campaign for Sheriff in 2011, Jenkins solicited campaign contributions from Rychlik and, in exchange, promised to swear him in as an auxiliary deputy if he won. 12/16/24 Tr. at 22:2–16 (Rychlik). When Jenkins ran for re-election in 2015, he again solicited contributions from Rychlik in exchange for deputization, *id.* at 22:17–23:5, and asked Rychlik to recruit additional wealthy businessmen who were willing to pay $5,000 or more to be sworn in as auxiliaries, *id.* at 25:8–26:19.

Jenkins and Rychlik referred to those businessmen as "money guys." *Id.* at 25:24–26:3. The money guys wanted to become auxiliary deputies primarily because they believed that status authorized them to carry a concealed weapon in all 50 states without a permit and because they hoped to receive "professional courtesy," meaning leniency, if they were pulled over for traffic violations. *Id.* at 27:18–28:11. Before he began cooperating with the Government, Rychlik recruited approximately half a dozen money guys to pay bribes to Jenkins, none of whom had any connection to Culpeper County. *Id.* at 26:7–9. Jenkins did not require the bribe payors to receive any training before becoming auxiliaries or to perform any services for the Sheriff's Office. *Id.* at 28:20–29:8. Campaign finance reports filed by Jenkins' campaign committee, Scott Jenkins for Sheriff, reported that multiple individuals identified by Rychlik had made contributions of $5,000 or more between 2015 and 2019. *See* 12/17/24 Tr. at 77:15–79:16 (Medearis); G801. The

investigation confirmed that those individuals were auxiliary deputies in the Culpeper County Sheriff's Office but were not residents of Culpeper County. *Id.*

During his 2019 reelection campaign, Jenkins reached out to Rychlik and asked him to recruit more bribe payors to contribute to his campaign. *See* 12/16/24 Tr. at 29:9–30:2 (Rychlik); G101, at 1–2. Rychlik responded that he had caught a "big fish," referring to Rick Rahim. G101, at 2. Rahim, a longtime associate of Rychlik's, was a wealthy businessman residing in Northern Virginia. *See* 12/12/24 Tr. 107:13–109:10 (Rahim). Several decades prior, Rahim had been convicted of a non-violent felony offense, and as a result had lost his right to possess firearms. *Id.* at 111:18–24. Under Virginia law, a convicted felon could petition the Circuit Court in the county of his residence to restore his firearms rights. *Id.* at 125:9–11; 12/13/24 Tr. at 10:17–12:3 (Owens). Rahim wanted Jenkins to use his official position to help him get his firearms rights restored in Culpeper Circuit Court and wanted to become an auxiliary deputy. 12/12/24 Tr. at 112:12–16 (Rahim).

Rychlik organized a meeting between Jenkins, Rychlik, and Rahim. *See* 12/12/24 Tr. at 115:4–10 (Rahim); 12/16/24 Tr. at 36:9–17 (Rychlik). On July 31, 2019, the three met in Jenkins' personal office at the Sheriff's Office. *See* 12/16/24 Tr. at 39:9–21 (Rychlik). During that meeting, Jenkins agreed to use his official position to help Rahim gain approval for his firearms rights restoration petition and to swear Rahim in as an auxiliary deputy in exchange for bribes. *See* 12/12/24 Tr. at 133:8–24 (Rahim); 12/16/24 Tr. at 41:2–12 (Rychlik). After the meeting, in the cab of Jenkins' pickup truck, Rahim handed Jenkins a $15,000 cash bribe in a manila envelope. *See* 12/12/24 Tr. at 135:24–136:11 (Rahim); 12/16/24 Tr. at 41:13–42:16 (Rychlik). At a dinner meeting several weeks later, Rahim gave Jenkins an additional $10,000 cash bribe. *See* 12/12/24 Tr. at 152:6–22 (Rahim). Neither of Rahim's cash bribes was deposited into Scott Jenkins for

Sheriff's bank account or reported on its campaign finance reports filed with the Virginia Department of Elections. *See* 12/17/24 Tr. at 91:17–24 (Medearis); G301.

At the same dinner meeting, Rahim gave Jenkins two checks for $17,500 each, one from Rahim's own business and one from an associate of Rahim's, as a purported loan for the construction of Jenkins' home. 12/12/24 Tr. at 152:10–14 (Rahim); G729. Jenkins laundered the funds by depositing them into his brother's bank account then initiating a series of cash and check withdrawals, some of which were deposited into his own personal bank account. *See* 12/17/24 Tr. at 96:10–101:20 (Medearis). He then failed to disclose that liability on mortgage applications filed with two separate banks. *Id.* at 105:1–107:17. Jenkins never repaid the $17,500 he owed to Rahim. *See* 12/12/24 Tr. at 155:9–25 (Rahim).

Jenkins soon began to deliver on his end of the corrupt bargain. Because Rahim was not yet eligible to become an auxiliary deputy, Jenkins issued him a custom-made identification card identifying him as a "member" of the Culpeper County Sheriff's Office with the "position" of "Helicopter Pilot." G107; 12/12/24 Tr. at 234:1–7 (Rahim). To make it appear that Rahim was a resident of Culpeper County—and therefore eligible to file his firearms rights restoration petition in Culpeper Circuit Court—Jenkins arranged for Rahim to enter a sham lease agreement on an old farmhouse owned by Jenkins' brother, Michael Jenkins. *Id.* at 177:4–181:12. Rahim executed the agreement and paid Michael Jenkins $3,000 in purported rent but never set foot inside the property. *Id.* at 180:25–182:17; G730; G317. Rahim then filed his petition in Culpeper Circuit Court falsely representing that he was "a resident of Culpeper County." G720. When the Deputy Commonwealth's Attorney called Jenkins to verify Rahim's residency in Culpeper County, Jenkins falsely told him that Rahim lived at the farmhouse. *See* 12/13/24 Tr. at 21:11–24:24 (Owens); G740.

Over the summer of 2020, Jenkins repeatedly told Rahim he was pressuring other local officials, such as the Commonwealth's Attorney, to approve his petition. *See* 12/12/24 Tr. at 197:20–206:9 (Rahim). Subsequently, when Rahim grew impatient with how long it was taking to get a hearing on his petition due to the Covid-19 pandemic, Jenkins called the presiding judge and asked him to move up Rahim's hearing date, which the judge did. *See* 12/13/24 Tr. at 67:13–71:20 (Durrer). At the hearing, Rahim falsely testified that he resided in Culpeper County and the judge granted his petition. *Id.* at 72:17–73:6 Subsequently, Jenkins swore Rahim in as an auxiliary deputy sheriff and issued him badges, credentials, a uniform, and a duty firearm. *See* 12/12/24 Tr. at 237:4–246:2 (Rahim).

Jenkins also asked Rahim to solicit others to pay bribes in exchange for auxiliary badges. *See id.* at 258:1–19. Rahim approached one of his business associates, Fredric Gumbinner. *Id.* at 258:20–259:22. Rahim and Gumbinner agreed that Gumbinner would make a $20,000 "donation" to Jenkins in exchange for becoming an auxiliary deputy. *Id.* at 259:23–260:25; 12/13/24 Tr. at 170:9–19 (Gumbinner). On October 1, 2019, Gumbinner wrote a $20,000 check to one of Rahim's companies, Food Truck Company LLC, which Rahim deposited into a business account. 12/12/24 Tr. at 264:17–265:21 (Rahim); 12/17/24 Tr. at 113:11–15 (Medearis); G308. The following day, Rahim arranged a meeting with Jenkins, where he gave Jenkins $20,000 in cash. *See* 12/12/27 Tr. at 267:7–269:20 (Rahim). Gumbinner's bribe money was not deposited into Scott Jenkins for Sheriff's bank account or reported on its campaign finance reports. *See* 12/17/24 Tr. at 112:10–19 (Medearis): G301.

After Jenkins won reelection, Rahim introduced Gumbinner to Rychlik and explained that Gumbinner helped provide "support"—meaning bribes—for Jenkins and expected to be deputized. G115. Over the course of several months, Rychlik pushed Jenkins to set a date for Gumbinner's

swearing in, reminding Jenkins that Gumbinner expected to be deputized in exchange for the money he had given Jenkins. G106. Gumbinner was sworn in on March 6, 2020. G707. Gumbinner received no training and never rendered any service to the Sheriff's Office. 12/13/24 Tr. at 185:3–17 (Gumbinner). He did, however, use his badge to attempt to evade traffic tickets, to seek early access to a Covid-19 vaccine, and to access the TSA PreCheck line at the airport. *Id.* at 185:25–187:14.

In 2022, Rychlik entered a plea agreement with the U.S. Attorney's Office for the Eastern District of Virginia relating to various tax offenses. *See* 12/16/24 Tr. at 15:17–16:21 (Rychlik). As part of his plea agreement, Rychlik agreed to cooperate with the investigation into Jenkins. *Id.* at 16:22–17:20. From September 2022 until January 2023, Rychlik arranged meetings between Jenkins and six bribe payors, which were recorded using hidden audio and video recording devices. The six bribe payors included four civilians—James Metcalf, Tom Cooper, Philip Howell, and Rubar Sandi—and two undercover FBI agents. *Id.* at 17:18–20, 70:4–71:5. Each of the bribe payors traveled to Culpeper, where they met with Jenkins at the Sheriff's Office, went to lunch with Jenkins, took the oath of office at the Clerk's Office, and received their official Culpeper County Sheriff's Office badge and credentials. *Id.* at 72:24–73:10. During the visit, each bribe payor paid Jenkins a bribe of between $5,000 and $10,000, either by cash or by check made out to Scott Jenkins for Sheriff. *Id.* at 71:6 –16. The bribe payors did not go through the same hiring process as regular deputies as required by General Order 1-15, received no training, and performed no services for the Sheriff's Office. 12/12/24 Tr. at 65:20–66:21 (Siebel).

In total, between September 2022 and January 2023, Jenkins accepted $25,000 in cash and $10,000 in checks as part of the bribery scheme. G805. Only the checks were deposited into Scott Jenkins for Sheriff's bank account and reported on its campaign finance reports. *Id.* The trial

evidence revealed that Jenkins used some of the bribe cash for personal purchases, such as the purchase of a firearm, and that he deposited some of it into his personal checking account. *See* 12/17/24 Tr. at 123:18–129:13, 134:6–135:7 (Medearis); G412, G413, G806.

In January 2023, after receiving cash bribes from four individuals, Jenkins called Rychlik, requesting an urgent meeting. 12/16/24 Tr. at 112:25–113:8. The two men met in a Target parking lot in Gainesville, Virginia. *Id.* at 113:13–14. Jenkins explained that he had a filing deadline and was concerned about reporting the cash bribes he received. He told Rychlik that he brought four firearms, which he wanted Rychlik to deliver to the four bribe payors and inform them—with a wink and a nudge—that he was completing their gun purchase "transaction" with Jenkins, even though no such transaction had been discussed with any of the bribe payors. He also asked Rychlik, who held a Federal Firearms License in connection with one of his businesses, to record the sham transactions. That way, Jenkins explained, he would not have to report the bribe money he had received in any public filing. Jenkins suggested that the bribe payors could give him the firearms back after the election. Jenkins then gave Rychlik four firearms and executed a handwritten receipt for the sham transfer. *Id.* at 113:24–115:18; G039; G040; G404–407; G702.

## II.    DISCUSSION AND RECOMMENDATION

### A.    Sentencing Guidelines Calculation

The Government bears the burden to establish the applicability of sentencing factors by a preponderance of the evidence. *See United States v. Grubbs*, 585 F.3d 793, 803 (4th Cir. 2009). The Government agrees with the Base Offense Level, special offense characteristics, and adjustments applied by the Probation Office. *See* Final Presentence Investigation Report ("Final PSR"), ECF No. 296 ¶¶ 14–48. For the reasons discussed below, the government respectfully submits that Jenkins should also receive a two-level enhancement for obstruction of justice

pursuant to U.S.S.G. § 3C1.1.   In sum, the Government respectfully submits that the following Guidelines calculation applies to Jenkins:

| | | |
|---|---|---|
| 2C1.1(a)(1) | Base offense level | 14 |
| 2C1.1(b)(1) | More than one bribe | +2 |
| 2C1.1(b)(2) & 2B1.1(b)(1)(E) | Value of payments (more than $95,000 but less than $150,000) | +8 |
| 2C1.1(b)(3) | Elected public official | +4 |
| 2C1.1(b)(4) | Facilitated obtaining government ID | +2 |
| 3B1.1(a) | Aggravating role | +4 |
| 3C1.1 | Obstruction of justice | +2 |
| | **TOTAL** | **36** |

Jenkins has a criminal history score of zero and is therefore in criminal history category I. *See* Final PSR, ECF No. 293 ¶ 52.  With a total offense level of 36 and a criminal history category of I, Jenkins' Guidelines range is 188 to 235 months' imprisonment.  The Court may impose a term of supervised release of not more than three years.  *See* 18 U.S.C. § 3583(b).

### 1.   Value of payments (U.S.S.G. §§ 2C1.1(b)(2) & 2B1.1(b)(1)(E))

Section 2C1.1(b)(2) of the Sentencing Guidelines provides that if the "value of the payment" to the public official exceeded $6,500, the offense level should be increased by the number of levels prescribed in § 2B1.1.  The "value of the payment" is based not only on the offenses of conviction, but also the defendant's "relevant conduct," meaning acts "that were part of the same course of conduct or common scheme or plan as the offense of conviction."  *See* U.S.S.G. § 1B1.3(a)(2).  The Government bears the burden to establish relevant conduct by a preponderance of the evidence.  *See United States v. Butner*, 277 F.3d 481, 487 (4th Cir. 2002).

Offenses are part of a "common scheme or plan" if they are "substantially connected to each other by at least one common factor, such as common victims, common accomplices,

common purpose, or similar *modus operandi*." *Id.* § 1B1.3 cmt. n.5(B)(i). Offenses that do not qualify as a common scheme or plan may be part of the "same course of conduct" if they are "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." *Id.* § 1B1.3 cmt. n.5(B)(ii). Factors relevant to that determination include "the degree of similarity of the offenses, the regularity (repetition) of the offenses, and the time interval between the offenses." *Id.* The "same-course-of-conduct standard 'requires only that the defendant [be] engaged in an identifiable pattern of certain criminal activity.'" *United States v. McDonald*, 28 F.4th 553, 564 (4th Cir. 2022) (quoting *United States v. McVey*, 752 F.3d 606, 611–12 (4th Cir. 2014)).

Jenkins accepted at least $110,000 as part of a common scheme or plan or the same course of conduct that included the offenses of conviction. The evidence at trial showed that Jenkins accepted $75,000 in connection with the charged offenses, including $25,000 from Rahim, $20,000 from Gumbinner, $5,000 from Metcalf, $5,000 from Cooper, $5,000 from Undercover Agent 1 ("Jerry McKee"), $10,000 from Undercover Agent 2 ("Mike"), and $5,000 from Philip Howell. *See* G805; 12/17/24 Tr. at 111:16–112:19, 118:7–122:24, 129:14–22 (Medearis).

The trial evidence showed that Jenkins' relevant conduct included accepting at least $35,000 in uncharged bribery transactions. First, Jenkins accepted $5,000 from Rubar Sandi in exchange for appointment as an auxiliary deputy as part of a common scheme or plan as the offenses of conviction. Like the offenses of conviction, the Sandi bribe was arranged by Kevin Rychlik as part of his active cooperation with the Government. *See* 12/16/24 Tr. at 106:17–112:24 (Rychlik). Tom Cooper, one of the payors of the charged bribes, was also involved in facilitating the payment. *See id.* at 218:15–226:18 (Cooper). Like the offenses of conviction, the purpose of the Sandi payment was to enrich Jenkins in exchange for an exercise of official power, namely,

deputization. And, as Cooper testified, the bribe payment followed the "[e]xact pattern" as his own bribe payment. *Id.* at 221:20. Thus, the Sandi bribe was "substantially connected" to the offenses of conviction by multiple "common factor[s]" and should be included in the calculation of the value of payments received by Jenkins. U.S.S.G. § 1B1.3 cmt. n.5(B)(i).

Second, the evidence at trial showed that Jenkins accepted multiple bribe payments both before and during the offenses of conviction from Rychlik's other "money guys," including Michael Duggin and Mark Cummings. Rychlik testified that, during Jenkins' 2015 re-election campaign, Jenkins approached him and asked for "help bringing in more people for money," promising to "[i]ssue them credentials and swear them in" in exchange. 12/16/24 Tr. at 25:13–20 (Rychlik). Rychlik recruited about half a dozen "money guys," who made donations of $5,000 or more to Jenkins' campaign in exchange for being sworn in. *Id.* at 26:7–19. When Jenkins reached out to Rychlik in the summer of 2019 to request his help in soliciting donations, he asked whether "Mike or Mark" would be interested. G101, at 1. Rychlik identified "Mike" and "Mark" as Michael Duggin and Mark Cummings, both of whom had previously made campaign contributions in exchange for being sworn in. *Id.* at 31:19–32:8. In early 2020, after Jenkins began his new term in office, Rychlik reached out again about Mike Duggin: "I also forgot to put Mike Duggin on you [*sic*] radar. One of my vASAR supporters you sworn in. He was good for a couple good $$ hits. Willing to do same if you wanna get him resworn." G106, at 4. Jenkins' response acknowledged his corrupt relationship with Duggin: "Sure I like Mike. I'll add him." *Id.* Likewise, former Culpeper deputy sheriff Bernard Feaganes testified that Jenkins directed him to facilitate Cummings' and Duggin's swearing in as auxiliaries. *See* 12/13/24 Tr. at 110:3–17.

Special Agent Medearis testified that he reviewed campaign finance reports for the names of the individuals that Rychlik identified as having paid bribes for badges. 12/27/24 Tr. at 77:16–

79:15.  Special Agent Medearis testified that Scott Jenkins for Sheriff reported two $5,000 and two $7,500 contributions from Duggin and one $5,000 contribution from Cummings.  G801. Medearis' investigation further revealed that, consistent with Rychlik's and Feaganes' testimony, both Duggin and Cummings were sworn as auxiliaries in Culpeper County, but that neither resided there.  *Id.*  Thus, the trial evidence demonstrates, by a preponderance of the evidence, that Jenkins accepted at least $30,000 in bribes from Duggin and Cummings.

The Duggin and Cummings bribes were part of the same course of conduct or a common scheme or plan as the offenses of conviction.  Indeed, the Court admitted the evidence of uncharged bribes as intrinsic to the charged conspiracy, not as other acts evidence pursuant to Federal Rule of Criminal Procedure 404(b).  *See* 12/18/24 Tr. at 25:2–19.  Those bribes shared a common purpose of enriching Jenkins and funding his campaigns in exchange for auxiliary deputy badges. They followed a similar *modus operandi* as the offenses of conviction and were facilitated by the same individual—Rychlik.  Although some of the bribe payments dated back to 2015, the bribes were by nature linked to the four-year electoral cycle and therefore were naturally grouped in election years.  *See* U.S.S.G. § 1B1.3 cmt. n.5(B)(2) (noting that, when considering temporal proximity, the "nature of the offenses may also be a relevant consideration" and providing example of tax returns that are filed on annual basis).  Thus, Jenkins should be held accountable for the value of the Duggin and Cummings bribes as relevant conduct.

The following table summarizes the payments received by Jenkins, including both the offenses of conviction and the relevant conduct involving Duggin and Cummins:

| Date | Bribe Payor | Amount | Source |
|------|-------------|--------|--------|
| 1/1/2015 | American Self Storage (Michael Duggin) | $7,500 | G801 |
| 4/29/2015 | Mark Cummings | $5,000 | G801 |
| 9/29/2015 | American Self Storage (Michael Duggin) | $5,000 | G801 |
| 9/11/2017 | American Self Storage (Michael Duggin) | $7,500 | G801 |
| 7/31/2019 | Rick Rahim | $15,000 | G805 |

| | | | |
|---|---|---|---|
| 8/8/2019 | American Self Storage (Michael Duggin) | $5,000 | G801 |
| 9/19/2019 | Rick Rahim | $10,000 | G805 |
| 10/2/2019 | Fred Gumbinner | $20,000 | G805 |
| 9/7/2022 | James Metcalf | $5,000 | G805 |
| 10/26/2022 | Tom Cooper | $5,000 | G805 |
| 11/14/2022 | UC-1 ("Jerry McKee") | $5,000 | G805 |
| 12/28/2022 | UC-2 ("Mike") | $10,000 | G805 |
| 12/29/2022 | Philip Howell | $5,000 | G805 |
| 1/4/2023 | Rubar Sandi | $5,000 | G805 |
| | **TOTAL** | **$110,000** | |

Because the total value of the payments was greater than $95,000 but less than $150,000, Jenkins should receive an eight-level enhancement pursuant to U.S.S.G. §§ 2C1.1(b)(2) & 2B1.1(b)(1)(E).

2. *Public official who facilitated obtaining a government identification document (U.S.S.G. § 2C1.1(b)(4))*

Section 2C1.1(b)(4) provides a two-level enhancement if "the defendant was a public official who facilitated . . . the obtaining of a government identification document." The Commentary defines "government identification document" as "a document made or issued by or under the authority of the United States Government, a State, or a political subdivision of a State, which, when completed with information concerning a particular individual, is of a type intended or commonly accepted for the purpose of identification of individuals." U.S.S.G. § 2C1.1 cmt. n.1. Here, the evidence showed that Jenkins issued official Sheriff's Office credentials to each of the bribe payors, which included identifying information such as name, signature, and photograph, and stated that they were "a duly sworn and qualified deputy sheriff vested with the powers and authorized to perform all duties of that office." *See* G438–G446. Thus, Jenkins should receive a two-level enhancement pursuant to U.S.S.G. § 2C1.1(b)(4).

### 3. Aggravating role (U.S.S.G. § 3B1.1(a))

Section 3B1.1(a) provides a four-level enhancement if "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." The Commentary defines "participant" as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 cmt. n.1. Undercover law enforcement agents are not "participants." *Id.* In determining whether criminal activity is "otherwise extensive," the Court must consider "all persons involved during the course of the offense," even if they were not criminally responsible. *Id.* § 3B1.1 cmt. n.3.

The Commentary further lists the factors the Court should consider when determining whether a defendant occupied a leadership or organizational role: "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." *Id.* § 3B1.1 cmt. n.4. A defendant's "role determination is to be based, not solely on his role in the counts of conviction, but on his role in the entirety of his relevant conduct." *United States v. Fells*, 920 F.2d 1179, 1184 (4th Cir.1990).

Jenkins' criminal activity involved at least nine other "participants": Rychlik, Rahim, Gumbinner, Metcalf, Cooper, Howell, Sandi, Cummings, and Duggin. In addition, the scheme drew in local officials from virtually every corner of Culpeper government who unwittingly facilitated the scheme: Sheriff's Office employees such as Peter Siebel, Bernard Feaganes, and David Myers; Clerk's Office employees such as Carson Beard, Sylvia Renninger, and Jennifer Weakley; the local Circuit Court Judge, Dale Durrer; and the Deputy Commonwealth's Attorney, Travis Owens, amongst others. Therefore, Jenkins' conduct both involved more than five participants and was "otherwise extensive."

14

Jenkins sat at the helm of this sprawling scheme—he initiated the scheme, maintained tight control over it, and reaped all its financial benefits. *See United States v. Thorson*, 633 F.3d 312, 319–20 (4th Cir. 2011) (upholding application of four-level aggravating role enhancement where evidence established that defendant "was the architect of 'a large portion of th[e] scheme'"). Jenkins both originated the scheme and spearheaded the recruitment of accomplices and bribe payors. Jenkins initially solicited Rychlik to make campaign contributions in exchange for an auxiliary deputy badge during his 2011 campaign for Sheriff. *See* 12/16/24 Tr. at 22:2–16 (Rychlik). During his subsequent re-election campaign, Jenkins again solicited Rychlik for bribes and asked him to recruit additional bribe payors, which Rychlik did at Jenkins' behest. *Id.* at 22:17–23:5, 25:8–20. And, during his 2019 re-election campaign, Jenkins repeatedly pushed Rychlik to find additional bribe payors before Rychlik ultimately succeeded in recruiting Rahim. *Id*. at 31:17–35:2. Jenkins subsequently asked Rahim to bring in additional bribe payors, prompting Rahim to recruit Gumbinner. *See* 12/12/24 Tr. at 258:1–24 (Rahim).

As Sheriff, Jenkins had sole authority to appoint auxiliary deputies and was responsible for overseeing the auxiliary deputy program. *See id.* at 52:1–11 (Siebel). Moreover, he controlled every facet of the scheme, from Rychlik's recruitment activities to the processing of appointment paperwork. Rychlik testified that he never recruited any money guys without Jenkins' knowledge and authorization. *See* 12/16/24 Tr. at 27:4–9, 71:25–72:9 (Rychlik). Similarly, Siebel and Feaganes, the Sheriff's Office employees who ran background checks and processed paperwork for auxiliaries, testified that they acted at Jenkins' direction and under his close supervision. *See* 12/12/24 Tr. at 56:19–58:8 (Siebel); 12/13/24 Tr. at 111:8–16 (Feaganes). Indeed, the trial evidence included multiple audio clips in which Jenkins directed various aspects of the scheme, from instructing Rychlik not to communicate about the scheme in writing, *see* G001; to

encouraging bribe payors to pay him in cash through his relatives to circumvent reporting requirements, *see* G011; to directing Rychlik to have the bribe payors sworn in first and make their donations later to make them appear less suspicious, *see* G013; to instructing Rychlik to break up the payments to avoid scrutiny, *see* G019; to inventing the false gun "transactions" to cover up the cash bribes, *see* G039, G040.

Finally, Jenkins received the entire fruits of the criminal scheme: all the bribe money went either to Jenkins personally or to his campaign. *See* 12/16/24 Tr. at 27:26–27:3, 71:6–18 (Rychlik). Thus, Jenkins should receive a four-level enhancement for his role as the organizer and leader of the criminal scheme pursuant to U.S.S.G. § 3B1.1(a). *See United States v. Spencer*, 799 F. App'x 120, 123 (3d Cir. 2020) (unpublished) (upholding application of four-level aggravating role enhancement to former mayor convicted of bribery scheme where "there was ample evidence that [defendant] directed his coconspirators, set the goals of the conspiracy and ultimately approved the group's actions").

### 4. Obstruction of justice (U.S.S.G. § 3C1.1)

Section 3C1.1 provides a two-level enhancement "if (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to . . . the defendant's offense of conviction . . . ." The conduct to which this adjustment applies includes "committing, suborning, or attempting to suborn perjury" and "providing materially false information to a judge or magistrate judge." U.S.S.G. § 3C1.1 cmt. n.4(B), (F); *see also United States v. Dunnigan*, 507 U.S. 87, 92 (1993) ("Both parties assume the phrase 'impede or obstruct the administration of justice' includes perjury, and the commentary to § 3C1.1 is explicit in so providing."). Scott Jenkins did both. First, Jenkins committed perjury at trial when he falsely testified that the $45,000 in cash that he received from Rahim was an

investment in a business venture. Second, Jenkins provided materially false information about his medical condition to the Court to obtain a continuance of his trial date. Either of these obstructive acts is sufficient to support a two-level enhancement under U.S.S.G. § 3C1.1.

a. Perjury at trial

Before applying an enhancement for perjury, the Court must "review the evidence and make independent findings necessary" to establish the elements of perjury, namely that the witness "[gave] false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Dunnigan*, 507 U.S. at 94–95; *United States v. Andrews*, 808 F.3d 964, 968 (4th Cir. 2015) (noting that "this court has reversed sentencing enhancements under § 3C1.1 where the district court failed to find a required factual element of perjury and provided no other basis for the enhancement"). Here, the evidence establishes that Jenkins perjured himself at trial.

Jenkins falsely testified that the cash that Rahim gave him was a "business investment." 12/17/24 Tr. at 175:7–18 (Jenkins). According to Jenkins, when Rahim learned that Jenkins had copyrighted the logo "Make Virginia Great Again," their "conversation quickly led to, you know, red shirts and hats and whatever? And that's what we did. Thousands of dollars." *Id.* at 175:19–176:11. Jenkins elaborated that, "we bought thousands and thousands of dollars – you know, there's probably a credit card bill if you look back just for the first order of over $10,000 just in shirts and hats." *Id.* at 176:14–17. And he claimed that the business venture foundered due to the COVID-19 pandemic. *Id.* at 176:17–23.

When pressed on cross-examination, Jenkins confirmed that he received a total of $45,000 in cash from Rahim: two payments of $15,000 and $10,000, respectively, followed by an additional payment of $20,000. *Id.* at 256:7–258:12. But he continued to assert that all that cash

17

was for a "business venture." *Id.* at 258:13–15; *see also id.* at 257:12–14 ("[T]hat's what all the money that I got from him was for, the things we were doing together, trying to make money. That's what Rick does."). Jenkins claimed that Rahim, a successful businessman, gave him all that cash with no written contract because "[t]here's a level of trust with a lot of men in this world that we don't break those bonds and we do things together." *Id.* at 259:15–17. And he flatly denied having received any money from Gumbinner. *Id.* at 279:19 ("Fred didn't give me money."), 280:2 ("I didn't get $20,000 from Fred Gumbinner, no.").

Jenkins' explanation of the $45,000 cash he received from Rahim was willfully false. The evidence at trial established—and the jury necessarily found beyond a reasonable doubt—that Rahim's initial two cash payments totaling $25,000 were a bribe paid in exchange for Jenkins' assistance with Rahim's petition to restore his firearms rights and for deputizing Rahim. Both Rahim and Rychlik testified unequivocally that Rahim's cash payments were made as part of a corrupt exchange for Jenkins' official acts, not as an investment in a business venture. *See* 12/12/24 Tr. at 133:8–24 (Rahim); 12/16/24 Tr. at 41:2–12 (Rychlik).

Rahim's and Rychlik's testimony was corroborated by their electronic communications. Before the July 31, 2019 initial meeting, Jenkins reached out to Rychlik for help building his "war chest," because he had a "finance report due soon." G101, at 1. Rychlik responded that Rahim wanted to get his firearms rights restored and that he was "very wealthy and helps a lot of causes." G101, at 3. Also before that meeting, Rahim emailed Rychlik a draft restoration petition and proposed order. G102. After the meeting, Rahim sent a Rychlik a revised order adding a "Seen and Agreed" signature line for the Commonwealth's Attorney, corroborating Rahim's and Rychlik's testimony that, during the meeting, Jenkins offered to pressure the Commonwealth's

Attorney to sign off on the petition.  *See* 12/12/24 Tr. at 138:1–19 (Rahim); 12/16/24 Tr. at 40:13–23 (Rychlik).

By contrast, there are no text messages from the period of the bribe payments discussing an investment in any business venture.  Jenkins and Rahim did discuss Jenkins' idea to sell "Make Virginia Great Again" t-shirts, but those discussions occurred several months after the bribe payments and were unrelated to them.  Rahim made his bribe payments to Jenkins on July 31, 2019, and September 19, 2019, and delivered Gumbinner's bribe payment to Jenkins on October 2, 2019.  G805.  Over two months later, on December 19, 2019, Jenkins raised the "Make Virginia Great Again" idea with Rahim for the first time.  *See* Exhibit 1.  Jenkins reached out to Rahim, told him that he had "bought the copy rights to 'Make Virginia Great Again' for all sorts of apparel items," and asked his opinion about strategy for selling them.  *Id.*  The content of the messages makes clear that this was the first discussion between Jenkins and Rahim regarding this idea.  *Id.* Four days later, Rahim and Jenkins exchanged additional text messages regarding pricing of the t-shirts.  *See* Exhibit 2.  None of the messages reference any prior discussions about this venture, much less any prior investment of $45,000.

Rahim's and Rychlik's accounts of the corrupt bargain were further corroborated by Jenkins' own recorded statements.  In December 2022, Jenkins became frustrated with Rahim for requesting additional favors.  *See* 12/16/24 Tr. at 61:20–23.  Jenkins and Rychlik discussed Jenkins' corrupt agreement with Rahim:

> JENKINS:     And if he thinks that any amount of support or help, um, I mean, I don't think he gets in his head, y'know. Okay. So you supported me and helped me.  Okay.  That's fine.  You did, and I am – I appreciate what support you give me, but you didn't do it for nothin'.  You got a felony record, a clean slate to carry – not only carry a gun.  We followed it up with swearing you in.  Name another sheriff in the whole State of Virginia that would do that.

G032. Thus, Jenkins himself acknowledged that Rahim gave his monetary "support" in exchange for official acts, not as a business venture.

The evidence at trial further established that the $20,000 cash payment that Rahim gave to Jenkins in October 2019 was a bribe from Gumbinner paid in exchange for becoming an auxiliary deputy. Both Rahim and Gumbinner testified that was the purpose of the payment, and the jury credited their testimony. *See* 12/12/24 Tr. at 264:12–266:11 (Rahim); 12/13/24 Tr. at 172:17– 176:6 (Gumbinner). Rahim testified that he, Rychlik, and Jenkins discussed the fact that the money was in exchange for Gumbinner getting sworn in and receiving a badge. *See* 12/12/24 Tr. at 269:3– 20 (Rahim).

Again, the witness testimony was corroborated by contemporaneous electronic communications. On October 1, 2019, the day that Rahim received Gumbinner's $20,000, Rahim texted Jenkins: "Sirs, Kevin asked me to really go to work. I've been busy getting you more donors. Have $20k in hand from friends for the campaign." G120, at 1. The text messages do not mention any business investment.

Subsequently, Rahim became frustrated that it was taking a long time for Gumbinner to be sworn in, and he vented that frustration to Rychlik. Rychlik, in turn, raised the issue with Jenkins, telling him that Rahim was "giving [him] crap about Fred not getting sworn yet after putting up all that $$." G106, at 4. Rychlik forwarded Jenkins a text message in which Rahim complained: "We've had his $20k for 6+ months, Kevin. He's gotten nothing. He makes me millions of dollars. I have to maintain credibility. That's my world. I have to give the money back. Or I have to set a date for him. I was sure you had at least put everything through by now and all we needed was to get him sworn." *Id.* at 5. After receiving those text messages, Jenkins and Rychlik had a phone call in which Jenkins agreed to set a date for Gumbinner to be sworn in. *See* 12/16/24 Tr. at 55:12–

20 (Rychlik).  Gumbinner was sworn in the following week.  *See* G707.  Jenkins' actions in response to Rychlik's text messages confirm that he well understood the origin and purpose of the $20,000 payment he received from Rahim.

 In sum, Jenkins' explanations for the $45,000 cash he received from Rahim were false.  Those falsehoods were material.  They went to the heart of the question before the jury: whether Jenkins engaged in a corrupt *quid pro quo* with Rahim and Gumbinner.  And those falsehoods were willful.  It is not plausible that Jenkins' lies resulted from "confusion, mistake, or faulty memory."  *Dunnigan*, 507 U.S. at  94–95.  Jenkins could not possibly have been mistaken about the origin and purpose of such a large sum of cash.  He had over a year between indictment and trial to refresh his memory of the relevant events and to review the extensive discovery provided by the Government.  Even so, Jenkins persisted in his lies when confronted with the above-described text messages that directly contradicted them.  *See* 12/17/24 Tr. at 277:10–280:11 (Jenkins).  The only plausible conclusion is that Jenkins told a series of willful, material lies while under oath in an effort to avoid responsibility for his criminal conduct.  He should be held accountable for that effort to subvert the trial process.  *See Dunnigan*, 507 U.S. at 97 ("It is rational for a sentencing authority to conclude that a defendant who commits a crime and then perjures herself in an unlawful attempt to avoid responsibility is more threatening to society and less deserving of leniency than a defendant who does not so defy the trial process.").

### b.  Obstruction relating to the continuance of the trial date

Jenkins should receive an obstruction enhancement on the independent ground that he provided false information about his medical condition to the Court to obtain a continuance of his trial date.  *See United States v. Jones*, 308 F.3d 425, 429 (4th Cir. 2002) (holding that, for the obstruction enhancement to apply, obstructive conduct need not be about the offense of conviction

itself provided it occurs in relation to the investigation, prosecution, or sentencing of the instant offense). Specifically, Jenkins falsely represented to the Court (1) that his medical team directed him to return to the emergency department on Wednesday, November 13, 2024, when in fact he did so on his own initiative; and (2) that his medical team advised him that he was at acute risk of heart attack or stroke should he proceed with trial as scheduled.

Jenkins' trial was set to begin on Tuesday, November 12, 2024. The morning of trial, 55 citizens appeared for service as prospective jurors. *See* 11/14/24 Tr. at 16:13–14. Jenkins, however, failed to appear, claiming that he was suffering from a medical emergency. *See* 11/12/24 Tr. (ECF No. 218) at 3:8–10. The Court set a status conference for the following morning at 11am, continued the trial to Thursday, November 14, 2024, and ordered Jenkins to provide his medical records to the Government and the Court "as they get information." *See* ECF No. 219.

Jenkins failed to provide any medical records until the following morning, shortly before the status conference. *See* 11/13/24 Tr. at 14:8–22. The records that Jenkins eventually provided indicated that he was diagnosed with hypertension and discharged at approximately 9:50am. *See id.* at 9:23–10:6; ECF No. 221. Later that afternoon, he visited his primary care physician, Dr. David Brooke Miller, who diagnosed Jenkins with hypertension that was aggravated by the "stress and anxiety" of trial and prescribed Jenkins additional medications. ECF No. 221.

At approximately 9:30am on Wednesday, November 13, 2024, shortly before the scheduled status conference, Jenkins' attorney emailed the Court, representing that Jenkins "reports that he spoke to the nurse from his doctor's office about 45 minutes ago," and that she had advised him to return to the emergency room if his blood pressure did not go down. *See* Exhibit 3. Based on that representation, the Court excused Jenkins from attending the status conference. *Id.* At the status conference, Jenkins' counsel advised the Court: "I can further

represent that Mr. Jenkins is on his way back to the emergency room right now. I just got a text message from him a moment ago, pursuant to his doctor's orders." 11/13/24 Tr. at 3:10–13. Based on the record before it, the Court denied Jenkins' request to further continue trial. *See* 11/13/24 Tr. at 17:15–18.

On Thursday, November 14, 2024, Jenkins appeared in Court with his counsel. All 55 prospective jurors reported to the courthouse again for jury duty. *See* 11/14/24 Tr. at 16:13–14. Jenkins' counsel acknowledged that, during the previous morning's status conference, Jenkins had not, in fact, entered the emergency department. Rather, he had waited in the parking lot until his blood pressure went down. *Id.* at 8:6–21.

However, Jenkins represented that he had visited the emergency department again the previous night and renewed his motion to continue the trial, representing that his physician had concluded that he was "at fairly acute risk of heart attack, of stroke." *Id.* at 3:14–23, 7:9–15. The Court determined that the record did not support a finding that proceeding to trial would put Jenkins' health at risk. *Id.* at 15:7–13. However, based on its concern that Jenkins' medical issues would further disrupt the trial schedule, the Court granted a continuance and set a bond review hearing for the following week. *Id.* at 15:24–18:9.

On November 22, 2024, the Court convened a bond review hearing. At the hearing, the Government presented the testimony of the three physicians who treated Jenkins the prior week: (1) Dr. John Doran, the emergency physician who treated Jenkins at Fauquier hospital on the morning of November 12, 2024, (2) Dr. David Brooke Miller, Jenkins' primary care physician, and (3) Dr. Will Goodrich, the emergency physician who treated Jenkins at UVA Health Culpeper in the early hours of November 14, 2024.

Dr. Doran testified that, on the morning of November 12, 2024, Jenkins presented with high blood pressure but "did not appear to be in any acute distress." 11/22/24 Tr. at 14:3–5. Dr. Doran performed a physical exam and ordered a battery of tests including an EKG, blood work, head CT, and chest X-ray. *Id.* at 15:25–16:10. All the tests came back normal, causing Dr. Doran to conclude that there was no need for hospitalization or emergent intervention. *Id.* at 17:10–17. Based on his condition at discharge, Dr. Doran testified that Jenkins was free to resume normal activities that same day. *Id.* at 21:11–16.

Dr. Miller then testified about his examination of Jenkins on the afternoon of November 12, 2024. When Dr. Miller discharged Jenkins, he was in "good condition." *Id.* at 45:1–2. Dr. Miller testified that he never stated that Jenkins was at "fairly acute risk of heart attack and stroke." *Id.* at 45:15–19. Moreover, Dr. Miller testified that he did not speak to Jenkins again after that visit; that any subsequent contact with his office would be recorded in Jenkins' medical records; that there was no record of any such contact; and that his staff does not dispense medical advice. *Id.* at 45:25–47:15.

Dr. Goodrich testified that he treated Jenkins in the emergency department at UVA Culpeper Heath in the early hours of November 14, 2024. *Id.* at 59:13–17. Dr. Goodrich testified that Jenkins was not in acute distress, that he was alert and oriented, and that his appearance was normal. *Id.* at 63:10–17. He further testified that during his examination, Jenkins' behavior gave him the impression of malingering, meaning making up or exaggerating symptoms for secondary gain. *Id.* at 67:3–68:21. Dr. Goodrich testified that at the time of discharge, Jenkins was not in any distress, was not at acute risk of heart attack or stroke, and was capable of participating in court proceedings. *Id.* at 80:17–21, 81:25–82:9.

The bond review hearing revealed that Jenkins told at least two lies to manipulate the Court's schedule. First, in advance of the November 13, 2024 status conference, he falsely represented, through counsel, that the "nurse from his doctor's office" had "advised" him to return to the emergency department if his blood pressure did not go down after taking his medication. *See* Exhibit 3. Based on that representation, the Court excused him from appearing. *Id.* Then, at the status conference, Jenkins caused his counsel to falsely represent to the Court that he was on his way back to the emergency department "pursuant to his doctor's orders." 11/13/24 Tr. at 3:10–13. Jenkins had also falsely advised his Probation Officer that he went to the ER at the direction of "his primary." 11/22/24 Tr. at 101:13–22.

The evidence presented at the bond review hearing established that Jenkins did not receive any advice from any medical professional at Dr. Miller's office the morning of the status conference. At the bond review hearing, Jenkins attempted to defend that lie by representing, through counsel, that "he called and had a conversation with Michelle, who told him that Dr. Miller was at a cattle – whatever he said it was. And that's the reason he went to the emergency room, but ultimately didn't go in, is because he was told to take your blood pressure a few times, and he did. It was down. He didn't go in. That's it." 11/22/24 Tr. at 109:16–21. However, Dr. Miller testified that Michelle is his "receptionist"—not a nurse, much less a doctor. *Id.* at 53:22–23. And Dr. Miller testified unequivocally that his staff would not have dispensed medical advice, particularly not without reporting any contact to him or noting it in the medical records. *Id.* at 45:20–47:15.

Regardless of whether Jenkins spoke to Dr. Miller's receptionist that morning, his representations that was acting on advice from "a nurse from his doctor's office" and that he returned to the emergency department on "doctor's orders" were false. Those falsehoods were

material.  Their purpose was to exaggerate the severity of Jenkins' medical condition and give the impression that he was acting at the direction of his medical team when, in reality, Jenkins repeatedly sought unnecessary medical care on his own initiative to delay his trial.  Based on Jenkins' false representation that he received advice from a nurse, the Court excused him from appearing at the November 13, 2024 status conference.  Had Jenkins appeared, the Court could have observed his condition and demeanor, which would have informed its decision about whether to continue the trial.  Moreover, Jenkins' efforts to lend his behavior a veneer of medical legitimacy were capable of influencing the Court's subsequent decision to grant the requested continuance.

Second, Jenkins falsely represented, again by providing false information to his counsel, that his doctors had warned that he was "at fairly acute risk of heart attack, of stroke."  11/14/24 Tr. at 3:14–23, 7:9–15.  In fact, none of the three physicians who treated Jenkins said anything of the sort.  Dr. Doran testified that Jenkins' condition was not emergent and that he was free to resume daily activities.  11/22/24 Tr. at 17:10–17, 21:11–16.  Dr. Miller specifically denied advising Jenkins that he was at "fairly acute risk of heart attack and stroke."  *Id.* at 45:15–19.  And Dr. Goodrich concluded that Jenkins did not have an emergency medical condition, was not at acute risk of heart attack or stroke, and could participate in court proceedings.  *Id.* at 74:20–24, 80:17–21, 81:25–82:9.  Thus, again, Jenkins told a willful lie to procure his desired outcome, continuance of his trial date.  And again, that lie was material.  The specter of a medical emergency occurring during trial was plainly capable of influencing the Court's decision as to whether to proceed.  In sum, over the course of three days when his trial was originally set to begin, Jenkins repeatedly and willfully twisted the truth to manipulate the Court's schedule and delay his trial date.  That conduct warrants a two-level obstruction enhancement.

*5. Zero-Point offender (U.S.S.G. § 4C1.1)*

Although Jenkins' criminal history score is zero, he is ineligible for a Zero-Point Offender reduction pursuant to U.S.S.G. § 4C1.1 for two reasons. First, Jenkins possessed and transferred firearms in connection with the offense. *See* U.S.S.G. § 4C1.1(7). Specifically, on January 30, 2023, he transferred four firearms to Rychlik and created false documentation in order to cover up the cash bribes he had received. *See* 12/16/24 Tr. at 113:24–115:18; G039; G040; G404–407. Second, as discussed above, Jenkins was the organizer or leader of criminal activity that involved more than five participants, so he should receive an aggravating role enhancement pursuant to § 3B1.1. *See* U.S.S.G. § 4C1.1(10).

**B.      The 18 U.S.C. § 3553(a) Factors**

The Supreme Court has advised that "district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007). And while those Guidelines serve as one factor among several that courts must consider in determining an appropriate sentence, it remains that "the Commission fills an important institutional role: It has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Kimbrough v. United States*, 552 U.S. 85, 90, 108–09 (2007) (internal quotation marks omitted). Thus, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Id.* (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)).

None of the § 3553(a) factors weigh against imposition of a sentence within that range. To the contrary, the § 3553(a) factors support the Government's recommended sentence of 188 months—the bottom of the applicable Guidelines range. That sentence is warranted due to Jenkins' repeated abuse of his position of public trust and his manifest disrespect for the judicial

process; the serious damage his conduct caused to the public's trust in law enforcement and democratic institutions; and the need to deter other public officials from engaging in similar misconduct.

### 1. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))

Both the nature and circumstances of the offense and Jenkins' history and characteristics weigh in favor of the Government's recommended sentence within the Guidelines range. Jenkins spent his entire career as a sworn law-enforcement officer. 12/17/24 Tr. at 152:15–153:16 (Jenkins). Each time he took office, he swore an oath to "support the Constitution of the Commonwealth of Virginia" and to "faithfully and impartially discharge all the duties incumbent upon [him]." G719. As Jenkins himself acknowledged, law-enforcement officers occupy a unique position of public trust. *See* 12/17/24 Tr. at 207:10–21 (Jenkins) ("Q. And you agree that it's important for law enforcement to be honest? A. Yes. Q. To have integrity? A. Yes. Q. Because the public relies on them? A. Yes. Q. Places their trust in their law enforcement officers? A. Yes.").

Yet Jenkins chose to repeatedly violate that trust by exploiting his official powers for personal gain. He concealed his crimes from the public by circumventing campaign finance reporting requirements and ethics disclosures, by laundering money through his brother's bank accounts and encouraging others to do the same, and by concealing his debts to Rahim from his creditors. And, after he was caught, he sought to manipulate the judicial process and to evade responsibility for his crimes by lying to the Court and the jury. The Court should consider Jenkins' abuse of his law-enforcement position and disrespect for the judicial process in determining his sentence. *See United States v. Young*, 818 F. App'x 185, 194 (4th Cir. 2020) (unpublished) (noting that the district court properly "found [defendant's] position as a police officer to be an aggravating factor relevant to the nature and circumstances of the offense").

Jenkins has a long history of abusing his power and lying under oath. In the late 1990s, while serving as a deputy sheriff in Culpeper, Jenkins was one of the lead investigators in the murder of Thelma Scroggins. *See Hash v. Johnson*, 845 F. Supp. 2d 711, 718 (W.D. Va. 2012). Jenkins and another deputy were responsible for developing Michael Wayne Hash as a suspect. *Id.* Hash was fifteen years old at the time of Scroggins' death and was charged with her murder four years later, when he was nineteen. *Id.* at 716. Hash was convicted of capital murder. *Id.*

The Commonwealth failed to disclose to the defense that Jenkins had reached a deal with one of its key witnesses, a prison informant named Paul Carter, to advocate for Carter to receive a reduced sentence in exchange for his testimony. At Hash's state postconviction proceedings, Jenkins testified falsely that Carter "was told we can't have anything to do with affecting his – his case that he was facing." *Id.* at 720. The state courts denied Hash's claims. *Id.* at 716–17. Hash subsequently filed a federal habeas petition and the district court authorized him to conduct additional discovery. *Id.* at 722. At a deposition in that proceeding, Jenkins was confronted with a letter that he had written to Carter promising, "if I'm ever asked by the U.S. Attorney in your case, I will tell him what you did" and a statement by Carter that "Scott Jenkins has agreed to talk to the prosecutor if asked for my sake." *Id.* Only then did Jenkins admit that he made a deal with Carter for his testimony at Hash's trial, contrary to his prior false testimony in state court. *Id.*

Jenkins also committed misconduct and lied under oath in relation to another of the prosecution's key witnesses, Weakley. The federal habeas court found that Jenkins coached Weakley to lie on the stand by feeding him information about the crime scene and bullying him into adopting the prosecution's version of the facts. *Id.* at 730, 750. The court also found that Jenkins testified falsely at Hash's trial that all interviews of Weakley were recorded. *Id.* at 729, 750. The court concluded that "the conduct of Investigators Jenkins and [another Culpeper

deputy], who coached Weakley's answers regarding Weakley's knowledge of crime scene details, so as to make his statement more reliable, rises to the level of outrageous misconduct because the acts were intentional and not merely negligent." *Id.* at 751. The court granted all Hash's requests for habeas relief, including his claim based on police and prosecutorial misconduct. *Id.* The Commonwealth dropped all charges against Hash and he was freed, having served 12 years in prison for a crime he did not commit. *See* Martha Neil, *Freed After 12 Years, Aided by Mom's Paralegal Work, Va. Man Wants Real Murdered ID'd*, ABA Journal (Aug. 21, 2012), https://www.abajournal.com/news/article/freed_after_12_years_aided_by_moms_paralegal_work_va._man_like_da_wants_rea (last visited Mar. 10, 2025).

In sum, Jenkins' lies and abuses of power in the instant case are not an aberration. Since his early days in law enforcement, Jenkins has displayed a shocking disregard for his ethical and legal responsibilities, resulting in the violation of the public's right to his honest services (in this case) and of at least one individual defendant's rights (in the Hash case). He has repeatedly lied under oath, with serious consequences both for that individual defendant and for the integrity of the criminal process writ large. The Government's proposed sentence of 188 months reflects Jenkins' longstanding pattern of misconduct and dishonesty.

    2.   *The Need for the Sentence to Reflect the Seriousness of the Offense, to Promote Respect for the Law, to Provide Just Punishment, and to Afford Adequate Deterrence and Protect the Public (18 U.S.C. § 3553(a)(2))*

The Court should impose a substantial sentence to reflect the serious nature of the misconduct in this case, to promote respect for the rule of law, and to punish Jenkins for his crimes. Jenkins repeatedly engaged in brazen acts of bribery over the course of many years. Jenkins' crimes involved granting law-enforcement authority to unvetted, untrained individuals—authority that included the right to carry a concealed weapon nationwide without going through the proper state permitting requirements and the power to arrest fellow citizens. That conduct put the public

at risk and gravely undermined the legitimacy and credibility of the Sheriff's Office, without which it cannot fulfil its mission of protecting and serving the public.

Moreover, by trading his official powers for campaign contributions, Jenkins prevented political challengers from competing on a fair playing field, thereby corrupting the electoral process and cementing his own power. Jenkins' cynical and self-serving conduct damaged the public's trust in public institutions at a time when that trust is already flagging. Thus, the Government's proposed sentence is necessary to reflect the gravity of Jenkins' misconduct and to promote respect for the rule of law.

A substantial sentence is also necessary to deter sheriffs and other public officials from engaging in similar misconduct. "Congress has recognized that general deterrence is particularly important in the context of white collar crime." *United States v. Sample*, 901 F.3d 1196, 1200 (10th Cir. 2018). That is because "[d]efendants in white-collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment." *Id.* (internal quotation marks and citation omitted). Conversely, "[i]n imposing minimal sentences on white-collar criminals, courts 'raise concerns of sentencing disparities according to socio-economic' status." *Id.* at 1201 (quoting *United States v. Levinson*, 543 F.3d 190, 201 (3d Cir. 2008)).

Furthermore, as the trial evidence revealed, there are few checks on sheriffs' authority and ample opportunities for corruption. Public corruption offenses are inherently difficult to detect and prove, making general deterrence particularly important. As one district court has observed: "Bribery, by its very nature, is a difficult crime to detect. Like prostitution, it occurs only between consenting parties both of whom have a strong interest is concealing their actions. And often, when it involves public corruption as in this case, one of the parties occupies a position of public

trust that makes him, or her, an unlikely suspect." *United States v. Paulus*, 331 F. Supp. 2d 727, 734 (E.D. Wis. 2004) (imposing above-Guidelines sentence in case of bribery of a public official), *aff'd*, 419 F.3d 693 (7th Cir. 2005)).  The Government's proposed sentence of 188 months would send a strong message to public officials who may be tempted to monetize the powers of their office that such misconduct will not be tolerated.

### 3. The Need to Avoid Unwarranted Sentencing Disparities (18 U.S.C. § 3553(a)(6))

The Government requests a Guidelines sentence in this case.  The Guidelines are the primary means available for assuring some measure of uniformity in sentencing, thereby fulfilling a key congressional goal in adopting the Sentencing Reform Act of 1984.  The Guidelines "reduce unwarranted federal sentencing disparities," *Freeman v. United States*, 564 U.S. 522, 525 (2011), by "creat[ing] a comprehensive sentencing scheme in which those who commit crimes of similar severity under similar conditions receive similar sentences." *Id.* at 533.  A sentencing court "necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities" by "correctly calculat[ing] and carefully review[ing] the Guidelines range." *Gall*, 552 U.S. at 54.  "[I]mposing a within-guidelines sentence is the surest way to avoid unwarranted disparities." *United States v. White*, 737 F.3d 1121, 1145 (7th Cir. 2013).

The applicable Guidelines in this case account for the nature of the charged crimes and the unique circumstances of Jenkins' case.  These factors distinguish Jenkins from his co-defendants, who are far less culpable than he is, as well as from other bribery defendants whose misconduct may have been less extensive or less harmful.  Reference to the Guidelines, while carefully considering the Section 3553(a) factors, is the best and only available means of preventing sentencing disparities that do not account for these distinguishing facts.

## III.    CONCLUSION

The Government respectfully requests that the Court sentence Jenkins to 188 months' imprisonment.

Respectfully submitted,

ZACHARY T. LEE
ACTING UNITED STATES ATTORNEY

By: */s/Melanie Smith*
     MELANIE SMITH
     VA Bar No. 82663
     Assistant United States Attorney
     255 West Main Street, Room 130
     Charlottesville, VA 22902
     (434) 293-3180
     melanie.smith@usdoj.gov

By: */s/ Celia Choy*
     CELIA CHOY
     DC Bar No. 1017211
     LINA PENG
     NY Bar No. 5150032
     Trial Attorneys
     U.S. Department of Justice
     Public Integrity Section
     1301 New York Ave. NW, 10th Floor
     Washington, DC 20530
     (202) 514-1412
     celia.choy@usdoj.gov
     lina.peng@usdoj.gov