UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>SCOTT HOWARD JENKINS,<br><br>Defendant. | Case No. 3:23-cr-00011 |

**DEFENDANT SCOTT JENKINS'S MEMORANDUM IN AID OF SENTENCING**

Defendant, Scott Jenkins, through undersigned counsel, hereby submits this memorandum in aid of sentencing in the above-captioned matter and states as follows:

**Introduction**

Scott Jenkins has been a dedicated law-enforcement officer his entire adult life. Since he turned 18, until early 2023, he served and protected the communities in which he worked and lived with honor and dedication. For three terms, Mr. Jenkins also served his constituents as the elected Sheriff of Culpeper County, VA.

The government argues that Mr. Jenkins "exploited his position," United States' Sentencing Memorandum ("Gov. Memo.") at 1, to "corruptly and unlawfully enrich himself and fund his re-election campaigns through bribery." *Id.* Mr. Jenkins steadfastly denies this accusation, notwithstanding the jury's verdict. As he has done from the beginning, Mr. Jenkins adamantly maintains his innocence.

On March 21, 2025, Mr. Jenkins will appear before this Court for sentencing in the above-captioned matter, in which he was found guilty by a jury of conspiracy, honest-services mail and wire fraud, and bribery. At that time, undersigned counsel will ask this Court to

sentence Mr. Jenkins to the minimum sentence necessary to achieve the goals of sentencing set forth in 18 U.S.C. § 3553(a). As we discuss in more detail below, a variance from the applicable guidelines range, resulting in a sentence that is significantly lower than what the government seeks, is appropriate and sufficient, but not greater than necessary, to achieve the statutory goals of sentencing in this matter.

## Relevant Procedural Background

On June 28, 2023, Mr. Jenkins was indicted with three co-defendants in connection with an allege bribery scheme the government contends Mr. Jenkins spearheaded. Mr. Jenkins's co-defendants subsequently pled guilty pursuant to cooperation agreements with the government. On June 12, 2024, Mr. Jenkins was charged by a superseding indictment with one count of conspiracy under 18 U.S.C. § 371; four counts of honest-services mail and wire fraud under 18 U.S.C. §§ 1341, 1343, and 1346; and seven counts of bribery concerning programs receiving federal funds under 18 U.S.C. § 666.

Unlike his co-defendants, Mr. Jenkins elected to exercise his constitutional right to a jury trial under the Sixth Amendment to the United States Constitution. That trial commenced with jury selection on December 11, 2024, and concluded on December 18, 2024, when the jury returned guilty verdicts on all counts. Sentencing in this matter has been scheduled for March 21, 2025 before this Court.

## Personal Background

Scott Jenkins was born and raised in Culpeper, VA, where he still lives to this day. He graduated high school in Culpeper, and then immediately began what would be a decades-long career in law enforcement. Mr. Jenkins has no juvenile or adult criminal history. He is married

with two children.  And he remains extremely close to his two brothers and parents, with whom he currently lives.

Unfortunately, Mr. Jenkins suffers from poor physical and mental health.  He has wrestled with obesity and high blood pressure for many years, and these already-serious conditions were exacerbated greatly by the stress of this case—in particular the trial.  In November 2024, Mr. Jenkins's physical and emotional health took a drastic downturn before the initial trial date in this matter, causing him to seek immediate treatment for acute and dangerous physical and emotional distress, and causing the initial trial date to be delayed by several weeks.  However, Mr. Jenkins has been compliant with the treatment regime he was placed on by his doctor and the Court, and he has been regularly taking medications and seeing a therapist since late November.

During his tenure as Sheriff of Culpeper County, Mr. Jenkins was a lighting rod for controversy, which he believes played a significant role in the DOJ's efforts to prosecute him.  He had the only Section 287(g) program in Virginia and was a well-known border-security advocate, working closely with border sheriffs and taking a strong public stance against the Biden administration's open-border policies.  He gained national notoriety in the fall of 2019/early 2020 when he took on Virginia Governor Ralph Northam and Virginia Democrats over the Second Amendment, stopping a Virginia assault-weapons ban by promising to swear in thousands of citizens as volunteer deputy sheriffs (who then would be permitted to keep their guns) should such a ban be put in place.  In the fall of 2022, Mr. Jenkins spoke in D.C. along with western-state sheriffs about a similar ban on the federal level.  Speaking to Breitbart afterward, Mr. Jenkins made the same promise of protecting the Second Amendment, stating that he would seek to have sheriffs across the nation join him in nullifying such a law.

3

During the 2020 Covid lockdowns, Mr. Jenkins protected his citizens' First Amendment rights by refusing to enforce laws closing churches. This stance came at a great cost, however, as Mr. Jenkins quickly became a political target. Finally, in the fall of 2022, shortly before he was indicted, and during a time when his phone calls were being recorded, Mr. Jenkins and other sheriffs who started the Protect America Now ("PAN") PAC were on a phone call discussing the possibility of flying to a secret location to view the Hunter Biden laptop, and then bringing charges against Hunter Biden based on any crimes depicted on it. When Mr. Jenkins was asked on the call if he was willing to participate in this operation, he responded that he was "in." A few weeks later, the DOJ indicted Sheriff Chuck Jenkins, a fellow PAN member and one of the participants on the call. Shortly after that, in early 2023, at the dawn of Mr. Jenkins's re-election year, the DOJ disclosed to Mr. Jenkins that it was investigating him too, and later indicted him just days after he filed as a candidate for re-election.

## Sentencing Law and Considerations

### A. General Principles

Pursuant to the Sentencing Reform Act of 1984, the United States Sentencing Commission promulgates federal sentencing guidelines ("USSG") designed to eliminate disparities in sentencing between similarly situated individuals convicted of similar crimes. During the early part of their existence, the sentencing guidelines were mandatory in that, in many cases, judges had very little discretion to impose a sentence that was not within a guideline range.

Following the Supreme Court's decisions in *United States v. Booker*, 543 U.S. 220 (2005), and *Gall v. United States*, 552 U.S. 38 (2007), however, the guidelines were held not to be mandatory, and judges were not even permitted to view a guideline range as "presumptively

4

reasonable." *Gall*, 552 U.S. at 47, 50.

As the Supreme Court stated in *Gall*:

"As an initial matter, the approaches we reject come too close to creating an impermissible presumption of unreasonableness for sentences outside the Guidelines range. See *id.* at ——, 127 S.Ct., at 2467 ('The fact that we permit courts of appeals to adopt a presumption of reasonableness does not mean that courts may adopt a presumption of unreasonableness'). Even the Government has acknowledged that such a presumption would not be consistent with *Booker.* See Brief for United States in *Rita v. United States,* O.T.2006, No. 06–5754, pp. 34–35."

*Gall*, *supra*, 552 U.S. at 47.

*Gall* set forth a three-step procedure that a sentencing court must follow when deciding on an appropriate sentence: *First*, a court must properly determine the guideline range applicable to a defendant. *Second*, the court must determine whether to apply any of the guidelines' departure policy statements to adjust the guideline range. *Third*, the court must consider all of the factors set forth in 18 U.S.C. § 3553(a) as a whole, including whether a variance is warranted. *Gall, supra.*

As set out in 18 U.S.C. § 3553(a), a court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of [the statute]."

Thus, when determining the particular sentence to impose, a court must consider:

1) The nature and circumstances of the offense and the history and characteristics of the defendant.

2) The need for the sentence imposed to

   a) Reflect the seriousness of the offense;

   b) Promote respect for the law and provide just punishment for the offense;

   c) Afford adequate deterrence to criminal conduct;

   d) Protect the public from further crimes of the defendant; and

e) Provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3) The kinds of sentences available;

4) The sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines;

5) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

6) The need to provide restitution to any victims of the offense.

**B. Applicable Sentencing Guidelines for Mr. Jenkins's Conduct**

As an initial matter, Mr. Jenkins accepts for the purposes of sentencing the guidelines calculation adopted by the probation officer, with one exception noted below.[1] According to the probation officer's final presentence report, the applicable guidelines range under USSG § 2C1.1 is as follows:[2]

- Base level:                                                            14
- Offense involving more than one bribe:                                 +2
- Value of payments was more than $95K but less than $150K               +8
- Offense involved an elected public official                            +4
- Defendant was an elected official who facilitated the obtaining of a government identification document    +2

---

[1] Mr. Jenkins does so based solely on the findings of the jury and without waiving any argument as to his innocence.

[2] Mr. Jenkins agrees with the probation officer and the government that all the offenses for which he was convicted should be grouped together for the purposes of calculating his guidelines range, and that the base-level offense should be calculated using USSG § 2C1.1 as the starting point. *See* USSG § 3D1.2(d).

- Victim-related adjustments     <u>+0</u>

- Defendant was an organizer or leader in criminal activity involving five or more participants     <u>+4</u>

- Obstruction of justice adjustment     <u>+0</u>

- **Adjusted offense level**     <u>**34**</u>

- Chapter Four adjustment     <u>+0</u>

- Acceptance of responsibility     <u>+0</u>

- **Total offense level**     <u>**34**</u>

The Government adopts the probation officer's calculations, *see* Gov. Memo. at 8, but argues that Mr. Jenkins also should receive an additional two-level enhancement for obstruction of justice pursuant to USSG § 3C1.1, for a total offense level of 36. *See id.* at 9.[3] Mr. Jenkins respectfully suggests that he should not receive a two-level enhancement for obstruction of justice, and further suggests that he should receive a three-point reduction to effectively negate the so-called "trial penalty," as discussed in more detail below, resulting in a total offense level of 31. In other words, the total offense level calculations are as follows[4]:

---

[3] The probation officer concluded that Mr. Jenkins is not entitled to a reduction for zero-point offenders because he "has not met all the criteria established in USSG § 4C1.1." Final Presentence Report ("PSR") at 21. The government concurs with this conclusion, but indicates in its sentencing memorandum that Mr. Jenkins is ineligible for this reduction because he "possessed and transferred firearms in connection with the offense." Gov. Memo. At 27 (citing USSG § 4C1.1(7)). For the purposes of sentencing, Mr. Jenkins does not contest the inapplicability of the zero-point offender reduction because he was found to be an organizer or leader of criminal activity involving five or more persons. *See* USSG § 4C1.1(10). He does not agree, however, that USSG § 4C1.1(7) should apply under the circumstances established at trial here.

[4] The probation officer, the government, and Mr. Jenkins all agree that Mr. Jenkins has no criminal history, and thus falls into Category I on the USSG Sentencing Table.

| Probation Officer | Government | Jenkins |
|---|---|---|
| 34 | 36 | 31 |

*First,* although the government adopts the probation officer's calculations, it argues for an additional two-level increase for obstruction of justice under USSG § 3C1.1 on two grounds: (1) that Mr. Jenkins committed perjury during his trial testimony, and (2) that Mr. Jenkins falsified his medical condition in order to delay his initial trial date. *See* Gov. Memo. at 16-26. The Court should reject both arguments.

As for Mr. Jenkins's trial testimony, the government, in essence, seeks to punish Mr. Jenkins for testifying contrary to its theory of prosecution. As an initial matter, the Application Notes to USSG § 3C1.1 caution that "the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory, and thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." USSG § 3C1.1, Application Note 2. This provision obviously exists because the details of testimony can be complicated, and witnesses often make mistakes—a factor that, in part, might well have been at play here. More troubling, however, is the government's use of Maslow's Hammer, in that it principally argues that Mr. Jenkins committed perjury because he testified contrary to its trial theory. Indeed, the Fourth Circuit cautioned against this very problem, finding that "there are [not] enough safeguards in place to prevent this enhancement from unfairly coercing defendants, guilty or innocent, into remaining silent at trial." *U.S. v. Dunnigan*, 944 F.2d 178, 185 (4th Cir. 1991). The court further noted that "[w]hatever light is held to it, a defendant's testimony that has been apparently rejected in material respects by a jury will almost

always compel a finding of untruthfulness." *Id.* This is precisely the analytical framework the government urges this Court to adopt.

Mr. Jenkins testified at trial that money he received from Rick Rahim—a cooperating co-defendant—was a business loan for "a business venture," which included, among other things, selling merchandise with Mr. Jenkins's trademarked slogan "Make Virginia Great Again." The government's main argument as to why this testimony must be treated as willfully false is because "[b]oth [Rick] Rahim and [Kevin] Rychlik testified unequivocally that Rahim's cash payments were made as part of a corrupt exchange for Jenkins' official acts, not as an investment in a business venture," Gov. Memo. at 18, and that, upon review of the record after the fact, the timelines do not precisely align with respect to the "Make Virginia Great Again" idea. *Id.* at 19.

But this is just another way of saying that because the jury apparently credited Rick Rahim and Kevin Rychlik—two cooperating witnesses for the government—Mr. Jenkins must have perjured himself. Of course, another interpretation is that Mr. Jenkins testified truthfully about his belief and understanding, and at most perhaps confused the timeline. This does not amount to perjury, and certainly does not justify a significant two-point increase in the offense level that would increase his prison exposure by *three years* at the low end of the guidelines range.

The government's back-up argument—that Mr. Jenkins falsified a medical event to delay his trial—is even more incredible. In essence, the government simply does not believe that Mr. Jenkins was seriously ill prior to the originally scheduled November 12, 2024 trial date, notwithstanding medical testimony that clearly established that Mr. Jenkins was suffering from critical levels of high blood pressure and other acute symptoms. And although the government selectively quotes from the testimony presented at the November 22, 2024 bond-review hearing

9

(after which this Court continued Mr. Jenkins on pre-trial release), it neglects Dr. Miller's note in Mr. Jenkins's file from November 12, 2024—the original trial date—in which Dr. Miller stated plainly that "[a]t this point in time, I feel as though [Mr. Jenkins] is having an acute stress reaction with elevated blood pressure and syncope. *I would like to get his condition stable before I would recommend resuming or starting his trial*. Please follow up with me in two weeks. Sooner if needed." (Emphasis added)

The fact of the matter is that Mr. Jenkins, who was already in poor physical and mental health, suffered an "acute stress reaction" prior to his first trial date, which put his blood pressure at dangerously high levels and caused him to lose consciousness on at least two occasions. Mr. Jenkins took these symptoms seriously and sought appropriate medical treatment. He and his wife communicated openly with undersigned counsel, who promptly relayed updates to the Court and government. Even in the middle of this, Mr. Jenkins still showed up for trial on November 14—obviously in bad shape—before the Court ultimately continued the matter. Most importantly, Mr. Jenkins complied with the treatment regime that his doctor prescribed—as discussed at length during the bond-review hearing—and, ultimately, Mr. Jenkins's health improved such that he reported to the rescheduled trial date without issue.

The government cannot credibly argue that Mr. Jenkins fabricated a well-documented health crisis simply on the grounds that its attorneys—none of whom are doctors—are skeptical of his story. And certainly not in an effort to stick Mr. Jenkins with a significant offense-level enhancement. The Court should therefore reject the government's request for the two-level increase under USSG § 3C1.1.

*Second*, the Court should give Mr. Jenkins a three-level reduction to compensate for the so-called "trial penalty." Unlike his cooperating co-defendants, Mr. Jenkins availed himself of

10

his fundamental, constitutional right to a jury trial. This is no small thing, as "[t]here is substantial evidence that the criminal jury trial, viewed as the jury trial right, was considered exceptionally important by the Founders and during the first 150 years (or so) of the nation's history." *United States v. Stevenson*, 425 F.Supp.3d 647, 653 (S.D. WV 2018). As a result of exercising this fundamental right, however, Mr. Jenkins is deprived of a two-level decrease for acceptance of responsibility, and another one-level decrease for accepting responsibility early enough to spare the government the effort of preparing for trial. *See* USSG § 3E1.1. This result turns on its head the fundamental role the public jury trial plays in our system and this Court should reject it.

"[T]he jury trial has been replaced, almost exclusively, by a system of secret plea-bargaining negotiations behind closed doors." *United States v. Tavberidze*, 2025 WL 748354, at *1 (S.D.N.Y. Mar. 10, 2025). This is because the prosecutor "typically charges – and is currently required to charge at the outset – the most serious crimes she can prove," thus making a plea bargain to a lesser offense a guaranteed way to "reduce[] the risk of the often much higher penalty a defendant would face if convicted at trial." *Id.* "The Sentencing Guidelines ('Guidelines') effectively reinforce the trial penalty by reducing the offense level calculation by two points if the defendant 'clearly demonstrates acceptance of responsibility' by pleading guilty, and a third point if, in the Government's view, the defendant has pled guilty quickly enough to permit the prosecutor to avoid preparing for trial." *Id.* (quoting USSG § 3E1.1).

As Judge Jed Rakoff notes in the *Tavberidze* opinion, he attempts to mitigate the so-called "trial penalty" in his courtroom by informing defendants that he will impose no greater sentence if they go to trial and lose than he would if they pled guilty to the same offense. *Id*.

11

Thus, Judge Rakoff "disregard[s] the three points effectively added to the offense level that would have been removed if the defendant had pleaded guilty." *Id.* at *2.[5]

Mr. Jenkins acknowledges that *Tavberidze* is not binding on this Court. However, he urges the Court to adopt Judge Rakoff's rationale, which makes universal sense. Mr. Jenkins maintained his innocence, as he was constitutionally permitted to do, and chose to proceed to a public jury trial. In doing so, however, Mr. Jenkins rejected an offer from the government that carried a prison range of less than half that which he now faces because the government "charge[d] the most serious crimes [it] could prove" in an effort to cajole Mr. Jenkins into pleading guilty to lesser charges. This is simply unacceptable given the fundamental importance of the Sixth Amendment's right to a public jury trial. The Court can "mitigate the trial penalty" by "disregard[ing] the three points effectively added to the offense level that would have been removed if [Mr. Jenkins] had pleaded guilty." *Tavberidze*, *supra*, at * 2. Mr. Jenkins urges the Court to do just that.

## C. Justification for a variance

Pursuant to 18 U.S.C. § 3553(a)(1), the Court must consider "the history and characteristics of the defendant" in determining the appropriate sentence to impose. "When a defendant presents non-frivolous reasons for imposing a different sentence [outside of the guidelines range], the district court must address or consider them and explain why it has rejected them," if that is in fact what it chooses to do. *United States v. Lozano*, 962 F.3d 773,

---

[5] Judge Rakoff actually went a step further in declaring that the third reduction point under USSG § 3E1.1(b) violates the Sixth Amendment because it operates as "an unconstitutional penalty imposed on a defendant for exercising his constitutional right to trial." *Tavberidze*, *supra*, at *2. This is because failing "to save the Government from having to prepare for trial … cannot possibly be an adequate ground for penalizing a defendant for the exercise of a constitutional right." *Id.* at *3.

782 (4th Circuit 2020) (internal quotations and citation omitted); *see also United States v. Shields*, 126 F.4th 356, 360 (4th Cir. 2025) (same).

Mr. Jenkins submits that his history and characteristics warrant a downward variance in this case. Mr. Jenkins is a 53-year-old man with no criminal history and a career of public service. He is in poor health, as demonstrated by his recent episode prior to trial. A prison sentence along the lines of what the government is seeking likely will amount to a death sentence for Mr. Jenkins. Likewise, as a former law-enforcement officer—and a high-profile one at that—Mr. Jenkins is especially susceptible to harm in prison. Under these circumstances, a sentence well below the applicable range is sufficient, but not greater than necessary, to comply with the sentencing objectives the Court must consider.

## Conclusion

For the foregoing reasons, and for any other reasons the Court might consider, Mr. Jenkins respectfully submits that (1) the applicable guidelines range in this case is 108-135 months, (2) that a downward variance is warranted in this case, and (3) that the Court should impose a sentence significantly below the applicable guidelines range, such that the sentence the Court ultimately imposes is appropriate and sufficient, but not greater than necessary, to achieve the statutory goals of sentencing in this matter.

Dated: March 17, 2025　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　_____/S/_ Christopher Leibig_____
　　　　　　　　　　　　　　　　Christopher Leibig (VA Bar No. 40594)
　　　　　　　　　　　　　　　　THE LAW OFFICES OF CHRISTOPHER LEIBIG
　　　　　　　　　　　　　　　　414 E Market Street
　　　　　　　　　　　　　　　　Charlottesville, VA 22902
　　　　　　　　　　　　　　　　Tel: (703) 683-4310
　　　　　　　　　　　　　　　　Email: chris@chrisleibiglaw.com

Philip Andonian (D.C. Bar No. 490792)*
MESSNER REEVES LLP
160 W. Santa Clara Street, Ste. 1000
San Jose, CA 95113
Tel: (408) 792-5958
Email: pandonian@messner.com

* - Admitted *pro hac vice*

*Counsel for Defendant Scott Jenkins*

**CERTIFICATE OF SERVICE**

    I, Philip Andonian, hereby certify that on March 17, 2025, I served a copy of the foregoing sentencing memorandum on all counsel of record via the Court's CM/ECF system.


        /S/ Philip Andonian
        Philip Andonian